**DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ (State Bar # 62386)**
**COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
165 Fell Street
San Francisco. CA 94102
Mailing Address: P.O. Box 270
San Francisco. CA 94104-0270
Tel: (415) 989-4730
Fax: (415) 989-0491
File No. 52,752

Attorneys for Plaintiffs
STEVEN M. GREENBAUM, ALAN HAYMAN,
and SHIRLEE HAYMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN M. GREENBAUM. ALAN HAYMAN, and SHIRLEE HAYMAN.    )<br>    )<br>Plaintiffs.    )<br>    )<br>vs.    )<br>    )<br>ISLAMIC REPUBLIC OF IRAN. et al.,    )<br>    )<br>Defendant.    )<br>_____    ) | CASE NO. 3:08-mc-80024-JSW<br><br>EX PARTE APPLICATION FOR ORDER AMENDING WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135 |

COMES NOW Plaintiffs STEVEN M. GREENBAUM. ALAN HAYMAN. and SHIRLEE

HAYMAN. who hereby apply to this court ex parte for the issuance of an order amending the Writ

of Execution issued by this court herein on 3/10/08 and issuing a new and different Writ of

Execution. changing the name therein from THE ISLAMIC REPUBLIC OF IRAN to THE

ISLAMIC REPUBLIC OF IRAN aka The Ministry of Petroleum on Behalf of the Islamic

Republic of Iran, Ministry of Oil on Behalf of the Islamic Republic of Iran, and The National

Iranian Oil Company on Behalf of the Islamic Republic of Iran. and its subsidiaries:

    1. National Iranian Gas Export Company
        Website: www.nigec.ir
        Email: info@nigec.ir

2. National Iranian South Oil Company
   Website: www.nisoc.com
   Email: info@nisoc.com

3. National Iranian Offshore Oil Company
   Website: www.iooc.co.ir
   Email: webmaster@iooc.co.ir

4. National Iranian Central Oil Fields Co.
   Website: www.icofc.ir
   Email: info@icofc.ir

5. Khazar Exploration & Production Co.
   Tehran HQ.
   No.19 – 11th Alley - Vozara Ave. - Arjantin sq.
   Tel: +98-21-88722430. 3
   Fax: +98-21-88711386

6. Petroleum Engineering & Development Co.
   Website: www.pedec.ir
   Email: info@pedec.net

7. Pars Oil and Gas Company
   Website: www.pogc.org
   Email: info@pogc.ir

8. Pars Special Economic energy Zone Co.
   Website: www.pseez.com
   Email: info@pseez.com

9. National Iranian Oil Terminals Company
   Website: www.nioc-otc.com
   Email: info@nioc-otc.com

10. National Iranian Drilling Company
    Website: www.nidc.ir
    Email: webmaster@nidc.ir

11. North Drilling Company
    Website: www.northdrilling.com
    Email: info@northdrilling.com

12. PetroIran Development Company
    Website: petroiran.com
    Email: info@petroiran.com

13. Ahwaz Pipe Mills Company
    Website: www.apm-ir.com
    Email: tabibi@apm-ir.com

14. Petropars
    Website: www.petropars.com
    Email: webadmin@ppars.com

EX PARTE APPLICATION FOR ORDER AMENDING WRIT OF EXECUTION TO INCLUDE ADDITIONAL
NAMES PURSUANT TO C.C.P. § 680.135 - CASE NO. 3:08-mc-80024-JSW                    2

15. Fuel Consumption Optimization Co.
    Website: www.ifco.ir
    Email: info@ifco.ir

16. National Iranian Tanker Co.
    Website: www.nitc.co.ir
    Email: administrator@nitc.co.ir

17. Exploration Service Company (ESC)
    Website: www.oeoc.ir
    Email: info@oeoc.ir

18. Kala Naft London Ltd.
    Website: www.kalaltd.com
    Email: admin@kalaltd.com

19. Kala Naft Canada Ltd.
    Website: www.kalanaftcanada.com
    Email: info@kalanaftcanada.com

20. Arvandan Oil and Gas Company
    Website: www.arvandan.org
    Email: info@arvandan.org

DATED:  March 13, 2008                    COOK COLLECTION ATTORNEYS


                                          By:   /s/ David J. Cook
                                          DAVID J. COOK, ESQ. (SB# 060859)
                                          Attorneys for Plaintiffs
                                          STEVEN M. GREENBAUM, ALAN
                                          HAYMAN, and SHIRLEE HAYMAN

F:\USERS\DJCNEW\iran.ex1sf

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA 94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA 94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52.752

7  Attorneys for Plaintiffs
   STEVEN M. GREENBAUM, ALAN HAYMAN,
8  and SHIRLEE HAYMAN

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11
   STEVEN M. GREENBAUM, ALAN    )    CASE NO. 3:08-mc-80024-JSW
12 HAYMAN, and SHIRLEE HAYMAN,  )
                                )    MEMORANDUM OF POINTS AND
13           Plaintiffs,         )    AUTHORITIES IN SUPPORT OF EX PARTE
                                )    APPLICATION FOR ORDER AMENDING
14 vs.                          )    WRIT OF EXECUTION TO INCLUDE
                                )    ADDITIONAL NAMES PURSUANT TO
15 ISLAMIC REPUBLIC OF IRAN, et al.,  )  C.C.P. § 680.135
                                )
16           Defendant.          )
                                )
17 ──────────────────────────────

                   **I. INTRODUCTION.**
18
       Plaintiffs STEVEN M. GREENBAUM, ALAN HAYMAN, and SHIRLEE HAYMAN
19
   ("Plaintiffs"), Judgment Creditors for and on behalf of The Islamic Republic of Iran ("Iran") move
20
   this court for the issuance of an Amended Writ of Execution, showing the true name and identity
21
   of the Judgment Debtor, from THE ISLAMIC REPUBLIC OF IRAN to THE ISLAMIC
22
   REPUBLIC OF IRAN aka The Ministry of Petroleum on Behalf of the Islamic Republic of Iran,
23
   Ministry of Oil on Behalf of the Islamic Republic of Iran, and The National Iranian Oil Company
24
   on Behalf of the Islamic Republic of Iran, and its subsidiaries:
25
           1. National Iranian Gas Export Company
26              Website: www.nigec.ir
                Email: info@nigec.ir
27

28
   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR ORDER
   AMENDING WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
   CASE NO. 3:08-mc-80024-JSW                                                          1

2. National Iranian South Oil Company
   Website: www.nisoc.com
   Email: info@nisoc.com

3. National Iranian Offshore Oil Company
   Website: www.iooc.co.ir
   Email: webmaster@iooc.co.ir

4. National Iranian Central Oil Fields Co.
   Website: www.icofc.ir
   Email: info@icofc.ir

5. Khazar Exploration & Production Co.
   Tehran HQ.
   No.19 – 11th Alley - Vozara Ave. - Arjantin sq.
   Tel: +98-21-88722430, 3
   Fax: +98-21-88711386

6. Petroleum Engineering & Development Co.
   Website: www.pedec.ir
   Email: info@pedec.net

7. Pars Oil and Gas Company
   Website: www.pogc.org
   Email: info@pogc.ir

8. Pars Special Economic energy Zone Co.
   Website: www.pseez.com
   Email: info@pseez.com

9. National Iranian Oil Terminals Company
   Website: www.nioc-otc.com
   Email: info@nioc-otc.com

10. National Iranian Drilling Company
    Website: www.nidc.ir
    Email: webmaster@nidc.ir

11. North Drilling Company
    Website: www.northdrilling.com
    Email: info@northdrilling.com

12. PetroIran Development Company
    Website: petroiran.com
    Email: info@petroiran.com

13. Ahwaz Pipe Mills Company
    Website: www.apm-ir.com
    Email: tabibi@apm-ir.com

14. Petropars
    Website: www.petropars.com
    Email: webadmin@ppars.com

1        15. Fuel Consumption Optimization Co.
        Website: www.ifco.ir
2            Email: info@ifco.ir

3        16. National Iranian Tanker Co.
        Website: www.nitc.co.ir
4            Email: administrator@nitc.co.ir

5        17. Exploration Service Company (ESC)
        Website: www.oeoc.ir
6            Email: info@oeoc.ir

7        18. Kala Naft London Ltd.
        Website: www.kalaltd.com
8            Email: admin@kalaltd.com

9        19. Kala Naft Canada Ltd.
        Website: www.kalanaftcanada.com
10           Email: info@kalanaftcanada.com

11       20. Arvandan Oil and Gas Company
        Website: www.arvandan.org
12           Email: info@arvandan.org

13       The basis therein is that Iran sells its oil resources by and through a Ministry of Petroleum,

14   Ministry of Oil, and/or The National Iranian Oil Company and its multiple subsidiaries. The

15   Ministry of Petroleum, Ministry of Oil, and The National Iranian Oil Company are all

16   instrumentalities and agencies of Iran, in that Iran nationalized the entire oil industry. They are

17   part and parcel of the state itself.

18       Under F.R.C.P. 69(a)(1), federal law follows the process and procedures of the state, as

19   follows:

20       Rule 69. Execution
    (a) In General.
21       (1) Money Judgment; Applicable Procedure.
    A money judgment is enforced by a writ of execution, unless the court directs
22       otherwise. The procedure on execution — and in proceedings supplementary to and
    in aid of judgment or execution — must accord with the procedure of the state
23       where the court is located, but a federal statute governs to the extent it applies.

24       From time to time, a Judgment Creditor may find that a Judgment Debtor does business

25   under new or different names. C.C.P. § 680.135 provides as follows:

26       **§ 680.135.**
    "Affidavit of Identity" means an affidavit or declaration executed by a judgment
27       creditor, under penalty of perjury, that is filed with the clerk of the court in which

28

the judgment is entered at the time the judgment creditor files for a writ of execution or an abstract of judgment. The affidavit of identity shall set forth the case name and number, the name of the judgment debtor stated in the judgment, the additional name or names by which the judgment debtor is known, and the facts upon which the judgment creditor has relied in obtaining the judgment debtor's additional name or names. The affidavit of identity shall not include the name or names of persons, including any corporations, partnerships, or any legal entities not separately named in the judgment in which the judgment debtor is a partner, shareholder, or member, other than the judgment debtor.

Accordingly, this Judgment Creditor seeks to have the court issue an order ex parte, amending the Writ to show the true and correct name of the Judgment Debtor. The National Iranian Oil Company and subsidiaries (hereinafter collectively "NIOC.")is another name for Iran and therefore, NIOC assets are subject to levy and execution.

For purpose of this court (USDC, Central District of California), these assets are located in the United States, and moreover in this District. 28 U.S.C. § 1963.

## II. FACTUAL BASIS.

Iran owns all of its oil and petroleum assets. This is confirmed by a number of sources. EIA also reports on *Exhibit "A"* that The National Iranian Oil Company ("NIOC") is state-owned (page 3), that The National Iranian South Oil Company is a subsidiary of NIOC, and on page 12, lists foreign company involvement as "BG, BHP, Bow Valley, BP, Eni, Gazprom, Lukoil, OMV, Petronas, Royal Dutch/Shell, Sheer Energy, Sinopec, Statoil, Total." For purpose of general background, the Energy Information Administration of the Department of Energy ("EIA") has identified the countries who are the recipients of Iranian crude oil exports, at least as of 2006, as listed on *Exhibit "B."* [1]

In further confirmation, that NIOC is a state entity, is an excerpt from the NIOC Annual Report 2004-2005, marked *Exhibit "C."*

This is a well settled issues in the Iran U.S. Claims Tribunal in *Oil Field of Texas, Inc., Claimant, v. The Government of the Islamic Republic of Iran, National Iranian Oil Company,*

---

[1] All exhibits are incorporated by reference as though fully set forth in this Memorandum in their entirety and are attached to the Declaration of David J. Cook, Esq. which is filed contemporaneously herein.

1  *Oil Service Company of Iran, Respondents.* (1- I.U.S.CT.R. p 347) CASE NO. 43 Award No.:

2  ITL 10-43-FT Iran - United States Claims Tribunal Filed December 9. 1982 in which the Tribunal

3  stated as follows (at pages 4 to 5):

4    "OSCO - a brief historical and legal background In March 1951 the Iranian
     Parliament enacted legislation nationalizing the Iranian oil industry. Later.
5    following a coup d'etat in Iran. a number of major multinational oil companies
     formed an Oil Consortium. which signed an Agreement ("the 1954 Agreement") for
6    the exploration. production. refining and exportation of Iranian oil.

7    The 1954 Agreement provided for the creation by the Consortium members of two
     operating companies, Iranian Oil Exploration and Producing Company ("IOEPC")
8    and Iranian Oil Refining Company ("IORC") to be incorporated under the law of
     the Netherlands. Their respective functions were to carry out exploration.
9    production. refining, transportation and other operations specified in the
     Agreement. The 1954 Agreement provided that the Consortium would fund all
10   activities of IOEPC and IORC and that the Consortium members would jointly and
     severally guarantee the performance of the operating companies.

11

     In 1973 the 1954 Agreement was replaced by a new agreement ("the 1973 Main
12   Agreement"). The preamble of the 1973 Main Agreement states:

13   Iran is determined that the right of full and complete ownership. operation and
     control in respect of all hydro-carbon reserves. assets and administration of the
14   petroleum industry shall be exercised by NIOC.

15   NIOC is an Iranian joint stock company which was incorporated by statute in Iran
     on 29 April 1951. All NIOC's shares are, and have always been, owned by the
16   Government of Iran. NIOC was established in order to exercise the ownership right
     of the Iranian nation in the oil and gas resources throughout the country and in the
17   continental shelf and to be responsible for the exploration, development.
     production. exploitation and distribution of petroleum and petroleum products both
18   within and outside Iran. The Iranian Ministry of Oil has subsequently assumed
     certain of NIOC's functions.

19
     The 1973 Main Agreement ended the role of IOEPC and IORC. and provided for
20   NIOC to operate and manage all oil-related operations.

21  The Tribunal stated at page 9 as follows:

22   "It remains. however. for the Tribunal to decide whether NIOC is an entity
     controlled by the Government of Iran within the meaning of that article.
23
     Respondents do not admit that NIOC is such an entity and have consequently left to
24   the Tribunal to decide this question.

25   The record in this case shows that NIOC was incorporated by statute in 1951. that
     all NIOC's shares are, and have always been, owned by the Government of Iran.
26   that NIOC according to its Statutes has been established in order to exercise the
     ownership right of Iran in its oil and gas resources and to be responsible for the
27   exploration. development. production. exploitation and distribution of petroleum

28

and petroleum products within and outside Iran and finally that the Iranian Ministry of Oil has now assumed certain of NIOC's functions.

Furthermore, according to the Statutes, the shareholder shall be represented at the General Meetings of the company by the Prime Minister and six other cabinet ministers.

Consequently, it is obvious that NIOC is, and was at all relevant times, totally controlled by the Government of Iran. In view of the above-mentioned purpose of the company and other available information it is also clear that NIOC is one of the instruments by which the Government of Iran conducted and currently conducts the country's national oil policy. It is therefore equally clear that NIOC is an agency or instrumentality controlled by the Government of Iran."
(Copy marked *Exhibit "D"*)

Plaintiff therefore has established that NIOC (and its subsidiary is an "agency or instrumental" controlled by the Government of Iran, and accordingly, levy upon its assets would be property. Under C.C.P. § 680.135. Plaintiff is entitled to an order seeking the issuance of an alias writ of execution which would properly identify the Islamic Republic of Iran with the designation of the National Iranian Oil Company. As a state-owned entity, the assets are readily subject to levy and execution under 28 U.S.C. § 1605A. The key sections which now breathe life into the collection efforts are found in 28 U.S.C. § 1605A(a)(1) & (g)(1), which provide as follows:

"(a) IN GENERAL. --
    "(1) NO IMMUNITY. – A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

"(g) PROPERTY IN CERTAIN ACTIONS –
    "(1) IN GENERAL. – subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of –
        "(A) the level of economic control over the property by the government of a foreign state;
        "(B) whether the profits of the property go to that government;
        "( C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE *APPLICATION* FOR ORDER AMENDING WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
CASE NO. 3:08-mc-80024-JSW                                                                    6

1          "(D) whether that government is the sole beneficiary in interest of
           the property; or
2          "(E) whether establishing the property as a separate entity would
           entitle the foreign state to benefits in United States courts while
3          avoiding its obligations.
           "(2) UNITED STATES SOVEREIGN IMMUNITY

4
           INAPPLICABLE.  Any property of a foreign state, or agency or instrumentality of
5          a foreign state, to which paragraph (1) applies shall not be immune from
           attachment in aid of execution, or execution, upon a judgement entered under
6          section 1605A because the property is regulated by the United States Government
           by reason of action taken against that foreign state under the Trading With the
7          Enemy Act or the International Emergency Economic Powers Act."

8          Having established that NIOC is a state entity, and therefore subject to levy and execution,

9   Plaintiff is entitled to an alias Writ of Execution properly identifying Iran, not only in its own

10  name, but the name of every entity by which it conducts business.

11                          **III.  MECHANISM OF LEVY.**

12         To the extent that a Writ of Execution is amended, the added "name" is not left without a

13  remedy in the event of an error in the amendment process.  C.C.P. § 699.510 provides as follows:

14         **§ 699.510.**
           (a) Subject to subdivision (b), after entry of a money judgment, a writ of execution
15         shall be issued by the clerk of the court upon application of the judgment creditor
           and shall be directed to the levying officer in the county where the levy is to be
16         made and to any registered process server. The clerk of the court shall give priority
           to the application for, and issuance of, writs of execution on orders or judgments
17         for child support and spousal support. A separate writ shall be issued for each
           county where a levy is to be made. Writs may be issued successively until the
18         money judgment is satisfied, except that a new writ may not be issued for a county
           until the expiration of 180 days after the issuance of a prior writ for that county
19         unless the prior writ is first returned.
           (b) If the judgment creditor seeks a writ of execution to enforce a judgment made,
20         entered, or enforceable pursuant to the Family Code, in addition to the
           requirements of this article, the judgment creditor shall satisfy the requirements of
21         any applicable provisions of the Family Code.
           © (1) The writ of execution shall be issued in the name of the judgment debtor as
22         listed on the judgment and may include the additional name or names by which the
           judgment debtor is known as set forth in the affidavit of identity, as defined in
23         Section 680.135, filed by the judgment creditor with the application for issuance of
           the writ of execution. Prior to the clerk of the court issuing a writ of execution
24         containing any additional name or names by which the judgment debtor is known
           that are not listed on the judgment, the court shall approve the affidavit of identity.
25         If the court determines, without a hearing or a notice, that the affidavit of identity
           states sufficient facts upon which the judgment creditor has identified the
26         additional names of the judgment debtor, the court shall authorize the issuance of
           the writ of execution with the additional name or names.
27         (2) In any case where the writ of execution lists any name other than that listed on

28

1  the judgment, the person in possession or control of the levied property, if other
   than the judgment debtor, shall not pay to the levying officer the amount or deliver
2  the property being levied upon until being notified to do so by the levying officer.
   The levying officer may not require the person, if other than the judgment debtor,
3  in possession or control of the levied property to pay the amount or deliver the
   property levied upon until the expiration of 15 days after service of notice of levy.
4  (3) If a person who is not the judgment debtor has property erroneously subject to
   an enforcement of judgment proceeding based upon an affidavit of identity, the
5  person shall be entitled to the recovery of reasonable attorney's fees and costs from
   the judgment creditor incurred in releasing the person's property from a writ of
6  execution, in addition to any other damages or penalties to which an aggrieved
   person may be entitled to by law, including the provisions of Division 4
7  (commencing with Section 720.010).

8  This serves as a safeguard against an erroneous levy and execution. Additionally, the only

9  apparent reported case is *IO Group, Inc. v. Michael Purser,* marked *Exhibit "E."*

10  Needless to say, NIOC is situated in Iran, but its assets are far flung, including certain

11  assets which have a United States nexus, and therefore subject to levy and execution. This court

12  having jurisdiction over the Judgment Debtor would have jurisdiction over all of its assets, as such

13  jurisdiction is ultimately *in personam.* In a recent case of *Fredric Goldman v. Orenthal James*

14  *Simpson,* Court of Appeal of the State of California, Second Appellate District, Division Four

15  (Los Angeles), Case No. B200082, the court stated as follows:

16  "Jurisdiction over the parties is necessary for the validity of any judgment in
    personam. (Cal. Code Civ. Proc. § 1917; *Pennoyer v. Neff* (1877) 95 U.S. 714, 722
17  [24 L.Ed. 565]; Allen v. Superior Court (1953) 41 Cal.2d 306, 309; Restatement,
    Judgments §§ 6, 14, and Intro. Note, p. 79.) Such jurisdiction depends upon three
18  factors: (1) Jurisdiction of the state, based upon there being sufficient minimum
    contacts existing between this state and the parties or their property or other
19  interests (see Section 410.10). (2) Notice and opportunity for a hearing (see
    Sections 412.10-412.30, 473.5). (3) Compliance with statutory jurisdictional
20  requirements for service of process (see Sections 413.10-417.30). In addition, the
    court in which the action is pending must be competent to hear and decide the type
21  of action and the amount in controversy that are involved in the case. When these
    factors are present, the court has acquired 'fundamental' jurisdiction over the
22  parties, and *this jurisdiction continues to final judgment and in subsequent*
    *proceedings incidental thereto.*" (Italics added)
23  (Copy marked *Exhibit "F"*)

24  ## IV. CONCLUSION.

25  The Iran-U.S. Claims Tribunal adjudicated NIOC to be an agency and instrumentality of

26  Iran, justifying the amendment to the Writ of Execution. Accordingly, Plaintiffs are entitled to

27  relief.

28

1   DATED:  March 13, 2008                   COOK COLLECTION ATTORNEYS

2

3                                            By:   /s/ David J. Cook
                                             DAVID J. COOK, ESQ. (SB# 060859)
4                                            Attorneys for Plaintiffs
                                             STEVEN M. GREENBAUM, ALAN
5                                            HAYMAN, and SHIRLEE HAYMAN

6   F:\USERS\DJCNEW\iran.ex1sf

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR ORDER
    AMENDING WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
    CASE NO. 3:08-mc-80024-JSW
                                                                                        9

1   **DAVID J. COOK, ESQ. (State Bar # 060859)**
    **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2   **COOK COLLECTION ATTORNEYS**
    **A PROFESSIONAL LAW CORPORATION**
3   165 Fell Street
    San Francisco, CA 94102
4   Mailing Address: P.O. Box 270
    San Francisco, CA 94104-0270
5   Tel.: (415) 989-4730
    Fax: (415) 989-0491
6   File No. 52,752

7   Attorneys for Plaintiffs
    STEVEN M. GREENBAUM, ALAN HAYMAN,
8   and SHIRLEE HAYMAN

9                  UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11
    STEVEN M. GREENBAUM, ALAN      )   CASE NO. 3:08-mc-80024-JSW
12  HAYMAN, and SHIRLEE HAYMAN,    )
                                   )   DECLARATION OF DAVID J. COOK, ESQ.
13           Plaintiffs,           )   IN SUPPORT OF EX PARTE APPLICATION
                                   )   FOR ORDER AMENDING WRIT OF
14  vs.                            )   EXECUTION TO INCLUDE ADDITIONAL
                                   )   NAMES PURSUANT TO C.C.P. § 680.135
15  ISLAMIC REPUBLIC OF IRAN, et al., )
                                   )
16           Defendant.            )
                                   )
17  ─────────────────────────────

18      I, DAVID J. COOK, hereby declare and state as follows:

19      1. I am one of the attorneys of record for Plaintiffs in the above-entitled action, am duly

20  authorized to practice before all courts in the State of California, and am familiar with the facts

    and circumstances in this action.
21
        2. The Energy Information Administration of the Department of Energy ("EIA") has
22
    identified the countries who are the recipients of Iranian crude oil exports, at least as of 2006, as
23
    listed on *Exhibit "A."* EIA also reports on *Exhibit "B"* that The National Iranian Oil Company
24
    ("NIOC") is state-owned (page 3), that The National Iranian South Oil Company is a subsidiary of
25
    NIOC, and on page 12, lists foreign company involvement as "BG, BHP, Bow Valley, BP, Eni,
26
    Gazprom, Lukoil, OMV, Petronas, Royal Dutch/Shell, Sheer Energy, Sinopec, Statoil, Total."
27

28  DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF EX PARTE APPLICATION FOR ORDER
    AMENDING WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
    CASE NO. 3:08-mc-80024-JSW                                                              1

1       3. In further confirmation, that NIOC is a state entity, is an excerpt from the NIOC Annual

2   Report 2004-2005, marked *Exhibit "C."*

3       4. This is a well settled issues in the Iran U.S. Claims Tribunal in *Oil Field of Texas, Inc.,*

4   *Claimant, v. The Government of the Islamic Republic of Iran, National Iranian Oil Company,*

5   *Oil Service Company of Iran, Respondents.* (1- I.U.S.CT.R. p 347) CASE NO. 43 Award No.:

6   ITL 10-43-FT Iran - United States Claims Tribunal Filed December 9, 1982 in which the Tribunal

7   stated as follows (at pages 4 to 5):

8       "OSCO - a brief historical and legal background In March 1951 the Iranian
        Parliament enacted legislation nationalizing the Iranian oil industry. Later,
9       following a coup d'etat in Iran, a number of major multinational oil companies
        formed an Oil Consortium, which signed an Agreement ("the 1954 Agreement") for
10      the exploration, production, refining and exportation of Iranian oil.

11      The 1954 Agreement provided for the creation by the Consortium members of two
        operating companies, Iranian Oil Exploration and Producing Company ("IOEPC")
12      and Iranian Oil Refining Company ("IORC") to be incorporated under the law of
        the Netherlands. Their respective functions were to carry out exploration,
13      production, refining, transportation and other operations specified in the
        Agreement. The 1954 Agreement provided that the Consortium would fund all
14      activities of IOEPC and IORC and that the Consortium members would jointly and
        severally guarantee the performance of the operating companies.
15
        In 1973 the 1954 Agreement was replaced by a new agreement ("the 1973 Main
16      Agreement"). The preamble of the 1973 Main Agreement states:

17      Iran is determined that the right of full and complete ownership, operation and
        control in respect of all hydro-carbon reserves, assets and administration of the
18      petroleum industry shall be exercised by NIOC.

19      NIOC is an Iranian joint stock company which was incorporated by statute in Iran
        on 29 April 1951. All NIOC's shares are, and have always been, owned by the
20      Government of Iran. NIOC was established in order to exercise the ownership right
        of the Iranian nation in the oil and gas resources throughout the country and in the
21      continental shelf and to be responsible for the exploration, development,
        production, exploitation and distribution of petroleum and petroleum products both
22      within and outside Iran. The Iranian Ministry of Oil has subsequently assumed
        certain of NIOC's functions.
23      The 1973 Main Agreement ended the role of IOEPC and IORC, and provided for
        NIOC to operate and manage all oil-related operations.
24
    The Tribunal stated at page 9 as follows:
25
        "It remains, however, for the Tribunal to decide whether NIOC is an entity
26      controlled by the Government of Iran within the meaning of that article.

27

28
    DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF EX PARTE APPLICATION FOR ORDER
    AMENDING WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
    CASE NO. 3:08-mc-80024-JSW                                                              2

1    Respondents do not admit that NIOC is such an entity and have consequently left to
     the Tribunal to decide this question.
2
     The record in this case shows that NIOC was incorporated by statute in 1951, that
3    all NIOC's shares are, and have always been, owned by the Government of Iran,
     that NIOC according to its Statutes has been established in order to exercise the
4    ownership right of Iran in its oil and gas resources and to be responsible for the
     exploration, development, production, exploitation and distribution of petroleum
5    and petroleum products within and outside Iran and finally that the Iranian Ministry
     of Oil has now assumed certain of NIOC's functions.
6
     Furthermore, according to the Statutes, the shareholder shall be represented at the
7    General Meetings of the company by the Prime Minister and six other cabinet
     ministers.
8
     Consequently, it is obvious that NIOC is, and was at all relevant times, totally
9    controlled by the Government of Iran. In view of the above-mentioned purpose of
     the company and other available information it is also clear that NIOC is one of the
10   instruments by which the Government of Iran conducted and currently conducts the
     country's national oil policy. It is therefore equally clear that NIOC is an agency or
11   instrumentality controlled by the Government of Iran."

12   A true and correct copy of this case is attached hereto marked *Exhibit "D."*

13       5. A true and correct copy of the case entitled *IO Group, Inc. v. Michael Purser* is

14   attached hereto marked *Exhibit "E."*

15       6. A true and correct copy of the recently published opinion entitled *Fredric Goldman v.*

16   *Orenthal James Simpson*, Court of Appeal of the State of California, Second Appellate District,

17   Division Four (Los Angeles). Case No. B200082, is attached hereto marked *Exhibit "F."*

18       7. Declarant confirmed the identity of the NIOC subsidiaries through a listing on their web

19   page, a true and correct copy is attached hereto marked *Exhibit "G."*

20

21   I declare under penalty of perjury that the foregoing is true and correct.

22   Executed on March 13, 2008.

23
                                    _____/s/ David J. Cook_____
24                                  DAVID J. COOK, ESQ. (SB# 060859)

25
     F:\USERS\DJCNEW\iran.ex1sf
26

27

28
     DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF EX PARTE APPLICATION FOR ORDER
     AMENDING WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
     CASE NO. 3:08-mc-80024-JSW                                                            3

# EXHIBIT "A"



# Energy Information Administration

*Official Energy Statistics from the U.S. Government*





me > International > Country Analysis Briefs > Iran

## Iran

*Iran is OPEC's second-largest oil producer and the fourth-largest crude oil exporter in the world.*

### Oil

According to *Oil and Gas Journal*, Iran has 136 billion barrels of proven oil reserves, or roughly 10 percent of the world's total proven petroleum reserves as of January 1, 2007. Iran has 40 producing fields, 27 onshore and 13 offshore, with the majority of crude oil reserves located in the southwestern Khuzestan region near the Iraqi border. Iran's crude oil is generally medium in sulfur content and in the 28°-35° API range.



October 2007

Background
Oil
Natural Gas
Electricity
Quick Facts
Links
Sources
**Full Report**
HTML
PDF
**Contact Info**
cabs@eia.doe.gov
(202)586-8800
(more contacts)



**Top Proven World Oil Reserves, January 1, 2007**

Source: Oil & Gas Journal, Jan. 1, 2007

Iran is OPEC's second-largest producer after Saudi Arabia. In 2006, Iran produced an estimated 4.2 million barrels per day (bbl/d) of total liquids, of which 3.8 million bbl/d was crude oil, equal to 5 percent of global production.



**OPEC Total Crude Oil Production in 2006E**

Source: EIA Short-Term Energy Outlook (May 2007)

Iran's oil consumption totaled 1.6 million bbl/d in 2006. The Iranian government heavily subsidizes the price of refined oil products which has contributed to increased domestic demand. Iran has limited refinery capacity to produce light fuels, and imports much of its gasoline supply. Iranian domestic oil demand is mainly for gasoline and automotive gasoils, but domestic demand for other oil products are declining due to the substitution of natural gas. However, it is an overall net petroleum products exporter due to large exports of residual fuel oil. Oil export revenues represent the majority of Iran's total exports earnings, but the country suffers from budget deficits due to a growing population and large government

subsidies on gasoline and food products. In 2005, the International Monetary Fund (IMF) estimated that energy subsidies accounted for 12 percent of Iran's GDP, the highest rate in the world according to an International Energy Agency (IEA) study.

| Major Iranian Oil Field Production and Reserves, 2006 | | |
|---|---|---|
| Field | Production Capacity (Thousand bbl/d) | Reserves (Million of Barrels) |
| Ahwaz-Asmari | 700 | 10,100 |
| Marun | 520 | 9,500 |
| Gachsaran | 480 | 8,500 |
| Karanj-Parsi | 250 | 4,650 |
| Agha Jari | 200 | 8,700 |
| Nowrooz and Soroosh | 200 | 6,000 |
| Doroud 1 & 2 | 200 | 600 |
| Rag-e-Safid | 180 | 2,400 |
| Bangestan | 158 | 6,500 |
| Abu Zar | 140 | 50 |
| Sirri A & E/C & D | 130 | 1,200 |
| Salman | 100 | 800 |
| Major Field Total: | 3,258 | 59,000 |

Source: Global Insight

Iran produced 6 million bbl/d of crude oil in 1974, but has been unable to produce at that level since the 1979 revolution due to a combination of war, limited investment, sanctions, and a high rate of natural decline in Iran's mature oil fields. Iran's oil fields need structural upgrades including enhanced oil recovery (EOR) efforts such as natural gas injection. Iran's fields have a natural annual decline rate estimated at 8 percent onshore and 10 percent offshore, while current Iranian recovery rates are 24-27 percent, 10 percent less than the world average. It is estimated that 400,000-500,000 bbl/d of crude production is lost annually due to reservoir damage and decreases in existing oil deposits.

*Upstream Projects*
The Azadegan project phases I and II represent the greatest potential increase in Iranian crude oil production. Azadegan contains 26 billion barrels of proven crude oil reserves, but is geologically complex and difficult to extract. Iran and Venezuela have agreed on a $4 billion investment in the Ayacucho 7 block, where there are an estimated 31 billion barrels of oil. Iran's Northern Drilling Company (NDC) has also worked with Russia's Lukoil on oil field development in the Caspian Sea. (See Caspian Sea Analysis Brief)

| New Major Iranian Upstream Projects through 2012 | | | |
|---|---|---|---|
| Field | Company | (Thousand bbl/d) | Online |
| Salman, Foroozan, Daroud | Total, Petro Iran | 200 | 2007 |
| Darkhown, Phase II & III | ENI | 100 | 2007 |
| South Pars (Ahwaz) | NIOC | 150 | 2008 |
| Azadegan Phase I (south) | NIOC | 100 | 2009 |
| Kushk-Hosseinieh | NIOC | 300 | 2010 |
| Yadavaran | NIOC & Chinese Partners | 300 | 2011 |
| Azadegan Phase II (north) | NOIC | 110 | 2012 |
| New Potential Total: | | 1,260 | |

Source: OPEC, *Global Insight*

Iran plans to increase oil production to over 5 million bbl/d by 2010, but it will need foreign help. According to *Global Insight*, an estimated $25-35 billion is required to meet the government's 5.8 million bbl/d target by 2015. Investment in Iran's energy sector has been tempered due to the election of the conservative government of President Mahmoud Ahmadinejad in 2005, the international controversy surrounding the Iranian uranium enrichment and nuclear program, and economic sanctions. According to the IEA 2007 Medium-Term Oil Market Report, Iran will not be able to increase its net expansion capacity through 2012.

### U.S. Sanctions
U.S. sanctions against Iran due to Iran's historic support for international terrorism and its actions against non-belligerent shipping in the Persian Gulf impact the development of its petroleum sector. According to the Iran Transactions Regulations, administered by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), U.S. persons may not directly or indirectly trade, finance, or facilitate any goods, services or technology going to or from Iran, including goods, services or technology that would benefit the Iranian oil industry. U.S. persons are also prohibited from entering into or approving any contract that includes the supervision, management or financing of the development of petroleum resources located in Iran.

### Sector Organization
The state-owned National Iranian Oil Company (NIOC) is responsible for oil and gas production and exploration. The National Iranian South Oil Company (NISOC), a subsidiary of NIOC, accounts for 80

percent of local oil production covering the provinces of Khuzestan, Bushehr, Fars, and Kohkiluyeh va Boyer Ahamd. Though private ownership of upstream functions is prohibited under the Iranian constitution, the government has allowed for buyback contracts which allow international oil companies (IOCs) to enter exploration and development through an Iranian affiliate. The contractor receives a remuneration fee, usually an entitlement to oil or gas from the developed operation. In August 2007, President Mahmoud Ahmadinejad appointed NIOC executive Gholamhossein Nozari to serve as Acting Oil Minister, replacing Vaziri Hamaneh and creating controversy over President Ahmadinejad's role in the energy sector.

**Exports**
According to International Energy Agency's Monthly Oil Data Service and Global Trade Atlas, Iran's net crude and product exports in 2006 averaged 2.5 million bbl/d, primarily to Japan, China, India, South Korea, Italy, and other Organization for Economic Co-operation and Development (OECD) nations, making it the fourth-largest exporter of crude oil in the world. In 2006, Iran's oil export revenues amounted to $54 billion.

| Top Iranian Crude Oil Exports, 2006 | |
|---|---|
| Country | Thousand bbl/d |
| Japan | 448 |
| China | 335 |
| India* | 302 |
| South Korea | 204 |
| Italy | 191 |
| Turkey | 179 |
| France | 135 |
| South Africa | 127 |
| Taiwan | 117 |
| Greece | 117 |
| Other | 345 |
| **Total Exports:** | **2,500** |

*India's imports only reported for April-August 2006
Source: IEA Monthly Oil Data Service, March 2007;
Global Trade Atlas

**Iran's Oil Production and Consumption, 1976-2006E**



Source: EIA *International Petroleum Monthly*
Short-Term Energy Outlook (July 2007)

*Export Terminals*
Iran has the largest oil tanker fleet in the Middle East, the National Iranian Tanker Company, which holds 29 ships including Very Large Crude Carriers. Kharg Island is the country's largest terminal with a holding capacity of 16 million barrels of oil and a loading capacity of 5 million bbl/d, followed by Lavan Island with capacity to store 5 million barrels and loading capacity of 200,000 bbl/d. Other important terminals include Kish Island, Abadan and Bandar Mahshar, and Neka, which helps facilitate imports from the Caspian region. The Strait of Hormuz, on the southeastern coast of Iran, is an important route for oil exports from Iran and other Persian Gulf countries. (See Persian Gulf Analysis Brief) At its narrowest point the Strait of Hormuz is 34 miles wide, yet an estimated 17 million barrels, or roughly two-fifths of all seaborne traded oil, flows through the Strait daily. Iranian Heavy Crude Oil is Iran's largest crude export at 1.6 million bbl/d followed by Iranian Light at 1 million bbl/d.

| Name | API Gravity | Sulfur Content | Exports (bbl/d) |
|------|-------------|----------------|-----------------|
| Iranian Heavy | 31° | 1.70% | 1.6 million |
| Iranian Light | 34.6° | 1.40% | 1 million |
| Foroozan Blend and Sirri | 29-31° | n/a | 165,000 |
| Lavan Blend | 34-35° | 1.8-2% | 75,000 |

**National Iranian Oil Company (NIOC) Crude Exports by Blend**

### Refining

Iran's total refinery capacity is 1.5 million bbl/d from nine refineries operated by the National Iranian Oil Refining and Distribution Company (NIORDC), a NIOC subsidiary. Iranian refineries are unable to keep pace with domestic demand, and face major infrastructure problems. The country plans to add around 985,000 bbl/d of refining capacity by 2012, mostly through expansions and upgrades for gasoline yields at the Bandar Abbas, Bushehr, and the 90-year-old Abadan refineries. Large expansion projects at Bandar Abbas, including new catalytic reformers, distillation units, and condensate splitters will help supply the domestic demand, but it will probably not eliminate all gasoline imports. Iran has also discussed joint ventures in Asia, including China, Indonesia, Malaysia, and Singapore to expand refining activity.

### IRAN REFINERY PROJECTS (through 2012)

| Refinery | Project Type | Online | Additional Refinery Capacity (bbl/d) | Notes |
|----------|--------------|--------|--------------------------------------|-------|
| Bandar Abbas | Upgrade & Expansion | 2012 | 300 | heavy crude processing |
| Bushehr | New Refinery | TBD | 170 | |
| Abadan | Upgrade | 2009 | 140 | |
| Abadan | New Refinery | 2012 | 80 | gasoline production |
| Arak | Expansion | 2009 | 80 | |
| Bandar Assaluyeh | New Refinery | TBD | 80 | |
| Bandar Abbas | Expansion | 2009 | 60 | |
| Tehran | Expansion | 2012 | 50 | gasoline production |
| Tabriz | Expansion | 2012 | 25 | gasoline production |
| **Total New Refinery Capacity:** | | | 985 | |

Source: PFC Energy, *Global Insight*

### Pipelines

Iran has an expansive domestic oil network including 5 pipelines, and multiple international pipeline projects under consideration. Recently, an expansion of the 150 mile pipeline from the port of Neka on the Caspian coast to Rey, Tabriz, and Tehran refineries has reached a capacity of 300,000 bbl/d according to *Global Insight*. Iran has invested in its import capacity at the Caspian port to handle increased product shipments from Russia and Azerbaijan, and enable crude swaps with Turkmenistan and Kazakhstan. In the case of crude swaps, the oil from the Caspian is consumed domestically in Iran, and an equivalent amount of oil is produced for export through the Persian Gulf with a Swiss-trading arm of NIOC for a swap fee.

*In 2006, Iran imported over 192,000 bbl/d of gasoline and relied upon imports to meet almost half of its fuel needs costing $5 billion.*

### Gasoline

Iran is the second biggest gasoline importer in the world after the United States, consuming over 400,000 bbl/d. According to FACTS Global Energy, Iran imported over 192,000 bbl/d of gasoline in 2006 costing $5 billion. The gasoline consumption growth rate has averaged ten percent annually over the past six years, and the cost of imports is expected to reach $6 billion in 2007, up from $2.8 billion in 2005. Gasoline prices are heavily subsidized, and sold below the market price at around 42 cents per gallon, which has encouraged increased consumption. An increase in vehicle sales in recent years has also contributed to the problem. According to PFC Energy, car ownership in Iran grew 250 percent between 1990 and 2006, and a majority of these vehicles are older models. Gasoline powered vehicles in Iran are expected to reach 14.9 million by the end of 2007. Iran does not have sufficient refining capacity to meets its domestic gasoline and other light fuel needs. Therefore Iran imports gasoline from India, Turkmenistan, Azerbaijan, the Netherlands, France, Singapore, and the United Arab Emirates. Iran also imports from large, multinational wholesalers such as BP, Shell, Total, Vitol, LUKoil, and several Chinese companies.

#### New Gasoline Rationing System

In June 2007, the Iranian government instituted a gasoline rationing system. The decision followed a 25 percent price increase to 42 cents per gallon in May. NIORDC is responsible for the program which allows private cars to purchase 26 gallons per month and taxis to buy 211 gallons per month. The rations and increased costs are politically unpopular in Iran. Customers are allowed to purchase their ration six months in advance. Part-time taxis, commercial vehicles, and government vehicles also have special

allowances. Records are maintained on smart cards, and later this year the government is expected to announce the price for gasoline bought beyond quota levels.

Iran's gasoline consumption dropped 30 percent immediately after the rationing scheme was adopted. NIOC executive, Hojjatollah Ghanimifard, stated that Iranian gasoline imports for August 2007 dropped 14 percent, although an additional $1.5 billion was requested by the Iranian Oil Ministry to increase gasoline imports through March 2008. The International Energy Agency reported in its August 2007 Oil Market Update that gasoline consumption will likely increase again due to the fact that Iran allows advance purchase of gasoline at a subsidized rate. The combination of rationing, price hikes, increased refining capacity, as well as compressed natural gas (CNG) production, will reduce Iranian gasoline import demand by an estimated 30,000 bbl/d in the next three years according to FACTS Global Energy.

**Contact Us** □ **Feedback** □ **Privacy/Security** □ **Jobs** □ **About Us**

**EXHIBIT "B"**

Case 3:08-mc-80024-JSW    Document 2-4    Filed 03/13/2008    Page 2 of 19
Case 2:08-cv-00740-GAF-SS    Document 37-4    Filed 03/04/2008    Page 2 of 19
Iran Energy Data, Statistics and Analysis - Oil, Gas, Electricity, Coal

# COUNTRY ANALYSIS

# Iran

Last Updated: October 2007

## Background

*Iran, one of OPEC's founding members, holds the world's third-largest proven oil reserves, and the world's second-largest natural gas reserves.*

Iran is a member of the Organization of the Petroleum Exporting Countries (OPEC), and ranks amongst the world's top three holders of proven oil and natural gas reserves. Iran is OPEC's second-largest exporter after Saudi Arabia, and is the fourth-largest exporter of crude oil globally after Saudi Arabia, Russia, and Norway. Natural gas accounts for half of Iran's total domestic energy consumption, while the remaining half is predominately oil consumption. The continued exploration and production of the offshore South Pars natural gas field in the Persian Gulf is a key part of in Iran's energy sector development plan.

### Total Energy Consumption in Iran, by Type (2004)



Natural gas 49%

Coal 1%

Hydro 2%

Oil 48%

Source: EIA International Energy Annual 2004

Iran Energy Data, Statistics and Analysis - Oil, Gas, Electricity, Coal



## Oil

*Iran is OPEC's second-largest oil producer and the fourth-largest crude oil exporter in the world.*

According to *Oil and Gas Journal*, Iran has 136 billion barrels of proven oil reserves, or roughly 10 percent of the world's total proven petroleum reserves as of January 1, 2007. Iran has 40 producing fields, 27 onshore and 13 offshore, with the majority of crude oil reserves located in the southwestern Khuzestan region near the Iraqi border. Iran's crude oil is generally medium in sulfur content and in the 28°-35° API range.

### Top Proven World Oil Reserves, January 1, 2007



Source: Oil & Gas Journal, Jan. 1, 2007

Iran is OPEC's second-largest producer after Saudi Arabia. In 2006, Iran produced an estimated 4.2 million barrels per day (bbl/d) of total liquids, of which 3.8 million bbl/d was crude oil, equal to 5 percent of global production.



OPEC Total Crude Oil Production in 2006E

Source: EIA Short-Term Energy Outlook (May 2007)

Iran's oil consumption totaled 1.6 million bbl/d in 2006. The Iranian government heavily subsidizes the price of refined oil products which has contributed to increased domestic demand. Iran has limited refinery capacity to produce light fuels, and imports much of its gasoline supply. Iranian domestic oil demand is mainly for gasoline and automotive gasoils, but domestic demand for other oil products are declining due to the substitution of natural gas. However, it is an overall net petroleum products exporter due to large exports of residual fuel oil. Oil export revenues represent the majority of Iran's total exports earnings, but the country suffers from budget deficits due to a growing population and large government subsidies on gasoline and food products. In 2005, the International Monetary Fund (IMF) estimated that energy subsidies accounted for 12 percent of Iran's GDP, the highest rate in the world according to an International Energy Agency (IEA) study.

| Major Iranian Oil Field Production and Reserves, 2006 | | |
|---|---|---|
| Field | Production Capacity (thousand bbl/d) | Reserves (Millions of Barrels) |
| Ahwaz-Asmari | 700 | 10,100 |
| Marun | 520 | 9,500 |
| Gachsaran | 480 | 8,500 |
| Karanj-Parsi | 250 | 4,650 |
| Agha Jari | 200 | 8,700 |
| Nowrooz and Soroosh | 200 | 6,000 |
| Doroud 1 & 2 | 200 | 600 |
| Rag-e-Safid | 180 | 2,400 |
| Bangestan | 158 | 6,500 |
| Abu Zar | 140 | 50 |
| Sirri A & E/C & D | 130 | 1,200 |
| Salman | 100 | 800 |
| Major Field Total: | 3,258 | 59,000 |

Source: Global Insight

Iran produced 6 million bbl/d of crude oil in 1974, but has been unable to produce at that level since the 1979 revolution due to a combination of war, limited investment, sanctions, and a high rate of natural decline in Iran's mature oil fields. Iran's oil fields need structural upgrades including

enhanced oil recovery (EOR) efforts such as natural gas injection. Iran's fields have a natural annual decline rate estimated at 8 percent onshore and 10 percent offshore, while current Iranian recovery rates are 24-27 percent, 10 percent less than the world average. It is estimated that 400,000-500,000 bbl/d of crude production is lost annually due to reservoir damage and decreases in existing oil deposits.

*Upstream Projects*

The Azadegan project phases I and II represent the greatest potential increase in Iranian crude oil production. Azadegan contains 26 billion barrels of proven crude oil reserves, but is geologically complex and difficult to extract. Iran and Venezuela have agreed on a $4 billion investment in the Ayacucho 7 block, where there are an estimated 31 billion barrels of oil. Iran's Northern Drilling Company (NDC) has also worked with Russia's Lukoil on oil field development in the Caspian Sea. (See Caspian Sea Analysis Brief)

| New Major Iranian Upstream Projects through 2012 | | | |
|---|---|---|---|
| Field | Company | Thousand bbl/d | Online |
| Salman, Foroozan, Daroud | Total, Petro Iran | 200 | 2007 |
| Darkhovin, Phase II & III | ENI | 100 | 2007 |
| South Pars (Ahwaz) | NOIC | 150 | 2008 |
| Azadegan Phase I (south) | NIOC | 100 | 2009 |
| Kushk-Hosseinieh | NOIC | 300 | 2010 |
| Yadavaran | NIOC & Chinese Partners | 300 | 2011 |
| Azadegan Phase II (north) | NOIC | 110 | 2012 |
| New Potential Total: | | 1,260 | |

Source: OPEC, *Global Insight*

Iran plans to increase oil production to over 5 million bbl/d by 2010, but it will need foreign help. According to *Global Insight*, an estimated $25-35 billion is required to meet the government's 5.8 million bbl/d target by 2015. Investment in Iran's energy sector has been tempered due to the election of the conservative government of President Mahmoud Ahmadinejad in 2005, the international controversy surrounding the Iranian uranium enrichment and nuclear program, and economic sanctions. According to the IEA 2007 Medium-Term Oil Market Report, Iran will not be able to increase its net expansion capacity through 2012.

**U.S. Sanctions**

U.S. sanctions against Iran due to Iran's historic support for international terrorism and its actions against non-belligerent shipping in the Persian Gulf impact the development of its petroleum sector. According to the Iran Transactions Regulations, administered by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), U.S. persons may not directly or indirectly trade, finance, or facilitate any goods, services or technology going to or from Iran, including goods, services or technology that would benefit the Iranian oil industry. U.S. persons are also prohibited from entering into or approving any contract that includes the supervision, management or financing of the development of petroleum resources located in Iran.

**Sector Organization**

The state-owned National Iranian Oil Company (NIOC) is responsible for oil and gas production and exploration. The National Iranian South Oil Company (NISOC), a subsidiary of NIOC, accounts for 80 percent of local oil production covering the provinces of Khuzestan, Bushehr, Fars, and Kohkiluyeh va Boyer Ahamd. Though private ownership of upstream functions is prohibited under the Iranian constitution, the government has allowed for buyback contracts which allow international oil companies (IOCs) to enter exploration and development through an Iranian affiliate. The contractor receives a remuneration fee, usually an entitlement to oil or gas from the developed operation. In August 2007, President Mahmoud Ahmadinejad appointed NIOC executive Gholamhossein Nozari to serve as Acting Oil Minister, replacing Vaziri Hamaneh and creating controversy over President Ahmadinejad's role in the energy sector.

**Exports**

According to International Energy Agency's Monthly Oil Data Service and Global Trade Atlas, Iran's net crude and product exports in 2006 averaged 2.5 million bbl/d, primarily to Japan, China, India, South Korea, Italy, and other Organization for Economic Co-operation and Development

(OECD) nations, making it the fourth-largest exporter of crude oil in the world. In 2006, Iran's oil export revenues amounted to $54 billion.

| Top Iranian Crude Oil Exports, 2006 | |
|---|---|
| Country | Thousand (bbl/d) |
| Japan | 448 |
| China | 335 |
| India* | 302 |
| South Korea | 204 |
| Italy | 191 |
| Turkey | 179 |
| France | 135 |
| South Africa | 127 |
| Taiwan | 117 |
| Greece | 117 |
| Other | 345 |
| Total Exports: | 2,500 |

*India's imports only reported for April-August 2006
Source: IEA Monthly Oil Data Service, March 2007;
Global Trade Atlas

### Iran's Oil Production and Consumption, 1976-2006E



Source: EIA *International Petroleum Monthly*
Short-Term Energy Outlook (July 2007)

*Export Terminals*
Iran has the largest oil tanker fleet in the Middle East, the National Iranian Tanker Company, which holds 29 ships including Very Large Crude Carriers. Kharg Island is the country's largest terminal with a holding capacity of 16 million barrels of oil and a loading capacity of 5 million bbl/d, followed by Lavan Island with capacity to store 5 million barrels and loading capacity of 200,000 bbl/d. Other important terminals include Kish Island, Abadan and Bandar Mahshar, and Neka, which helps facilitate imports from the Caspian region. The Strait of Hormuz, on the southeastern coast of Iran, is an important route for oil exports from Iran and other Persian Gulf countries. (See Persian Gulf Analysis Brief) At its narrowest point the Strait of Hormuz is 34 miles wide, yet an estimated 17 million barrels, or roughly two-fifths of all seaborne traded oil, flows through the Strait daily. Iranian Heavy Crude Oil is Iran's largest crude export at 1.6 million bbl/d followed by Iranian Light at 1 million bbl/d.

| National Iranian Oil Company (NIOC) Crude Exports by Blend | | | |
|---|---|---|---|
| Name | API Gravity | Sulfur content | Exports (bbl/d) |
| Iranian Heavy | 31° | 1.70% | 1.6 million |
| Iranian Light | 34.6° | 1.40% | 1 million |
| Foroozan Blend and Sirri | 29-31° | n/a | 165,000 |
| Lavan Blend | 34-35° | 1.8-2% | 75,000 |

## Refining

Iran's total refinery capacity is 1.5 million bbl/d from nine refineries operated by the National Iranian Oil Refining and Distribution Company (NIORDC), a NIOC subsidiary. Iranian refineries are unable to keep pace with domestic demand, and face major infrastructure problems. The country plans to add around 985,000 bbl/d of refining capacity by 2012, mostly through expansions and upgrades for gasoline yields at the Bandar Abbas, Bushehr, and the 90-year-old Abadan refineries. Large expansion projects at Bandar Abbas, including new catalytic reformers, distillation units, and condensate splitters will help supply the domestic demand, but it will probably not eliminate all gasoline imports. Iran has also discussed joint ventures in Asia, including China, Indonesia, Malaysia, and Singapore to expand refining activity.

| IRAN REFINERY PROJECTS (through 2012) | | | | |
|---|---|---|---|---|
| Refinery | Project Type | Online | Additional Production Capacity (thousand bbl/d) | Notes |
| Bandar Abbas | Upgrade & Expansion | 2012 | 300 | heavy crude processing |
| Bushehr | New Refinery | TBD | 170 | |
| Abadan | Upgrade | 2009 | 140 | |
| Abadan | New Refinery | 2012 | 80 | gasoline production |
| Arak | Expansion | 2009 | 80 | |
| Bandar Assaluyeh | New Refinery | TBD | 80 | |
| Bandar Abbas | Expansion | 2009 | 60 | |
| Tehran | Expansion | 2012 | 50 | gasoline production |
| Tabriz | Expansion | 2012 | 25 | gasoline production |
| | Total New Refinery Capacity: | | 985 | |

Source: PFC Energy, *Global Insight*

## Pipelines

Iran has an expansive domestic oil network including 5 pipelines, and multiple international pipeline projects under consideration. Recently, an expansion of the 150 mile pipeline from the port of Neka on the Caspian coast to Rey, Tabriz, and Tehran refineries has reached a capacity of 300,000 bbl/d according to *Global Insight*. Iran has invested in its import capacity at the Caspian port to handle increased product shipments from Russia and Azerbaijan, and enable crude swaps with Turkmenistan and Kazakhstan. In the case of crude swaps, the oil from the Caspian is consumed domestically in Iran, and an equivalent amount of oil is produced for export through the Persian Gulf with a Swiss-trading arm of NIOC for a swap fee. .

*In 2006, Iran imported over 192,000 bbl/d of gasoline and relied upon imports to meet almost half of its fuel needs costing $5*

## Gasoline

Iran is the second biggest gasoline importer in the world after the United States, consuming over 400,000 bbl/d. According to FACTS Global Energy, Iran imported over 192,000 bbl/d of gasoline in 2006 costing $5 billion. The gasoline consumption growth rate has averaged ten percent annually over the past six years, and the cost of imports is expected to reach $6 billion in 2007, up from $2.8 billion in 2005. Gasoline prices are heavily subsidized, and sold below the market

*billion.* price at around 42 cents per gallon, which has encouraged increased consumption. An increase in vehicle sales in recent years has also contributed to the problem. According to PFC Energy, car ownership in Iran grew 250 percent between 1990 and 2006, and a majority of these vehicles are older models. Gasoline powered vehicles in Iran are expected to reach 14.9 million by the end of 2007. Iran does not have sufficient refining capacity to meets its domestic gasoline and other light fuel needs. Therefore Iran imports gasoline from India, Turkmenistan, Azerbaijan, the Netherlands, France, Singapore, and the United Arab Emirates. Iran also imports from large, multinational wholesalers such as BP, Shell, Total, Vitol, LUKoil, and several Chinese companies.

*New Gasoline Rationing System*
In June 2007, the Iranian government instituted a gasoline rationing system. The decision followed a 25 percent price increase to 42 cents per gallon in May. NIORDC is responsible for the program which allows private cars to purchase 26 gallons per month and taxis to buy 211 gallons per month. The rations and increased costs are politically unpopular in Iran. Customers are allowed to purchase their ration six months in advance. Part-time taxis, commercial vehicles, and government vehicles also have special allowances. Records are maintained on smart cards, and later this year the government is expected to announce the price for gasoline bought beyond quota levels.

Iran's gasoline consumption dropped 30 percent immediately after the rationing scheme was adopted. NIOC executive, Hojjatollah Ghanimifard, stated that Iranian gasoline imports for August 2007 dropped 14 percent, although an additional $1.5 billion was requested by the Iranian Oil Ministry to increase gasoline imports through March 2008. The International Energy Agency reported in its August 2007 Oil Market Update that gasoline consumption will likely increase again due to the fact that Iran allows advance purchase of gasoline at a subsidized rate. The combination of rationing, price hikes, increased refining capacity, as well as compressed natural gas (CNG) production, will reduce Iranian gasoline import demand by an estimated 30,000 bbl/d in the next three years according to FACTS Global Energy.

## Natural Gas

*Iran is the world's third largest consumer of natural gas, and the South Pars Natural Gas offshore field the most significant development project in the country's energy sector.* According to *Oil and Gas Journal,* Iran has an estimated 974 trillion cubic feet (Tcf) in proven natural gas reserves. Iran holds the world's second largest reserves after Russia. Around 62 percent of Iranian natural gas reserves are located in non-associated fields, and have not been developed. Major natural gas fields include: South and North Pars, Tabnak, and Kangan-Nar. In 2005, Iran produced and consumed 3.6 Tcf of natural gas. Natural gas consumption is expected to grow around 7 percent annually for the next decade.

Both production and consumption have grown rapidly over the past 20 years, and natural gas is often used for re-injection into mature oilfields in Iran. According to FACTS Global Energy, Iran's natural gas exports will be minimal due to rising domestic demand even with future expansion and production from the massive South Pars project. In 2005, 65 percent of Iranian natural gas was marketed production, while 18 percent was for EOR gas re-injection, and 17 percent was lost due to flaring and the reduction of wet natural gas from hydrocarbon extraction. Like the oil industry, natural gas prices in Iran are heavily subsidized by the government.





World Natural Gas Reserves by Country, January 1, 2007

Trillion Cubic Feet

Russia — 1,680.0
Iran — 974.0
Qatar — 910.5
Saudi Arabia — 239.5
UAE — 214.4
USA — 204.4
Nigeria — 181.9
Algeria — 161.7
Venezuela — 152.4

Source: Oil & Gas Journal, Jan. 1, 2007

### Sector Organization

The National Iranian Gas Company (NIGC) is responsible for natural gas infrastructure, transportation, and distribution. Due to the poor investment climate, some foreign companies including British Petroleum (BP) and Chile's Sipetrol have chosen to divest in Iran's natural gas sector. Total, Eni, and Shell are the largest remaining foreign investors. In response, Iran has looked toward eastern firms, like state-owned Indian Oil Corp. and China Petroleum & Chemical Corporation, or Sinopec, to take an increased role in Iranian natural gas upstream development. Under Iran's buy-back scheme, foreign firms hand over operations of fields to NIOC, and after development they receive payment from natural gas production to cover their investment.

### Liquefied Natural Gas (LNG)

According to FACTS, Global Energy, Iran may only be able to reach peak LNG exports of around 1,462 Bcf as a lifetime ceiling. LNG projects in Iran lag behind neighboring Qatar, the world's largest LNG exporter. A $500-million contract for Iran LNG is part of the South Pars Phase 12 development. Pars Oil and Gas Company (PAGC) is responsible for upstream LNG development, and downstream development is divided amongst various companies including the National Iranian Gas Export Company (NIGEC).

### South Pars Field



The most significant energy development project in Iran is the offshore South Pars field, which is estimated to have 450 Tcf of natural gas reserves, or around 47 percent of Iran's total natural gas reserves. Discovered in 1990, and located 62 miles offshore in the Persian Gulf, South Pars has a 25 phase development scheme spanning 20 years. The Iranian government expects each phase to yield 1 Bcf/d, and is developing the South Pars field primarily to meet its domestic market demand. The first five phases are completed, while the next five are due by the end of 2007. The Iranian government plans for the first 16 phases to be online by 2010, keeping pace with Qatar's connected North Field. The majority of South Pars natural gas development will be allocated to the domestic market for consumption and gas re-injection, with the remainder exported to South Asia or Europe, LNG production, and gas to liquids (GTL).

### Exploration and Production

Iranian natural gas field exploration occurs in the Fars province including the Varavi, Shanol, and Homa fields, and in the Persian Gulf Salman gas field. Former Oil Minister Kazem Vaziri-Hamaneh announced in August 2007, that a natural gas discovery in the Fars province should produce up to 30 million cubic feet per day (Mcf/d) from 17 new wells. Iran also announced new agreements with IOCs associated with the South Pars project, and SKS, a private Malaysian company to develop non-associated Golshan and Ferdos fields for LNG exports. Their investment will amount to $16 billion, but is in early stages. Iran and Kuwait have recently settled a dispute over the Arash (Al Dorra) offshore natural gas field in the Persian Gulf which they will jointly develop and explore. The field lies on the continental shelf between Iran, Kuwait, and Saudi Arabia.

### Pipelines

Iran's domestic natural gas pipelines increased over recent years, and future projects are planned for the IGAT (1-8) pipeline series. The 745 mile Iran-Turkey pipeline completed in 2001 can move 1.4 Bcf/d. Iran imports 800 Mcf/d from Turkmenistan via pipeline from the bordering Korpedze field to Iran's Kurt Kul town for consumption in northern Iran. This $195-million pipeline is the first in the Caspian region to bypass Russia. In March 2007, the 87-mile long Iran-Armenia pipeline was completed in Agarak, and will transport 200 Mcf/d to Armenia in exchange for electricity. The Nabucco pipeline is an another proposed project which will run 2050 miles from Iran and other Caspian states through Turkey to Austria and the European Union. Construction is slated to start in 2009, and the project will cost an estimated $6.8 billion with a capacity to transport 300 Mcf/d.

*Iran-Pakistan-India (IPI) Pipeline*



Source: U.S. Government

The most controversial pipeline proposal is the $7.4-billion Iran-Pakistan-India (IPI) line which would transport Iranian natural gas south to the Asian subcontinent. With a proposed 1724 miles and a 5.4 Bcf/d capacity, the pipeline has been stalled in the past due in part to disputes over the cost of the shipments. NIOC's Director of International Affairs Hojjatollah Ghanimifard invited President Musharraf of Pakistan and Prime Minister Singh of India to discuss the pipeline in July 2007, but the final arrangement has not been announced. Pakistan and India still need to settle transportation tariffs. Iran would probably extend its domestic IGAT-7 pipeline into Pakistan, and not create a new parallel pipeline. The 545-mile IGAT-7 has a total capacity of 5.4 Bcf/d and runs from Assaluyeh to Iranshahr. The IGAT-7 should be completed by 2011.

## Electricity

*Iran's electricity demand is projected to grow 6 percent annually through 2015.*

In 2004, Iran generated 156 billion kilowatthours (Bkwh) and consumed 145 Bkwh. 146 Bkwh was generated by conventional thermal electric power, and the remaining 11 Bkwh was generated by hydroelectric power. As of 2004, EIA shows no significant generation from nuclear electric power. Iran will need to increase its electricity generation to meet its rapid consumption growth. The IEA estimates that energy intensity in Iran is 30 percent higher than in OECD countries. According to FACTS Global Energy, Iran's electricity demand is projected to grow at 6 percent per year through 2015.

In Iran multiple sources of power generation are being explored. One option for meeting electricity demand includes using fuel oil for power generation, particularly efficient for plants located close to oil refineries. Iran also plans to boost natural gas production use to meet its electricity demand. Hydroelectric plants and the controversial nuclear power program will also be part of Iran's overall electricity plan if technological advances, investment, and political pressure allow. State-owned Tavanir and other regional subsidiaries dominate the power sector, and are responsible for power generation, transmission, and distribution. However, the Iranian government has moved to attract private investment in its electricity sector.



Iran's Electricity Generation and Consumption, 1984-2004

Source: EIA International Energy Annual 2004

### International Cooperation

According to *Middle East Economic Survey* (MEES), Pakistan's governmental Central Development Working Party has approved a plan to import 100-400 MW of electric power from Iran for up to 6.3 cents per kwh over 30 years. Iran and Turkey plan to build three power plants together using natural gas to generate 6,000 MW, and they plan to build joint hydroelectric plants starting in 2008. Iran's Deputy Energy Minister Mohmmad Ahmadian stated that Iran would like to link with Russia's electricity network, though such a project would require at least two years to fulfill. Iran has expressed interest in increasing supplies to Azerbaijan after the necessary infrastructure is built.

# Profile

## Energy Overview

| | |
|---|---|
| Proven Oil Reserves (January 1, 2007E) | 136 billion barrels |
| Oil Production (2006E) | 4.16 million barrels per day, of which 3.8 million barrels per day was crude oil. |
| Oil Consumption (2006E) | 1.6 million barrels per day |
| Crude Oil Distillation Capacity (2007E) | 1,451 thousand barrels per day |
| Proven Natural Gas Reserves (January 1, 2007E) | 974 trillion cubic feet |
| Natural Gas Production (2005E) | 3.6 trillion cubic feet |
| Natural Gas Consumption (2005E) | 3.6 trillion cubic feet |
| Recoverable Coal Reserves | 462 million short tons |

Case 3:08-cv-00740-GAF-SS    Document 37-4    Filed 03/04/2009    Page 12 of 98

| | |
|---|---|
| (2007E) | |
| Coal Production (2004E) | 1 million short tons |
| Coal Consumption (2004E) | 1.7 million short tons |
| Electricity Installed Capacity (2004E) | 34.3 gigawatts |
| Electricity Production (2004E) | 156 billion kilowatt hours |
| Electricity Consumption (2004E) | 145 billion kilowatt hours |
| Total Energy Consumption (2004E) | 6.4 quadrillion Btus*, of which Natural Gas (49%), Oil (48%), Hydroelectricity (2%), Coal (1%) |
| Total Per Capita Energy Consumption (2004E) | 95.5 million Btus |
| Energy Intensity (2004E) | 10,280 Btu per $2000-PPP** |

## Environmental Overview

| | |
|---|---|
| Energy-Related Carbon Dioxide Emissions (2004E) | 402 million metric tons, of which Oil (52%), Natural Gas (42%), Coal (1%) |
| Per-Capita, Energy-Related Carbon Dioxide Emissions (2004E) | 6 metric tons |
| Carbon Dioxide Intensity (2004E) | 0.6 Metric tons per thousand $2000-PPP** |

## Oil and Gas Industry

| | |
|---|---|
| Organization | The Ministry of Petroleum (MoP) manages: 1) National Iranian Oil Company (NIOC) - oil and gas exploration and production, refining and oil transportation; 2) National Iranian Gas Company (NIGC) - manages gathering, treatment, processing, transmission, distribution, and exports of gas and gas liquids; 3) National Iranian Petrochemical Company (NPC) - handles petrochemical production, distribution, and exports; and 4) National Iranian Oil Refining and Distribution Company (NIORDC) handles oil refining and transportation, with some overlap to NIOC.  The National Iranian Offshore Oil Co. (IOOC) is in charge of offshore oil fields in the Persian Gulf. The National Iranian South Oil Fields Co. (NIOC South) is in charge of onshore oilfields in southern Iran. Pars Oil & Gas Co. (POGC) is in charge of the offshore North and South Pars gas fields. Khazar Exploration & Production Co. is in charge of Iran's Caspian Sea sector. Also, the National Iranian Tanker Company (NITC) controls the second largest fleet of tankers in OPEC. |
| Major Oil/Gas Ports | Kharg Island, Lavan Island, Sirri Island, Ras Bahregan |
| Foreign Company Involvement | BG, BHP, Bow Valley, BP, Eni, Gazprom, Lukoil, OMV, Petronas, Royal Dutch/Shell, Sheer Energy, Sinopec, Statoil, Total |
| Major Oil Fields | Agha Jari, Ahwaz, Bangestan, Bibi Hakimeh, Darkhovin, Doroud, Gachsaran, Mansouri (Bangestan), Marun, Masjid-e Soleiman, Parsi, Rag-e-Safid, Soroush/Nowruz |
| Major Natural Gas Fields | South Pars, North Pars, Khufi, Zireh, Tabnak, Nar-Kangan, Aghar, Dalan, Sarkhoun, Mand |

Case 3:08-cv-00740-GAF-SS    Document 37-4    Filed 03/04/2008    Page 13 of 19

| Major Refineries (capacity, bbl/d) | Abadan (400,000), Isfahan (265,000), Bandar Abbas (232,000); Tehran (225,000), Arak (150,000), Tabriz (112,000), Shiraz (40,000), Kermanshah (30,000), Lavan Island (20,000) |
|---|---|
| Major Export Terminals (loading capacity, bbl/d) | Kharg Island (5 million), Lavan Island (200,000), Neka (50,000), Assaluyeh (250,000 gas liquids), Kish Island and Abadan and Bandar Mahshahr |

\* The total energy consumption statistic includes petroleum, dry natural gas, coal, net hydro, nuclear, geothermal, solar, wind, wood and waste electric power. The renewable energy consumption statistic is based on International Energy Agency (IEA) data and includes hydropower, solar, wind, tide, geothermal, solid biomass and animal products, biomass gas and liquids, industrial and municipal wastes. Sectoral shares of energy consumption and carbon emissions are also based on IEA data.
\*\*GDP figures from OECD estimates based on purchasing power parity (PPP) exchange rates.

## Links

**U.S. Government**
CIA World Factbook - Iran
EIA - Country Information on Iran
Library of Congress Country Study on Iran
OPEC Fact Sheet
U.S. State Department - Iran
U.S. Treasury Department's Office of Foreign Asset Controls

**Foreign Government Agencies**
Interests Section of the Islamic Republic of Iran in Washington, DC (in the Pakistani Embassy)
Permanent Mission of the Islamic Republic of Iran to the United Nations
Salam Iran Home Page

**Energy**
National Iranian Oil Company
National Petrochemical Company of Iran
Pars Times: Caspian Sea Region
Pars Times: Iran Oil and Gas Resources

**General**
BBC Iran
BBC Persian
Bushehr: Global Security.org
Iran Nuclear Resources
Iran Press Service
Iranian Trade
Pars Times: Persian Gulf Region

## Sources

AFX Asia
Agence France Presse
AME Info
AP Worldstream
APS Review Oil Market Trends
ARMINFO News
Argus Media Ltd.
Asia in Focus
Asia Pulse
Bangkok Post
BBC
Business Monitor International
Business Standard
CIA World Factbook
Deutsche Bank
Dow Jones
FACTS Global Energy, Inc .
Financial Times
Economist Intelligence Unit Ltd.
Energy and Commodities Digest
EU Energy

Eurasia Group
Global Insight
Gulf News
Indian Business Insight
IHS Inc.
Inside U.S. Trade
International Energy Agency
International Gas Report
International Monetary Fund
International Oil Daily
International Petroleum Finance
IPR Strategic Information Database
Middle East Business Intelligence
Middle East Economic Digest
Middle East Economic Survey
New York Times
Newsday
Oil and Gas Journal
Organization of Petroleum Exporting Countries
Petroleum Economist
Petroleum Intelligence Weekly
PFC Energy, Inc.
Pipeline and Gas Journal
Platt's Commodity News
Press Trust of India Limited
Prime-News Business
Reuters
Rigzone
St. Petersburg Times
Straits Times
Trend News Agency
Turan Information Agency
Upstream
U.S. Energy Information Administration
Xinhua News Agency

## Contact Info

cabs@eia.doe.gov
(202)586-8800
cabs@eia.doe.gov

EXHIBIT "C"

## Foreword:

This very report is one of the annual reports of National Iranian Oil Company which includes all its activities and programs during the period from March 20th, 2004 to March 19th, 2005 based on the reports presented by NIOC directorates and subsidiaries.

It is hoped that this report provides you with useful information pertaining to NIOC.

## Company Profile:

NIOC is one of the affiliates of the Petroleum Ministry which is run by the government of Islamic Republic of Iran. NIOC is responsible for all operations associated with crude oil and gas exploration and production.

In 1950 and in the wake of petroleum industry nationalization, NIOC commenced its activities; today NIOC is known as the third biggest oil company in the world. During these years, especially after Islamic Revolution in Iran ,NIOC not only focused on oil reserves preservation, but also took some effective measures to explore new oil and gas fields; and enhance oil recovery coefficient through implementation of various projects, so that in 2004 through exploration of two oil and gas fields, 6289 mbl crude oil, 422 bcm gas and 128 mbl gas condensates was added to the volume of Iran's in-place reserves. NIOC is also carrying out a lot of R&D projects which leads to development of oil fields, technology transfer and preservation of oil and gas reservoirs.

NIOC major activities include crude oil and gas exploration, production and marketing. There are 27 subsidiary companies that work under supervision of NIOC to carry out their responsibilities.

# Introduction:

In 2004 and through exploration of 2 oil & gas fields, NIOC managed to add 6289 mbl crude oil, 422 bcm gas and 1289 mbl gas liquids and condensates to the volume of Iran's in-place reserves.

Due Due to high oil prices in 2004, the revenue resulted from crude oil export rose by 71.3 percent compared with the budget figures for crude oil trades in cash and in the form of swap. Buyback projects enjoyed considerable progress, chief among them are completion of phase one of South Pars gas field, bringing phases 4 &5 of South Pars gas field on stream and producing by 55.2 mcm/d, completion of Darkhoain phase 1 with 50,000 b/d, completion and development of Soroush field with a capacity of 100,000 b/d and bringing Nourooz field on stream with primary production rate of 25,000 b/d.

Doroud field started its additional production in 2002. Its additional production rate, in 2004, was around 13,000 b/d.In addition to the above-mentioned projects, the comprehensive survey and development program for development of 16 fields in the central regions, 3 fields (Ahwaz Asmari, Bibi Hakimeh and Maroun Asmari) and 7 out of 8 south oil fields and Kouh Mund have been completed.

# Oil and Iran's National Security:

Oil and national security have been constantly intermingled with each other in the contemporary political history of Iran which have played an effective role in their mutual and structural relationship.

The pivotal role of oil in Iran's sixty-year economic and political development, actuates the Iranian officials to consider oil and gas issue as one of the most important factors effective in national security.

Being chief among production factors, oil and gas are considered to be important energy carriers and they are known as capital, liquidity, wealth, opportunity and provider of grounds for superior technology transfer and recognition, as well. Oil as a national opportunity ought to be converted into a generator capital so that in this way more value added and a higher economic growth and national potentiality can be achieved.

Possessing giant energy resources, especially oil and gas and enjoying its political and economic geography, Iran has a valuable and unique position in the world.

In a world where national security of nations has been interwoven with each other, securing this special position is of strategic

importance to Iran. Playing a primal role in supplying the world energy, which can guarantee sufficient revenue for the country development, guarantees the national security of the country, as well.

Raising oil export rate depends on the production potentiality and raising recovery coefficient of oil reservoirs, meanwhile oil price in fundamental parameters and political issues. Therefore, in order to increase oil revenues ,some policies should be applied so that the resultant of these policies along with synergy could lead to maximum profitability from oil wealth.

Those who have self-confidence and take benefit from new opportunities to concede this chain to the next generations, rule the world.

It was in the reported period that the policy for establishment of strategic link among Asian producers and consumers was designed and followed up as an economic movement and a way to establish national security in the country.

Establishment of relationship with Asian companies and giving priority to Japan, China, Pakistan and India as the biggest present and future consumers and Asia consumption poles, has been in line with implementation of this policy.

**NextPage**

# EXHIBIT "D"

*Oil Field of Texas, Inc., Claimant,*

*v.*

*The Government of the Islamic Republic of Iran, National Iranian Oil Company, Oil Service Company of Iran, Respondents.*

*CASE NO. 43*

*Award No. ITL 10-43-FI*

Iran - United States Claims Tribunal
Filed December 9, 1982

INTERLOCUTORY AWARD

CONCURRING OPINION OF RICHARD M. MOSK

INTERLOCUTORY AWARD

Question as to whether the Tribunal has jurisdiction over claims based on contract between the Claimant and Oil Service Company of Iran
jurisdiction relinquished by Chamber One to the Full Tribunal for the purpose of deciding this issue.

Claimant represented by:

Attorney for Claimant: Mr. Platt W. Davis III, and Mr. Lawrence W. Newman.
Counsel: Mr. Carl R. Schenker, Jr., Mr. Anthony G. Petrello, Mr. Axel H. Baum, and Mr. Hamid Sabi.
Mr. Alan Rauch, Chairman of the Board of Oil Field of Texas, Inc.

The Government of the Islamic Republic of Iran and National
Iranian Oil Company represented by:

Mr. Mohammad K. Eshragh, Agent of the Islamic Republic of Iran, Mr. A. Mouri, Representative of National Iranian Oil Company, Professor D. W. Bowett, and Mr. K. A. Bowett, of Counsel.

Oil Service Company of Iran not represented.

Introduction

Through a Contract dated 26 February 1975 with subsequent additions and amendments ("the Lease Agreement") concluded between Claimant and Oil Service Company of Iran ("OSCO"), Claimant agreed to lease certain equipment to OSCO. This lease agreement concerned four systems ("stacks") of blowout preventors with related equipment for use in a petroleum exploration and drilling programme in Southern Iran that OSCO conducted for National Iranian Oil Company ("NIOC") pursuant to a service contract. A blowout preventor is a device designed to prevent uncontrolled flow of fluids from a well.

Under the terms of the Lease Agreement, OSCO is obligated to pay Claimant a certain daily rate for the four stacks of blowout preventors which were leased to OSCO. The Lease Agreement also provides that OSCO is liable for any loss of or damage to the equipment during the lease and that, in case of total loss or destruction of any set of equipment, the rental payment shall continue with respect to such set of equipment until an acceptable replacement has been delivered or funds sufficient to buy such replacement have been delivered to Claimant. Claimant contends that one stack of blowout preventors was completely destroyed by a blowout fire on 1 August 1978 while the stack was leased to and in the possession of OSCO. In addition to the equipment originally leased by Claimant to OSCO under the Lease Agreement, Claimant leased to OSCO a further blowout preventor, which according to Claimant was returned on 15 February 1978 in damaged condition. Lastly, OSCO agreed to purchase some equipment to be used in the operation of the blowout preventors leased by Claimant to OSCO. Claimant asserts that this equipment was delivered to OSCO, which failed to compensate Claimant for the equipment, notwithstanding repeated demands for payment.

Claimant contends that NIOC is liable for OSCO's contractual obligations and that NIOC is an agency, instrumentality or entity controlled by the Government of Iran. Thus, based on the contracts with OSCO, Claimant seeks compensation in the instant case from NIOC for the following loss and expense, together with interest thereon: (a) the present value of the leased equipment allegedly destroyed by fire in Iran, (b) the accrued unpaid daily rents, including rents for the destroyed stack of blowout preventors from 1 August 1978, (c) the expense incurred in repairing the alleged damage to the equipment returned in February 1978, (d) the present value of the equipment which OSCO, according to Claimant, ordered and received but did not pay for, and (e) the present value of the remaining stacks of blowout preventors which, according to Claimant, have not been returned to it. By its Statement of Claim, Claimant seeks compensation for these alleged losses and expenses also from the Government of Iran.

Respondents deny that the Government of Iran or NIOC is liable for OSCO's obligations and assert that the Tribunal has no jurisdiction over the above-mentioned claims.

In addition to these contract-related claims, Claimant also seeks compensation from NIOC inter alia on the theory of unjust enrichment and from the Government of Iran on the theory that this Government expropriated Oil Field's property-rights under the Lease Agreement in

violation of international law.

The issue

According to Article II of the Declaration of the Government of the Democratic and Popular Republic of Algeria concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran ("the Claims Settlement Declaration"), the Tribunal has jurisdiction over the following categories of claims:

(a) claims of nationals of the United States against Iran and claims of nationals of Iran against the United States;
(b) official claims of the United States and Iran against each other arising out of contractual arrangements between them for the purchase and sale of goods and services;
(c) certain disputes as to the interpretation or performance of any provision of [the Algiers Declarations].
The term "Iran" is defined as follows in Article VII, paragraph 3, of the Claims Settlement Declaration:

"Iran" means the Government of Iran, any political subdivision of Iran, and any agency, instrumentality, or entity controlled by the Government of Iran or any political subdivision thereof.

In accordance with an order issued by the Tribunal, the Government of Iran and NIOC submitted on 30 April 1982 a Preliminary Statement of Defence on the issue of jurisdiction. The Government of Iran and NIOC asserted in this Statement of Defence that none of the claims brought by Oil Field of Texas ("Oil Field") are within the jurisdiction of the Tribunal, since these claims are not attributable to the Government of Iran or NIOC but lie solely against OSCO, a registered private joint stock company in Iran. Respondents contend that NIOC is not a branch of the Government or a political subdivision thereof, that neither the Government of Iran nor NIOC exerted control over OSCO and that, consequently, OSCO does not fall within the definition of "Iran" in Article VII, paragraph 3, of the Claims Settlement Declaration.

In an order dated 6 May 1982 Chamber One of the Tribunal - the Chamber to which this case is assigned - decided to relinquish jurisdiction to the Full Tribunal for the limited purpose of hearing and deciding the jurisdictional issues raised in the Preliminary Statement of Defence of 30 April 1982.

Following an order by the Tribunal, Claimant has submitted a Memorial in response to the Preliminary Statement of Defence. NIOC has filed a Reply Memorial on 19 July 1982. The parties presented their oral arguments at a Hearing before the Tribunal on 26-28 July 1982.

The issues thus presented by the parties, which they have referred to as jurisdictional issues, involve also the question of NIOC's liability for the claims.

Claimant has submitted the following alternative arguments in support of its contention that NIOC is liable for OSCO's contractual obligations

and that the Tribunal has jurisdiction over the claims based on contract:

(1) OSCO acted as an agent of NIOC in connection with incurring the obligations at issue in the instant case;
(2) OSCO was controlled by NIOC;
(3) NIOC is the successor to debts and obligations incurred by OSCO; and
(4) NIOC's denials of liability are inconsistent with its prior conduct.
Claimant asserts that in the event the Tribunal does not find that it has jurisdiction over the claims based on the contracts entered into by OSCO on the basis of any of these arguments, NIOC would be liable under other theories, such as unjust enrichment, because NIOC received substantial benefits from the contracts.

OSCO - a brief historical and legal background

In March 1951 the Iranian Parliament enacted legislation nationalizing the Iranian oil industry. Later, following a coup d'etat in Iran, a number of major multinational oil companies formed an Oil Consortium, which signed an Agreement ("the 1954 Agreement") for the exploration, production, refining and exportation of Iranian oil.

The 1954 Agreement provided for the creation by the Consortium members of two operating companies, Iranian Oil Exploration and Producing Company ("IOEPC") and Iranian Oil Refining Company ("IORC") to be incorporated under the law of the Netherlands. Their respective functions were to carry out exploration, production, refining, transportation and other operations specified in the Agreement. The 1954 Agreement provided that the Consortium would fund all activities of IOEPC and IORC and that the Consortium members would jointly and severally guarantee the performance of the operating companies.

In 1973 the 1954 Agreement was replaced by a new agreement ("the 1973 Main Agreement"). The preamble of the 1973 Main Agreement states:

Iran is determined that the right of full and complete ownership, operation and control in respect of all hydro-carbon reserves, assets and administration of the petroleum industry shall be exercised by NIOC.

NIOC is an Iranian joint stock company which was incorporated by statute in Iran on 29 April 1951. All NIOC's shares are, and have always been, owned by the Government of Iran. NIOC was established in order to exercise the ownership right of the Iranian nation in the oil and gas resources throughout the country and in the continental shelf and to be responsible for the exploration, development, production, exploitation and distribution of petroleum and petroleum products both within and outside Iran. The Iranian Ministry of Oil has subsequently assumed certain of NIOC's functions.

The 1973 Main Agreement ended the role of IOEPC and IORC, and provided for NIOC to operate and manage all oil-related operations.

This Agreement also required the Consortium members to form a "Service Company". That Service Company, OSCO, was to be formed as a non-profit, Iranian joint stock company. The relevant Articles of the 1973 Main Agreement provide:

## ARTICLE 11

A. NIOC shall provide all capital and other funds required for required for the purpose of all operations provided for in this Agreement.
B. The Trading Companies [companies exercising the rights and obligations of the Consortium Members relating to the purchase and resale of crude oil] shall advance to NIOC by way of pre-payment for crude oil to be purchased by them, a proportion of the funds required by NIOC for annual budgeted capital expenditure, relating to the operations under this Agreement, and any revisions thereto, approved and issued by NIOC in accordance with Article 16 for each year in accordance with procedures agreed between the Trading Companies and NIOC.
C. The amount of such advance for each year by the Trading Companies shall be 40 per cent of such funds as are required by NIOC for such capital expenditure. The Trading Companies shall have the option to vary the proportion from time to time upon giving two years' prior written notice to NIOC, but no notice to vary the proportion shall be given to take effect earlier than five years after Effective Date.
D. Each annual advance made by the Trading Companies under Section B above shall be set-off against any sums due from them in respect of subsequent sales of crude oil by NIOC in equal annual instalments over a period of ten years following the year in which such advance was made, in accordance with procedures agreed between the Trading Companies and NIOC.

## ARTICLE 16

A. For the purpose of developing the programmes and budgets in respect of the operations to be carried out under this Agreement:
(1) during November of each year the Consortium Members shall submit to NIOC their offtake requirements of each grade of crude oil for the next year but one, and their estimated offtake requirements of each grade of crude oil for each of the four subsequent years;

(2) during December of each year NIOC and the Consortium Members shall meet for consultation concerning a provisional Exploration and Capacity Development Plan for the five years referred to in paragraph (1) above.
D. During the term of the Service Contract referred to in Article in Article 17 NIOC shall entrust to the Service Company the duty of working out the detailed programmes and budgets provided for in this Article as directed and controlled by NIOC. Such programmes and budgets shall be submitted for final approval to NIOC and shall become operative after such approval.

## ARTICLE 17

A. The Consortium Members shall cause a Service Company to be formed in Iran as a non-profit private joint stock company to carry out operations as assigned to it by NIOC in accordance with a Service Contract to be entered into with NIOC. The Service Contract shall have an initial term of five years. It shall continue in effect thereafter subject to termination by either party on two years' prior written notice.
B. NIOC shall provide as necessary to the Service Company in accordance with the provisions of the Service Contract all capital and other

funds to enable the Service Company to carry out the operations assigned to it.

On 2 July 1973 OSCO was incorporated as an Iranian corporation. Its Statutes provide that the object of the Company in its capacity as contractor to NIOC, and in accordance with the terms and provisions of the service contract between NIOC and OSCO, is to implement the relevant provisions of the 1973 Main Agreement, relating to exploration, development and production of petroleum and petroleum products and the processing operations and transportation of such products. The capital of the company is fixed at 1 million Rials. All shares are, and have always been, owned ultimately by the Consortium members.

The Statutes also provide that Ordinary General Meetings of the Company shall be held at least once a year and that Extraordinary General Meetings may be called at any time by inter alia a decision of the Board of Directors.

According to the Statutes the Ordinary General Meetings shall have authority to act on the following: to hear reports and the proposals relating to the Company's financial status and the annual balance sheet; to fix the remuneration of the Directors, Inspector and Auditors; to effect the election of the Directors, the Inspector and the Auditors; to nominate the Chairman and Managing Director and the Vice Chairman and Deputy Managing Director from amongst the Directors.

At an Extraordinary General Meeting the shareholders shall have authority to decide upon the modification of the Statutes, any increase in the capital of the Company, the winding up of the Company or the alteration of its name, and any matter not within the authority of the Ordinary General Meeting.

As to the votes of the shareholders at General Meetings the Statutes provide that each shareholder, whose name appears in the Register of shareholders 21 days before the date of a meeting, shall have one vote for each share registered in his name. The vote of the holders of a majority of shares is required for adoption of resolutions at General Meetings.

The Board of Directors shall consist of not less than four and not more than seven members who shall be elected by the General Meetings. According to the Statutes the Board of Directors is the fully authorised body and legal representative of the Company to manage and conduct its business at all times without any limitation.

Pursuant to Article 17(A) of the 1973 Main Agreement, NIOC entered into a service contract with OSCO dated 19 July 1973 ("the 1973 Service Contract"). The preamble of this contract states in part:

WHEREAS NIOC as owner and operator in the Area defined in the Main Agreement desires to avail itself of the services of the Service Company for the conduct of operations in the Area, and whereas for the purpose of ensuring such operations are carried out with the greatest expedition and efficiency, during the terms of this Contract, the parties have entered into this Contract ....

The relevant provisions of the 1973 Service Contract read as follows:

## ARTICLE 2: Operations

NIOC hereby assigns to the Service Company, such operations under the Main Agreement as relate to exploration, development and production of crude oil and natural gas and to NGL processing operations as well as to transportation to and loading at the relevant loading terminals of crude oil, bunker fuel and NGL products (hereinafter referred to as "the Operations"), with the exception of the functions in relation to the Operations carried out by NIOC prior to the effective date of this Contract.

The Service Company, as a contractor, shall carry out the Operations in accordance with good oil industry practice and sound engineering principles on behalf of and under the overall direction and control of NIOC.

## ARTICLE 3: Planning and Budgeting

The Service Company shall, upon the receipt and within the limits of NIOC's directives given in accordance with Article 16 of the Main Agreement, work out for NIOC's approval, detailed programmes and budgets for the Operations as well as expansions and development thereof.

Programme and budget proposals developed by the Service Company in accordance with NIOC's directives with any alternative solutions shall be submitted to NIOC for selection and approval. Budget proposals and any revisions thereof shall be implemented by the Service Company when approved by NIOC.

NIOC may in preparing for programmes, plans and budgets require the Service Company to carry out through consultants or sub-contractors such studies or investigations as may be required by NIOC to assist in developing forward planning.

## ARTICLE 4: Engagement of Contractors and Consultants
Materials Agency

The Service Company shall take over all contracts with contractors and consultants engaged in the Operations at the effective date of this Contract, or as soon as possible thereafter, to the extent to which the said contractors or consultants are so willing.

Within the budgets approved by NIOC, the Service Company may award contracts to sub-contractors and consultants and purchase and administer materials in accordance with the procedures in use in respect of operations within the Area at the effective date of this Contract, or with any amendments thereto, or any alternative procedures that may be agreed from time to time between the parties hereto.

## ARTICLE 6: Personnel

REPRINTED IN: 1-1

The Service Company shall take over the contracts of service of all those persons employed in the Operations at the effective date of this Contract, who are willing to enter into the service of the Service Company on the terms of their said respective contracts at that date. Thereafter personnel will be selected by the Service Company and employed subject to the rules and regulations of the Service Company, which rules and regulations will be co-ordinated from time to time with those of NIOC.

The Service Company shall prepare in consultation with NIOC plans and programmes for industrial and technical training and education of employees of the Service Company as appropriate and shall be responsible to NIOC for the execution of those plans and programmes.

ARTICLE 7: Personnel and Accounting Policy and Procedures

The Service Company shall adopt personnel policies and procedures and accounting methods and procedures consistent with those relating to the Operations and in use at the effective date of this Contract, in accordance with amendments thereto, or any alternative procedures that may be agreed from time to time between the parties hereto.

ARTICLE 8: Services by NIOC

Housing facilities, medical care and other amenities to the extent required by the Service Company for its personnel and their dependents, shall be provided by NIOC. The parties shall consult with one another from time to time as necessary on the provision by NIOC of these services for the Operations.

ARTICLE 10: Costs; Funding; Account: Auditors:

The Service Company shall carry out its duties under this Contract without profit, and all costs and expenses incurred by the Service Company shall be on behalf and for the account of NIOC. The Service Company shall deliver to NIOC in respect of each year (and monthly on a provisional basis) accounts of such costs, in a form to be agreed with NIOC.

NIOC shall provide all capital and other funds required by the Service Company in performing this Contract and the parties will agree on a cash call procedure for the implementation of this funding.

The principal books and accounts of the Service Company shall be kept in U.S. Dollars and for this purpose any conversion from any currency other than U.S. dollars which may be required shall be made in accordance with Article 22 of the Main Agreement.

NIOC shall appoint an internationally recognised firm of Chartered Accountants to carry out an audit in respect of each year of the books and accounts of the Service Company and to certify the accounts delivered to NIOC in accordance with this Article. Notwithstanding this provision the Service Company shall have the right to employ and appoint auditors for its own purposes.

In addition, Article 5 of the 1973 Service Contract provides that OSCO shall contract with Iranian Oil Service Company Limited ("IROS"), a company incorporated under the laws of the United Kingdom. IROS would according to the same article provide services related to the procurement, inspection and expediting of materials and such administrative and technical services as OSCO may require to be performed outside Iran.

Reasons

The Statement of Claim originally filed by Claimant also named OSCO as one of the Respondents in this case. However, at the Hearing on 26-28 July 1982 Claimant clarified its position in this respect. As Claimant has eventually defined its position, it raises no monetary claim against OSCO and seeks consequently compensation for its loss and expense only from the Government of Iran and NIOC. Thus, the Tribunal does not have to decide the issue of whether it has jurisdiction over a claim against OSCO on the alleged ground that OSCO was at the relevant times an entity controlled by the Government of Iran within the meaning of Article VII, paragraph 3, of the Claims Settlement Declaration.

It remains, however, for the Tribunal to decide whether NIOC is an entity controlled by the Government of Iran within the meaning of that article.

Respondents do not admit that NIOC is such an entity and have consequently left to the Tribunal to decide this question.

The record in this case shows that NIOC was incorporated by statute in 1951, that all NIOC's shares are, and have always been, owned by the Government of Iran, that NIOC according to its Statutes has been established in order to exercise the ownership right of Iran in its oil and gas resources and to be responsible for the exploration, development, production, exploitation and distribution of petroelum and petroleum products within and outside Iran and finally that the Iranian Ministry of Oil has now assumed certain of NIOC's functions.

Furthermore, according to the Statutes, the shareholder shall be represented at the General Meetings of the company by the Prime Minister and six other cabinet ministers.

Consequently, it is obvious that NIOC is, and was at all relevant times, totally controlled by the Government of Iran. In view of the above-mentioned purpose of the company and other available information it is also clear that NIOC is one of the instruments by which the Government of Iran conducted and currently conducts the country's national oil policy. It is therefore equally clear that NIOC is an agency or instrumentality controlled by the Government of Iran.

As to the question of liability Claimant first contends that NIOC is liable for OSCO's contractual obligations because OSCO acted as an agent of NIOC in connection with incurring the obligations at issue in the instant case.

In support of this contention Claimant asserts that general principles of commercial law should govern NIOC's liability and that these principles mean that NIOC must be held responsible, as OSCO's principal, for debts and obligations under the Lease Agreement. Claimant argues that a number of provisions in the 1973 Main Agreement, the 1973 Service Contract and the Lease Agreement itself indicate that OSCO acted as NIOC's agent.

Lastly, Claimant argues that OSCO's status as an agent of NIOC was confirmed by the so-called "Fidelity Affidavit" that Oil Field and other companies entering into contracts with OSCO were required to complete. This affidavit form required Oil Field to acknowledge that it was engaging in business activities "with, for, or involving the Imperial Government of Iran."

Respondents deny that the relationship between NIOC and OSCO is governed by general principles of commercial law and argue that the question as to whether NIOC is liable to Claimant as OSCO's principal is to be determined by reference to Iranian law. Further, Respondents argue that under Iranian law the relationship between NIOC and OSCO is one of employer and contractor and cannot be categorized as one of principal and agent.

OSCO was established to serve the needs of both NIOC and the oil companies. Its direction was shared, and the benefits of its activities accrued to both groups. It was a unique organization made possible because it served the separate, and certainly not always common, interests of NIOC and the companies. This unique duality, in turn, adds to the difficulty of determining the question of agency.

It is correct that some provisions in the 1973 Main Agreement and the 1973 Service Contract, as pointed out by Claimant, state that certain of OSCO's operations were carried out on behalf of NIOC. Article 17(A) of the 1973 Main Agreement required the creation of OSCO "to carry out operations as assigned to it by NIOC". Article 2 of the 1973 Service Contract provides that the operations assigned to OSCO were expressly required to be carried out "on behalf of and under the overall direction and control of NIOC". Article 10 of the same contract contemplates that all of OSCO's costs and expenses were incurred "on behalf and for the account of NIOC".

The fact that OSCO was required to act on behalf of NIOC is not inconsistent with the role of independent contractor. Indeed, it is in the very nature of contractors to perform services at another's behest and to obtain a benefit for another. While the phrase "on behalf of" is often used as a short-hand indication of agency, especially in the signing of instruments, it can also connote that an action is being taken in the interest or for the benefit of another. In the text of a contract, this second meaning is as likely, if not more likely, than the first. Therefore, the use of this and similar language cannot be deemed inconsistent with independent contractorship.

Furthermore, it has to be noted that Article 2 of the 1973 Service Contract at the same time refers to OSCO as NIOC's contractor and that Article 3 of the same agreement provides that NIOC in preparing for programmes, plans and budgets may require OSCO to carry out through consultants or sub-contractors such studies and investigations as may be required by NIOC to assist in developing forward planning. Similarly, Article 4 provides that OSCO may award contracts to sub-contractors and consultants. Thus, the 1973 Service Contract refers to OSCO as NIOC's contractor and to OSCO's contract partners for the provision of services and goods for the operations relating to exploration,

development and production of crude oil and natural gas as OSCO's sub-contractors. These formulations do not support Claimant's contention that OSCO concluded the contracts on NIOC's behalf as NIOC's agent.

The Lease Agreement does not contain any clear indication that it was entered into by OSCO as agent on NIOC's behalf. On the contrary, the agreement was signed by a representative of IIROS, who expressly indicated in the agreement that he signed the contract for and on behalf of OSCO.

Lastly, the fact that Oil Field was required to complete and submit the Fidelity Affidavit does not suggest an agency relationship. By its terms, the Fidelity Affidavit merely recites the fact that Oil Field's services related to activities "with, for or involving" the Government. That the Government, through NIOC, was involved in and benefited by the business of oil extraction was obvious. However, no inference can be drawn from this fact which would shed any light on OSCO's specific role.

Thus, the Tribunal holds that Claimant has not submitted sufficient evidence to prove that OSCO acted as an agent of NIOC. On balance, the provisions of the 1973 Service Contract and the Lease Agreement rather indicate that OSCO acted as a contractor when entering into the Lease Agreement.

Claimant also asserts that NIOC is liable for OSCO's contractual obligations because OSCO was controlled by the Government of Iran.

The Tribunal therefore has to decide whether the extent of control exercised by NIOC, if any, is sufficient to make NIOC directly liable for OSCO's contractual obligations on an alter ego or identity theory. Claimant refers to Article 16(D) and Articles 17(A) and (B) of the 1973 Main Agreement and Articles 2, 3, 6, 7 and 10 of the 1973 Service Contract to demonstrate that OSCO from its creation was controlled by NIOC.

It is indisputable that NIOC as a result of the above-mentioned provisions in the 1973 Main Agreement and the 1973 Service Contract exercised a considerable influence over OSCO's finances and operations. However, the question of NIOC's control over OSCO must be viewed in a wider perspective.

It has to be borne in mind that the Consortium members owned, and have always owned, all shares in OSCO. OSCO's Statutes do not in any way restrict the rights that normally flow from the holding of capital stock in a company. Thus, the Consortium members had inter alia the right to elect the Board of Directors and to nominate the Chairman and Managing Director and the Vice Chairman and Deputy Managing Director from amongst the Directors. Consequently, there can be little doubt that it was the Consortium members who ultimately conducted the operations of the company. The influence exercised by NIOC over OSCO which NIOC exercised on the basis of the terms of this contract was - although of a therefore of a contractual nature. The influence over OSCO which NIOC exercised on the basis of the terms of this contract was - although of a far-reaching nature - not in principle different from the influence exercised over any independent contractor by its customer, if the contractor has been set up to serve, and in practice serves, the needs of one single or dominating customer. Respondents have also referred to a Memorandum dated 8 May 1974 by Mr. R. Milne, then Managing Director of OSCO, to the Consortium members. This Memorandum shows

that the Consortium members regarded OSCO as an instrument by means of which they could assert a certain influence over NIOC's operations. The Tribunal therefore concludes that the influence that NIOC exercised over OSCO on the basis of the 1973 Main Agreement and the 1973 Service Contract falls far short of such a total control by one company over another which might have as a consequence that the controlling company is liable for the obligations of the controlled company.

Further, Claimant contends that NIOC is liable for OSCO's contractual obligations because NIOC is the successor to debts and obligations incurred by OSCO.

Respondents have denied that NIOC is OSCO's legal successor. They argue that the relationship between NIOC and OSCO falls to be determined in accordance with Iranian law and that under Iranian law NIOC is not OSCO's legal successor, nor has OSCO merged with NIOC. Respondents also deny the existence of any general principle that a legal successor must assume the liabilities as well as the assets of its predecessor.

Respondents add that by early 1979 the expatriate employees of OSCO had left Iran. Although NIOC did not take over the day to day management of OSCO, inevitably, in the absence of its contractor (OSCO), NIOC took steps to discharge its duties and obligations conferred on it under Iranian law and its own Statutes and began to operate the oil fields. These were operations for which NIOC was responsible under its Statutes and which were contracted to OSCO under the 1973 Main Agreement. The withdrawal of OSCO's expatriate personnel in Iran as of December 1978 rendered OSCO incapable of performing its obligations under the 1973 Service Contract. In the absence of the contractor, NIOC had no alternative but to take steps itself.

Claimant does not contend that NIOC succeeded OSCO as a result of a formal corporate merger or succession in accordance with Iranian law.

There is, however, quite apart from Respondents' own contention that NIOC had to operate the oil fields, overwhelming evidence submitted in this case proving that NIOC as from March 1979 gradually assumed control over OSCO's personnel and oil field operations and took over the contracts entered into by OSCO with sub-contractors and consultants for these operations:

1. Of particular interest in this respect is a letter dated 10 March 1979 from Mr. Hassan Nazih, then Chairman of NIOC, to the Consortium members. In this letter NIOC announced the termination of the 1973 Main Agreement and of NIOC's own relationship with OSCO. The letter then goes on to say:

2. In our future operations, there will be no place for OSCO, nor for the large number of expatriate personnel who used to work for it. Expatriate personnel for secondment or direct employment by us, has [sic] already been advised as per our telex JR28 dated 22nd. January 1979 and subsequent telexes.

4. All Iranian personnel employed in the operations by OSCO shall be transferred to NIOC under the terms and conditions of the contracts with OSCO.

5. NIOC is willing to take over all contracts which contractors and consultants entered into by OSCO for its operations under the present

arrangements.

2. In a circular dated 3 March 1979 NIOC announced that it was necessary gradually to "merge" the present organizations and operations of NIOC and OSCO at Abadan and in the fields.

3. In another circular dated 22 July 1980 the Ministry of Oil states:

From the First of Mordad 1359 [23 July 1980] the Tehran office - NIOC-Fields (the former Iran Oil Services Company) shall be closed down and its subject units merged with the relevant units of the National Iranian Oil Company.

4. In a telex sent in late March 1979 to sixteen companies, NIOC represented itself as a party to all contracts entered into by OSCO. This telex states:

We are requested to inform you that Mr. Esmail Fakhraie has been appointed as Manager Drilling and that he will be the Company representative in all OSCO contracts related to drilling effective immediately.

We request you to advise your interested associated companies, subsidiaries and sub-contractors of this appointment.

5. Letters sent by NIOC to a number of companies that had entered into contracts with OSCO show that NIOC made payments under these contracts to the companies concerned.

6. NIOC also sent a number of letters to various companies directing these companies to perform activities under contracts entered into by OSCO.

7. NIOC sent letters to companies that had entered into contracts with OSCO in which NIOC asserted purchase option rights under these contracts.

8. Similarly, in other letters NIOC asserted certain rights of termination under various contracts entered into by OSCO.

9. In a settlement agreement regarding certain disputes with an American company dated 30 August 1979 NIOC expressly admitted in the preamble of the agreement that it had taken over OSCO's role under the contract concerned.

10. Finally, the Government of Iran has explicitly represented to the Tribunal in two cases filed against Chase Manhattan Bank of New York, and Reading & Bates Offshore Drilling Company (Claims Nos. 576 and 580) that NIOC is the legal successor to OSCO.

From the inception of OSCO in 1973, its relations with NIOC were, as stated above, of a complex nature and the circumstances in this case are unique. Not surprisingly, these circumstances do not fall clearly within well developed and discussed doctrines of law. The controlling rules have therefore to be derived from principles of international law applicable in analogous circumstances or from general principles of law. The development of international law has always been a process of applying such established legal principles to circumstances not previously encountered.

The evidence in this case shows that performance of the tasks assigned by NIOC to OSCO was not abandoned after 1979, but was instead undertaken directly by NIOC itself, with OSCO personnel and within an organisational framework previously created in many instances by OSCO. The factual circumstances of NIOC's assumption of control over OSCO's personnel and operations and its taking over of the contracts with sub-contractors and consultants resulted in NIOC's de facto succession to OSCO's rights and obligations with respect to these sub-

contractors and consultants.

As to the legal consequences of this de facto succession it should be pointed out that NIOC since the creation of OSCO in 1973 through the cash call procedure provided for in Article 10 of the 1973 Service Contract invariably had provided OSCO with the funds necessary in order to meet OSCO's contractual obligations. It can be assumed that those doing business with OSCO relied on the fact that NIOC would continue to provide those funds to OSCO through the cash call procedure. From the point of view of general principles of law it would be difficult to accept that the de facto succession which took place would have as a consequence that NIOC could totally escape its previous obligation to provide the funds necessary to meet the contractual liabilities arising out of contracts entered into by OSCO for the provision of services and goods regarding operations relating to exploration, development and production of crude oil and natural gas. The fact that no formal corporate merger or succession in accordance with Iranian law took place between the companies does not alter this conclusion. Rules in national law on merger and succession normally contain provisions in order to safeguard the interests of the creditors of the company which ceases to exist. If a de facto succession of rights and obligations in a certain field has taken place without the observance of such rules under the applicable national law, it is even more important to establish a rule under international law that such succession must have as a consequence that the surviving company is under an obligation to pay appropriate compensation taking into account all the circumstances of the case.

The Tribunal holds that in this and all similar cases before the Tribunal the task of determining the extent and the amounts of NIOC's liability should be left to the respective Chamber since such issues will best be resolved at the Hearing of the merits of the case.

For the reasons given above

THE TRIBUNAL concludes as to the issues raised in the Preliminary Statement of Defence of 30 April 1982

that NIOC is the de facto successor to OSCO's rights and obligations and that the Tribunal has jurisdiction over Oil Field's claims.

The case is referred back to ychamber One for further proceedings.

The Hague, 7-8 December 1982

Gunnar Lagergren
(President)

Pierre Bellet

Nils Mangard

Mahmoud M. Kashani
Dissenting opinion

Howard M. Holtzmann
Concurring opinion

Shafie Shafeiei
Dissenting opinion

George H. Aldrich

Richard M. Mosk
Concurring opinion

Mostafa Jahangir Sani
Dissenting opinion

**Concurring Opinion Of Richard M. Mosk With Respect To
Interlocutory Award**

I concur in the result of the decision of the majority of the Tribunal holding that the Tribunal has jurisdiction over the claim of Claimant Oil Field of Texas Inc. ("Claimant" or "Oil Field") and holding that Claimant has alleged facts sufficient to constitute a valid claim that Respondent National Iranian Oil Company ("NIOC") is liable to Claimant for obligations arising out of transactions involving Oil Services Company of Iran ("OSCO"). [1] I agree with the majority opinion that if OSCO was not the agent of NIOC, NIOC is liable for the debts of OSCO as its successor. In my view, NIOC, as OSCO's successor, is liable for obligations under contracts executed by OSCO, such as the one to which Oil Field is a party. Unlike the majority, I would hold that NIOC is liable under the alternative theory that OSCO executed the contract with Claimant on behalf of and as agent of NIOC. Also, I do not agree with the majority's analysis of the issue of "control". On the record before the Tribunal, the question of "control" only bears on the issue of agency.

PROCEEDINGS AND ISSUES

On November 16, 1981, Oil Field filed its claim against Iran, NIOC and OSCO seeking compensation for amounts allegedly unpaid for

equipment leased, equipment sold, destroyed leased equipment, and unreturned equipment and for interest on unpaid amounts and costs.

Claimant's claims are based upon a variety of theories. Claimant alleges that Iran and NIOC have, in effect, seized control of and expropriated Claimant's property; have prohibited the performance of OSCO's contract obligations and have therefore taken or expropriated Claimant's contractual rights; have prevented Claimant from enforcing its contractual rights; and have wrongfully and tortiously interfered with Claimant's contractual relationship with OSCO. Claimant has also asserted that NIOC and Iran are liable because OSCO acted as NIOC's agent or because NIOC is OSCO's successor or because NIOC and Iran have been unjustly enriched.

On February 23, 1982, the Agent of the Islamic Republic of Iran, in a letter to the Tribunal, stated that these claims are not within the Tribunal's jurisdiction because of a "complete separation of the personality of OSCO" from Iran and its agencies or instrumentalities. He alleged that this "separation" existed because OSCO's stock was held by a consortium of international oil companies rather than by Iran or NIOC. The Iranian Agent requested that Iran be permitted to "submit its pleas as to the separation of personality [of OSCO] and the claimants' lack of standing to sue the Islamic Republic of Iran and/or companies affiliated to the Ministry of Petroleum on behalf of OSCO, without entering into the points of merit."

By an order dated March 15, 1982, Chamber 1 -- the chamber to which this case is assigned -- directed that Respondents in this case and those in other cases file, on or before April 30, 1982, statements of defense "on the issues of jurisdiction." Similar orders were issued in cases by Chambers 2 and 3.

On April 30, 1982, Iran and NIOC filed their Statement of Defense concerning jurisdiction in this case. Iran and NIOC filed virtually identical Statements of Defense in 19 other cases. In these Statements of Defense, Iran and NIOC denied liability on any ground for debts and obligations incurred by OSCO and sought "a declaration by the Tribunal that to the extent that the Claims seek to make NIOC and/or Iran liable for the obligations of OSCO, the Claims are outside the jurisdiction of the Tribunal."

On May 6, 1982, Chamber 1 issued an order in this case "relinquish[ing] jurisdiction to the Full Tribunal . . . for the limited purpose of hearing and deciding the jurisdictional issues raised in the Preliminary Statement of Defense...." By its order dated May 7, 1982, the Tribunal directed Oil Field "to file a brief with the Tribunal by June 8, 1982, addressing itself to the jurisdictional issue."

In its memorial, Claimant asserted that the question presented was, "[d]oes the Tribunal have jurisdiction over those claims of Oil Field related to the Lease Agreement?"

Respondent in its memorial asserted that "[t]he OSCO issue is therefore the jurisdictional question: does the Tribunal have jurisdiction over claims filed with it which are either against OSCO as Respondents or are against Iran and/or NIOC as Respondents on the basis that they are/were jointly or individually liable for the obligations of OSCO?"

REPRINTED IN: 1-1

During the hearing, which was held on July 26-28, 1982, Counsel for Oil Field asserted that it was not then pursuing a claim against whatever presently remained of the entity OSCO, but rather was proceeding on claims against NIOC and Iran arising out of an agreement executed by Oil Field and OSCO.

Unfortunately the Tribunal and the parties intertwined issues of jurisdiction and of liability. There never was a serious question of jurisdiction. The Tribunal and the parties all share responsibility for the confusion caused by initially framing the issues as jurisdictional and then expanding into issues of liability.

The majority has discussed what it perceives to be three issues (none of which relates to jurisdiction): (1) whether OSCO executed the lease agreement with Oil Field as an agent of NIOC so as to impose liability thereunder upon NIOC; (2) whether NIOC is liable for OSCO's contractual obligations by virtue of NIOC's control over OSCO; and (3) whether NIOC is liable for OSCO's contractual obligations as a successor to the debts of OSCO.

Claimant has based its claim on a number of theories, some of which are not grounded on agency, control or succession. In this respect, Claimant has alleged that Iran and NIOC expropriated its property and its contract rights and tortiously interfered with its contract rights and that Iran breached the 1955 Treaty of Amity, Economic Relations, and Consular Rights between The United States of America and Iran, 8 U.S.T. 899, 284 U.N.T.S. 93, by, inter alia, not providing effective means of enforcement of contractual rights. Claimant has also asserted that to the extent it could not recover under its contract, it had an alternative claim for unjust enrichment.

The majority, however, only deals with whether NIOC and Iran are liable to Claimant under the OSCO-Oil Field lease agreement by virtue of three alternative theories -- agency, control and succession. The majority's opinion, by not dealing with Claimant's other theories, presumably leaves Claimant and other claimants free to pursue claims under such other theories.

FACTS

Prior to 1951, the Anglo-Iranian Oil Company, an English company, was the sole concessionaire of Iran's oil properties and was generally responsible for the exploration, production, refining, and transportation of Iranian oil. In 1951 Iran nationalized its oil industry, and the Government of Iran founded the National Iranian Oil Company to operate the nationalized oil industry. All of the shares of stock of NIOC have been owned by Iran.

In 1954, Iran and NIOC entered into an agreement with eight major oil companies -- a "consortium" of American and European oil companies ("Consortium"). Under the agreement Iran granted the Consortium exploration, drilling, refining, and transportation rights with respect to oil in a specified sector of Iran. Furthermore, the agreement called for the establishment by the Consortium of two operating companies. The first, Iranian Oil Exploration and Producing Company ("IOEPC"), was to explore for and produce oil; the second, Iranian Oil Refining Company

("IORC"), was to operate a refinery.

In 1973, the parties replaced the 1954 agreement with a new agreement ("1973 Main Agreement") whereby NIOC took over control of all exploration, extraction and refining activities in Iran. Since NIOC desired the type of technical assistance previously provided by IOEPC and IORC, the 1973 Main Agreement required the Consortium members to form a "Service Company." That "Service Company" was to be formed as a non-profit Iranian joint stock company to "carry out operations as assigned to it by NIOC in accordance with a Service Contract to be entered into with NIOC." Under the 1973 Main Agreement, NIOC was to fund [2] and control [3] the "Service Compan's" operations.

Pursuant to the 1973 Main Agreement, the Consortium formed the "Service Company", OSCO, as an Iranian nonprofit corporation, [4] which then entered into the service contract with NIOC ("1973 Service Contract"). All of the issued shares of OSCO, except nominal qualifying shares required by Iranian law to be held by the directors of OSCO, were owned by Iranian Oil Participants Limited ("IOPL"), a company incorporated in England. The Consortium members owned all of the issued shares of IOPL.

Also in 1973 NIOC entered into an agreement with Iranian Oil Services Limited, ("IROS"), the shares of which were owned by the Consortium but which was to act "outside Iran for NIOC's operations at Abadan Refinery." Under the 1973 Services Contract, OSCO was to contract with IROS to obtain materials and services outside Iran.

The preamble to the 1973 Service Contract referred to NIOC as the "owner and operator" of, in essence, the Iranian oil industry. Provisions of the 1973 Service Contract indicated NIOC's control over OSCO's activities and funding. In this connection it is important to set forth the following specific provisions of the 1973 Service Contract:

Article 2: Operations

The Service Company, as a contractor, shall carry out the Operations in accordance with good oil industry practice and sound engineering principles on behalf of and under the overall direction and control of NIOC.

Article 3: Planning and Budgeting

The Service Company shall, upon the receipt and within the limits of NIOC's directives given in accordance with Article 16 of the Main Agreement, work out for NIOC's approval, detailed programmes and budgets for the Operations as well as expansions and development thereof.

Programme and budget proposals developed by the Service Company in accordance with NIOC's directives with any alternative solutions shall

be submitted to NIOC for selection and approval. Budget proposals and any revisions thereof shall be implemented by the Service Company when approved by NIOC.

NIOC may in preparing for programmes, plans and budgets require the Service Company to carry out through consultants or sub-contractors such studies or investigations as may be required by NIOC to assist in developing forward planning.

Article 4: Engagement of Contractors and Consultants,
Materials Agency

Within the budgets approved by NIOC, the Service Company may award contracts to sub-contractors and consultants and purchase and administer materials in accordance with the procedures in use in respect of operations within the Area at the effective date of this Contract, or with any amendments thereto, or any alternative procedures that may be agreed from time to time between the parties hereto.

Article 10: Costs; Funding; Accounts; Auditors

The Service Company shall carry out its duties under this Contract without profit, and all costs and expenses incurred by the Service Company shall be on behalf and for the account of NIOC. The Service Company shall deliver to NIOC in respect of each year (and monthly on a provisional basis) accounts of such costs, in a form to be agreed with NIOC.

NIOC shall provide all capital and other funds required by the Service Company in performing this Contract and the parties will agree on a cash call procedure for the implementation of this funding.

Thus, as set forth in the 1973 Main Agreement, the 1973 agreements fulfilled Iran's determination "that the full and complete ownership, operation and control in respect of all hydrocarbon reserves, assets and administration of the petroleum industry shall be exercised by NIOC...." [5] The Consortium still had rights to purchase and sell Iranian Oil.

The former Chairman of the Board and Managing Director of OSCO, George H. Link, submitted an affidavit in which he stated that NIOC's approval was required or obtained for all of OSCO's major projects and plans, OSCO's budgets, various "commitments for expenditures" by OSCO, OSCO's list of approved bidders on contracts over $1 million and the awarding of contracts to such bidders, recommendations concerning bid lists and the awarding of contracts to bidders, the awarding of contracts of over 1 million rials (approximately $15,000) and the hiring of expatriates. [6] According to Mr. Link, OSCO owned no realty or equipment; NIOC held title to all such property; and all disbursements of funds by OSCO were made through "cash calls" from OSCO to NIOC since OSCO had no money of its own other than what it received from NIOC under these procedures.

Mr. Link also declared that of the 10,000 persons working for OSCO in 1978, about 600 were expatriates. Of these 600 expatriates, 200 were

provided by the Consortium members. He asserted that Iranian nationals held positions at all levels of OSCO, including on its Board of Directors, and that no director or senior manager of OSCO was replaced without consultation with NIOC.

In 1974, Claimant was contacted about the possibility of leasing four blowout preventers and related equipment for use in Iran. Mr. Alan Rauch, the Chairman of the Board of Directors of Claimant, stated in an affidavit, that at that time, he made inquiries as to the relationship between OSCO and NIOC and obtained information about the main features of the 1973 Service Contract. He further stated that Oil Field made an offer to lease equipment to OSCO "only because NIOC appeared to be responsible for OSCO's debts and obligations."

Oil Field and OSCO executed a lease agreement dated February 26, 1975 whereby Oil Field provided equipment for use in Iran ("Lease Agreement"). [7] IROS acted as agent of OSCO in connection with this Lease Agreement. The Lease Agreement did say that it is between Oil Field and OSCO, but the preamble to that Lease Agreement provided that NIOC "has under an international agreement appointed [OSCO] to undertake certain operations in the production and export of crude oil from South Iran." Under the Lease Agreement, OSCO was required to maintain an insurance policy on the leased property, which insurance policy "shall name the Company [OSCO], NIOC and the Contractor [Oil Field] as named insureds thereunder." The Lease Agreement also provided that it "and any legal relationship arising therefrom shall be subject to English law."

In December of 1975, Claimant received a letter from OSCO's London representative referring to the Lease Agreement and stating as follows:

We have to advise you that it is now an Iranian Government requirement that all foreign firms engaged in business activity with the Government of Iran or its related orgainsations [sic], companies and contractors, should complete a duly certified affidavit in accordance with the print enclosed; such affidavit to form part of the contract documents.

The form affidavit provided to Claimant stated that the contractor (i.e. Claimant) "proposes to engage in certain business activities ... with, for, or involving" the Government of Iran. The affidavit (called a "Fidelity Affidavit") dealt with a representation of no improper payments. Oil Field complied with the request by supplying a signed copy of the required affidavit to a consular officer of Iran and to OSCO. According to Claimant, the obligations of the Lease Agreement were fulfilled until the latter part of 1978. Since that time lease payments were delayed and then ceased, amounts for goods remained unpaid, Claimant received no payment for a leased blowout preventer destroyed by fire and leased equipment was not returned.

In late 1978 and early 1979, during the civil unrest which occurred prior to and during the revolution, OSCO's expatriate personnel left Iran.

On March 10, 1979 NIOC wrote to the Consortium that in "3ur future operations, there will be no place for OSCO...." The letter further provided that all "Iranian personnel employed in the operations by OSCO shall be transferred to NIOC under the terms and conditions of the contracts with OSCO" and that "NIOC is willing to take over all contracts with contractors and consultants entered into by OSCO for its operations under the present arrangements."

Indeed, in its memorials NIOC asserted that in order to keep the oil industry functioning, it had "to carry out the operations which had previously been contracted to OSCO by virtue of the Service Contract." Also, a March, 1979 NIOC circular referred to a merger of certain units with "the present organizations and operations at Abadan and the fields" and that certain activities would be under the supervision of a manager of "National Iranian Oil Company (Oil Services Company of Iran (Private Company))."

Thereafter it was announced in a Government circular that "NIOC-Fields (the former Iran Oil Services Company) shall be closed down and its subject units merged with the relevant units of the National Iranian Oil Company ...." [8]

During the Spring of 1979, NIOC began to communicate directly with companies that had contracts executed by OSCO. OSCO had previously carried out such contract-related communications. Initially, correspondence was sent over the signature of NIOC representatives on OSCO stationery. For a brief time thereafter, NIOC officials corresponded on paper without a letterhead. Ultimately, correspondence was either on NIOC stationery or on stationery containing the letterhead, "NIOC-Oil Fields" in Farsi.

NIOC explicitly represented itself to many companies as the party to their contracts executed by OSCO. NIOC caused the following telex to be sent to a number of companies in late March, 1979:

We are requested to inform you that Mr. Esmail Fakhraie has been appointed as Manager Drilling [sic] and that he will be the Company representative in all OSCO contracts related to Drilling effective immediately.

We request you to advise your interested associated companies, subsidiaries and subcontractors of this appointment.

NIOC paid to Oil Field and other companies certain monies due under various contracts executed by OSCO. The payments were made directly to the contracting companies and not through OSCO. NIOC directed various companies to perform activities under contracts executed by OSCO. For example, in a letter dated March 28, 1979, Mr. Fakhraie, signing on behalf of NIOC (but on OSCO stationery), requested Sediran Drilling Co. to mobilize its drilling rigs. NIOC sent an identical request dated March 28, 1979 to Sedco International S.A. Similarly, Compagnie Francaise de Prospection Sismique received a letter dated May 22, 1979, written under a NIOC-Oil Field letterhead, requesting a resumption of seismic operations. Halliburton Ltd. and Dowell Schlumberger received a memorandum from Mr. Fakhraie, dated June 3, 1979, requesting commencement of cementing activities on specified wells.

NIOC asserted purchase option rights under various contracts executed by OSCO. For example, in a letter to Santa Fe International Services, Inc., dated May 14, 1979, Mr. Fakhraie stated:

On the basis of clause 15 of the contract No. 3-75-046-339 dated 15/1/1973 signed between Santa Fe and the Company NIOC would like to exersize [sic] its option to purchase the drilling units currently stacked in Ahwaz.... (Emphasis added).

Similarly, Irano-Reading & Bates reported it received a July 31, 1979 telex providing that:

NIOC is considering to exercise its option to purchase drilling plant under the subject contract. In order to work out accrued depreciations, you are requested to provide NIOC with documentary evidence of the date of purchase of individual units. (Emphasis added).

An Irano-Reading & Bates telex dated August 14, 1979, quoted a letter written by Mr. Fakhraie in which NIOC informed that company that NIOC had "decided to take advantage of its legitimate rights mentioned in Article 14 of the Contract to purchase the drilling rigs." (Emphasis added).

NIOC asserted certain rights of termination under various contracts executed by OSCO. For example, Mr. Fakhraie, in a letter dated March 28, 1979, stated that Irano-Reading & Bates had,

failed to comply with the terms of the abovementioned contract in mobilizing the rest of the rigs. Therefore, in compliance with Article 40 in general and Clause 6-1-40 and 5-140 in particular of the contract, we would like to bring to your attention that effective 6/1/1358 [March 26, 1979] we declare the contract nil [sic] and void.

In a letter dated April 13, 1979, NIOC purported to cancel Sedco International's contract but reserved the "other rights of this company contemplated in the contract mutually agreed upon, in accordance with Article 41 of the contract." (Emphasis added). NIOC sent a similar letter of termination to Sediran dated April 13, 1979. On December 9, 1979, Halliburton received a telex stating that NIOC was terminating "the subject contract and ammendments [sic] with cause without prejudice to our other right contemplated under subject contract." (Emphasis added).

In a number of other contexts, NIOC acknowledged its obligations under contracts executed by OSCO. For example, in a letter to Iranian authorities dated July 22, 1979, a NIOC official stated that Santa Fe's contracts which had been executed by OSCO, were with NIOC:

According to the agreement between Santa Fe and NIOC regarding the equipment which has been imported without payment of customs tax to drill oil wells for NIOC and as per the agreement and future operations of this company, permission to export all rigs stated above has been given under the auspices of NIOC material department. (Emphasis added).

NIOC entered into a settlement agreement with Santa Fe, dated August 30, 1979, in which agreement NIOC expressly admitted having taken over OSCO's activities under Santa Fe's drilling contracts:

WHEREAS, the National Iranian Oil Company has subsequently taken over all activities previously done by The Oil Service Company of Iran (Private Company) as the "Company" under said drilling contracts....

Further, NIOC entered into a settlement agreement with Williams Brothers International Corp., dated October 15, 1979, on NIOC-Oil Fields stationery, covering payments due under a contract executed by OSCO for construction of high pressure gas transmission lines.

All of these activities by NIOC suggest that it, rather than OSCO, had at all times been, or at least became, the real party to the contracts.

Such a suggestion also follows from NIOC's conduct towards Claimant. In June of 1979, NIOC had paid Oil Field for rents due on certain equipment through December 1978. But in July, 1979, Oil Field received a telex from IROS (which had been acting for OSCO and was NIOC's representative in London), stating that "the Islamic Court of Ahwaz has instructed NIOC to stop any payment to Oil Field rentals until further instructions.... " A representative of IROS in London told Claimant to discuss the matter with "Mr. Fakhraie of NIOC."

In 1980, NIOC asked Oil Field to provide details to present a claim for the insurance on the destroyed blowout preventer and even requested that Oil Field waive its rights under the insurance policy in favor of NIOC.

In 1979, NIOC was placed under the authority of, and became affiliated with, the Iranian Oil Ministry. In 1980, Iran purported to "nullify" the 1973 Main Agreement.

In 1982, Iranian entities submitted claims to the Tribunal asserting that NIOC was OSCO's successor.

There is no indication that the entity OSCO has ceased to exist. It appears, however, that since NIOC took over its assets, OSCO has remained as a shell. It could not and did not even pay its former employees. In 1980 IOPL entered into an agreement with IROS to loan monies to IROS "for the purpose of making payments on behalf of Oil Service Company of Iran. . . to certain former OSCO expatriate staff in respect of losses incurred by them and credit balances on their personal accounts." This agreement, which was not executed by OSCO, was to take effect, inter alia, when "the delivery [was made] to IOP[L] by OSCO of an assignment. . . by OSCO to IOP[L] of its right to be reimbursed by NIOC or any other source for the sums expended by IROS out of the loans made hereunder...."

## JURISDICTION

Article II, paragraph 1, of the Declaration Of The Government Of The Democratic And Popular Republic Of Algeria Concerning The Settlement Of Claims By The Government Of The United States Of America And The Government Of The Islamic Republic Of Iran ("Claims Settlement Declaration") provides that this Tribunal shall decide claims of nationals of the United States against "Iran" if the claims "are outstanding on the date of this agreement, whether or not filed with any court, and arise out of debts, contracts (including transactions which are the subject of letters of credit or bank guarantees), expropriations or other measures affecting property rights...." Article VII, paragraph 3, of the Claims Settlement Declaration provides that "'Iran' means the Government of Iran, any political subdivision of Iran, and any agency, instrumentality, or entity controlled by the Government of Iran or any political subdivision thereof."

In the instant case, Claimant, which purports to be a United States national, has brought a claim against the Government of Iran and NIOC, which is an agency, instrumentality or entity controlled by the Government of Iran, based on debts, contracts, expropriations or other measures

affecting property rights.

There can be no serious question that this Tribunal has jurisdiction over Oil Field's claim as against Iran and NIOC. Since the Claimant is not now proceeding against the entity OSCO, there is no pending issue of jurisdiction over a claim against OSCO.

## SUCCESSION

The majority has gone beyond any issue of jurisdiction to consider NIOC's liability based on evidence of the NIOC-OSCO relationship. As I discuss infra, I conclude that NIOC is liable for OSCO's debts as OSCO's principal. I agree, however, with the majority that if NIOC is not liable as OSCO's principal, NIOC is liable as OSCO's successor. In my view, as such a successor, NIOC is fully liable for OSCO's obligations under traditional legal principles, for that is the consequence and meaning of succession. [9]

If OSCO was not acting as agent of NIOC, the evidence supports the alternative theory adopted by the majority that NIOC is OSCO's successor. Prior to late 1978, OSCO had 10,000 employees and was administering numerous contracts and annually disbursing substantial monies provided by NIOC. By March of 1979, OSCO's 600 expatriates had departed, and all of the other OSCO operations had been taken over by NIOC. [10]

While the corporate shell of OSCO may still exist, its principal assets have been taken over by NIOC. Indeed, since OSCO's Statutes (articles of incorporation) limited its purpose to providing services to NIOC in connection with oil development and production in Iran -- work now done directly by NIOC -- there is no longer any reason for OSCO's continued existence.

NIOC began communicating with companies as if NIOC had supplanted OSCO as a contracting party. NIOC sent some of such communications on OSCO stationery. Moreover, NIOC represented itself to companies as the party to their contracts executed by OSCO. NIOC made payments, requested performance and claimed rights under such contracts, including exercising purchase options and termination clauses. On one occasion NIOC even referred to its "legitimate rights" under a contract executed by OSCO and another company.

In two claims filed with the Tribunal, Iranian Governmental entities alleged and relied on the fact that NIOC was OSCO's successor. [11]

In circulars, Iran and NIOC described the assumption of OSCO's assets and activities by NIOC as a merger.

In short, NIOC simply took over a going concern from OSCO, without any payment to OSCO, and then continued OSCO's business. OSCO apparently remains a shell, unable to pay even its former employees. Yet NIOC has not made provision to compensate OSCO's creditors, such as Oil Field. NIOC has asserted rights under contracts while at the same time refusing to comply with its obligations thereunder. NIOC, although taking over all of the assets and business of OSCO, seeks to avoid liability for the obligations of that business. Moreover, NIOC and Iran have in other matters, in effect, represented and admitted that NIOC is OSCO's successor.

As a result of the facts and the law, NIOC must be treated as the successor to OSCO's liabilities and must be obligated to the same extent as OSCO.

The majority holds NIOC liable with respect to OSCO's obligations to OSCO's creditors by applying international law derived from analogy to municipal law governing mergers and succession. Although Respondents suggest that Iranian law should apply, there is no clear showing that Iranian law specifically deals with the situation in issue or is inconsistent with the principles of commercial and international law found applicable by the majority. Cf. Norwegian Shipowners Claims (U.S.A. v. Norway) 1 R.Int'l. Arb. Awards 305,330-331 (1922). Without going into a discussion of how one formulates or determines international law, a subject of a great deal of scholarship, it appears that the majority's conclusion is supported by recognized principles of law and analogies thereto.

Indeed, when, as here, a Tribunal is faced with "a new situation," Reparation for Injuries Suffered in the Service of the United Nations, [1949] I.C.J. Rpts. 174, 182, that Tribunal is justified in grounding its decision on principles of international law. See Simpson and Fox, International Tribunals 136 (1952); see also Article V of the Claims Settlement Declaration. In the instant case the Tribunal has adopted as international law, a doctrine which can be derived from municipal law, legal authorities and principles of justice. Thus, holding that NIOC's liability can be based on a "de facto" succession is justified under Article V of the Claims Settlement Declaration, which requires that all cases be decided "on the basis of respect for law," and which directs the Tribunal to utilize applicable "principles of commercial and international law." [12]

There is legal authority for the proposition that even in the absence of a formal merger or consolidation, which normally protects creditors, when one company takes over and continues the business of another, especially without consideration or provision for creditors, the former company is liable to creditors of the latter on the theory that there has been a de facto merger or consolidation. Such liability is based on the theory that under such circumstances it would be unjust for the company obtaining the assets of a business to avoid any liabilities connected therewith. See Annot, 49 ALR 3d 881 (1973); accord, Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182 n.5 (1973).

As one authority on comparative law has written:

On no point are courts more united than that the successor to the assets of a going concern must accept the debts with it. This point is expressed in most of the laws which contain any significant detail of the means and consequences of fusion... Where statutes are silent, courts may be expected to apply the rules developed for 'transfer of assets,' which impose liabilities on the successor to assets even without legislative guidance.

Conrad, Fundamental Changes in Marketable Share Companies, XIII Int'l Ency. of Comp. Law, Ch. 6 at 88 (undated) (footnote omitted). [13] To

allow an entity to take over the assets of another without any consideration, thereby leaving the creditors of the latter without any remedy, would result in a gross injustice. [14] See id. at 60-61.

Moreover, NIOC has, in order to derive certain benefits, represented itself as the party to contracts executed by OSCO. Iranian Government entities have even represented to this Tribunal that NIOC is OSCO's successor. Such representations may amount to an implied assumption of liability for OSCO's debts. See Eadjevardian v. Laidlaw-Coggeshell Inc., 431 F. Supp. 834, 839-840 (S.D.N.Y. 1977). At the very least, such representations should be viewed as admissions, which would constitute powerful evidence of succession. See D.W. Bowett, Estoppel Before International Tribunals and Its Relation to Acquiescence, [1957] Brit. Y.B. Intl. L. 176,195. In addition, there is authority for the proposition that Iran and NIOC should not now be able to disavow these representations.

As one writer, quoting in part from a leading English case, has stated:

It is a principle of good faith that "a man shall not be allowed to blow hot and cold -- to affirm at one time and deny at another ... Such a principle has its basis in common sense and common justice, and whether it is called 'estoppel', or by any other name, it is one which courts of law have in modern times most usefully adopted."

3. Cheng, General Principles of Law As Applied by International Courts and Tribunals 141-42 (1953); see also Argentine-Chile Frontier Case, XVI R. Int'l. Arb. Awards 115, 164 (1966).
This principle has long been accepted as a rule of international law. Another writer has noted:

The doctrine has been invoked [by international tribunals] in varying forms over a period of a century and a half; and although there have been occasions on which it has been held to be inapplicable to the particular facts, its jurisprudential basis has been unchallenged.

I.C. MacGibbon, Estoppel in International Law 7 Int'l & Comp. L.Q. 468, 479 (1958). There are suggestions that in international law, "estoppel", or its equivalent, may be utilized, even in the absence of technical municipal law requirements, such as reliance. Id. at 478. Underlying the use of estoppel or analogous doctrines in international law "is the requirement that a State ought to be consistent in its attitude to a given factual or legal situation." Id. at 468. Such a principle should apply in the instant case.
Thus, for all of the foregoing reasons, if, as the majority concludes, NIOC was not OSCO's principal, NIOC is the successor to the liability of OSCO to Oil Field and should be liable to Oil Field to the same extent as would be NIOC's predecessor, OSCO.

AGENCY

The majority has held that OSCO did not enter into the Lease Agreement with Oil Field as an agent of NIOC. Whether such an arrangement can be viewed as creating an agency relationship is not free from doubt. The arrangement between NIOC and OSCO was unusual. Nevertheless, I would hold that the relationship is such that agency principles are applicable, thus rendering NIOC fully liable under contracts executed by

OSCO in the course and scope of such relationship.

The Lease Agreement between OSCO and Oil Field provided that the "contract and any legal relationship arising therefrom shall be subject to English law." This choice of law provision makes English law "the proper law of the contract." 2 Dicey and Morris, The Conflict of Laws 753 (10th ed. 1980). Moreover, since OSCO's representative in London (IROS) dealt with foreign contractors, such as Claimant, in connection with contracts executed by OSCO, the transaction in issue has sufficient contacts with England for choice of law purposes, quite apart from the choice of law clause.

Authorities suggest that there is uncertainty as to the source of choice of law doctrines and the proper law to apply. See 1 Schwarzenberger, International Law 74-78 (3d ed. 1957); see also Steiner and Vagts, Transnational Legal Problems 774-776 (1977); Riphagen, The Relationship Between Public and Private Law and the Rules of Conflict of Laws, Academie de Droit International, 1 [1961] Recueil des Cours 215. Although the law of the contract, English law, might seem an appropriate selection to supply the choice of law principles, 1 Dicey and Morris, The Conflict of Laws 64 (10th ed. 1980), the fact that the issue involves NIOC's relationship to OSCO and whether NIOC is a party to the contract adds some doubt to this conclusion. Because of this uncertainty in the applicable choice of law rules, the Tribunal should apply its own rules of conflict of laws. Restatement (Second) of Foreign Relations Laws of the United States, Sec. 194 Comment a. at pp. 584-85 (1965); see Sapphire International Petroleum Ltd v. National Iranian Oil Company 35 I.L.R. 136, 170-176 (1963). In the instant case, however, the applicable choice of law rule does not affect the result. [15]

Generally questions as to the existence of an agency relationship, as well as the scope thereof, are decided by resort to the law of the country where the relationship is to have been created. 2 Dicey and Morris, The Conflict of Laws 909 (10th ed. 1980); Fridman, The Law of Agency 289 (3d ed. 1971). Also important is the fact that the 1973 Service Agreement between OSCO and NIOC incorporates the choice of law provisions of the 1973 Main Agreement providing that the latter agreement is to be interpreted in accordance with the laws of Iran. Thus, in view of the circumstances of this case, Iranian law is applicable to the question of whether the agreement between OSCO and NIOC resulted in an agency relationship.

If there was an agency relationship between NIOC and OSCO, issues of the liability of NIOC as OSCO's principal to a third party, such as Oil Field, should be determined by the law of the contract, which, in the instant case, is English law. 2 Dicey and Morris, The Conflict of Laws 911-912 (10th ed. 1980); Cheshire and North's Private International Law 238 (10th ed. 1979); see generally Rigaux, Agency, III Int'l Ency. of Comp. Law, Ch. 29 (undated). As one authority has stated in pointing out that "the law of external relationship" often determines the rights of a third party against a principal in an international commercial transaction, the "protection of third parties who act in good faith must be the overriding consideration." Schmitthoff, Agency in International Trade, Academie de Droit International, [1970] I Recueil des Cours 107, 180. [16]

NIOC refers to Article 968 of the Iranian Civil Code which provides: "Liabilities arising out of transactions are subject to the laws of the place of the performance of the transaction except in cases where the parties to the transaction are both foreign nationals and have explicitly or impliedly declared the transaction to be subject to the laws of another country." To the extent such a law is applicable or binding, the place of

performance -- payment and delivery -- was the State of Texas in the United States. Agency principles in the United States are generally similar to the agency laws of England, since both countries utilize the common law.

Respondents correctly state in their memorial that "[w]hether or not an agency exists in a given case . . depends upon the particular circumstances of that case. It is question [sic] of fact." Iranian law provides that "[a]n attorneyship comes into being, whether by way of proposal or acceptance, by any word or act which indicates an agency." The Civil Code of Iran, Article 658 (Sabi trans. 1973) (also translated as, "[a]n agency is effected by offer and acceptance by any word or act which is indicative thereof." Vafai, Commercial Laws of the Middle East - Iran. Bk.8,p. 91 (1982)). The agency relationship may therefore arise either expressly or by implication. See also Schmitthoff, Agency in International Trade, Academie de Droit International, [1970] I Recueil des Cours 107, 135-138 (civil law generally); see also Restatement (Second) of Agency | 32, Comment a; id. at | 33, Comments a,b. and c; id. at | 34. Thus, there is no prerequisite for the parties to identify themselves expressly as "principal" and "agent." See Fridman, The Law of Agency 10-11 (3d ed. 1971).

The 1973 Main Agreement provided that NIOC was to exercise "full and complete ownership, operation and control" over its oil industry, and that the Service Company [OSCO] was to "carry out operations as assigned to it by NIOC...." The 1973 Service Contract provided that OSCO "shall carry out the Operations . . . on behalf of and under the overall direction and control of NIOC," and that "all costs and expenses incurred by [OSCO] shall be on behalf and for the account of NIOC." NIOC controlled the budget, finances and programs of OSCO and provided to OSCO all capital and other funds required by OSCO to carry out its activities. Indeed OSCO had no function other than to render services to and on behalf of NIOC.

NIOC's extensive control over the activities of OSCO suggests an agency relationship, especially since that control was to further NIOC's own, rather than OSCO's business. [17] OSCO's connection with the Consortium has no bearing on OSCO's agency relationship with NIOC, especially vis-a-vis contractors such as Oil Field.

Since OSCO was put in a position where it was dependent upon NIOC's resources and control and was given authority to act solely for NIOC, and not for itself, it would be reasonable to conclude that OSCO was in a position to affect NIOC's relations with third persons, a position which is the essence of agency. Fridman, The Law of Agency 8 (3d. ed. 1971). Thus, based on the express terms of the 1973 Service Contract and the above-mentioned facts, OSCO was acting in a representative capacity for NIOC.

Since OSCO was NIOC's agent, it remains to determine whether under English law, NIOC is liable as a principal to Oil Field. [18] An agent may contract with third parties on matters within the scope of the agency relationship, and thereby create a "direct contractual relationship ... between [the] principal and third part[ies]." Fridman, The Law of Agency 160 (3d ed. 1971). The Lease Agreement itself includes the following clause in the preamble:

The National Iranian Oil Company . . . has under an international agreement appointed the |Oil Service| Company [of Iran] to undertake certain operations in the production and export of crude oil from South Iran. (Emphasis added.)

Interestingly, the word "appointed" is used in Iranian agency law. That law provides, "[a]n attorneyship is a contract whereby one of the parties appoints the other as his representative for the accomplishment of some matter." The Civil Code of Iran, Article 656 (Sabi trans. 1973) (amphasis added). The preamble clause, pursuant to which the Lease Agreement was then entered into, functioned as a disclosure by OSCO that it acted as NIOC's agent in dealing with Oil Field. Thus, even if the Lease Agreement did not specifically refer to NIOC as OSCO's principal, such a reference was unnecessary, since the circumstances indicated such agency relationship to Claimant. Schmitthoff, Agency in International Trade, Academie de Droit International [1970] 1 Recueil des Cours 135,138-143. In addition to the preamble language, the Lease Agreement required NIOC to be one of the beneficiaries of the insurance on the leased equipment. If NIOC was not a party to the agreement; it would have no insurable interest. Also, Claimant asserts it was generally aware of the 1973 Service Agreement at the time the Lease Agreement was executed and believed that NIOC was responsible for agreements executed by OSCO. Moreover, the later-required Fidelity Affidavit confirmed that Oil Field's contract with OSCO constituted business "with, for, or involving" NIOC and Iran.

Certainly the Lease Agreeemt was within the scope and purpose of OSCO's agency relationship with NIOC. All of OSCO's activities were "on behalf of and under the overall direction and control of NIOC." All of OSCO's costs and expenses were incurred "on behalf of and for the account of NIOC." 1973 Service Agreement.

That NIOC undertook obligations entered into by OSCO is also consistent with such an agency relationship. In this connection NIOC made payments and exercised options under contracts executed by OSCO, thus suggesting that NIOC considered itself to be in effect the contracting party. NIOC expressly referred to rights under contracts executed by OSCO as NIOC's rights.

That the 1973 Service Contract refers to OSCO as a "contractor" does not, as the majority suggests, negate an agency relationship. A contractor, and even an independent contractor, may also be an agent. See Restatement (Second) of Agency | 2(3) (1958); Rigaux, Agency, Ch. 29, III Int'l Ency. of Comp. Law 7 (undated). Indeed, in Iranian law an "agent may be an employee of the principal or an independent contractor." Sabi, The Commercial Laws of Iran 20 (1973), reprinted in IV Nelson, Digest of Commercial Laws of the World (1982). Thus, the majority's conclusion is premised in large part on the erroneous assumption that a "contractor" and an "agent" are mutually exclusive. [19]

Moreover, Article 19(E) of the 1973 Main Agreement stated: "[OSCO], functioning solely as contractor for NIOC on a non-profit making basis, shall not be liable to any contractor's or income tax." This exemption reflects a status inconsistent with OSCO's alleged role as an independent third party acting for its own account. Article 2 of the 1973 Service Contract by providing that OSCO as "a contractor, shall carry out the Operations... on behalf of and under the overall direction and control of NIOC," indicated that OSCO would be acting for the account of NIOC - - not its own. Article 4 of OSCO's Statutes restricts OSCO's actions as "contractor to the NIOC," to those "in accordance with the terms and provisions of the service contract," which, I submit, established OSCO as NIOC's agent.

For the above reasons, on the basis of agency principles, I would hold NIOC liable to Oil Field as a party to the Lease Agreement.

## CONTROL

Before discussing the issue of "control," one should ask, control for what purpose? Cf. Vagts, The Corporate Alien: Definitional Questions in Federal Restraints On Foreign Enterprise, 74 Harv . L.Rev. 1489, 1547 (1961).

First, control may be relevant to jurisdiction in connection with the definition of Iran or the United States under Article VII, paragraphs 3 and 4, of the Claims Settlement Declaration. This issue is not now before the Tribunal since Claimant is presently not pursuing a claim against OSCO as an entity controlled by Iran or otherwise. [20]

Second, the issue of control might concern whether NIOC exercised such control over OSCO that NIOC would be liable for OSCO's debts under theories of corporate identity or alter ego or of piercing the corporate veil. [21] Such theories normally would not apply in a case such as the instant one where the Claimant is not attempting to impose liability on the shareholders. [22]

This is not to say that alter ego or identity theories are never applicable when the question involves the liability of those who are not the record owners of the stock of a corporation. For example, such principles might, in some circumstances, apply to persons or entities, who, by their control of the corporation or its stock, may be treated as actual, assumed, beneficial or constructive owners of the controlled entity or as the real parties in interest. In the instant case, however, neither the parties nor the Tribunal focused on the legal or factual issues involved in such a determination. This may be due to the manner in which the issues were framed by the parties and the Tribunal. See supra. The Tribunal's cursory discussion of the "alter ego" or "identity" issue reflects the inadequacy of the Tribunal's record on the issue. In light of that record, the Tribunal should not have reached the question.

Third, the degree of control might be relevant to other theories of liability, such as tortious interference with contractual or advantageous relations and liability to creditors by virtue of an expropriation of a company or of its assets. Although these theories have been raised by Claimant, they were not the subject of the preliminary proceeding heard by the Tribunal.

The level, degree and purpose of control is relevant in the present proceeding only on the question of the application of agency principles. If NIOC exercised such control over OSCO that OSCO was in reality acting on behalf of NIOC, then OSCO would, in effect, be NIOChs agent, and NIOC would be liable under agency principles. "Control" in this sense is simply one factor to be considered in connection with agency issues.

Thus, the control exercised by NIOC over OSCO supports the Claimant's position that NIOC was liable under the Lease Agreement as a principal by virtue of principles of agency.

REPRINTED IN: 1-1

## CONCLUSION

I concur in the "Interlocutory Award" of the Tribunal holding that NIOC is the de facto successor to OSCO's rights and obligations and that the Tribunal has jurisdiction over Oil Field's claims.

The Hague December 10, 1982
Richard M. Mosk

END

[1] Since the majority opinion does not deal with the liability of the Government of the Islamic Republic of Iran ("Iran"), I do not discuss that issue.

[2] "NIOC shall provide as necessary to the Service Company [OSCO] in accordance with the provisions of the Service Contract all capital and other funds to enable the Service Company to carry out the operations assigned to it." Art 17 (B).

[3] "During the term of the Service Contract referred to in Article 17 NIOC shall entrust to the Service Company the duty of working out the detailed programmes and budgets provided for in this Article as directed and controlled by NIOC. Such programmes and budgets shall be submitted for final approval to NIOC and shall become operative after such approval." Article 16 (D).

[4] The paid in capital was 1,000,000 rials or about $15,000.

[5] "In Iran, the new agreement was seen as the zenith of Iranian triumph in the nationalisation [sic] of Iranian oil industry." 1976 Iran Almanac 223 (Echo of Iran).

[6] Respondent submitted a telex from an unidentified person, apparently connected with NIOC, to NIOC's counsel in this case, denying that some of these approvals were required or solicited. Respondents also submitted what purported to be a memorandum concerning OSCO's contracting policy in which there is no reference to NIOC, but rather to various contracts committees.

[7] The Lease Agreement was amended from time to time (as late as June, 1977) to add additional equipment and to extend the term, Oil Field also, pursuant to the Lease Agreement sold some materials for use in Iran.

[8] Many written communications were submitted to the Tribunal by the parties which were not authenticated formally. Generally there were no evidentiary objections to such communications being considered by the Tribunal. As I noted in my dissenting and concurring opinion, "On The Issues of Jurisdiction" in Case Nos. 6, 51, 68, 121, 140, 159, 254, 293 and 466 (Forum-Selection Clauses), "International tribunals apply liberal standards in accepting and considering evidence. Indeed, one authority has written: 'In international procedure ... evidence is always admitted upon being duly presented in accordance with the time limits fixed by the tribunal; it will only be excluded upon a showing by the party challenging it of a specific ground requiring such action.' Sandifer, Evidence Before International Tribunals 179 (rev. ed. 1975)."

[9] See Black's Law Dictionary 1283 (5th ed. 1979) ("Successor" - "Term with reference to corporations, generally means another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes burdens of first corporation.")

[10] NIOC's justification for such a takeover is irrelevant. Whether or not OSCO or the Consortium were at fault, as suggested by Respondents, has no bearing on NIOC's legal responsibility to Claimant Oil Field.

[11] Claimant requested the production of other claims filed or lodged by Iran with the Tribunal involving Osco-related transactions. Iran delivered to the Tribunal several hundred claims, of doubtful jurisdiction, by its oil agencies against United States nationals, which claims would seemingly be OSCO-related, since it was OSCO that had most of the direct dealings with contractors. Iran not only opposed the production of such claims but withdrew and removed most of them at the time of the proceedings in the instant case. Quite apart from the propriety of such actions (see Sandifer, Evidence Before International Tribunals 115, 163 (rev.ed. 1975)), they should result in the drawing of inferences against Iran and NIOC. Id. at 147-154.

[12] "The Tribunal shall decide all cases on the basis of respect for law, applying such choice of law rules and principles of commercial and international law as the Tribunal determines to be applicable, taking into account relevant usages of the trade, contract provisions and changed circumstances." Art. V, Claims Settlement Declaration.

[13] See Art. 231 of The Civil Code of Iran (Sabi trans. 1973) ("Undertakings or contracts are only binding on the two parties concerned or their legal substitutes...." (Emphasis added)).

[14] Even in those situations where it has been held that a government expropriation of a company does not constitute a taking of rights of creditors against such a company, the possibility of Government liability for that debt has been recognized. See In the Matter of the Claim of Universal Oil Products (1959) (U.S. Foreign Claims Settlement Commission) quoted in 8 Whiteman, Digest of International Law 995-96 (1967). Holdings by the United States Foreign Claims Settlement Commission that expropriations of companies did not constitute takings of creditors' rights were based on statutory requirements that compensation could only be for expropriations, not for other theories of liability, such as succession. Moreover, there is other authority holding that the failure to compensate a creditor of an expropriated company does constitute a taking. See generally 8 Whiteman, Digest of International Law, supra at 997-98. Dickson Car Wheel Company (1931) United States-Mexico Claims Commission, 4 R. Int'l Arb. Awards 669, is distinguishable in that the Commission denied a claim by a creditor of a railway company against the Government which took over the assets of the railway company because the Commission found the railway company still had assets and income and would have assets returned to it so that it could respond to claims. There is no such evidence in the instant case. Moreover, the dissenting opinion by Commissioner Nielsen in that case appears persuasive. Id. at 682.

[15] Claimant asserts that by virtue of Article V of the Claims Settlement Declaration, the "applicable legal rules and principles should be those derived from general commercial law and international law, rather than from the municipal law of any single nation." I believe that my conclusion is consistent with general principles of commercial and international law.

[16] But see Fridman, The Law of Agency 291 (3d ed. 1971) ("Indeed, it can be said that the agency relationship in the conflict of laws is still the subject of considerable doubt.") In view of the principle expressed by Prof. Schmitthoff, the law of the contract with the third person should govern on questions of apparent authority and undisclosed principal. See Rigaux, Agency, III Int'l Ency. of Comp. Law. Ch. 29 p. 16 (undated); 2 Dicey and Morris, The Conflict of Laws 912 (10th ed. 1980). Although the doctrines of or related to apparent authority and undisclosed principal might be invoked to impose liability on NIOC, I need not reach such issues because of my conclusion that there was an agency relationship, the essence of which was disclosed to Claimant.

[17] "Whenever one uses control of a corporation to further his own, rather than the corporation's business, he will be liable for the corporation's acts under the doctrine of agency...." House of Koscot Dev. Corp. v. American Line Cosmetics, Inc., 468 F.2d. 64, 67 (5th Cir. 1972). Interestingly, counsel for NIOC analogized OSCO's relationship with NIOC to IROS' relationship with NIOC. IROS acted not only as agent for OSCO, but also for NIOC. Indeed IROS contracted with NIOC to act outside Iran for NIOC. In

1979 NIOC insisted that IROS could only continue its activities if its stock were transferred to NIOC.

[18] Claimant and Respondents submitted conflicting evidence on Iranian law.

[19] The majority states that Claimant had "not submitted sufficient evidence to prove OSCO acted as an agent of NIOC." That the Oil Field Lease Agreement includes indications that OSCO was a party thereto is, I believe, outweighed by the other factors I discuss.

[20] Control as a jurisdictional factor under Article VII, paragraph 2, of the Claims Settlement Declaration, is not in issue in this case.

[21] There has been some confusion between agency and identity for purposes of imposing liability -- at least in the context of parent and subsidiary companies. See Weisser and Mursam Shoe Corporation, 127 F. 2d 344, 348 n. 11 (2d Cir. 1942); House of Koscot Dev. Corp. v. American Line Cosmetics, Inc., 468 F. 2d 64, 67 n.2, n.3 (5th Cir. 1972).

[22] See Banco Nacional de Cuba v. Sabbatino, 27 F.R.D. 255, 258 (S.D.N.Y. 1961); Banco Nacional de Cuba v. First National City Bank, 478 F.2d 191, 193 (2d Cir. 1973); Banco para el Commercio Exterior de Cuba v. First National City Bank, 658 F.2d 913 (2d Cir. 1981), cert. granted ___ U.S. ___ (1982), 51 U.S.L.W. 3303 (Oct. 18, 1982).

# EXHIBIT "E"

Case 3:08-mc-80024-JSW    Document 2-7    Filed 03/13/2008    Page 2 of 18
Page 1 of 3
2005 WL 1155255
Case 2:08-cv-00740-GAF-SS    Document 37-6    Filed 03/04/2008    Page 2 of 18

First Reported in F.Supp.2d, 2005 WL 1155255 (N.D.Cal.)
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
IO GROUP, INC., a California corporation, Plaintiff,
v.
Michael PURSER, an individual, Bareback.Com, Inc. a New York Corporation,
Defendants.
No. C-04-2823(SBA).
May 16, 2005.

Gill Sperlein (172887), San Francisco, California, for Plaintiff Io Group, Inc.

AFFIDAVIT OF IDENTITY AND ORDER

ARMSTRONG, J.

### Cal.Code Civ. Pro. 680.135

\*1 I, GILL SPERLEIN, declare:

1. I am an attorney at law licensed to practice in the State of California and attorney of record for Plaintiff Io Group, Inc.

2. I submit this Affidavit of Identity in accordance with California Code of Civil Procedure which reads in its entirety:

"'Affidavit of Identity' means an affidavit or declaration executed by a judgment creditor, under penalty of perjury, that is filed with the clerk of the court in which the judgment is entered at the time the judgment creditor files for a writ of execution or an abstract of judgment. The affidavit of identity shall set forth the case name and number, the name of the judgment debtor stated in the judgment, the additional name or names by which the judgment debtor is known, and the facts upon which the judgment creditor has relied in obtaining the judgment debtor's additional name or names. The affidavit of identity shall not include the name or names of persons, including any corporations, partnerships, or any legal entities not separately named in the judgment in which the judgment debtor is a partner, shareholder, or member, other than the judgment debtor." Cal.Code Civ. Pro. § 680.135.

3. The Court entered judgment in favor of plaintiff Io Group, Inc. and against defendants on January 26, 2005.

4. The names of the judgment debtors as listed on the Order of Judgment are Michael Purser and Bareback.com, Inc.

5. Judgment debtor Bareback.com, Inc. is also known as, and does business as, "A Workshop".

6. I relied on the following facts in obtaining the judgment debtor's additional name.

7. Bareback.com, Inc. is a New York corporation that owns and operates the website, www.bareback.com.

8. All domain names must be registered with an Internet Corporation for Assigned Names and Numbers (ICANN) accredited registrar. This process allows domain names to be associated with specific locations on the Internet identified by an Internet Protocol (ip) address which consists of a series of numbers. Therefore, when someone enters a domain name such as www.cand.uscourts.gov into a Internet browser, the browser goes to a specified location on the Internet and nowhere else.

9. Each domain name can only be registered to one person or entity at any given time.

10. Information about the individuals or businesses who registered a specific domain name is publicly available on the Internet through a simple process called a "whois search". I personally performed a whois search for www.bareback.com and a true and complete copy of the result is attached hereto as Exhibit A.

11. For over three years I have been involved in tracing and identifying the true owners of Internet websites engaged in copyright infringement. In my experience, I have found that many individuals and organizations register domain names using pseudonyms, assumed names or fictitious names in order that they might operate an Internet website while maintaining a certain level of anonymity.

\*2 12. The domain name www.bareback.com, owned and operated by Bareback.com, Inc., is registered under the pseudonym, assumed name, or fictitious name "A Workshop," 300 West 49th



Case 3:08-mc-80024-JSW    Document 2-7    Filed 03/13/2008    Page 3 of 18
2005 WL 1155255                                                        Page 2 of 3
        Case 2:08-cv-00740-GAF-SS    Document 37-6    Filed 03/04/2008    Page 3 of 18

Street, Apt.310, New York, New York, 10019.

13. The registration information for *www.bareback.com* also contains the e-mail address *amvscom@aol.com*. This e-mail address belongs to and is used by Michael Purser and *www.bareback.com*. I received e-mails from the e-mail address *amvscom @aol.com* signed, Michael, Bareback.com. Moreover, *amvscom@aol.com* is listed on the *www.bareback.com* website as the e-mail address for contacting customer service and in a separate location is listed as the e-mail address for the custodian of records for the site. In other words, Bareback.com, Inc. shares an e-mail address with "A Workshop" thereby indicating they are the same entity.

14. Bareback.com, Inc. registered the trademark bareback.com with the United States Patent and Trademark Office. The registration lists Bareback.com, Inc. as the owner of the mark, with the address of 300 West 49th Street, Apt.310, New York, New York, 10019.

15. Bareback, Inc. is incorporated in the State of New York and has registered its agent for service of process as Michael Purser, 300 West 49th Street, Apt. 310, New York, New York, 10019, however, neither Michael Purser nor Bareback.com, Inc are located at that address.

16. After unsuccessful attempts to serve Michael Purser and Bareback.com, Inc. at 300 West 49th Street, I requested a forwarding address from the United States Post Office. The United States Post Office reported that mail formerly received at 300 West 49th Street, Apt. 310, New York, New York, 10019 is currently being received at 676A, 9th Avenue, # 302, New York, New York, 10036.

17. The address for "A Workshop" on the registration for *www.bareback.com* is 676A, 9th Avenue, # 302, New York, New York, 10036. Therefore, Michael Purser and Bareback.com, Inc. also share an address with "A Workshop".

18. Businesses entities operating in New York State are required to either register with the New York Department of State (corporations--NY CLS Bus Corp § 403 and 1301; and limited liability companies--NY CLS LLC § 209) or must register with the Clerk of the County (partnerships and sole proprietorships using assumed names--NY CLS Gen Bus § 130).

19. "A Workshop" is not registered with the New York Department of State, or the New York County Clerk, thereby indicating "A Workshop".is not a unique and separate business entity, but rather serves as a pseudonym or assumed name for the existing business entity, Bareback.com, Inc.

20. In summary, Bareback, Inc., which holds an ownership interest in the trademark bareback.com, registered the domain name bareback.com using the fictitious business name "A Workshop." "A Workshop," which is not registered as a separate business entity in New York, shares the same e-mail address and street addresses as Bareback.com. These facts indicate that Bareback.com Inc. uses the pseudonym or fictitious business name "A Workshop" and "A Workshop" should be included as a judgment debtor.

*3 Pursuant to the laws of the United States, I declare under penalty of perjury the foregoing is true and correct.

ORDER

The Court having considered the above Affidavit of Identity,
IT IS SO ORDERED, that the term judgment debtor include the name "A Workshop."

EXHIBIT A

whois

--------------------

Whois:  bareback.com


-------------------------

@ whois.  Magic    Whois
-------------------------


Server Used: [whois.domaindiscover.com]
bareback.com = [64.49.215.69]
Registrant:
A Workshop
676A 9th Ave 302
New York N.Y. 10036-3602
US
Domain Name: BAREBACK.COM

Case 3:08-mc-80024-JSW    Document 2-7    Filed 03/13/2008    Page 4 of 18
2005 WL 1155255                                                         Page 3 of 3
Case 2:08-cv-00740-GAF-SS    Document 37-6    Filed 03/04/2008    Page 4 of 18

Administrative Contact Technical Contact Zone Contact:
A Workshop
Webmaster
676A 9th Ave 302
New York N.Y. 10036-3602
US
347-251-3249
212-898-1173 [fax]
amvscom@aol.com
Domain created on 20-Nov-2000
Domain expires on 20-Nov-2009
Last updated on 15-Jul-2003
Domain servers in listed order:
NS.RACKSPACE.COM
NS2.RACKSPACE.COM
Register or transfer domains at BuyDomains for as low as 9/yr. Every
domain comes with 100 FREE Value Added Services: traffic stats
custom 1-page website email URL frame forwarding whois spam
protection toll free 24x7 phone support & more ...
N.D.Cal.,2005.
Io Group, Inc. v. Purser
Not Reported in F.Supp.2d, 2005 WL 1155255 (N.D.Cal.)

END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT "F"

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FREDRIC GOLDMAN, | B200082 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC036340) |
| v. | |
| ORENTHAL JAMES SIMPSON, | |
| Defendant and Appellant. | |

COURT OF APPEAL SECOND DIST.

F I L E D

FEB 2 0 2008

JOSEPH A. LANE

APPEAL from an order of the Superior Court of Los Angeles County, Gerald Rosenberg, Judge. Affirmed.

Richard L. Enkelis and Ronald P. Slates for Defendant and Appellant.

Sommer Barnard, Jonathan G. Polak; Haven Law, Peter T. Haven; Cook Collection Attorneys and David J. Cook for Plaintiff and Respondent.

## INTRODUCTION

Defendant Orenthal James Simpson appeals from an order denying his motion to vacate the renewal of a money judgment in favor of plaintiff Frederic Goldman. Simpson contends that the renewal of the judgment was void because he had insufficient contacts with California to confer personal jurisdiction when the renewal was entered. We conclude that the trial court properly denied Simpson's motion to vacate because it was untimely, and because it was based on a ground – insufficient contacts with California to confer personal jurisdiction at the time of the renewal – unavailable under the statutory renewal of judgment procedure. Rather, the court had continuing jurisdiction, derived from its jurisdiction at the time of the original judgment, to enter the renewal. Accordingly, we affirm the order denying the motion to vacate renewal of the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Judgment was entered against Simpson on March 10, 1997, in Goldman's action for wrongful death and for damages based on survival rights filed by Goldman individually, and as personal representative of the estate of Ronald Lyle Goldman, deceased. On September 21, 2006, Goldman filed an application for renewal of the judgment pursuant to Code of Civil Procedure section 683.120, well before the original judgment was due to expire by operation of law on March 10, 2007.[1] The clerk of the court entered the renewal (§ 683.150), and Goldman served and filed notice of renewal of the judgment (§ 683.160) on or about October 20, 2006.

---

[1]    All undesignated section references are to the Code of Civil Procedure.

2

Nearly six months later, on April 10, 2007, Simpson filed a motion to vacate renewal of the judgment. He contended that all defenses that would have been available to him at the time of the original judgment were still available at the time of the application for renewal of judgment. He argued that because he had moved from California to Florida and had become a resident of Florida, the California court did not have jurisdiction over him to renew the judgment.

The matter was heard in May 2007, after which the trial court entered an order denying the motion to vacate the renewal of judgment. This timely appeal followed.

## DISCUSSION

Simpson contends that when the renewal of the judgment was entered, he had insufficient contacts with California to confer personal jurisdiction. Therefore, according to Simpson, the renewal of the judgment was void, and the trial court erred in denying his motion to vacate the renewal. We conclude, however, that Simpson's motion was untimely, and that the trial court had continuing jurisdiction to renew the judgment.

Before the 1982 enactment of the Enforcement of Judgments Law (§ 680.010 et seq.), the sole method by which a judgment creditor could extend the enforcement period of a money judgment was by obtaining a new judgment against the judgment debtor in an independent action based on the judgment. (See *Pratali v. Gates* (1992) 4 Cal.App.4th 632, 637-638.) In the Enforcement of Judgments Law, the Legislature adopted an alternative summary procedure for renewal. (*Ibid.*; § 683.050; see Recommendation Proposing the Enforcement of Judgments Law (Oct. 1980) 15 Cal. Law Revision Com. Rep. (1980) p. 2009.) Under this procedure, a money judgment is enforceable for 10 years from the date it is entered. (§ 683.020.) To obtain a renewal of the judgment, the judgment creditor

3

must file an application for renewal with the clerk of the court that entered the judgment before the expiration of the 10-year period of enforceability. (§ 683.130, subd. (a); see § 683.140 [setting forth information to be included in application].) "Upon the filing of the application, the court clerk shall enter the renewal of the judgment in the court records." (§ 683.150, subd. (a).)  The creditor must serve notice of the renewal on the debtor, (§ 683.160, subd. (a)), and the debtor then has 30 days after service to make a motion to vacate or modify the renewal (*ibid.*; see § 683.170, subd. (b)).

Thus, a judgment creditor has two distinct methods by which to continue to pursue collection of a judgment as it nears expiration of the 10-year period of enforceability: the renewal of judgment provisions set forth in sections 683.110 et seq., or an independent action on the judgment.  Although the two methods are distinct, the defenses available to the judgment debtor in the statutory procedure are the same as in an independent action on the judgment.  As here relevant, section 683.170, subdivision (a), provides that "[t]he renewal of a judgment pursuant to this article may be vacated on any ground that would be a defense to an action on the judgment."

In the instant case, Simpson filed a motion to vacate Goldman's statutory renewal of the judgment, contending that lack of personal jurisdiction would be a defense in an independent action on the judgment, and therefore, under section 683.170, subdivision (a), he could assert that defense in support of his motion to vacate the renewal of judgment.  Simpson's motion, however, was untimely. Section 683.170, subdivision (b), provides that a noticed motion to vacate renewal of judgment must be filed "[n]ot later than 30 days after service of the notice of renewal."  Here, Goldman filed his application for renewal of the judgment on September 21, 2006, and the court clerk entered the renewal on that date. Goldman served and filed notice of renewal of the judgment, as required by section

4

683.160, on or about October 20, 2006. Yet Simpson did not file his motion to
vacate renewal of the judgment until almost six months later, on April 10, 2007.
Thus, Simpson filed his motion too late.[2]

Apparently recognizing that his motion was untimely, Simpson attempts to
resurrect the motion on the following logic (as best we understand it). Under
section 683.170, subdivision (a), Simpson could raise in his motion any defense
that would have been available in an independent action on the judgment. Lack of
personal jurisdiction, rendering the judgment void, is a defense in an independent
action on the judgment. Therefore, lack of personal jurisdiction could be raised in
Simpson's motion to vacate. Further, because lack of personal jurisdiction renders
the judgment void, and a void judgment can be attacked at any time, his motion
cannot be deemed untimely. And finally, because the court that renewed the
judgment had no jurisdiction over him, his motion to vacate the renewal should
have been granted.

Simpson's logic fails on a host of grounds. In an independent action on a
judgment, the debtor may challenge the judgment "in accordance with the rules
and principles governing collateral attack" (*Kirkpatrick v. Harvey* (1942) 51
Cal.App.2d 170, 172; see also *Cradduck v. Financial Indem. Co.* (1966) 242
Cal.App.2d 850, 855), including "lack of personal or subject matter jurisdiction.
. . . Nonjurisdictional errors, however, are not appropriate procedural targets

---

[2]  We note, as well, that Simpson's delay was calculated. At the hearing on the
motion to vacate, Simpson's counsel admitted that "[a]s soon as March 10, 2007 passed
[the date Goldman's judgment would expire], we notified this court that we would be
bringing the action." He continued: "So this is a challenge that we made as soon as we
were in a legal position to make it." In other words, Simpson waited until the 10-year
period to enforce the judgment had passed in an attempt to ensure, in the event that the
trial court were to vacate the renewal of judgment, that Goldman could not again seek to
renew the judgment before it had expired.

within this context." (*Armstrong v. Armstrong* (1976) 15 Cal.3d 942, 950.) Such a *collateral attack* challenges the jurisdiction of the court to enter the *original* judgment. Certainly, therefore, in making a statutory motion under section 683.170, subdivision (a), to vacate a renewal of judgment, the debtor may contend that the court lacked personal jurisdiction *at the time of the initial judgment.* (See *Fidelity Creditor Service, Inc. v. Browne* (2001) 89 Cal.App.4th 195, 201-202 [failure to have ever served process on a defendant is a defense to an action on the judgment and therefore can be raised on a § 683.170 motion].) But it is an entirely different matter to contend that the renewed judgment must be vacated because the debtor has insufficient personal contacts with the state to confer personal jurisdiction *at the time of the renewal.*

The statutory renewal of judgment is an automatic, ministerial act accomplished by the clerk of the court; entry of the renewal of judgment does not constitute a new or separate judgment.[3] "Filing the renewal application (and paying the appropriate filing fee, Gov.C. § 70626(b)) results in *automatic* renewal of the judgment. No court order or new judgment is required. The court clerk simply enters the renewal of judgment in the court records. [See CCP § 683.150; *Jonathan Neil & Assocs., Inc. v. Jones* (2006) [138 Cal.App.4th] 1481, 1487, 1489." (Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2007) ¶ 6:75, p. 6A-41.) Thus, "[t]he judgment renewal procedure is a different mechanism to extend the life of a judgment than that of bringing an independent action on a judgment. (*Fidelity Creditor Service v. Browne, supra,* 89

---

[3]    In contrast, "[a]n action based on a judgment is an action based on contract. The judgment becomes a debt which the judgment debtor is obligated to pay and the law implies a contract on his part to pay it. [Citation.]" (*United States Capital Corp. v. Nickelberry* (1981) 120 Cal.App.3d 864, 867.) Thus, when successful, an action on a judgment results in the entry of a new judgment.

Cal.App.4th at p. 200.) Entry by the trial court clerk of a renewal is a ministerial act." (*Jonathan Neil & Associates, Inc. v. Jones, supra*, 138 Cal.App.4th at p. 1489, fn. 1.) "[R]enewal does not create a new judgment or modify the present judgment. Renewal merely extends the enforceability of the judgment." (*Id.* at p. 1489.) The renewed judgment "has no independent existence" from the original judgment.[4] (*Id.* at p. 1490.)

We conclude that the court that entered the original judgment has continuing jurisdiction to enforce the judgment through the statutory renewal process. Section 410.50 provides: "(a) Except as otherwise provided by statute, the court in which an action is pending has jurisdiction over a party from the time summons is served on him as provided by Chapter 4 (commencing with Section 413.10). . . . [¶] (b)

---

[4]    That a renewed judgment does not constitute a new or separate judgment is further evidenced by the fact that the renewed judgment is not appealable. "The renewal of a judgment is *not* an appealable event . . . because 'there is no separate entity called a "renewed judgment."'" Although the renewal extends the enforceability period, the judgment creditor's rights still arise only from the underlying judgment. (*Jonathan Neil & Assocs., Inc. v. Jones* [*supra,* 138 Cal.App.4th] 1481, 1487.)" (Ahart, Cal. Practice Guide: Enforcing Judgments and Debts, *supra,* ¶ 6:91, p. 6A-46.) Instead. it is the order denying a motion to vacate renewal of a judgment that is appealable, as an order after (the underlying) judgment. (*Jonathan Neil & Associates. Inc. v. Jones, supra,* 138 Cal.App.4th at p. 1487.)

We also note that there is no statutory requirement that the notice of renewal be served on the judgment debtor in order for the renewal to be effective. (See § 683.160.) "Service on the judgment debtor is not necessary to renew the judgment. However. *no writ of execution* can issue on the *renewed* judgment until proof of service of the Notice has been filed with the court clerk. Nor, pending filing of proof of service, may the judgment creditor commence any other enforcement proceeding (e.g., examination of judgment debtor), unless it would have been available under the *nonrenewed* original judgment. [CCP § 683.160(b)]." (Ahart, Cal. Practice Guide: Enforcing Judgments and Debts, *supra,* ¶ 6:78, pp. 6A-41 to 6A-42.) Thus, there is no specified time period within which the renewal of judgment must be served on the judgment debtor. The statute instead provides that the judgment creditor may not initiate any enforcement proceedings unless and until the judgment debtor has been served with the notice of renewal.

7

*Jurisdiction of the court over the parties and the subject matter of an action continues throughout subsequent proceedings in the action.*" (Italics added.) The Judicial Council Comment following section 410.50 states that the statute "continues the law governing the acquisition of judicial jurisdiction by a California court (subdivision (a)) and *the continuation of such jurisdiction throughout all subsequent proceedings which arise out of the original cause of action* (subdivision (b)).

"Jurisdiction over the parties is necessary for the validity of any judgment in personam. (Cal. Code Civ. Proc. § 1917; *Pennoyer v. Neff* (1877) 95 U.S. 714, 722 [24 L.Ed. 565]; *Allen v. Superior Court* (1953) 41 Cal.2d 306, 309; Restatement, Judgments §§ 6, 14, and Intro. Note, p. 79.) Such jurisdiction depends upon three factors: (1) Jurisdiction of the state, based upon there being sufficient minimum contacts existing between this state and the parties or their property or other interests (see Section 410.10). (2) Notice and opportunity for a hearing (see Sections 412.10-412.30, 473.5). (3) Compliance with statutory jurisdictional requirements for service of process (see Sections 413.10-417.30). In addition, the court in which the action is pending must be competent to hear and decide the type of action and the amount in controversy that are involved in the case. When these factors are present, the court has acquired 'fundamental' jurisdiction over the parties, and *this jurisdiction continues to final judgment and in subsequent proceedings incidental thereto.*" (Italics added.)

The parties have not cited, and our research has not disclosed, any case law addressing whether the renewal of a judgment pursuant to section 683.120 constitutes a "subsequent proceeding[] in the action" as contemplated by section 410.50, such that a court has continuing jurisdiction over the parties as a result of its having had fundamental jurisdiction when entering the original judgment. However, because entry of the renewal by the court clerk is a ministerial act that

8

merely extends the enforceability of the original judgment, and because the
renewed judgment has no independent existence apart from the original judgment
(*Jonathan Neil & Associates v. Jones, supra,* 138 Cal.App.4th at pp. 1489-1490),
we conclude that the renewal procedure is properly treated as a "subsequent
proceeding" under section 410.50. The superior court, therefore, has ongoing,
continuing jurisdiction to effectuate the statutory renewal of the judgment, and the
renewal is not subject to attack on the ground that the debtor has insufficient
personal contacts with California to establish personal jurisdiction when the
renewal is entered. "[W]here jurisdiction of the person . . . has once attached it is
not defeated by the removal of the person . . . beyond the jurisdiction of the court.
[15 Corpus Juris, p. 824; 21 C.J.S., Courts, § 93.] Jurisdiction once acquired is not
defeated by subsequent events which might have prevented jurisdiction had they
occurred before personal service of the action was made. [Citation.]" (*Maloney v.
Maloney* (1944) 67 Cal.App.2d 278, 280 [child custody proceedings]; see also *In
re Larry P.* (1988) 201 Cal.App.3d 888, 895; 2 Witkin, Cal. Procedure (4th ed.
1996) Jurisdiction, § 401, at p. 1010 [citing § 410.50, subd. (b)]; Moore & Thomas,
Cal. Civ. Prac. Procedure (database updated Oct. 2007) Judgments, § 28:4.)

Thus, Goldman's renewed judgment was not void for lack of personal
jurisdiction. The trial court properly denied Simpson's motion to vacate because it
was untimely, and because it was based on a ground – insufficient contacts with
California to confer personal jurisdiction at the time of the renewal – unavailable
under section 683.170, subdivision (a). Rather, the court had continuing
jurisdiction under section 410.50, derived from its jurisdiction at the time of the
original judgment, to enter the renewal.

## DISPOSITION

The order denying Simpson's motion to vacate the renewal of judgment is affirmed.  Respondent shall recover his costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, J.



We concur:




EPSTEIN, P. J.




MANELLA, J.




10

# EXHIBIT "G"



Islamic Republic of Iran

National Iranian Oil Company

NIOC

**NIOC Subsidiary Companies**

National Iranian Oil Company

# Subsidiaries

The National Iranian Oil Company (NIOC) was established in February 1948 with the objective of exploration, development, production, marketing of crude oil and natural gas. Having in possession huge hydrocarbon reserves, NIOC is the fourth largest state oil firm in the world.

The oil and gas in place reserves are 137 billion barrels and 29.17 trillion cubic meters, respectively which gives it a unique status on the global energy supply map. In fact, in recent years NIOC has been invariably ranked as the world's fourth largest oil company.

Current NIOC production capacities include over 4 million barrels of crude oil and in excess of 1.7 million cubic meters of natural gas per day. On the export side, the company benefits from its modern extensive facilities on the three islands of Kharg, Lavan and Siri consisting of 17 jetties capable of berthing tankers of all sizes to lift and export its crude oil.

Organizational Structure:

NIOC's General Assembly (consisting of the President, Vice President, Director General of the Management and Planning Organization, Ministers of Oil, Energy, Industries and Mines, Labor and Social Affairs, Economy and Finance) is its highest decision marking body. It determines the company's general policy guidelines, and approves annual budgets, operations, financial statements and balance sheets. The Company's Board of Directors has the authority and major responsibilities to approve operational schemes within the general framework ratified by the General Assembly. It approves transactions and contracts, and

**National Iranian Gas Export Company**
- Website: www.nigec.ir
- email: info@nigec.ir

**National Iranian South Oil Company**
- Website: www.nisoc.com
- email: info@nisoc.com

**National Iranian Offshore Oil Company**
- Website: www.iooc.co.ir
- email: webmaster@iooc.co.ir

**National Iranian Central Oil Fields Co.**
- Website: www.icofc.ir
- email: info@icofc.ir

**Khazar Exploration & Production Co.**

**Petroleum Engineering & Development Co.**
- Website: www.pedec.ir
- email: info@pedec.net

**Pars Oil and Gas Company**
- Website: www.pogc.org
- email: info@pogc.ir

**Pars Special Economic Energy Zone Co.**
- Website: www.pseez.com
- email: info@pseez.com

**National Iranian Oil Terminals Company**
- Website: www.nioc-otc.com
- email: info@nioc-otc.com

**National Iranian Drilling Company**
- Website: www.nidc.ir
- email: webmaster@nidc.ir

**North Drilling Company**

...reports and Board reports and annual
...sheets for presentation to the General
Assembly. The Board supervises the
...implementation of general policy guidelines
...by the General Assembly, and pursues
...operations via the company's Managing
Director.

With appropriate division of tasks and
delegation of responsibilities to subsidiaries-
...NIOC has been able to establish
...degrees of coordination within its
...set up. In fact, NIOC's "Directors"
...primarily in policy making and supervision
while subsidiaries act as their executive arm in
coordinating an array of operations such as
exploration, drilling, production and delivery of
crude oil and natural gas, for export and
domestic consumption.

**Website:** www.northdrilling.com
**email:** info@northdrilling.com

**PetroIran Development Company**
**Website:** www.petroiran.com
**email:** info@petroiran.com

**Ahwaz Pipe Mills Company**
**Website:** www.apm-ir.com
**email:** tabibi@apm-ir.com

**Petropars**
**Website:** www.petropars.com
**email:** webadmin@ppars.com

**Fuel Consumption Optimization Co.**
**Website:** www.ifco.ir
**email:** info@ifco.ir

**National Iranian Tanker Co.**
**Website:** www.nitc.co.ir
**email:** administrator@nitc.co.ir

**Exploration Service Company (ESC)**
**Website:** www.oeoc.ir
**email:** info@oeoc.ir

**Kala Naft London Ltd.**
**Website:** www.kalaltd.com
**email:** admin@kalaltd.com

**Kala Naft Canada Ltd.**
**Website:** www.kalanaftcanada.com
**email:** info@kalanaftcanada.com

**Arvandan Oil and Gas Company**
**Website:** www.arvandan.org
**email:** info@arvandan.org



National Iranian Oil Company Today.
wmv Format
4.37 MB

1   **DAVID J. COOK, ESQ. (State Bar # 060859)**
    **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2   **COOK COLLECTION ATTORNEYS**
    **A PROFESSIONAL LAW CORPORATION**
3   165 Fell Street
    San Francisco, CA 94102
4   Mailing Address: P.O. Box 270
    San Francisco, CA 94104-0270
5   Tel.: (415) 989-4730
    Fax: (415) 989-0491
6   File No. 52,752

7   Attorneys for Plaintiffs
    STEVEN M. GREENBAUM, ALAN HAYMAN,
8   and SHIRLEE HAYMAN

9                 UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11

12   STEVEN M. GREENBAUM, ALAN   )    CASE NO. 3:08-mc-80024-JSW
    HAYMAN, and SHIRLEE HAYMAN,   )
                            )
13            Plaintiffs,         )    [PROPOSED] ORDER DIRECTING CLERK
                            )    TO ISSUE AMENDED WRIT OF
14   vs.                       )    EXECUTION
                            )
15   ISLAMIC REPUBLIC OF IRAN, et al.,   )
                            )
16           Defendant.        )
    ————————————————————— )

17

18         Based upon the Declaration of David J. Cook, Esq., and finding that The National Iranian

19   Oil Company is an apparent agency and/or instrumentality of The Islamic Republic of Iran

20   ("Iran"), along with The Ministry of Petroleum and The Ministry of Oil, and furthermore finding

21   that Iran has nationalized its oil industry and The National Iranian Oil Company and its

22   subsidiaries are agency and instrumentality of Iran, and in the interest of justice herein, and

23   without prejudice to any later motion to quash or set aside this order, and for good cause

  appearing, therefore,

24

25         IT IS HEREBY ORDERED that the Clerk of this Court shall issue, forthwith, an Amended

26   Writ of Execution which identifies the Judgment Debtor, from THE ISLAMIC REPUBLIC OF

27   IRAN to THE ISLAMIC REPUBLIC OF IRAN aka The Ministry of Petroleum on Behalf of the

28   Islamic Republic of Iran, Ministry of Oil on Behalf of the Islamic Republic of Iran, and The

1  National Iranian Oil Company on Behalf of the Islamic Republic of Iran, and its subsidiaries:

2      1. National Iranian Gas Export Company
       Website: www.nigec.ir
3         Email: info@nigec.ir

4      2. National Iranian South Oil Company
       Website: www.nisoc.com
5         Email: info@nisoc.com

6      3. National Iranian Offshore Oil Company
       Website: www.iooc.co.ir
7         Email: webmaster@iooc.co.ir

8      4. National Iranian Central Oil Fields Co.
       Website: www.icofc.ir
9         Email: info@icofc.ir

10      5. Khazar Exploration & Production Co.
       Tehran HQ.
11         No.19 – 11th Alley - Vozara Ave. - Arjantin sq.
       Tel: +98-21-88722430. 3
12         Fax: +98-21-88711386

13      6. Petroleum Engineering & Development Co.
       Website: www.pedec.ir
14         Email: info@pedec.net

15      7. Pars Oil and Gas Company
       Website: www.pogc.org
16         Email: info@pogc.ir

17      8. Pars Special Economic energy Zone Co.
       Website: www.pseez.com
18         Email: info@pseez.com

19      9. National Iranian Oil Terminals Company
       Website: www.nioc-otc.com
20         Email: info@nioc-otc.com

21      10. National Iranian Drilling Company
       Website: www.nidc.ir
22         Email: webmaster@nidc.ir

23      11. North Drilling Company
       Website: www.northdrilling.com
24         Email: info@northdrilling.com

25      12. PetroIran Development Company
       Website: petroiran.com
26         Email: info@petroiran.com

27

28

13. Ahwaz Pipe Mills Company
    Website: www.apm-ir.com
    Email: tabibi@apm-ir.com

14. Petropars
    Website: www.petropars.com
    Email: webadmin@ppars.com

15. Fuel Consumption Optimization Co.
    Website: www.ifco.ir
    Email: info@ifco.ir

16. National Iranian Tanker Co.
    Website: www.nitc.co.ir
    Email: administrator@nitc.co.ir

17. Exploration Service Company (ESC)
    Website: www.oeoc.ir
    Email: info@oeoc.ir

18. Kala Naft London Ltd.
    Website: www.kalaltd.com
    Email: admin@kalaltd.com

19. Kala Naft Canada Ltd.
    Website: www.kalanaftcanada.com
    Email: info@kalanaftcanada.com

20. Arvandan Oil and Gas Company
    Website: www.arvandan.org
    Email: info@arvandan.org

IT IS FURTHER ORDERED that the granting of this order, issuance of the Writ of

Execution herein, and any levy and execution thereunder, shall be without prejudice to any third

party contesting the validity of the claims and assertions therein, and filing any adverse claim,

including a Third Party Claim which may be permitted under C.C.P. § 699.510, or otherwise as

allowed by law herein.

DATED: _____          _____
                                        JEFFREY S. WHITE
                                        JUDGE OF THE UNITED STATES
                                        DISTRICT COURT

F:\USERS\DJCNEW\iran.ex1sf

[PROPOSED] ORDER DIRECTING CLERK TO ISSUE AMENDED WRIT OF EXECUTION
CASE NO. 3:08-mc-80024-JSW                                                          3

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA 94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA 94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52.752

7  Attorneys for Plaintiffs
   STEVEN M. GREENBAUM, ALAN HAYMAN,
8  and SHIRLEE HAYMAN

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11
   STEVEN M. GREENBAUM, ALAN          )    CASE NO. 3:08-mc-80024-JSW
12 HAYMAN, and SHIRLEE HAYMAN,        )
                                      )
13            Plaintiffs,             )    PROOF OF SERVICE
                                      )
14 vs.                               )
                                      )
15 ISLAMIC REPUBLIC OF IRAN, et al., )
                                      )
16            Defendant.              )
                                      )
17 ─────────────────────────────────

18 *Via Email dr-ahmadinejad@president.ir*     ISLAMIC REPUBLIC OF IRAN
   PRESIDENT DR. AHMADINEJAD                   Khomeini Avenue
19                                             United Nations Street
   ISLAMIC REPUBLIC OF IRAN                    Teheran, Iran
20 acting through its                          ATTN: Responsible Officer
   MINISTRY OF DEFENSE AND
21 SUPPORT FOR ARMED FORCES                    1. National Iranian Gas Export Company
   No. 1 Shahid Kaboli Street                  Website: www.nigec.ir
22 Beginning of Resalat Highway                Email: info@nigec.ir
   Seyyed Khandan Bridge
23 P.O. Box 16765-1479                         2. National Iranian South Oil Company
   Tehran, Iran                                Website: www.nisoc.com
24 Attn: Responsible Officer                   Email: info@nisoc.com

25 ISLAMIC REPUBLIC OF IRAN                    3. National Iranian Offshore Oil Company
   Pasadaran Avenue                            Website: www.iooc.co.ir
26 Golestan Yekom                              Email: webmaster@iooc.co.ir
   Teheran, Iran
27 ATTN: Responsible Officer                   4. National Iranian Central Oil Fields Co.
                                               Website: www.icofc.ir
28                                             Email: info@icofc.ir

PROOF OF SERVICE - CASE NO. 3:08-mc-80024-JSW                              1

5. Khazar Exploration & Production Co.
Tehran HQ.
No.19 – 11th Alley - Vozara Ave. - Arjantin sq.
Tehran, Iran
Tel: +98-21-88722430, 3
Fax: +98-21-88711386

6. Petroleum Engineering & Development Co.
Website: www.pedec.ir
Email: info@pedec.net

7. Pars Oil and Gas Company
Website: www.pogc.org
Email: info@pogc.ir

8. Pars Special Economic energy Zone Co.
Website: www.pseez.com
Email: info@pseez.com

9. National Iranian Oil Terminals Company
Website: www.nioc-otc.com
Email: info@nioc-otc.com

10. National Iranian Drilling Company
Website: www.nidc.ir
Email: webmaster@nidc.ir

11. North Drilling Company
Website: www.northdrilling.com
Email: info@northdrilling.com

12. PetroIran Development Company
Website: petroiran.com
Email: info@petroiran.com

13. Ahwaz Pipe Mills Company
Website: www.apm-ir.com
Email: tabibi@apm-ir.com

14. Petropars
Website: www.petropars.com
Email: webadmin@ppars.com

15. Fuel Consumption Optimization Co.
Website: www.ifco.ir
Email: info@ifco.ir

16. National Iranian Tanker Co.
Website: www.nitc.co.ir
Email: administrator@nitc.co.ir

17. Exploration Service Company (ESC)
Website: www.oeoc.ir
Email: info@oeoc.ir

18. Kala Naft London Ltd.
Website: www.kalaltd.com
Email: admin@kalaltd.com

19. Kala Naft Canada Ltd.
Website: www.kalanaftcanada.com
Email: info@kalanaftcanada.com

20. Arvandan Oil and Gas Company
Website: www.arvandan.org
Email: info@arvandan.org

1    I declare:

2    I am employed in the County of San Francisco, California. I am over the age of eighteen
(18) years and not a party to the within cause. My business address is 165 Fell Street, San
3    Francisco, CA 94102. On the date set forth below, I served the attached:

4    EX PARTE APPLICATION FOR ORDER AMENDING WRIT OF EXECUTION TO
INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135

5
6    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE
APPLICATION FOR ORDER AMENDING WRIT OF EXECUTION TO INCLUDE
ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135

7
8    DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF EX PARTE
APPLICATION FOR ORDER AMENDING WRIT OF EXECUTION TO INCLUDE
ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135

9
10    [PROPOSED] ORDER DIRECTING CLERK TO ISSUE AMENDED WRIT OF
EXECUTION

11    on the above-named person(s) by:

12    __XXX__ (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage
thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the
13    person(s) served above.

14    __XXX__ (BY EMAIL) Emailing addressed to the person's/company's email address listed
above.

15
16    I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2008.

17
18                                        ___/s/ Karene Jen_____
                                              Karene Jen
19

20

21

22

23

24

25

26

27

28