DAVID J. COOK, ESQ. (State Bar # 060859)
ROBERT J. PERKISS, ESQ (State Bar # 62386)
COOK COLLECTION ATTORNEYS
A PROFESSIONAL LAW CORPORATION
165 Fell Street
San Francisco, CA 94102
Mailing Address: P.O. Box 270
San Francisco, CA 94104-0270
Tel: (415) 989-4730
Fax: (415) 989-0491
File No. 52,752

Attorneys for Plaintiffs
STEVEN M. GREENBAUM, ALAN HAYMAN,
and SHIRLEE HAYMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN M. GREENBAUM, ALAN HAYMAN, and SHIRLEE HAYMAN, <br><br> Plaintiffs, <br><br> vs. <br><br> ISLAMIC REPUBLIC OF IRAN, et al., <br><br> Defendant. | CASE NO. 3:08-mc-80024-JSW <br><br> SECOND EX PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135 |

COMES NOW Plaintiffs STEVEN M. GREENBAUM, ALAN HAYMAN, and SHIRLEE

HAYMAN, who hereby apply to this court ex parte for the issuance of an order amending the Writ

of Execution issued by this court herein on 3/10/08 and issuing a new and different Writ of

Execution, changing the name therein from THE ISLAMIC REPUBLIC OF IRAN to THE

ISLAMIC REPUBLIC OF IRAN aka The Ministry of Petroleum on Behalf of the Islamic

Republic of Iran, Ministry of Oil on Behalf of the Islamic Republic of Iran, on behalf of the

following:

///

///

1      1.     National Iranian Gas Company
                  Website: www.nigc.org
2                 Email: webmaster@nigc.org

3      2.     National Iranian Petrochemical Company
                  Website: www.nipc.net
4                 Email: webmaster@nipc.net

5      3.     National Iranian Oil Refining and Distribution Co.
                  Website: www.niordc.ir
6                 Email: info@niordc.ir

7   and all subsidiaries, subdivisions, affiliates, and related entities.

8   DATED:  March 13, 2008            COOK COLLECTION ATTORNEYS

9

10                         By:  /s/ David J. Cook
                          DAVID J. COOK, ESQ. (SB# 060859)
                          Attorneys for Plaintiffs
11                        STEVEN M. GREENBAUM, ALAN
                        HAYMAN, and SHIRLEE HAYMAN

12

13   F:\USERS\DJCNEW\iran.ex2sf

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA 94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA 94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52.752

7  Attorneys for Plaintiffs
   STEVEN M. GREENBAUM, ALAN HAYMAN,
8  and SHIRLEE HAYMAN

9                 UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11

12  STEVEN M. GREENBAUM, ALAN          )    CASE NO. 3:08-mc-80024-JSW
    HAYMAN, and SHIRLEE HAYMAN,        )
13                                     )    MEMORANDUM OF POINTS AND
         Plaintiffs,                   )    AUTHORITIES IN SUPPORT OF SECOND
                                       )    EX PARTE APPLICATION FOR ORDER
14  vs.                                )    AMENDING AND TO DIRECT ISSUANCE
                                       )    OF SECOND AMENDED AND ALIAS WRIT
15  ISLAMIC REPUBLIC OF IRAN, et al.,  )    OF EXECUTION TO INCLUDE
                                       )    ADDITIONAL NAMES PURSUANT TO
16       Defendant.                    )    C.C.P. § 680.135
                                       )
17  _____   )

                    I. **INTRODUCTION.**
18
        Plaintiffs STEVEN M. GREENBAUM, ALAN HAYMAN, and SHIRLEE HAYMAN
19
    ("Plaintiffs"), Judgment Creditors for and on behalf of The Islamic Republic of Iran ("Iran") move
20
    this court for the issuance of a Second Amended and Alias (additional) Writ of Execution,
21
    showing the true name and identity of the Judgment Debtor, from THE ISLAMIC REPUBLIC OF
22
    IRAN to THE ISLAMIC REPUBLIC OF IRAN aka The Ministry of Petroleum on Behalf of the
23
    Islamic Republic of Iran, Ministry of Oil on Behalf of the Islamic Republic of Iran, and The
24
    National Iranian Oil Company on Behalf of the Islamic Republic of Iran, on behalf of the
25
    following:
26

27

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE APPLICATION
    FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF
    EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
    CASE NO. 3:08-mc-80024-JSW                                                                    1

1.      National Iranian Gas Company
   Website: www.nigc.org
   Email: webmaster@nigc.org

2.      National Iranian Petrochemical Company
   Website: www.nipc.net
   Email: webmaster@nipc.net

3.      National Iranian Oil Refining and Distribution Co.
   Website: www.niordc.ir
   Email: info@niordc.ir

and all subsidiaries, subdivisions, affiliates, and related entities.

The basis is that Iran, through the Ministry of Petroleum, owns and controls three separate entities (hereinafter "Agencies"), which are the subject of this motion, constituting agencies and instrumentalities of Iran, in that Iran nationalized the entire oil industry. They are part and parcel of the state itself.

Under F.R.C.P. 69(a)(1), federal law follows the process and procedures of the state, as follows:

> Rule 69. Execution
> (a) In General.
> (1) Money Judgment: Applicable Procedure.
> A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution — and in proceedings supplementary to and in aid of judgment or execution — must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

From time to time, a Judgment Creditor may find that a Judgment Debtor does business under new or different names. C.C.P. § 680.135 provides as follows:

> § 680.135.
> "Affidavit of Identity" means an affidavit or declaration executed by a judgment creditor, under penalty of perjury, that is filed with the clerk of the court in which the judgment is entered at the time the judgment creditor files for a writ of execution or an abstract of judgment. The affidavit of identity shall set forth the case name and number, the name of the judgment debtor stated in the judgment, the additional name or names by which the judgment debtor is known, and the facts upon which the judgment creditor has relied in obtaining the judgment debtor's additional name or names. The affidavit of identity shall not include the name or names of persons, including any corporations, partnerships, or any legal entities not separately named in the judgment in which the judgment debtor is a partner, shareholder, or member, other than the judgment debtor.

Accordingly, this Judgment Creditor seeks to have the court issue an order ex parte.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
CASE NO. 3:08-mc-80024-JSW

2

1   amending the Writ to show the true and correct name of the Judgment Debtor.    For purpose of

2   this court (USDC. Central District of California), these assets are located in the United States, and

3   moreover in this District.  28 U.S.C. § 1963.

4                                      II.  **FACTUAL BASIS.**

5          Iran owns all of its oil and petroleum assets.  This is confirmed by a number of sources.

6   EIA also reports on *Exhibit "A"* that the organizational structure is found as follows:

7          "The Ministry of Petroleum (MoP) manages: 1) National Iranian Oil Company
           (NIOC) - oil and gas exploration and production, refining and oil transportation: 2)
8          National Iranian Gas Company (NIGC) - manages gathering, treatment, processing,
           transmission, distribution, and exports of gas and gas liquids; 3) National Iranian
9          Petrochemical Company (NPC) - handles petrochemical production, distribution
           and exports: and 4) National Iranian Oil Refining and Distribution Company
10         (NIORDC) handles oil refining and transportation, with some overlap to NIOC.
           The National Iranian Offshore Oil Co. (IOOC) is in charge of offshore oil fields in
11         the Persian Gulf.  The National Iranian South Oil Fields Co. (NIOC South) is in
           charge of onshore oilfields in southern Iran.  Pars Oil & Gas Co. (POGC) is in
12         charge of the offshore North and South Pars gas fields. Khazar Exploration &
           Production Co. is in charge of Iran's Caspian Sea sector.  Also. the National Iranian
13         Tanker Company (NITC) controls the second largest fleet of tankers in OPEC." (P.
           12)

14
           This likewise is further confirmed by the four separate downloads from the Ministry of
15
     Petroleum of Iran marked *Exhibits "B" "C" "D" and "D-1."*
16
           Helpful in this analysis is rulings by Iran U.S. Claims Tribunal in *Oil Field of Texas, Inc.,*
17
     *Claimant, v. The Government of the Islamic Republic of Iran, National Iranian Oil Company,*
18
     *Oil Service Company of Iran, Respondents.* (1- I.U.S.CT.R. p 347) CASE NO. 43 Award No.:
19
     ITL 10-43-FT Iran - United States Claims Tribunal Filed December 9, 1982 in which the Tribunal
20
     stated as follows (at pages 4 to 5):
21
           "OSCO - a brief historical and legal background In March 1951 the Iranian
22         Parliament enacted legislation nationalizing the Iranian oil industry. Later.
           following a coup d'etat in Iran. a number of major multinational oil companies
23         formed an Oil Consortium. which signed an Agreement ("the 1954 Agreement") for
           the exploration, production, refining and exportation of Iranian oil.
24
           The 1954 Agreement provided for the creation by the Consortium members of two
25         operating companies. Iranian Oil Exploration and Producing Company ("IOEPC")
           and Iranian Oil Refining Company ("IORC") to be incorporated under the law of
26         the Netherlands. Their respective functions were to carry out exploration,
           production. refining. transportation and other operations specified in the
27

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE APPLICATION
     FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF
     EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
     CASE NO. 3:08-mc-80024-JSW                                                                    3

1    Agreement. The 1954 Agreement provided that the Consortium would fund all
     activities of IOEPC and IORC and that the Consortium members would jointly and
2    severally guarantee the performance of the operating companies.

3    In 1973 the 1954 Agreement was replaced by a new agreement ("the 1973 Main
     Agreement"). The preamble of the 1973 Main Agreement states:
4
     *Iran is determined that the right of full and complete ownership, operation and*
5    *control in respect of all hydro-carbon reserves, assets and administration of the*
     *petroleum industry shall be exercised by NIOC.*
6
     NIOC is an Iranian joint stock company which was incorporated by statute in Iran
7    on 29 April 1951. All NIOC's shares are, and have always been. owned by the
     Government of Iran. NIOC was established in order to exercise the ownership right
8    of the Iranian nation in the oil and gas resources throughout the country and in the
     continental shelf and to be responsible for the exploration, development.
9    production, exploitation and distribution of petroleum and petroleum products both
     within and outside Iran. The Iranian Ministry of Oil has subsequently assumed
10   certain of NIOC's functions.

11   The 1973 Main Agreement ended the role of IOEPC and IORC, and provided for
     NIOC to operate and manage all oil-related operations.
12
     The Tribunal stated at page 9 as follows:
13
     "It remains, however, for the Tribunal to decide whether NIOC is an entity
14   controlled by the Government of Iran within the meaning of that article.

15   Respondents do not admit that NIOC is such an entity and have consequently left to
     the Tribunal to decide this question.
16
     The record in this case shows that NIOC was incorporated by statute in 1951. that
17   all NIOC's shares are, and have always been, owned by the Government of Iran.
     that NIOC according to its Statutes has been established in order to exercise the
18   ownership right of Iran in its oil and gas resources and to be responsible for the
     exploration. development, production, exploitation and distribution of petroleum
19   and petroleum products within and outside Iran and finally that the Iranian Ministry
     of Oil has now assumed certain of NIOC's functions.
20
     Furthermore. according to the Statutes. the shareholder shall be represented at the
21   General Meetings of the company by the Prime Minister and six other cabinet
     ministers.
22
     Consequently, it is obvious that NIOC is, and was at all relevant times, totally
23   controlled by the Government of Iran. In view of the above-mentioned purpose of
     the company and other available information it is also clear that NIOC is one of the
24   instruments by which the Government of Iran conducted and currently conducts the
     country's national oil policy. It is therefore equally clear that NIOC is an agency or
25   instrumentality controlled by the Government of Iran."
     (Copy marked *Exhibit "E"*)
26
     The Tribunal has likewise ruled that the *National Iranian Gas Company* is an agency and
27

1  instrumental in *Onesco Inc vs. National Iranian Gas Company and the Islamic Republic of Iran*

2  12 Iran-US U.S.C.T.R. 160 (Case Number 263, Award Number 254-263-2) (copy marked *Exhibit*

3  *"F"*) at page as follows:

4     "The *Respondents clearly* fall within the definition of "Iran" contained in Article
       VII, paragraph 3, of the Claims Settlement Declaration.
5     (Emphasis added) (page 2)"

6  In *Dames and Moore vs. The Islamic Republic of Iran. . . The National Iranian Gas Company*

7  *etc.* 4-1mU.SCT. R. 212 (Case Number 54, Award 97 54 3) (copy marked *Exhibit "G"*), the court

8  held that the *National Iranian Gas Company* is an agency and instrumentality of Iran, as follows:

9     "It is not contested that AEOI, NISCO and *NIGC* are entities controlled by the
       Government of Iran and, therefore, all of the claims are against "Iran" as that term
10    is defined in Article VII, paragraph 3, of the Claims Settlement Declaration." (Page
       5)
11

    In *Iran National Gas Company vs. United States* 17-1 US CT.R. 183 (Case Number B40. ) (copy
12
    marked *Exhibit "H"*), the court stated as follows at page 2:
13
14    "6. The Tribunal notes that the claim was filed by the *Iran National Gas Company*
       under the signature of the Deputy Minister of Oil of the Islamic Republic of Iran.
       The Tribunal has previously determined that this Claimant is an entity controlled
15    by the Government of Iran and that it clearly falls within the definition of "Iran"
       contained in Article VII, paragraph 3, of the Claims Settlement Declaration. See
16    Dames and Moore and The Islamic Republic of Iran et al., Award No. 97-54-3 (20
       December 1983) at p. 11; and Onesco, Inc. and National Iranian Gas Company,
17    Award No. 254-263-2 (18 September 1986) at p. 3. Therefore, the claim is one
       between the two Governments and is an "official claim[]" the Tribunal's
18    jurisdiction over which is defined in Article II, paragraph 2, of the Claims
       Settlement Declaration."
19
    The Tribunal has also ruled that the *National Petrochemical Company* is an agency and
20
    instrumental of Iran in *Amoco vs. The Government of the Islamic Republic of Iran . . . National*
21
    *Petrochemic al Company etc.,* 15 Iran United States Tribunal Reports P. 189 (Case Number 56,
22
    Award 310 56 - 3) (copy marked *Exhibit "I"*), as follows:
23
24    "25. Although the Tribunal finds no reason to dispute the separate corporate status
       of NIOC, NPC [*National Petrochemical Company*] or Khemco, such status is
       irrelevant in determining whether these companies are proper Respondents. It is
25    undisputed that these three companies are entities controlled by Iran within the
       terms of the CSD and are thus potentially proper Respondents to this claim. The
26    claim in this Case is based on two distinct legal theories: first, expropriation and,
       second, breach of contract. It is clear that each of the named Respondents is prima
27

28

facie a proper party to at least one of the alternative theories. Under the expropriation theory Iran is indisputably a proper Respondent. Each of the other Respondents was directly or indirectly involved in the contractual relationship here at issue, thus raising the possibility of liability under the breach of contract theory. Whether any of the Respondents is ultimately found liable on these theories is an issue which pertains to the merits of this Case. The Tribunal thus cannot determine the attributability of the claim to the respective Respondents named as a preliminary issue."

Plaintiff therefore has established that the three Agencies and their subsidiaries constitute an "agency or instrumentality" controlled by the Government of Iran, and accordingly, levy upon its assets would be property of Iran. Under C.C.P. § 680.135, Plaintiff is entitled to an order seeking the issuance of a Second Amended and Alias Writ of Execution which would properly identify the Islamic Republic of Iran with the designation of these Agencies. Plaintiff seeks a second and separate writ from the original writ as issued by this court and subject to amendment by way of the prior ex parte application filed on March 4, 2008.

As a state-owned entity, the assets are readily subject to levy and execution under 28 U.S.C. § 1605A. The key sections which now breathe life into the collection efforts are found in 28 U.S.C. § 1605A(a)(1) & (g)(1), which provide as follows:

"(a) IN GENERAL. --
        "(1) NO IMMUNITY. – A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

"(g) PROPERTY IN CERTAIN ACTIONS –
        "(1) IN GENERAL. – subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of –
                "(A) the level of economic control over the property by the government of a foreign state;
                "(B) whether the profits of the property go to that government;
                "( C) the degree to which officials of that government manage the property or otherwise control its daily affairs;
                "(D) whether that government is the sole beneficiary in interest of

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
CASE NO. 3:08-mc-80024-JSW                                                                                    6

the property: or

"(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

"(2) UNITED STATES SOVEREIGN IMMUNITY

INAPPLICABLE. Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgement entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act."

Having established that these Agencies are part of Iran, and therefore subject to levy and execution, Plaintiff is entitled to a Second Amended and Alias Writ of Execution properly identifying Iran, not only in its own name, but the name of every entity by which it conducts business.

## III. MECHANISM OF LEVY.

To the extent that a Writ of Execution is amended, the added "name" is not left without a remedy in the event of an error in the amendment process. C.C.P. § 699.510 provides as follows:

§ 699.510.

(a) Subject to subdivision (b), after entry of a money judgment, a writ of execution shall be issued by the clerk of the court upon application of the judgment creditor and shall be directed to the levying officer in the county where the levy is to be made and to any registered process server. The clerk of the court shall give priority to the application for, and issuance of, writs of execution on orders or judgments for child support and spousal support. A separate writ shall be issued for each county where a levy is to be made. Writs may be issued successively until the money judgment is satisfied, except that a new writ may not be issued for a county until the expiration of 180 days after the issuance of a prior writ for that county unless the prior writ is first returned.

(b) If the judgment creditor seeks a writ of execution to enforce a judgment made, entered, or enforceable pursuant to the Family Code, in addition to the requirements of this article, the judgment creditor shall satisfy the requirements of any applicable provisions of the Family Code.

© (1) The writ of execution shall be issued in the name of the judgment debtor as listed on the judgment and may include the additional name or names by which the judgment debtor is known as set forth in the affidavit of identity, as defined in Section 680.135, filed by the judgment creditor with the application for issuance of the writ of execution. Prior to the clerk of the court issuing a writ of execution containing any additional name or names by which the judgment debtor is known that are not listed on the judgment, the court shall approve the affidavit of identity. If the court determines, without a hearing or a notice, that the affidavit of identity states sufficient facts upon which the judgment creditor has identified the additional names of the judgment debtor, the court shall authorize the issuance of

1     the writ of execution with the additional name or names.
      (2) In any case where the writ of execution lists any name other than that listed on
2     the judgment, the person in possession or control of the levied property, if other
      than the judgment debtor, shall not pay to the levying officer the amount or deliver
3     the property being levied upon until being notified to do so by the levying officer.
      The levying officer may not require the person, if other than the judgment debtor,
4     in possession or control of the levied property to pay the amount or deliver the
      property levied upon until the expiration of 15 days after service of notice of levy.
5     (3) If a person who is not the judgment debtor has property erroneously subject to
      an enforcement of judgment proceeding based upon an affidavit of identity, the
6     person shall be entitled to the recovery of reasonable attorney's fees and costs from
      the judgment creditor incurred in releasing the person's property from a writ of
7     execution, in addition to any other damages or penalties to which an aggrieved
      person may be entitled to by law, including the provisions of Division 4
8     (commencing with Section 720.010).

9     This serves as a safeguard against an erroneous levy and execution. Additionally, the only

10    apparent reported case is *IO Group, Inc. v. Michael Purser,* marked *Exhibit "J."*

11         Needless to say, these Agencies are situated in Iran, but their assets are far flung, including

12    certain assets which have a United States nexus, and therefore subject to levy and execution. This

13    court having jurisdiction over the Judgment Debtor would have jurisdiction over all of its assets,

14    as such jurisdiction is ultimately *in personam.* In a recent case of *Fredric Goldman v. Orenthal*

15    *James Simpson.* Court of Appeal of the State of California, Second Appellate District, Division

16    Four (Los Angeles). Case No. B200082, the court stated as follows:

17         "Jurisdiction over the parties is necessary for the validity of any judgment in
           personam. (Cal. Code Civ. Proc. § 1917; *Pennoyer v. Neff* (1877) 95 U.S. 714, 722
18         [24 L.Ed. 565]; Allen v. Superior Court (1953) 41 Cal.2d 306, 309; Restatement,
           Judgments §§ 6, 14, and Intro. Note, p. 79.) Such jurisdiction depends upon three
19         factors: (1) Jurisdiction of the state, based upon there being sufficient minimum
           contacts existing between this state and the parties or their property or other
20         interests (see Section 410.10). (2) Notice and opportunity for a hearing (see
           Sections 412.10-412.30, 473.5). (3) Compliance with statutory jurisdictional
21         requirements for service of process (see Sections 413.10-417.30). In addition, the
           court in which the action is pending must be competent to hear and decide the type
22         of action and the amount in controversy that are involved in the case. When these
           factors are present, the court has acquired 'fundamental' jurisdiction over the
23         parties, and *this jurisdiction continues to final judgment and in subsequent
           proceedings incidental thereto.*" (Italics added)
24         (Copy marked *Exhibit "K"*)

25    Plaintiff has more than supplied a verifiable factual basis under C.C.P. § 680.135 linking these

26    Agencies to Iran and the Writ of Execution should be amended to show the true and correct name

27

28    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE APPLICATION
      FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF
      EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
      CASE NO. 3:08-mc-80024-JSW                                                                    8

1  of Iran by including the Agencies themselves.

2  ### IV. CONCLUSION.

3  Plaintiff has made its burden of proof that these Agencies are part and parcel of Iran, that
4  they are essentially assets of the Judgment Debtor, and capable of being subject to enforcement.

5  DATED: March 13, 2008                    COOK COLLECTION ATTORNEYS

6

7                                          By: __/s/ David J. Cook_____
                                           DAVID J. COOK, ESQ. (SB# 060859)
8                                          Attorneys for Plaintiffs
                                           STEVEN M. GREENBAUM, ALAN
9                                          HAYMAN, and SHIRLEE HAYMAN

10  F:\USERS\DJCNEW\iran.ex2sf

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX PARTE APPLICATION
    FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF
    EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
    CASE NO. 3:08-mc-80024-JSW                                                          9

1   **DAVID J. COOK, ESQ.** (State Bar # 060859)
    **ROBERT J. PERKISS, ESQ** (State Bar # 62386)
2   **COOK COLLECTION ATTORNEYS**
    **A PROFESSIONAL LAW CORPORATION**
3   165 Fell Street
    San Francisco. CA 94102
4   Mailing Address: P.O. Box 270
    San Francisco. CA 94104-0270
5   Tel.: (415) 989-4730
    Fax: (415) 989-0491
6   File No. 52.752

7   Attorneys for Plaintiffs
    STEVEN M. GREENBAUM. ALAN HAYMAN,
8   and SHIRLEE HAYMAN

9                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11
    STEVEN M. GREENBAUM, ALAN        )    CASE NO. 3:08-mc-80024-JSW
12  HAYMAN, and SHIRLEE HAYMAN,      )
                                     )    DECLARATION OF DAVID J. COOK, ESQ.
13            Plaintiffs,            )    IN SUPPORT OF SECOND EX PARTE
                                     )    APPLICATION FOR ORDER AMENDING
14  vs.                             )    AND TO DIRECT ISSUANCE OF SECOND
                                     )    AMENDED AND ALIAS WRIT OF
15  ISLAMIC REPUBLIC OF IRAN, et al.. )    EXECUTION TO INCLUDE ADDITIONAL
                                     )    NAMES PURSUANT TO C.C.P. § 680.135
16            Defendant.             )
                                     )
17

18          I. DAVID J. COOK, hereby declare and state as follows:

19          1. I am one of the attorneys of record for Plaintiffs in the above-entitled action. am duly

20  authorized to practice before all courts in the State of California, and am familiar with the facts

21  and circumstances in this action.

22          2. Iran owns all of its oil and petroleum assets.  This is confirmed by a number of sources.

23  EIA also reports on *Exhibit "A"* that the organizational structure is found as follows:

24          "The Ministry of Petroleum (MoP) manages: 1) National Iranian Oil Company
            (NIOC) - oil and gas exploration and production. refining and oil transportaton; 2)
25          National Iranian Gas Company (NIGC) - manages gathering, treatment. processing.
            transmission. distribution, and exports of gas and gas liquids: 3) National Iranian
26          Petrochemical Company (NPC) - handles petrochemical production, distribution
            and exports; and 4) National Iranian Oil Refining and Distribution Company
27

28  DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF SECOND EX PARTE APPLICATION FOR
    ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF
    EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
    CASE NO. 3:08-mc-80024-JSW                                                          1

1    (NIORDC) handles oil refining and transportation. with some overlap to NIOC.
     The National Iranian Offshore Oil Co. (IOOC) is in charge of offshore oil fields in
2    the Persian Gulf. The National Iranian South Oil Fields Co. (NIOC South) is in
     charge of onshore oilfields in southern Iran. Pars Oil & Gas Co. (POGC) is in
3    charge of the offshore North and South Pars gas fields. Khazar Exploration &
     Production Co. is in charge of Iran's Caspian Sea sector. Also, the National Iranian
4    Tanker Company (NITC) controls the second largest fleet of tankers in OPEC." (P.
     12)

5
     This likewise is further confirmed by the four separate downloads from the Ministry of Petroleum
6
     of Iran marked *Exhibits "B" "C" "D" and "D-1."*
7
8        3. Helpful in this analysis is rulings by Iran U.S. Claims Tribunal in *Oil Field of Texas,*
9    *Inc., Claimant, v. The Government of the Islamic Republic of Iran, National Iranian Oil*
10   *Company, Oil Service Company of Iran, Respondents.* (1- I.U.S.CT.R. p 347) CASE NO. 43

11   Award No.: ITL 10-43-FT Iran - United States Claims Tribunal Filed December 9, 1982 in which

12   the Tribunal stated as follows (at pages 4 to 5):

13       "OSCO - a brief historical and legal background In March 1951 the Iranian
         Parliament enacted legislation nationalizing the Iranian oil industry. Later,
14       following a coup d'etat in Iran, a number of major multinational oil companies
         formed an Oil Consortium. which signed an Agreement ("the 1954 Agreement") for
15       the exploration. production, refining and exportation of Iranian oil.

16       The 1954 Agreement provided for the creation by the Consortium members of two
         operating companies, Iranian Oil Exploration and Producing Company ("IOEPC")
17       and Iranian Oil Refining Company ("IORC") to be incorporated under the law of
         the Netherlands. Their respective functions were to carry out exploration,
18       production. refining, transportation and other operations specified in the
         Agreement. The 1954 Agreement provided that the Consortium would fund all
19       activities of IOEPC and IORC and that the Consortium members would jointly and
         severally guarantee the performance of the operating companies.

20       In 1973 the 1954 Agreement was replaced by a new agreement ("the 1973 Main
         Agreement"). The preamble of the 1973 Main Agreement states:
21
         *Iran is determined that the right of full and complete ownership, operation and*
22       *control in respect of all hydro-carbon reserves, assets and administration of the*
         *petroleum industry shall be exercised by NIOC.*
23
         NIOC is an Iranian joint stock company which was incorporated by statute in Iran
24       on 29 April 1951. All NIOC's shares are. and have always been, owned by the
         Government of Iran. NIOC was established in order to exercise the ownership right
25       of the Iranian nation in the oil and gas resources throughout the country and in the
         continental shelf and to be responsible for the exploration, development,
26       production. exploitation and distribution of petroleum and petroleum products both
         within and outside Iran. The Iranian Ministry of Oil has subsequently assumed
27

28   DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF SECOND EX PARTE APPLICATION FOR
     ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF
     EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
     CASE NO. 3:08-mc-80024-JSW                                                          2

1    certain of NIOC's functions.

2    The 1973 Main Agreement ended the role of IOEPC and IORC, and provided for
     NIOC to operate and manage all oil-related operations.

3
     The Tribunal stated at page 9 as follows:

4
5    "It remains, however, for the Tribunal to decide whether NIOC is an entity
     controlled by the Government of Iran within the meaning of that article.

6    Respondents do not admit that NIOC is such an entity and have consequently left to
     the Tribunal to decide this question.

7
     The record in this case shows that NIOC was incorporated by statute in 1951. that
8    all NIOC's shares are. and have always been, owned by the Government of Iran.
     that NIOC according to its Statutes has been established in order to exercise the
9    ownership right of Iran in its oil and gas resources and to be responsible for the
     exploration. development. production, exploitation and distribution of petroleum
10   and petroleum products within and outside Iran and finally that the Iranian Ministry
     of Oil has now assumed certain of NIOC's functions.

11
     Furthermore. according to the Statutes. the shareholder shall be represented at the
12   General Meetings of the company by the Prime Minister and six other cabinet
     ministers.

13
     Consequently, it is obvious that NIOC is, and was at all relevant times, totally
14   controlled by the Government of Iran. In view of the above-mentioned purpose of
     the company and other available information it is also clear that NIOC is one of the
15   instruments by which the Government of Iran conducted and currently conducts the
     country's national oil policy. It is therefore equally clear that NIOC is an agency or
16   instrumentality controlled by the Government of Iran."

17   A true and correct copy of this case is attached hereto marked *Exhibit "E."*

18       4. The Tribunal has likewise ruled that the *National Iranian Gas Company* is an agency

19   and instrumental in *Onesco Inc vs. National Iranian Gas Company and the Islamic Republic of*

20   *Iran* 12 Iran-US U.S.C.T.R. 160 (Case Number 263, Award Number 254-263-2). in which the

21   court stated as follows. and a true and correct copy is attached hereto marked *Exhibit "F."*

22   "The *Respondents clearly* fall within the definition of "Iran" contained in Article
     VII. paragraph 3, of the Claims Settlement Declaration.
23   (Emphasis added) (page 2)"

24       5. In *Dames and Moore vs. The Islamic Republic of Iran. . . The National Iranian Gas*

25   *Company etc.* 4-1mU.S.CT. R. 212 (Case Number 54, Award 97 54 3). a true and correct copy

26   which is attached hereto marked *Exhibit "G,"*, the court held that the *National Iranian Gas*

27

28   DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF SECOND EX PARTE APPLICATION FOR
     ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF
     EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
     CASE NO. 3:08-mc-80024-JSW                                                                    3

1   *Company* is an agency and instrumentality of Iran, as follows:

2      "It is not contested that AEOI, NISCO and *NIGC* are entities controlled by the
       Government of Iran and, therefore, all of the claims are against "Iran" as that term
3      is defined in Article VII, paragraph 3, of the Claims Settlement Declaration." (Page
       5)
4
5      6. In *Iran National Gas Company vs. United States* 17-1 US CT.R. 183 (Case Number

6   B40, ), a true and correct copy is attached hereto marked *Exhibit "H,"* the court stated as follows

7   at page 2:

8      "6. The Tribunal notes that the claim was filed by the *Iran National Gas Company*
       under the signature of the Deputy Minister of Oil of the Islamic Republic of Iran.
9      The Tribunal has previously determined that this Claimant is an entity controlled
       by the Government of Iran and that it clearly falls within the definition of "Iran"
10     contained in Article VII, paragraph 3, of the Claims Settlement Declaration. See
       Dames and Moore and The Islamic Republic of Iran et al., Award No. 97-54-3 (20
11     December 1983) at p. 11; and Onesco, Inc. and National Iranian Gas Company,
       Award No. 254-263-2 (18 September 1986) at p. 3. Therefore, the claim is one
12     between the two Governments and is an "official claim[]" the Tribunal's
       jurisdiction over which is defined in Article II, paragraph 2, of the Claims
13     Settlement Declaration."

14     7. The Tribunal has also ruled that the *National Petrochemical Company* is an agency

15  and instrumental of Iran in *Amoco vs. The Government of the Islamic Republic of Iran . . .*

16  *National Petrochemic al Company etc.,* 15 Iran United States Tribunal Reports P. 189 (Case

17  Number 56, Award 310 56 - 3), a true and correct copy which is attached hereto marked *Exhibit*

18  *"I,"* as follows:

19     "25. Although the Tribunal finds no reason to dispute the separate corporate status
       of NIOC, NPC [*National Petrochemical Company*'] or Khemco, such status is
20     irrelevant in determining whether these companies are proper Respondents. It is
       undisputed that these three companies are entities controlled by Iran within the
21     terms of the CSD and are thus potentially proper Respondents to this claim. The
       claim in this Case is based on two distinct legal theories: first, expropriation and,
22     second, breach of contract. It is clear that each of the named Respondents is prima
       facie a proper party to at least one of the alternative theories. Under the
23     expropriation theory Iran is indisputably a proper Respondent. Each of the other
       Respondents was directly or indirectly involved in the contractual relationship here
24     at issue, thus raising the possibility of liability under the breach of contract theory.
       Whether any of the Respondents is ultimately found liable on these theories is an
25     issue which pertains to the merits of this Case. The Tribunal thus cannot determine
       the attributability of the claim to the respective Respondents named as a
26     preliminary issue."

27

28  DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF SECOND EX PARTE APPLICATION FOR
    ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF
    EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
    CASE NO. 3:08-mc-80024-JSW                                                              4

8.  Declarant therefore has established that the three Agencies and their subsidiaries constitute an "agency or instrumentality" controlled by the Government of Iran, and accordingly, levy upon its assets would be property of Iran.  Under C.C.P. § 680.135, Plaintiff is entitled to an order seeking the issuance of a Second Amended and Alias Writ of Execution which would properly identify the Islamic Republic of Iran with the designation of these agencies.  Plaintiff seeks a second and separate writ from the original writ as issued by this court and subject to amendment by way of the prior ex parte application filed on March 4, 2008.

9.  A true and correct copy of the case entitled *IO Group, Inc. v. Michael Purser* is attached hereto marked *Exhibit "J."*

10.  A true and correct copy of the recently published opinion entitled *Fredric Goldman v. Orenthal James Simpson*, Court of Appeal of the State of California, Second Appellate District, Division Four (Los Angeles), Case No. B200082, is attached hereto marked *Exhibit "K."*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2008.


_____/s/ David J. Cook_____
DAVID J. COOK, ESQ. (SB# 060859)

F:\USERS\DJCNEW\iran.ex2sf

DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF SECOND EX PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
CASE NO. 3:08-mc-80024-JSW                                                                        5

# EXHIBIT "A"

Energy Information Administration                                    www.eia.doe.gov

COUNTRY ANALYSIS BRIEFS

# Iran

Last Updated: October 2007

## Background

*Iran, one of OPEC's founding members, holds the world's third-largest proven oil reserves, and the world's second-largest natural gas reserves.*

Iran is a member of the Organization of the Petroleum Exporting Countries (OPEC), and ranks amongst the world's top three holders of proven oil and natural gas reserves. Iran is OPEC's second-largest exporter after Saudi Arabia, and is the fourth-largest exporter of crude oil globally after Saudi Arabia, Russia, and Norway. Natural gas accounts for half of Iran's total domestic energy consumption, while the remaining half is predominately oil consumption. The continued exploration and production of the offshore South Pars natural gas field in the Persian Gulf is a key part of in Iran's energy sector development plan.

### Total Energy Consumption in Iran, by Type (2004)



Natural gas 49%
Coal 1%
Hydro 2%
Oil 48%

Source: EIA International Energy Annual 2004



## Oil

*Iran is OPEC's second-largest oil producer and the fourth-largest crude oil exporter in the world.*

According to *Oil and Gas Journal*, Iran has 136 billion barrels of proven oil reserves, or roughly 10 percent of the world's total proven petroleum reserves as of January 1, 2007. Iran has 40 producing fields, 27 onshore and 13 offshore, with the majority of crude oil reserves located in the southwestern Khuzestan region near the Iraqi border. Iran's crude oil is generally medium in sulfur content and in the 28°-35° API range.

### Top Proven World Oil Reserves, January 1, 2007



Source: Oil & Gas Journal, Jan. 1, 2007

Iran is OPEC's second-largest producer after Saudi Arabia. In 2006, Iran produced an estimated 4.2 million barrels per day (bbl/d) of total liquids, of which 3.8 million bbl/d was crude oil, equal to 5 percent of global production.



**OPEC Total Crude Oil Production in 2006E**

| Country | Million Barrels Per Day |
|---|---|
| Saudi Arabia | 9.2 |
| Iran | 3.8 |
| Kuwait | 2.5 |
| Venezuela | 2.5 |
| United Arab Emirates | 2.5 |
| Nigeria | 2.2 |
| Iraq | 2.0 |
| Libya | 1.7 |
| Algeria | 1.4 |
| Indonesia | 0.9 |
| Qatar | 0.8 |

Source: EIA Short-Term Energy Outlook (May 2007)

Iran's oil consumption totaled 1.6 million bbl/d in 2006. The Iranian government heavily subsidizes the price of refined oil products which has contributed to increased domestic demand. Iran has limited refinery capacity to produce light fuels, but imports much of its gasoline supply. Iranian domestic oil demand is mainly for gasoline and automotive gasoils, but domestic demand for other oil products are declining due to the substitution of natural gas. However, it is an overall net petroleum products exporter due to large exports of residual fuel oil. Oil export revenues represent the majority of Iran's total exports earnings, but the country suffers from budget deficits due to a growing population and large government subsidies on gasoline and food products. In 2005, the International Monetary Fund (IMF) estimated that energy subsidies accounted for 12 percent of Iran's GDP, the highest rate in the world according to an International Energy Agency (IEA) study.

| Major Iranian Oil Field Production and Reserves, 2006 | | |
|---|---|---|
| Field | Production Capacity Thousand (bbl/d) | Reserves Millions of Barrels |
| Ahwaz-Asmari | 700 | 10,100 |
| Marun | 520 | 9,500 |
| Gachsaran | 480 | 8,500 |
| Karanj-Parsi | 250 | 4,650 |
| Agha Jari | 200 | 8,700 |
| Nowrooz and Soroosh | 200 | 6,000 |
| Doroud 1 & 2 | 200 | 600 |
| Rag-e-Safid | 180 | 2,400 |
| Bangestan | 158 | 6,500 |
| Abu Zar | 140 | 50 |
| Sirri A & E/C & D | 130 | 1,200 |
| Salman | 100 | 800 |
| Major Field Total: | 3,258 | 59,000 |

Source: Global Insight

Iran produced 6 million bbl/d of crude oil in 1974, but has been unable to produce at that level since the 1979 revolution due to a combination of war, limited investment, sanctions, and a high rate of natural decline in Iran's mature oil fields. Iran's oil fields need structural upgrades including

enhanced oil recovery (EOR) efforts such as natural gas injection. Iran's fields have a natural annual decline rate estimated at 8 percent onshore and 10 percent offshore, while current Iranian recovery rates are 24-27 percent, 10 percent less than the world average. It is estimated that 400,000-500,000 bbl/d of crude production is lost annually due to reservoir damage and decreases in existing oil deposits.

*Upstream Projects*
The Azadegan project phases I and II represent the greatest potential increase in Iranian crude oil production. Azadegan contains 26 billion barrels of proven crude oil reserves, but is geologically complex and difficult to extract. Iran and Venezuela have agreed on a $4 billion investment in the Ayacucho 7 block, where there are an estimated 31 billion barrels of oil. Iran's Northern Drilling Company (NDC) has also worked with Russia's Lukoil on oil field development in the Caspian Sea. (See Caspian Sea Analysis Brief)

| New Major Iranian Upstream Projects through 2012 | | | |
|---|---|---|---|
| **Field** | **Company** | **Thousand bbl/d** | **Online** |
| Salman, Foroozan, Daroud | Total, Petro Iran | 200 | 2007 |
| Darkhovin, Phase II & III | ENI | 100 | 2007 |
| South Pars (Ahwaz) | NOIC | 150 | 2008 |
| Azadegan Phase I (south) | NIOC | 100 | 2009 |
| Kushk-Hosseinieh | NOIC | 300 | 2010 |
| Yadavaran | NIOC & Chinese Partners | 300 | 2011 |
| Azadegan Phase II (north) | NOIC | 110 | 2012 |
| **New Potential Total:** | | 1,260 | |

Source: OPEC, *Global Insight*

Iran plans to increase oil production to over 5 million bbl/d by 2010, but it will need foreign help. According to *Global Insight*, an estimated $25-35 billion is required to meet the government's 5.8 million bbl/d target by 2015. Investment in Iran's energy sector has been tempered due to the election of the conservative government of President Mahmoud Ahmadinejad in 2005, the international controversy surrounding the Iranian uranium enrichment and nuclear program, and economic sanctions. According to the IEA 2007 Medium-Term Oil Market Report, Iran will not be able to increase its net expansion capacity through 2012.

## U.S. Sanctions
U.S. sanctions against Iran due to Iran's historic support for international terrorism and its actions against non-belligerent shipping in the Persian Gulf impact the development of its petroleum sector. According to the Iran Transactions Regulations, administered by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), U.S. persons may not directly or indirectly trade, finance, or facilitate any goods, services or technology going to or from Iran, including goods, services or technology that would benefit the Iranian oil industry. U.S. persons are also prohibited from entering into or approving any contract that includes the supervision, management or financing of the development of petroleum resources located in Iran.

## Sector Organization
The state-owned National Iranian Oil Company (NIOC) is responsible for oil and gas production and exploration. The National Iranian South Oil Company (NISOC), a subsidiary of NIOC, accounts for 80 percent of local oil production covering the provinces of Khuzestan, Bushehr, Fars, and Kohkiluyeh va Boyer Ahamd. Though private ownership of upstream functions is prohibited under the Iranian constitution, the government has allowed for buyback contracts which allow international oil companies (IOCs) to enter exploration and development through an Iranian affiliate. The contractor receives a remuneration fee, usually an entitlement to oil or gas from the developed operation. In August 2007, President Mahmoud Ahmadinejad appointed NIOC executive Gholamhossein Nozari to serve as Acting Oil Minister, replacing Vaziri Hamaneh and creating controversy over President Ahmadinejad's role in the energy sector.

## Exports
According to International Energy Agency's Monthly Oil Data Service and Global Trade Atlas, Iran's net crude and product exports in 2006 averaged 2.5 million bbl/d, primarily to Japan, China, India, South Korea, Italy, and other Organization for Economic Co-operation and Development

(OECD) nations, making it the fourth-largest exporter of crude oil in the world. In 2006, Iran's oil export revenues amounted to $54 billion.

| Top Iranian Crude Oil Exports, 2006 | |
|---|---|
| Country | Thousand (bbl/d) |
| Japan | 448 |
| China | 335 |
| India* | 302 |
| South Korea | 204 |
| Italy | 191 |
| Turkey | 179 |
| France | 135 |
| South Africa | 127 |
| Taiwan | 117 |
| Greece | 117 |
| Other | 345 |
| **Total Exports:** | **2,500** |
| *India's imports only reported for April-August 2006 | |
| Source: IEA Monthly Oil Data Service, March 2007; Global Trade Atlas | |

### Iran's Oil Production and Consumption, 1976-2006E



Source: EIA *International Petroleum Monthly*
Short-Term Energy Outlook (July 2007)

*Export Terminals*
Iran has the largest oil tanker fleet in the Middle East, the National Iranian Tanker Company, which holds 29 ships including Very Large Crude Carriers. Kharg Island is the country's largest terminal with a holding capacity of 16 million barrels of oil and a loading capacity of 5 million bbl/d, followed by Lavan Island with capacity to store 5 million barrels and loading capacity of 200,000 bbl/d. Other important terminals include Kish Island, Abadan and Bandar Mahshar, and Neka, which helps facilitate imports from the Caspian region. The Strait of Hormuz, on the southeastern coast of Iran, is an important route for oil exports from Iran and other Persian Gulf countries. (See Persian Gulf Analysis Brief) At its narrowest point the Strait of Hormuz is 34 miles wide, yet an estimated 17 million barrels, or roughly two-fifths of all seaborne traded oil, flows through the Strait daily. Iranian Heavy Crude Oil is Iran's largest crude export at 1.6 million bbl/d followed by Iranian Light at 1 million bbl/d.

| National Iranian Oil Company (NIOC) Crude Exports by Blend | | | |
|---|---|---|---|
| Name | API Gravity | Sulfur content | Exports (bbl/d) |
| Iranian Heavy | 31° | 1.70% | 1.6 million |
| Iranian Light | 34.6° | 1.40% | 1 million |
| Foroozan Blend and Sirri | 29-31° | n/a | 165,000 |
| Lavan Blend | 34-35° | 1.8-2% | 75,000 |

### Refining

Iran's total refinery capacity is 1.5 million bbl/d from nine refineries operated by the National Iranian Oil Refining and Distribution Company (NIORDC), a NIOC subsidiary. Iranian refineries are unable to keep pace with domestic demand, and face major infrastructure problems. The country plans to add around 985,000 bbl/d of refining capacity by 2012, mostly through expansions and upgrades for gasoline yields at the Bandar Abbas, Bushehr, and the 90-year-old Abadan refineries. Large expansion projects at Bandar Abbas, including new catalytic reformers, distillation units, and condensate splitters will help supply the domestic demand, but it will probably not eliminate all gasoline imports. Iran has also discussed joint ventures in Asia, including China, Indonesia, Malaysia, and Singapore to expand refining activity.

| IRAN REFINERY PROJECTS (through 2012) | | | | |
|---|---|---|---|---|
| Refinery | Project Type | Online | Additional Production Capacity (thousand bbl/d) | Notes |
| Bandar Abbas | Upgrade & Expansion | 2012 | 300 | heavy crude processing |
| Bushehr | New Refinery | TBD | 170 | |
| Abadan | Upgrade | 2009 | 140 | |
| Abadan | New Refinery | 2012 | 80 | gasoline production |
| Arak | Expansion | 2009 | 80 | |
| Bandar Assaluyeh | New Refinery | TBD | 80 | |
| Bandar Abbas | Expansion | 2009 | 60 | |
| Tehran | Expansion | 2012 | 50 | gasoline production |
| Tabriz | Expansion | 2012 | 25 | gasoline production |
| Total New Refinery Capacity: | | | 985 | |

Source: PFC Energy, *Global Insight*

### Pipelines

Iran has an expansive domestic oil network including 5 pipelines, and multiple international pipeline projects under consideration. Recently, an expansion of the 150 mile pipeline from the port of Neka on the Caspian coast to Rey, Tabriz, and Tehran refineries has reached a capacity of 300,000 bbl/d according to *Global Insight*. Iran has invested in its import capacity at the Caspian port to handle increased product shipments from Russia and Azerbaijan, and enable crude swaps with Turkmenistan and Kazakhstan. In the case of crude swaps, the oil from the Caspian is consumed domestically in Iran, and an equivalent amount of oil is produced for export through the Persian Gulf with a Swiss-trading arm of NIOC for a swap fee.

*In 2006, Iran imported over 192,000 bbl/d of gasoline and relied upon imports to meet almost half of its fuel needs costing $5*

### Gasoline

Iran is the second biggest gasoline importer in the world after the United States, consuming over 400,000 bbl/d. According to FACTS Global Energy, Iran imported over 192,000 bbl/d of gasoline in 2006 costing $5 billion. The gasoline consumption growth rate has averaged ten percent annually over the past six years, and the cost of imports is expected to reach $6 billion in 2007, up from $2.8 billion in 2005. Gasoline prices are heavily subsidized, and sold below the market

*billion.*

price at around 42 cents per gallon, which has encouraged increased consumption. An increase in vehicle sales in recent years has also contributed to the problem. According to PFC Energy, car ownership in Iran grew 250 percent between 1990 and 2006, and a majority of these vehicles are older models. Gasoline powered vehicles in Iran are expected to reach 14.9 million by the end of 2007. Iran does not have sufficient refining capacity to meets its domestic gasoline and other light fuel needs. Therefore Iran imports gasoline from India, Turkmenistan, Azerbaijan, the Netherlands, France, Singapore, and the United Arab Emirates. Iran also imports from large, multinational wholesalers such as BP, Shell, Total, Vitol, LUKoil, and several Chinese companies.

*New Gasoline Rationing System*
In June 2007, the Iranian government instituted a gasoline rationing system. The decision followed a 25 percent price increase to 42 cents per gallon in May. NIORDC is responsible for the program which allows private cars to purchase 26 gallons per month and taxis to buy 211 gallons per month. The rations and increased costs are politically unpopular in Iran. Customers are allowed to purchase their ration six months in advance. Part-time taxis, commercial vehicles, and government vehicles also have special allowances. Records are maintained on smart cards, and later this year the government is expected to announce the price for gasoline bought beyond quota levels.

Iran's gasoline consumption dropped 30 percent immediately after the rationing scheme was adopted. NIOC executive, Hojjatollah Ghanimifard, stated that Iranian gasoline imports for August 2007 dropped 14 percent, although an additional $1.5 billion was requested by the Iranian Oil Ministry to increase gasoline imports through March 2008. The International Energy Agency reported in its <u>August 2007 Oil Market Update</u> that gasoline consumption will likely increase again due to the fact that Iran allows advance purchase of gasoline at a subsidized rate. The combination of rationing, price hikes, increased refining capacity, as well as compressed natural gas (CNG) production, will reduce Iranian gasoline import demand by an estimated 30,000 bbl/d in the next three years according to FACTS Global Energy.

# Natural Gas

*Iran is the world's third largest consumer of natural gas, and the South Pars Natural Gas offshore field the most significant development project in the country's energy sector.*

According to *Oil and Gas Journal*, Iran has an estimated 974 trillion cubic feet (Tcf) in proven natural gas reserves. Iran holds the world's second largest reserves after Russia. Around 62 percent of Iranian natural gas reserves are located in non-associated fields, and have not been developed. Major natural gas fields include: South and North Pars, Tabnak, and Kangan-Nar. In 2005, Iran produced and consumed 3.6 Tcf of natural gas. Natural gas consumption is expected to grow around 7 percent annually for the next decade.

Both production and consumption have grown rapidly over the past 20 years, and natural gas is often used for re-injection into mature oilfields in Iran. According to FACTS Global Energy, Iran's natural gas exports will be minimal due to rising domestic demand even with future expansion and production from the massive South Pars project. In 2005, 65 percent of Iranian natural gas was marketed production, while 18 percent was for EOR gas re-injection, and 17 percent was lost due to flaring and the reduction of wet natural gas from hydrocarbon extraction. Like the oil industry, natural gas prices in Iran are heavily subsidized by the government.



**World Natural Gas Reserves by Country, January 1, 2007**

| Country | Trillion Cubic Feet |
|---|---|
| Russia | 1,680.0 |
| Iran | 974.0 |
| Qatar | 910.5 |
| Saudi Arabia | 239.5 |
| UAE | 214.4 |
| USA | 204.4 |
| Nigeria | 181.9 |
| Algeria | 161.7 |
| Venezuela | 152.4 |

Source: Oil & Gas Journal, Jan. 1, 2007

### Sector Organization

The National Iranian Gas Company (NIGC) is responsible for natural gas infrastructure, transportation, and distribution. Due to the poor investment climate, some foreign companies including British Petroleum (BP) and Chile's Sipetrol have chosen to divest in Iran's natural gas sector. Total, Eni, and Shell are the largest remaining foreign investors. In response, Iran has looked toward eastern firms, like state-owned Indian Oil Corp. and China Petroleum & Chemical Corporation, or Sinopec, to take an increased role in Iranian natural gas upstream development. Under Iran's buy-back scheme, foreign firms hand over operations of fields to NIOC, and after development they receive payment from natural gas production to cover their investment.

### Liquefied Natural Gas (LNG)

According to FACTS, Global Energy, Iran may only be able to reach peak LNG exports of around 1,462 Bcf as a lifetime ceiling. LNG projects in Iran lag behind neighboring Qatar, the world's largest LNG exporter. A $500-million contract for Iran LNG is part of the South Pars Phase 12 development. Pars Oil and Gas Company (PAGC) is responsible for upstream LNG development, and downstream development is divided amongst various companies including the National Iranian Gas Export Company (NIGEC).

### South Pars Field



©petroleumreports.com

The most significant energy development project in Iran is the offshore South Pars field, which is estimated to have 450 Tcf of natural gas reserves, or around 47 percent of Iran's total natural gas reserves. Discovered in 1990, and located 62 miles offshore in the Persian Gulf, South Pars has a 25 phase development scheme spanning 20 years. The Iranian government expects each phase to yield 1 Bcf/d, and is developing the South Pars field primarily to meet its domestic market demand. The first five phases are completed, while the next five are due by the end of 2007. The Iranian government plans for the first 16 phases to be online by 2010, keeping pace with Qatar's connected North Field. The majority of South Pars natural gas development will be allocated to the domestic market for consumption and gas re-injection, with the remainder exported to South Asia or Europe, LNG production, and gas to liquids (GTL).

## Exploration and Production

Iranian natural gas field exploration occurs in the Fars province including the Varavi, Shanol, and Homa fields, and in the Persian Gulf Salman gas field. Former Oil Minister Kazem Vaziri-Hamaneh announced in August 2007, that a natural gas discovery in the Fars province should produce up to 30 million cubic feet per day (Mcf/d) from 17 new wells. Iran also announced new agreements with IOCs associated with the South Pars project, and SKS, a private Malaysian company to develop non-associated Golshan and Ferdos fields for LNG exports. Their investment will amount to $16 billion, but is in early stages. Iran and Kuwait have recently settled a dispute over the Arash (Al Dorra) offshore natural gas field in the Persian Gulf which they will jointly develop and explore. The field lies on the continental shelf between Iran, Kuwait, and Saudi Arabia.

## Pipelines

Iran's domestic natural gas pipelines increased over recent years, and future projects are planned for the IGAT (1-8) pipeline series. The 745 mile Iran-Turkey pipeline completed in 2001 can move 1.4 Bcf/d. Iran imports 800 Mcf/d from Turkmenistan via pipeline from the bordering Korpedze field to Iran's Kurt Kul town for consumption in northern Iran. This $195-million pipeline is the first in the Caspian region to bypass Russia. In March 2007, the 87-mile long Iran-Armenia pipeline was completed in Agarak, and will transport 200 Mcf/d to Armenia in exchange for electricity. The Nabucco pipeline is an another proposed project which will run 2050 miles from Iran and other Caspian states through Turkey to Austria and the European Union. Construction is slated to start in 2009, and the project will cost an estimated $6.8 billion with a capacity to transport 300 Mcf/d.

*Iran-Pakistan-India (IPI) Pipeline*



Source: U.S. Government

The most controversial pipeline proposal is the $7.4-billion Iran-Pakistan-India (IPI) line which would transport Iranian natural gas south to the Asian subcontinent. With a proposed 1724 miles and a 5.4 Bcf/d capacity, the pipeline has been stalled in the past due in part to disputes over the cost of the shipments. NIOC's Director of International Affairs Hojjatollah Ghanimifard invited President Musharraf of Pakistan and Prime Minister Singh of India to discuss the pipeline in July 2007, but the final arrangement has not been announced. Pakistan and India still need to settle transportation tariffs. Iran would probably extend its domestic IGAT-7 pipeline into Pakistan, and not create a new parallel pipeline. The 545-mile IGAT-7 has a total capacity of 5.4 Bcf/d and runs from Assaluyeh to Iranshahr. The IGAT-7 should be completed by 2011.

## Electricity

*Iran's electricity demand is projected to grow 6 percent annually through 2015.*

In 2004, Iran generated 156 billion kilowatthours (Bkwh) and consumed 145 Bkwh. 146 Bkwh was generated by conventional thermal electric power, and the remaining 11 Bkwh was generated by hydroelectric power. As of 2004, EIA shows no significant generation from nuclear electric power. Iran will need to increase its electricity generation to meet its rapid consumption growth. The IEA estimates that energy intensity in Iran is 30 percent higher than in OECD countries. According to FACTS Global Energy, Iran's electricity demand is projected to grow at 6 percent per year through 2015.

In Iran multiple sources of power generation are being explored. One option for meeting electricity demand includes using fuel oil for power generation, particularly efficient for plants located close to oil refineries. Iran also plans to boost natural gas production use to meet its electricity demand. Hydroelectric plants and the controversial nuclear power program will also be part of Iran's overall electricity plan if technological advances, investment, and political pressure allow. State-owned Tavanir and other regional subsidiaries dominate the power sector, and are responsible for power generation, transmission, and distribution. However, the Iranian government has moved to attract private investment in its electricity sector.

| (2007E) | |
|---|---|
| **Coal Production (2004E)** | 1 million short tons |
| **Coal Consumption (2004E)** | 1.7 million short tons |
| **Electricity Installed Capacity (2004E)** | 34.3 gigawatts |
| **Electricity Production (2004E)** | 156 billion kilowatt hours |
| **Electricity Consumption (2004E)** | 145 billion kilowatt hours |
| **Total Energy Consumption (2004E)** | 6.4 quadrillion Btus*, of which Natural Gas (49%), Oil (48%), Hydroelectricity (2%), Coal (1%) |
| **Total Per Capita Energy Consumption (2004E)** | 95.5 million Btus |
| **Energy Intensity (2004E)** | 10,280 Btu per $2000-PPP** |

## Environmental Overview

| **Energy-Related Carbon Dioxide Emissions (2004E)** | 402 million metric tons, of which Oil (52%), Natural Gas (42%), Coal (1%) |
|---|---|
| **Per-Capita, Energy-Related Carbon Dioxide Emissions (2004E)** | 6 metric tons |
| **Carbon Dioxide Intensity (2004E)** | 0.6 Metric tons per thousand $2000-PPP** |

## Oil and Gas Industry

| **Organization** | The Ministry of Petroleum (MoP) manages: 1) National Iranian Oil Company (NIOC) - oil and gas exploration and production, refining and oil transportation; 2) National Iranian Gas Company (NIGC) - manages gathering, treatment, processing, transmission, distribution, and exports of gas and gas liquids; 3) National Iranian Petrochemical Company (NPC) - handles petrochemical production, distribution, and exports; and 4) National Iranian Oil Refining and Distribution Company (NIORDC) handles oil refining and transportation, with some overlap to NIOC. The National Iranian Offshore Oil Co. (IOOC) is in charge of offshore oil fields in the Persian Gulf. The National Iranian South Oil Fields Co. (NIOC South) is in charge of onshore oilfields in southern Iran. Pars Oil & Gas Co. (POGC) is in charge of the offshore North and South Pars gas fields. Khazar Exploration & Production Co. is in charge of Iran's Caspian Sea sector. Also, the National Iranian Tanker Company (NITC) controls the second largest fleet of tankers in OPEC. |
|---|---|
| **Major Oil/Gas Ports** | Kharg Island, Lavan Island, Sirri Island, Ras Bahregan |
| **Foreign Company Involvement** | BG, BHP, Bow Valley, BP, Eni, Gazprom, Lukoil, OMV, Petronas, Royal Dutch/Shell, Sheer Energy, Sinopec, Statoil, Total |
| **Major Oil Fields** | Agha Jari, Ahwaz, Bangestan, Bibi Hakimeh, Darkhovin, Doroud, Gachsaran, Mansouri (Bangestan), Marun, Masjid-e Soleiman, Parsi, Rag-e-Safid, Soroush/Nowruz |
| **Major Natural Gas Fields** | South Pars, North Pars, Khuff, Zireh, Tabnak, Nar-Kangan, Aghar, Dalan, Sarkhoun, Mand |

| Major Refineries (capacity, bbl/d) | Abadan (400,000), Isfahan (265,000), Bandar Abbas (232,000); Tehran (225,000), Arak (150,000), Tabriz (112,000), Shiraz (40,000), Kermanshah (30,000), Lavan Island (20,000) |
|---|---|
| Major Export Terminals (loading capacity, bbl/d) | Kharg Island (5 million), Lavan Island (200,000), Neka (50,000), Assaluyeh (250,000 gas liquids), Kish Island and Abadan and Bandar Mahshahr |

* The total energy consumption statistic includes petroleum, dry natural gas, coal, net hydro, nuclear, geothermal, solar, wind, wood and waste electric power. The renewable energy consumption statistic is based on International Energy Agency (IEA) data and includes hydropower, solar, wind, tide, geothermal, solid biomass and animal products, biomass gas and liquids, industrial and municipal wastes. Sectoral shares of energy consumption and carbon emissions are also based on IEA data.
**GDP figures from OECD estimates based on purchasing power parity (PPP) exchange rates.

# Links

**U.S. Government**
CIA World Factbook - Iran
EIA - Country Information on Iran
Library of Congress Country Study on Iran
OPEC Fact Sheet
U.S. State Department - Iran
U.S. Treasury Department's Office of Foreign Asset Controls

**Foreign Government Agencies**
Interests Section of the Islamic Republic of Iran in Washington, DC (in the Pakistani Embassy)
Permanent Mission of the Islamic Republic of Iran to the United Nations
Salam Iran Home Page

**Energy**
National Iranian Oil Company
National Petrochemical Company of Iran
Pars Times: Caspian Sea Region
Pars Times: Iran Oil and Gas Resources

**General**
BBC Iran
BBC Persian
Bushehr: Global Security.org
Iran Nuclear Resources
Iran Press Service
Iranian Trade
Pars Times: Persian Gulf Region

# Sources

AFX Asia
Agence France Presse
AME Info
AP Worldstream
APS Review Oil Market Trends
ARMINFO News
Argus Media Ltd.
Asia in Focus
Asia Pulse
Bangkok Post
BBC
Business Monitor International
Business Standard
CIA World Factbook
Deutsche Bank
Dow Jones
FACTS Global Energy, Inc .
Financial Times
Economist Intelligence Unit Ltd.
Energy and Commodities Digest
EU Energy

# EXHIBIT "B"



# Ministry of Petroleum

Islamic Republic Of IRAN

Thursday, March 06, 2008

Home    About    Subcompanies    Publications    Main Links    Contact Us

Last Update : 12/10/2003                    Home→Subcompanies→NPC



# National Iranian Petrochemical Company

Projects    Members    Top Chart    About Us

**Preface:**

The National Petrochemical Company (NPC), a subsidiary to the Iranian Petroleum Ministry, is owned by the government of the Islamic Republic of Iran. It is responsible for the development and operation of the country's petrochemical sector.

Founded in 1964, NPC began its activities by operating a small fertilizer plant. Today, NPC is the second largest producer and exporter of petrochemicals in the Middle East. Over these years, it has not only expanded the range and volume of its products, but it has also taken steps in areas such as R&D to achieve more self-sufficiency.

Two special economic zones on the northern coast of the Persian Gulf have been developed to be home to the NPC's new project. These two zones enjoy a good access to feedstock, infrastructural facilities, local and international markets and skilled manpower.

NPC's major activities are production, sale, distribution and export of chemicals and petrochemicals. Currently allied with more than 50 subsidiaries, including 9 production complexes and 18 project implementing companies, NPC operates as a mother company handling policy-making, planning, directing and overseeing the activities of its subsidiaries and affiliates.

**Subsidiary Companies:**

The NPC subsidiariesare as follows:
- Khorasan Petrochemical Co.
- Tabriz Petrochemical Co.
- Esfehan Petrochemical Co.
- Arak Petrochemical Co.
- Kharg Petrochemical Co.
- Shiraz Petrochemical Co.
- Razi Petrochemical Co.
- Oromiyeh Petrochemical Co.
- Bandar Imam Petrochemical Co.
- Khorasan Petrochemical Co.
- Petrochemical Commercial Co.
- NPC International Co.
- Non-Basic Services Co.
- Petrochemical Development & Management Co.
- Bou Ali Project
- Arvand Project
- Amir Kabiri Project

- Borzouyeh Project
- Tondgoyan Project
- Fanavaran Project
- Bisotuni Project
- Damavand Project
- Assaluyeh Project
- Maroon Project
- Pars Project
- Fajr Project
- Jam Project
- Acid Acetic Karoon Project
- Oreh & Amonium Assaluyeh Project
- Elam Project
- Kermanshah Project
- Simorgh Project
- Laleh Project
- Omonium(III) Project

## Contact Informations and Links:

**Tehran HQ. :**

Address : North Sheykh Bahaei streat - Tehran Iran

Tel : +98-21-88059760-76 , 88059778-89

Fax : +98-21-88059701-2

Po Box : 19395-6896

Email :    webmaster@nipc.net

Web Site :    www.nipc.net






Please send all comments and suggestions to : Webmaster@mop.ir
© copyright 2004 Islamic Republic of IRAN Petroleum Ministry of IRAN all rights reserved.

# EXHIBIT "C"



# Ministry of Petroleum

Islamic Republic Of IRAN

Thursday, March 06, 2008    **Home**  **About**  **Subcompanies**  **Publications**  **Main Links**  **Contact Us**

Last Update : 12/10/2003    Home→Subcompanies→NIORDC

## National Iranian Oil Refining & Distribution Company

Projects    Members    Top Chart    About Us

## History

Although National Iranian Oil Refining and Distribution Company ( NIORDC ) is formed nearly in the past decade and began its activities within a new framework, the company is actually inherited 90 years of Iran's Oil Industries experiences in the fields of refining, transferring and distributing of oil products, as well as, engineering and construction of installations of oil industries.

NIORDC and its subordinate companies has been established to separate oil upstream activities from downstream activities.NIORDC was established on March 08 / 1992 and undertook to perform all the operations related to refining crude oil and transfer and distribution of oil products.

## Task & Goals
### Responsibilities And Duties Of NIORDC:

- Refining crude oil and producing variety of oil products in the refineries.
- Transferring crude oil from production bases and "Khazar Terminal" to the refineries and also transferring oil products from refineries and import bases to distribution procurement depots and distribution centres.
- Main provider of energy and distributor of oil products.
- Performing all refining projects and schemes, transfer and storing.
- Production, transfer and distribution of 250 million litres of oil products per day.
- Daily export of around 60 million litres of oil products abroad via oil terminals.
- Providing different sectors – industry, agriculture and power plants – with fuel and feed regularly e.g. petrochemical complexes to help them continue production in the country.
- Providing consuming fuel in residential sector, business sector in urban and the peasantry communities all over the country.
- Providing more than 4 million vehicles – heavy and light – existing in the transportation cycle with their required daily fuel.

## Installations And Capabilities Of NIORDC:

- Nine crude oil refineries in Tehran , Tabriz , Isfahan , Abadan , Kermanshah , Shiraz , Bandar Abbas , Arak and Lavan Island .

## Our Policy

- Providing desirable fuel supplying services and supplying feed of industries and factories all over the country in due time.
- Reducing consumption rate through employing energy consumption management and raising export rate to make foreign currency.
- Reducing waste materials through improving efficiency in refining and distribution system.
- Reducing enviroment pollution to reach stable development.
- Rasing human force productivity and promoting level of training.
- Increasing output of refinery facilities and transfer are distribution of oil products.
- Reducing cost of production, transfer and distribution of oil products.

### Subsidary Companies:

The NIORDC subsidiariesare as follows:
- National Iranian Oil Products Distribution Co.
- Management of Construction & Development of "CNG" Stations Co.
- National Iranian Oil Engineering and Construction Co.
- Oil Pipeline and Telecommunication Co.
- Oil Refining Co.

### Contact Informations and Links:

**Tehran HQ. :**

**Opposite of Arak Alley - Ostad Nejatollahi Ave.**

**Tel : +98-21-88801001-14 , 66465488**

**Fax : +98-21-66152138 , 66466007**

**Zip Code :15989**

**P.O.Box : 15815/3499**

Email :    info@niordc.ir

Web Site :    www.niordc.ir



# EXHIBIT "D"



# Ministry of Petroleum

Islamic Republic Of IRAN

Thursday, March 06, 2008     Home  About  Subcompanies  Publications  Main Links  Contact Us

Last Update : 12/10/2003         Home→Subcompanies→NIGC



# National Iranian Gas Company

**Projects**  **Members**  **Top Chart**  **About Us**

**Preface:**

National Gas company of Iran as one of the four principal Co.'s affiliated to oil ministry of Islamic Republic of Iran with 25 billions Ris.initial capital has established in1344 A.H.or 1965 AD.

This company, from the beginning of establishment up to now, appropriate to socioeconomical development growth and utilizing natural gas as one of the important sources in supplying fuel and energy production and obtaining some part of the required exchange, has gradually achieved various capabilities, competences and resources and possibilities including specialized and efficient man power with theoretical and actual insight and knowledge as well as numerous and various advanced and modern workshops, machinery, equipment, and tools for performing of the Co.'s operations, so that, today, it is able to do all affairs concerning calculation, designing and engineering, supplying the project goods from different sources, execution, manufacture and establishment , starting, utilization, and maintenance of refineries, high voltage transfer pipeline, gas pressure increasing and decreasing stations, supply and in city networks, cathodic protection systems, dispatching and remote control, precision tools and control equipment systems provisional, financial, administrative, organizational and man power systems, by its own, complying with authentic international and acceptable standards.

From the start of its establishment in various circumstances specially in emergency and unusual conditions, for maintaining and continuation of the operations, by its strong and loyal supports of specialized and faithful forces and finding scientific, experimental and rational solutions the company has overcome the troubles and problems resulted from development of investment and continuation of the current operations, and provided, by changing, transforming and modifying and making use of Experimental, scientific sources, and engineering know ledges, techniques and technologies, and productivity and entrepreneurship and innovation, sufficient guarantees for continuation of operations in normal and optimum conditions, where attaining to such abilities in less than 30 yrs. for gas industry being so complicated, is much more like a miracle than reality.

**The Most Important Capabilities Of The Company For Joint Cooperation With Organizations And Companies.**

**A) Advisory, Engineering And Studies Services.**

1)Technical and economical studies and presenting expertise advice on technical and economical justifications and the survey of fundamental projects.
2)Engineering studies and the survey and assessment of great projects.
3)Designing and engineering services and preparation of maps and determination of the
Projects requirement list and or presenting advice required for

10) Theoretical and practical performance and execution of general, supplementary and specialized education courses on technical and specialized and or management and supervisory and computer fields,.

**B) Exceptional Operations Of Projects**

1) Performance and/or supervision on the performance of the projects of pipelines, gas supply networks, supplying gas for industries , power plants and internal network, of residential and satellite complexes and towns, pumping and pressure reinforcement stations, refineries and their affiliated services structure and road building and town planning and affiliated substructure installations, power, precision tools and control equipment, catholic protection, instruments and machinery mechanical system.
2) Installation and startup of telephone centres and communication and dispatch systems.
3) Technical inspection and control of parts, instruments and machinery including, electrical mechanical and electronic systems and precision tools.
4) Installation, establishment and execution of safety and fire fighting instruments and systems.
5) Execution and assembling store keeping, classification and codification systems of items.
6) Execution and assembling institutions and organization.
7) Execution of projects and presentation of computer services.

**C) Maintenance**

1) Preparation and adjustment of repairing programs specially fundamental repairs and performing the fundamental repairs reconstruction and optimising machinery, turbines and compressors, different types of pumps and generally refinery instruments and machinery, pipelines, networks and gas pressure increase or decrease stations together with affiliated and subordinate installations and power instruments and systems and precision tools and control equipments.
2) Maintenance of telephone centres and Communication and dispatch systems.

**D) Marketing And Commerce And Goods Transport**

1)Commercial survey and studies for finding domestic and foreign sources for supplying goods.
2) Survey of the market and marketing for supplying the products and productions connected to gas and/or oil.

construction and installations, pipelines and transfer networks, pumping and pressure reinforcement stations, dissociation and remoistening centres and gas refinery, supplying gas to industries and residential compounds and fuel transformation, catholic protection systems, power systems, precision tools and control and measurement equipment, communication 1 dispatching and telephone centre installation systems, mechanical systems and storing installations,

4) Performing technical studies and comprehensive surveys for determination or change in industrial standards of the items and engineering, investigations and research on mechanical and chemical fields, chemicals and parts and laboratory services for physical and chemical tests and experiments chemicals, parts and metal and plastic items, different kinds of valves and appliances and gas burner instruments.

5) Performing studies and surveying and presenting advisories for the security of installations andBuildings and technical inspection and quality control and instalment, construction and establishment of preventive systems and instruments and or guarding against accidents specially explosion combustion and holocaust.

6) Performing studies and surveying and presenting organizational and institutional advice.

7) Performing studies and surveying and presenting advice for provision and supply of goods, store keeping systems and methods, and mechanization.

8) Performing studies and surveying and presenting advice for the method of prediction and installation and establishment of installation protection systems.

9) Performing studies, surveying, designing and suggesting contractual, engineering, commercial, financial, and administrative methods and systems.

3) Loading and transport of merchandise and commercial goods from parts of entry, customs and, or between storing centres of goods.

The NIGC subsidiariesare as follows:
- Markazi
- Khorasan
- Qazvin
- Qom

## Contact Informations and Links:

Tehran HQ. :

    Address : NIGC Bldg. - South Aban Ave.

    Tel : +98-21-88131

    Fax : +98-21-88309049

Email :   webmaster@nigc.org

Web Site :   www.nigc.org

   

Please send all comments and suggestions to : Webmaster@mop.ir
© copyright 2004 Islamic Republic of IRAN Petroleum Ministry of IRAN all rights reserved.

# EXHIBIT "D-1"

# Ministry of Petroleum

Islamic Republic Of IRAN

Thursday, March 06, 2008

Home   About   Subcompanies   Publications   Main Links   Contact Us

Last update: 17/1/2004

Home→Subcompanies

## Subcompanies






### National Iranian Oil Company

Fifty five years have passed since the National Iranian Oil Company (NIOC) was established in February 1948 with the objective of .....................................................**More**

Email : webmaster@nioc.com
Web Site : www.nioc.com



### National Iranian Petrochemical Company

The National Petrochemical Company (NPC), a subsidiary to the Iranian Petroleum Ministry, is owned by the government of the Islamic Republic of Iran. ............................**More**

Email : webmaster@nipc.net
Web Site : www.nipc.net



### National Iranian Gas Company

National Gas company of Iran as one of the four principal Co.'s affiliated to oil ministry of Islamic Republic of Iran with 25 billions Ris................................................................**More**

Email : webmaster@nigc.org
Web Site : www.nigc.org



### National Iranian Oil Refining and Distribution Co.

Although National Iranian Oil Refining and Distribution Company ( NIORDC ) is formed nearly in the past decade and began its activities within a new framework, .............**More**



Email : info@niordc.ir
Web Site : www.niordc.ir





Please send all comments and suggestions to : **Webmaster@mop.ir**
© copyright 2004 Islamic Republic of IRAN Petroleum Ministry of IRAN all rights reserved.

D-1

innovation, sufficient guarantees for continuation of operations in normal and optimum conditions, where attaining to such abilities in less than 30 yrs. for gas industry being so complicated, is much more like a miracle than reality.

## The Most Important Capabilities Of The Company For Joint Cooperation With Organizations And Companies.

### A) Advisory, Engineering And Studies Services.

1)Technical and economical studies and presenting expertise advice on technical and economical justifications and the survey of fundamental projects.
2)Engineering studies and the survey and assessment of great projects.
3)Designing and engineering services and preparation of maps and examination of the
Projects requirement list and or presenting advice required for construction and installations, pipelines and transfer networks, pumping and pressure reinforcement stations, dissociation and remoistening centres and gas refinery, supplying gas to industries and residential compounds and fuel transformation, catholic protection systems, power systems, precision tools and control and measurement equipment, communication 1 dispatching and telephone centre installation systems, mechanical systems and storing installations,
4) Performing technical studies and comprehensive surveys for determination or change in industrial standards of the items and engineering, investigations and research on mechanical and chemical fields, chemicals and parts and laboratory services for physical and chemical tests and experiments chemicals, parts and metal and plastic items, different kinds of valves and appliances and gas burner instruments.
5) Performing studies and surveying and presenting advisories for the security of installations andBuildings and technical inspection and quality control and instalment, construction and establishment of preventive systems and instruments and or guarding against accidents specially explosion combustion and holocaust.
6) Performing studies and surveying and presenting organizational and institutional advice.
7) Performing studies and surveying and presenting advice for provision and supply of goods, store keeping systems and methods, and mechanization.
8) Performing studies and surveying and presenting advice for the method of prediction and installation and establishment of installation protection systems.
9) Performing studies, surveying, designing and suggesting contractual, engineering, commercial, financial, and administrative methods and systems.

reconstruction and optimising machinery, turbines and compressors, different types of pumps and generally refinery instruments and machinery, pipelines, networks and gas pressure increase or decrease stations together with affiliated and subordinate installations and power instruments and systems and precision tools and control equipments.
2) Maintenance of telephone centres and Communication and dispatch systems.

### D) Marketing And Commerce And Goods Transport

1)Commercial survey and studies for finding domestic and foreign sources for supplying goods.
2) Survey of the market and marketing for supplying the products and productions connected to gas and/or oil.
3) Loading and transport of merchandise and commercial goods from parts of entry, customs and, or between storing centres of goods.

The NIGC subsidiariesare as follows:
› Markazi
› Khorasan
› Qazvin
›Qom

### Contact Informations and Links:

Tehran HQ. :

   Address : NIGC Bldg. - South Aban Ave.

   Tel : +98-21-88131

   Fax : +98-21-88309049

Email :    webmaster@nigc.org

Web Site :    www.nigc.org

   

Please send all comments and suggestions to  Webmaster@mop.ir
(a) copyright 2004 Islamic Republic of IRAN Petroleum Ministry of IRAN all rights reserved

# EXHIBIT "E"



*Oil Field of Texas, Inc., Claimant,*
*v.*
*The Government of the Islamic Republic of Iran, National*
*Iranian Oil Company, Oil Service Company of Iran,*
*Respondents.*

CASE NO. 43
Award No.: ITL 10-43-FT

Iran - United States Claims Tribunal
Filed December 9, 1982

INTERLOCUTORY AWARD

CONCURRING OPINION OF RICHARD MOSK

## INTERLOCUTORY AWARD

Question as to whether the Tribunal has jurisdiction over claims based on contract between the Claimant and Oil Service Company of Iran. Jurisdiction relinquished by Chamber One to the Full Tribunal for the purpose of deciding this issue.

Claimant represented by:

Attorney for Claimant: Mr. Platt W. Davis III, and Mr. Lawrence W. Newman,
Counsel: Mr. Carl R. Schenker, Jr., Mr. Anthony G. Petrello, Mr. Axel H. Baum, and Mr. Hamid Sabi,
Mr. Alan Rauch, Chairman of the Board of Oil Field of Texas, Inc.

The Government of the Islamic Republic of Iran and National
Iranian Oil Company represented by:

Mr. Mohammad K. Eshragh, Agent of the Islamic Republic of Iran, Mr. A. Mouri, Representative of National Iranian Oil Company, Professor D. W. Bowett, and Mr. R. A. Brown, of Counsel.

Oil Service Company of Iran not represented.

Introduction

Case 3:08-mc-80024-SW Document 18 Filed 03/13/2008 Page 3 of 33

Through a Contract dated 26 February 1975 with subsequent additions and amendments ("the Lease Agreement") concluded between Claimant and Oil Service Company of Iran ("OSCO"), Claimant agreed to lease certain equipment to OSCO. This lease agreement concerned four systems ("stacks") of blowout preventors with related equipment for use in a petroleum exploration and drilling programme in Southern Iran that OSCO conducted for National Iranian Oil Company ("NIOC") pursuant to a service contract. A blowout preventor is a device designed to prevent uncontrolled flow of fluids from a well.

Under the terms of the Lease Agreement, OSCO is obligated to pay Claimant a certain daily rate for the four stacks of blowout preventors which were leased to OSCO. The Lease Agreement also provides that OSCO is liable for any loss of or damage to the equipment during the lease and that, in case of total loss or destruction of any set of equipment, the rental payment shall continue with respect to such set of equipment until an acceptable replacement has been delivered to Claimant. Claimant contends that one stack of blowout preventors was completely destroyed by a blowout fire on 1 August 1978 while the stack was leased to and in the possession of OSCO. In addition to the equipment originally leased by Claimant to OSCO under the Lease Agreement, Claimant leased to OSCO a further blowout preventor, which according to Claimant was returned on 15 February 1978 in damaged condition. Lastly, OSCO agreed to purchase some equipment to be used in the operation of the blowout preventors leased by Claimant to OSCO. Claimant asserts that this equipment was delivered to OSCO, which failed to compensate Claimant for the equipment, notwithstanding repeated demands for payment.

Claimant contends that NIOC is liable for OSCO's contractual obligations and that NIOC is an agency, instrumentality or entity controlled by the Government of Iran. Thus, based on the contracts with OSCO, Claimant seeks compensation in the instant case from NIOC for the following losses and expense, together with interest thereon: (a) the present value of the leased equipment allegedly destroyed by fire in Iran, (b) the accrued unpaid daily rents, including rents for the destroyed stack of blowout preventors from 1 August 1978, (c) the expense incurred in repairing the alleged damage to the equipment returned in February 1978, (d) the present value of the equipment which OSCO, according to Claimant, ordered and received but did not pay for, and (e) the present value of the remaining stacks of blowout preventors which, according to Claimant, have not been returned to it. By its Statement of Claim, Claimant seeks compensation for these alleged losses and expenses also from the Government of Iran.

Respondents deny that the Government of Iran or NIOC is liable for OSCO's obligations and assert that the Tribunal has no jurisdiction over the above-mentioned claims.

In addition to these contract-related claims, Claimant also seeks compensation from NIOC inter alia on the theory of unjust enrichment and from the Government of Iran on the theory that this Government expropriated Oil Field's property-rights under the Lease Agreement in

violation of international law.

The issue

According to Article II of the Declaration of the Government of the Democratic and Popular Republic of Algeria concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran ("the Claims Settlement Declaration"), the Tribunal has jurisdiction over the following categories of claims:

(a) claims of nationals of the United States against Iran and claims of nationals of Iran against the United States;
(b) official claims of the United States and Iran against each other arising out of contractual arrangements between them for the purchase and sale of goods and services;
(c) certain disputes as to the interpretation or performance of any provision of [the Algiers Declarations].
The term "Iran" is defined as follows in Article VII, paragraph 3, of the Claims Settlement Declaration:

"Iran" means the Government of Iran, any political subdivision of Iran, and any agency, instrumentality, or entity controlled by the Government of Iran or any political subdivision thereof.

In accordance with an order issued by the Tribunal, the Government of Iran and NIOC submitted on 30 April 1982 a Preliminary Statement of Defence on the issue of jurisdiction. The Government of Iran and NIOC asserted in this Statement of Defence that none of the claims brought by Oil Field of Texas ("Oil Field") are within the jurisdiction of the Tribunal, since these claims are not attributable to the Government of Iran or NIOC but lie solely against OSCO, a registered private joint stock company in Iran. Respondents contend that NIOC is not a branch of the Government or a political subdivision thereof, that neither the Government of Iran nor NIOC exerted control over OSCO and that, consequently, OSCO does not fall within the definition of "Iran" in Article VII, paragraph 3, of the Claims Settlement Declaration.

In an order dated 6 May 1982 Chamber One of the Tribunal - the Chamber to which this case is assigned - decided to relinquish jurisdiction to the Full Tribunal for the limited purpose of hearing and deciding the jurisdictional issues raised in the Preliminary Statement of Defence of 30 April 1982.

Following an order by the Tribunal, Claimant has submitted a Memorial in response to the Preliminary Statement of Defence. NIOC has filed a Reply Memorial on 19 July 1982. The parties presented their oral arguments at a Hearing before the Tribunal on 26-28 July 1982.

The issues thus presented by the parties, which they have referred to as jurisdictional issues, involve also the question of NIOC's liability for the claims.

Claimant has submitted the following alternative arguments in support of its contention that NIOC is liable for OSCO's contractual obligations

and that the Tribunal has jurisdiction over the claims based on contract:

(1) OSCO acted as an agent of NIOC in connection with incurring the obligations at issue in the instant case;

(2) OSCO was controlled by NIOC;

(3) NIOC is the successor to debts and obligations incurred by OSCO; and

(4) NIOC's denials of liability are inconsistent with its prior conduct.

Claimant asserts that in the event the Tribunal does not find that it has jurisdiction over the claims based on the contracts entered into by OSCO on the basis of any of these arguments, NIOC would be liable under other theories, such an unjust enrichment, because NIOC received substantial benefits from the contracts.

OSCO - a brief historical and legal background

In March 1951 the Iranian Parliament enacted legislation nationalizing the Iranian oil industry. Later, following a coup d'etat in Iran, a number of major multinational oil companies formed an Oil Consortium, which signed an Agreement ("the 1954 Agreement") for the exploration, production, refining and exportation of Iranian oil.

The 1954 Agreement provided for the creation by the Consortium members of two operating companies, Iranian Oil Exploration and Producing Company ("IOEPC") and Iranian Oil Refining Company ("IORC") to be incorporated under the law of the Netherlands. Their respective functions were to carry out exploration, production, refining, transportation and other operations specified in the Agreement. The 1954 Agreement provided that the Consortium would fund all activities of IOEPC and IORC and that the Consortium members would jointly and severally guarantee the performance of the operating companies.

In 1973 the 1954 Agreement was replaced by a new agreement ("the 1973 Main Agreement"). The preamble of the 1973 Main Agreement states:

It is determined that the right of full and complete ownership, operation and control in respect of all hydro-carbon reserves, assets and administration of the petroleum industry shall be exercised by NIOC.

NIOC is an Iranian joint stock company which was incorporated by statute in Iran on 29 April 1951. All NIOC's shares are, and have always been, owned by the Government of Iran. NIOC was established in order to exercise the ownership right of the Iranian nation in the oil and gas resources throughout the country and in the continental shelf and to be responsible for the exploration, development, production, exploitation and distribution of petroleum and petroleum products both within and outside Iran. The Iranian Ministry of Oil has subsequently assumed certain of NIOC's functions.

The 1973 Main Agreement ended the role of IOEPC and IORC, and provided for NIOC to operate and manage all oil-related operations.

Case 3:08-mc-80024-JSW   Document 35   Filed 03/13/2008   Page 5 of 18

This Agreement also required the Consortium members to form a "Service Company". That Service Company, OSCO, was to be formed as a non-profit, Iranian joint stock company. The relevant Articles of the 1973 Main Agreement provide:

## ARTICLE 11

A. NIOC shall provide all capital and other funds required for required for the purpose of all operations provided for in this Agreement.

B. The Trading Companies [companies exercising the rights and obligations of the Consortium Members relating to the purchase and resale of crude oil] shall advance to NIOC by way of pre-payment for crude oil to be purchased by them, a proportion of the funds required by NIOC for annual budgeted capital expenditure, relating to the operations under this Agreement, and any revisions thereto, approved and issued by NIOC in accordance with Article 16 for each year in accordance with procedures agreed between the Trading Companies and NIOC.

C. The amount of such advance for each year by the Trading Companies shall be 40 per cent of such funds as are required by NIOC for such capital expenditure. The Trading Companies shall have the option to vary the proportion from time to time upon giving two years' prior written notice to NIOC, but no notice to vary the proportion shall be given to take effect earlier than five years after Effective Date.

D. Each annual advance made by the Trading Companies under Section B above shall be set-off against any sums due from them in respect of subsequent sales of crude oil by NIOC in equal annual instalments over a period of ten years following the year in which such advance was made, in accordance with procedures agreed between the Trading Companies and NIOC.

## ARTICLE 15

A. For the purpose of developing the programmes and budgets in respect of the operations to be carried out under this Agreement:
(1) during November of each year the Consortium Members shall submit to NIOC their offtake requirements of each grade of crude oil for the next year but one, and their estimated offtake requirements of each grade of crude oil for each of the four subsequent years;

## ARTICLE 16

(2) during December of each year NIOC and the Consortium Members shall meet for consultation concerning a provisional Exploration and Capacity Development Plan for the five years referred to in paragraph (1) above.

B. During the term of the Service Contract referred to in Article in Article 17 NIOC shall entrust to the Service Company the duty of working out the detailed programmes and budgets provided for in this Article as directed and controlled by NIOC. Such programmes and budgets shall be submitted for final approval to NIOC and shall become operative after such approval.

## ARTICLE 17

A. The Consortium Members shall cause a Service Company to be formed in Iran as a non-profit private joint stock company to carry out operations as assigned to it by NIOC in accordance with a Service Contract to be entered into with NIOC. The Service Contract shall have an initial term of five years. It shall continue in effect thereafter subject to termination by either party on two years' prior written notice.

B. NIOC shall provide as necessary to the Service Company in accordance with the provisions of the Service Contract all capital and other

funds to enable the Service Company to carry out the operations assigned to it.

On 2 July 1973 OSCO was incorporated as an Iranian corporation. Its Statutes provide that the object of the Company in its capacity as contractor to NIOC, and in accordance with the terms and provisions of the service contract between NIOC and OSCO, is to implement the relevant provisions of the 1973 Main Agreement, relating to exploration, development and production of petroleum and petroleum products and the processing operations and transportation of such products. The capital of the company is fixed at 1 million Rials. All shares are, and have always been, owned ultimately by the Consortium members.

The Statutes also provide that Ordinary General Meetings of the Company shall be held at least once a year and that Extraordinary General Meetings may be called at any time by inter alia a decision of the Board of Directors.

According to the Statutes the Ordinary General Meetings shall have authority to act on the following: to hear reports and the proposals relating to the Company's financial status and the annual balance sheet; to fix the remuneration of the Directors, Inspector and Auditors; to effect the election of the Directors, the Inspector and the Auditors; to nominate the Chairman and Managing Director and the Vice Chairman and Deputy Managing Director from amongst the Directors.

At an Extraordinary General Meeting the shareholders shall have authority to decide upon the modification of the Statutes, any increase in the capital of the Company, the winding up of the Company or the alteration of its name, and any matter not within the authority of the Ordinary General Meeting.

As to the votes of the shareholders at General Meetings the Statutes provide that each shareholder, whose name appears in the Register of shareholders 21 days before the date of a meeting, shall have one vote for each share registered in his name. The vote of the holders of a majority of shares is required for adoption of resolutions at General Meetings.

The Board of Directors shall consist of not less than four and not more than seven members who shall be elected by the General Meetings. According to the Statutes the Board of Directors is the fully authorised body and legal representative of the Company to manage and conduct its business at all times without any limitation.

Pursuant to Article 17(A) of the 1973 Main Agreement, NIOC entered into a service contract with OSCO dated 19 July 1973 ("the 1973 Service Contract"). The preamble of this contract states in part:

WHEREAS NIOC as owner and operator in the Area defined in the Main Agreement desires to avail itself of the services of the Service Company for the conduct of operations in the Area, and whereas for the purpose of ensuring such operations are carried out with the greatest expedition and efficiency, during the terms of this Contract, the parties have entered into this Contract ....

The relevant provisions of the 1973 Service Contract read as follows:

http://www.iiusct.com/Documents/En/1269.aspx

ARTICLE 2: Operations

NIOC hereby assigns to the Service Company, such operations under the Main Agreement as relate to exploration, development and production of crude oil and natural gas and to NGL processing operations as well as to transportation to and loading at the relevant loading terminals of crude oil, bunker fuel and NGL products (hereinafter referred to as "the Operations"), with the exception of the functions in relation to the Operations carried out by NIOC prior to the effective date of this Contract.

The Service Company, as a contractor, shall carry out the Operations in accordance with good oil industry practice and sound engineering principles on behalf of and under the overall direction and control of NIOC.

ARTICLE 3: Planning and Budgeting

The Service Company shall, upon the receipt and within the limits of NIOC's directives given in accordance with Article 16 of the Main Agreement, work out for NIOC's approval, detailed programmes and budgets for the Operations as well as expansions and development thereof.

Programme and budget proposals developed by the Service Company in accordance with NIOC's directives with any alternative solutions shall be submitted to NIOC for selection and approval. Budget proposals and any revisions thereof shall be implemented by the Service Company when approved by NIOC.

NIOC may in preparing for programmes, plans and budgets require the Service Company to carry out through consultants or sub-contractors such studies or investigations as may be required by NIOC to assist in developing forward planning.

ARTICLE 4: Engagement of Contractors and Consultants

Materials Agency

The Service Company shall take over all contracts with contractors and consultants engaged in the Operations at the effective date of this Contract, or as soon as possible thereafter, to the extent to which the said contractors or consultants are so willing.

Within the budgets approved by NIOC, the Service Company may award contracts to sub-contractors and consultants and purchase and administer materials in accordance with the procedures in use in re pect of operations within the Area at the effective date of this Contract, or with any amendments thereto, or any alternative procedures that may be agreed from time to time between the parties hereto.

ARTICLE 6: Personnel

The Service Company shall take over the contracts of service of all those persons employed in the Operations at the effective date of this Contract, who are willing to enter into the service of the Service Company on the terms of their said respective contracts at that date. Thereafter personnel will be selected by the Service Company and employed subject to the rules and regulations of the Service Company, which rules and regulations will be co-ordinated from time to time with those of NIOC.

The Service Company shall prepare in consultation with NIOC plans and programmes for industrial and technical training and education of employees of the Service Company as appropriate and shall be responsible to NIOC for the execution of those plans and programmes.

ARTICLE 7: Personnel and Accounting Policy and Procedures

The Service Company shall adopt personnel policies and accounting methods and procedures consistent with those relating to the Operations and in use at the effective date of this Contract, in accordance with amendments thereto, or any alternative procedures that may be agreed from time to time between the parties hereto.

ARTICLE 8: Services by NIOC

Housing facilities, medical care and other amenities to the extent required by the Service Company for its personnel and their dependents, shall be provided by NIOC. The parties shall consult with one another from time to time as necessary on the provision by NIOC of these services for the Operations.

ARTICLE 10: Costs: Funding: Account: Auditors:

The Service Company shall carry out its duties under this Contract without profit, and all costs and expenses incurred by the Service Company shall be on behalf and for the account of NIOC. The Service Company shall deliver to NIOC in respect of each year (and monthly on a provisional basis) accounts of such costs, in a form to be agreed with NIOC.

NIOC shall provide all capital and other funds required by the Service Company in performing this Contract and the parties will agree on a cash call procedure for the implementation of this funding.

The principal books and accounts of the Service Company shall be kept in U.S. Dollars and for this purpose any conversion from any currency other than U.S. dollars which may be required shall be made in accordance with Article 22 of the Main Agreement.

NIOC shall appoint an internationally recognised firm of Chartered Accountants to carry out an audit in respect of each year of the books and accounts of the Service Company and to certify the accounts delivered to NIOC in accordance with this Article. Notwithstanding this provision the Service Company shall have the right to employ and appoint auditors for its own purposes.

In addition, Article 5 of the 1973 Service Contract provides that OSCO shall contract with Iranian Oil Service Company Limited ("IROS"), a company incorporated under the laws of the United Kingdom. IROS would according to the same article provide services related to the procurement, inspection and expediting of materials and such administrative and technical services as OSCO may require to be performed outside Iran.

Reasons

The Statement of Claim originally filed by Claimant also named OSCO as one of the Respondents in this case. However, at the Hearing on 26-28 July 1982 Claimant clarified its position in this respect. As Claimant has eventually defined its position, it raises no monetary claim against OSCO and seeks consequently compensation for its loss and expense only from the Government of Iran and NIOC. Thus, the Tribunal does not have to decide the issue of whether it has jurisdiction over a claim against OSCO on the alleged ground that OSCO was at the relevant time .. n entity controlled by the Government of Iran within the meaning of Article VII, paragraph 3, of the Claims Settlement Declaration.

It remains, however, for the Tribunal to decide whether NIOC is an entity controlled by the Government of Iran within the meaning of that article.

Respondents do not admit that NIOC is such an entity and have consequently left to the Tribunal to decide this question.

The record in this case shows that NIOC was incorporated by statute in 1951, that all NIOC's shares are, and have always been, owned by the Government of Iran, that NIOC according to its Statutes has been established in order to exercise the ownership right of Iran in its oil and gas resources and to be responsible for the exploration, development, production, exploitation and distribution of petroleum and petroleum products within and outside Iran and finally that the Iranian Ministry of Oil has now assumed certain of NIOC's functions.

Furthermore, according to the Statutes, the shareholder shall be represented at the General Meetings of the company by the Prime Minister and six other cabinet ministers.

Consequently, it is obvious that NIOC is, and was at all relevant times, totally controlled by the Government of Iran. In view of the above-mentioned purpose of the company and other available information it is also clear that NIOC is one of the instruments by which the Government of Iran conducted and currently conducts the country's national oil policy. It is therefore equally clear that NIOC is an agency or instrumentality controlled by the Government of Iran.

As to the question of liability Claimant first contends that NIOC is liable for OSCO's contractual obligations because OSCO acted as an agent of NIOC in connection with incurring the obligations at issue in the instant case.

Case 3:08-mc-80030-JSW    Document 3-5    Filed 03/18/2008    Page 11 of 18

In support of this contention Claimant asserts that general principles of commercial law should govern NIOC's liability and that these principles mean that NIOC must be held responsible, as OSCO's principal, for debts and obligations under the Lease Agreement. Claimant argues that a number of provisions in the 1973 Main Agreement, the 1973 Service Contract and the Lease Agreement itself indicate that OSCO acted as NIOC's agent.

Lastly, Claimant argues that OSCO's status as an agent of NIOC was confirmed by the so-called "Fidelity Affidavit" that Oil Field and other companies entering into contracts with OSCO were required to complete. This affidavit form required Oil Field to acknowledge that it was engaging in business activities "with, for, or involving the Imperial Government of Iran."

Respondents deny that the relationship between NIOC and OSCO is governed by general principles of commercial law and argue that the question as to whether NIOC is liable to Claimant as OSCO's principal is to be determined by reference to Iranian law. Further, Respondents argue that under Iranian law the relationship between NIOC and OSCO is one of employer and contractor and cannot be categorized as one of principal and agent.

OSCO was established to serve the needs of both NIOC and the oil companies. Its direction was shared, and the benefits of its activities accrued to both groups. It was a unique organization made possible because it served the separate, and certainly not always common, interests of NIOC and the companies. This unique duality, in turn, adds to the difficulty of determining the question of agency.

It is correct that some provisions in the 1973 Main Agreement and the 1973 Service Contract, as pointed out by Claimant, state that certain of OSCO's operations were carried out on behalf of NIOC. Article 17(A) of the 1973 Main Agreement required the creation of OSCO "to carry out operations as assigned to it by NIOC". Article 2 of the 1973 Service Contract provides that the operations assigned to OSCO were expressly required to be carried out "on behalf of and under the overall direction and control of NIOC". Article 10 of the same contract contemplates that all of OSCO's costs and expenses were incurred "on behalf and for the account of NIOC".

The fact that OSCO was required to act on behalf of NIOC is not inconsistent with the role of independent contractor. Indeed, it is in the very nature of contractors to perform services at another's behest and to obtain a benefit for another. While the phrase "on behalf of" is often used as a short-hand indication of agency, especially in the signing of instruments, it can also connote that an action is being taken in the interest or for the benefit of another. In the text of a contract, this second meaning is as likely, if not more likely, than the first. Therefore, the use of this and similar language cannot be deemed inconsistent with independent contractorship.

Furthermore, it has to be noted that Article 2 of the 1973 Service Contract at the same time refers to OSCO as NIOC's contractor and that Article 3 of the same agreement provides that NIOC in preparing for programmes, plans and budgets may require OSCO to carry out through consultants or sub-contractors such studies and investigations as may be required by NIOC to assist in developing forward planning. Similarly, Article 4 provides that OSCO may award contracts to sub-contractors and consultants. Thus, the 1973 Service Contract refers to OSCO as NIOC's contractor and to OSCO's contract partners for the provision of services and goods for the operations relating to exploration,

http://www.iusct.com/Documents/En/1269.aspx

The Lease Agreement does not contain any clear indication that it was entered into by OSCO as agent on NIOC's behalf. On the contrary, the agreement was signed by a representative of IROS, who expressly indicated in the agreement that he signed the contract for and on behalf of OSCO.

development and production of crude oil and natural gas as OSCO's sub-contractors. These formulations do not support Claimant's contention that OSCO concluded the contracts on NIOC's behalf as 'NIOC's agent.

Lastly, the fact that Oil Field was required to complete and submit the Fidelity Affidavit does not suggest an agency relationship. By its terms, the Fidelity Affidavit merely recites the fact that Oil Field's services related to activities "with, for or involving" the Government. That the Government, through NIOC, was involved in and benefited by the business of oil extraction was obvious. However, no inference can be drawn from this fact which would shed any light on OSCO's specific role.

Thus, the Tribunal holds that Claimant has not submitted sufficient evidence to prove that OSCO acted as an agent of NIOC. On balance, the provisions of the 1973 Service Contract and the Lease Agreement rather indicate that OSCO acted as a contractor when entering into the Lease Agreement.

Claimant also asserts that NIOC is liable for OSCO's contractual obligations because OSCO was controlled by the Government of Iran.

The Tribunal therefore has to decide whether the extent of control exercised by NIOC, if any, is sufficient to make NIOC directly liable for OSCO's contractual obligations on an alter ego or identity theory. Claimant refers to Article 16(D) and Articles 17(A) and (B) of the 1973 Main Agreement and Articles 2, 3, 6, 7 and 10 of the 1973 Service Contract to demonstrate that OSCO from its creation was controlled by NIOC.

It is indisputable that NIOC as a result of the above-mentioned provisions in the 1973 Main Agreement and the 1973 Service Contract exercised a considerable influence over OSCO's finances and operations. However, the question of NIOC's control over OSCO must be viewed in a wider perspective.

It is to be borne in mind that the Consortium members owned, and have always owned, all shares in OSCO. OSCO's Statutes do not in any way restrict the rights that normally flow from the holding of capital stock in a company. Thus, the Consortium members had inter alia the right to elect the Board of Directors and to nominate the Chairman and Managing Director and the Vice Chairman and Deputy Managing Director from amongst the Directors. Consequently, there can be little doubt that it was the Consortium members who ultimately conducted the operations of the company. The influence exercised by NIOC was primarily based on the terms of the 1973 Service Contract and was therefore of a contractual nature. The influence over OSCO which NIOC exercised on the basis of the terms of this contract was - although of a far-reaching nature - not in principle different from the influence exercised over any independent contractor by its customer, if the contractor has been set up to serve, and in practice serves, the needs of one single or dominating customer. Respondents have also referred to a Memorandum dated 8 May 1974 by Mr. R. Milne, then Managing Director of OSCO, to the Consortium members. This Memorandum shows

http://www.iusct.com/Documents/En/1269.aspx

Case 1:08-mc-00021-JSW Document 35 Page 13 of 18 Page 03/13/2008

that the Consortium members regarded OSCO as an instrument by means of which they could assert a certain influence over NIOC's operations. The Tribunal therefore concludes that the influence that NIOC exercised over OSCO on the basis of the 1973 Main Agreement and the 1973 Service Contract falls far short of such a total control by one company over another which might have as a consequence that the controlling company is liable for the obligations of the controlled company.

Further, Claimant contends that NIOC is liable for OSCO's contractual obligations because NIOC is the successor to debts and obligations incurred by OSCO.

Respondents have denied that NIOC is OSCO's legal successor. They argue that the relationship between NIOC and OSCO falls to be determined in accordance with Iranian law and that under Iranian law NIOC is not OSCO's legal successor, nor has OSCO merged with NIOC. Respondents also deny the existence of any general principle that a legal successor must assume the liabilities as well as the assets of its predecessor.

Respondents add that by early 1979 the expatriate employees of OSCO had left Iran. Although NIOC did not take over the day to day management of OSCO, inevitably, in the absence of its contractor (OSCO), NIOC took steps to discharge its duties and obligations conferred on it under Iranian law and its own Statutes and began to operate the oil fields. These were operations for which NIOC was responsible under its Statutes and which were contracted to OSCO under the 1973 Main Agreement. The withdrawal of OSCO's expatriate personnel in Iran as of December 1978 rendered OSCO incapable of performing its obligations under the 1973 Service Contract. In the absence of the contractor, NIOC had no alternative but to take steps itself.

Claimant does not contend that NIOC succeeded OSCO as a result of a formal corporate merger or succession in accordance with Iranian law.

There is, however, quite apart from Respondents' own contention that NIOC had to operate the oil fields, overwhelming evidence submitted in this case proving that NIOC as from March 1979 gradually assumed control over OSCO's personnel and oil field operations and took over the contracts entered into by OSCO with sub-contractors and consultants for these operations:

1. Of particular interest in this respect is a letter dated 10 March 1979 from Mr. Hassan Nazih, then Chairman of NIOC, to the Consortium members. In this letter NIOC announced the termination of the 1973 Main Agreement and of NIOC's own relationship with OSCO. The letter then goes on to say:

2. In our future operations, there will be no place for OSCO, nor for the large number of expatriate personnel who used to work for it. Expatriate personnel for secondment or direct employment by us, has [sic] already been advised as per our telex JR28 dated 22nd. January 1979 and subsequent telexes.

3. All Iranian personnel employed in the operations by OSCO shall be transferred to NIOC under the terms and conditions of the contracts with OSCO.

4. NIOC is willing to take over all contracts which contractors and consultants entered into by OSCO for its operations under the present

3/5/2008

Case:08-mc-80024-SW Document 3-5 Filed 03/13/2008 Page 13 of

arrangements.

2. In a circular dated 3 March 1979 NIOC announced that it was necessary gradually to "merge" the present organizations and operations of NIOC and OSCO at Abadan and in the fields.

3. In another circular dated 22 July 1980 the Ministry of Oil states:

From the First of Mordad 1359 [23 July 1980] the Tehran office - NIOC-Fields (the former Iran Oil Services Company) shall be closed down and its subject units merged with the relevant units of the National Iranian Oil Company.

4. In a telex sent in late March 1979 to sixteen companies, NIOC represented itself as a party to all contracts entered into by OSCO. This telex states:

We are requested to inform you that Mr. Esmail Fakhraie has been appointed as Manager Drilling and that he will be the Company representative in all OSCO contracts related to drilling effective immediately.

We request you to advise your interested associated companies, subsidiaries and sub-contractors of this appointment.

5. In letters sent by NIOC to a number of companies that had entered into contracts with OSCO show that NIOC made payments under these contracts to the companies concerned.

6. NIOC also sent a number of letters to various companies directing these companies to perform activities under contracts entered into by OSCO.

7. NIOC sent letters to companies that had entered into contracts with OSCO in which NIOC asserted purchase option rights under these contracts.

8. Similarly, in other letters NIOC asserted certain rights of termination under various contracts entered into by OSCO.

9. In a settlement agreement regarding certain disputes with an American company dated 30 August 1979 NIOC expressly admitted in the preamble of the agreement that it had taken over OSCO's role under the contract concerned.

10. Finally, the Government of Iran has explicitly represented to the Tribunal in two cases filed against Chase Manhattan Bank of New York, and Reading & Bates Offshore Drilling Company (Claims Nos. 576 and 580) that NIOC is the legal successor to OSCO.

From the inception of OSCO in 1973, its relations with NIOC were, as stated above, of a complex nature and the circumstances in this case are unique. Not surprisingly, these circumstances do not fall clearly within well developed and discussed doctrines of law. The controlling rules have therefore to be derived from principles of international law applicable in analogous circumstances or from general principles of law. The development of international law has always been a process of applying such established legal principles to circumstances not previously encountered.

The evidence in this case shows that performance of the tasks assigned by NIOC to OSCO was not abandoned after 1979, but was instead undertaken directly by NIOC itself, with OSCO personnel and within an organisational framework previously created in many instances by OSCO. The factual circumstances of NIOC's assumption of control over OSCO's personnel and operations and its taking over of the contracts with sub-contractors and consultants resulted in NIOC's de facto succession to OSCO's rights and obligations with respect to these sub-

http://www.iusct.com/Documents/En/1269.aspx

3/5/2008

contractors and consultants.

As to the legal consequences of this de facto succession it should be pointed out that NIOC since the creation of OSCO in 1973 through the cash call procedure provided for in Article 10 of the 1973 Service Contract invariably had provided OSCO with the funds necessary in order to meet OSCO's contractual obligations. It can be assumed that those doing business with OSCO relied on the fact that NIOC would continue to provide those funds to OSCO through the cash call procedure. From the point of view of general principles of law it would be difficult to accept that the de facto succession which took place would have as a consequence that NIOC could totally escape its previous obligation to provide the funds necessary to meet the contractual liabilities arising out of contracts entered into by OSCO for the provision of services and goods regarding operations relating to exploration, development and production of crude oil and natural gas. The fact that no formal corporate merger or succession in accordance with Iranian law took place between the companies does not alter this conclusion. Rules in national law on merger and succession normally contain provisions in order to safeguard the interests of the creditors of the company which ceases to exist. If a de facto succession of rights and obligations in a certain field has taken place without the observance of such rules under the applicable national law, it is even more important to establish a rule under international law that such succession must have as a consequence that the surviving company is under an obligation to pay appropriate compensation taking into account all the circumstances of the case.

The Tribunal holds that in this and all similar cases before the Tribunal the task of determining the extent and the amounts of NIOC's liability should be left to the respective Chamber since such issues will best be resolved at the Hearing of the merits of the case.

For the reasons given above

THE TRIBUNAL concludes as to the issues raised in the Preliminary Statement of Defence of 30 April 1982

that NIOC is the de facto successor to OSCO's rights and obligations and that the Tribunal has jurisdiction over Oil Field's claims.

The case is referred back to ychamber One for further proceedings.

The Hague, 7-8 December 1982

Gunnar Lagergren
(President)

Pierre Bellet

Nils Mangard

Case 1:08-mc-00021-JSW   Document 35   Filed 03/13/2008   Page 15 of 21

REPRINTED IN: I- I

Mahmoud M. Kashani
Dissenting opinion

Howard M. Holtzmann
Concurring opinion

Shafie Shafeiei
Dissenting opinion

George H. Aldrich

Richard M. Mosk
Concurring opinion

Mostafa Jahangir Sani
Dissenting opinion

## Concurring Opinion Of Richard M. Mosk With Respect To Interlocutory Award

I concur in the result of the decision of the Tribunal holding that the Tribunal has jurisdiction over the claim of Claimant Oil Field of Texas Inc. ("Claimant" or "Oil Field") and holding that Claimant has alleged facts sufficient to constitute a valid claim that Respondent National Iranian Oil Company ("NIOC") is liable to Claimant for obligations arising out of transactions involving Oil Services Company of I n ("OSCO"). [1] I agree with the majority opinion that if OSCO was not the agent of NIOC, NIOC is liable for the debts of OSCO as its successor. In my view, NIOC, as OSCO's successor, is liable for obligations under contracts executed by OSCO, such as the one to which Oil Field is a party. Unlike the majority, I would hold that NIOC is liable under the alternative theory that OSCO executed the contract with Claimant on behalf of and as agent of NIOC. Also, I do not agree with the majority's analysis of the issue of agency. On the record before the Tribunal, the question of "control" only bears on the issue of agency.

PROCEEDINGS AND ISSUES

On November 16, 1981, Oil Field filed its claim against Iran, NIOC and OSCO seeking compensation for amounts allegedly unpaid for

http://www.iusct.com/Documents/En/1269.aspx

Case 1:08-mc-00021-JSR Document 35 Filed 09/18/2008 Page

equipment leased, equipment sold, destroyed leased equipment, and unreturned equipment and for interest on unpaid amounts and costs.

Claimant's claims are based upon a variety of theories. Claimant alleges that Iran and NIOC have, in effect, seized control of and expropriated Claimant's property; have prohibited the performance of OSCO's contract obligations and have therefore taken or expropriated Claimant's contractual rights; have prevented Claimant from enforcing its contractual rights; and have wrongfully and tortiously interfered with Claimant's contractual relationship with OSCO. Claimant has also asserted that NIOC and Iran are liable because OSCO acted as NIOC's agent or because NIOC is OSCO's successor or because NIOC and Iran have been unjustly enriched.

On February 23, 1982, the Agent of the Islamic Republic of Iran, in a letter to the Tribunal, stated that these claims are not within the Tribunal's jurisdiction because of a "complete separation of the personality of OSCO" from Iran and its agencies or instrumentalities. He alleged that this "separation" existed because OSCO's stock was held by a consortium of international oil companies rather than by Iran or NIOC. The Iranian Agent requested that Iran be permitted to "submit its pleas as to the separation of personality [of OSCO] and the claimants' lack of standing to sue the Islamic Republic of Iran and/or companies affiliated to the Ministry of Petroleum on behalf of OSCO, without entering into the points of merit."

By an order dated March 15, 1982, Chamber 1 -- the chamber to which this case is assigned -- directed that Respondents in this case and those in other cases file, on or before April 30, 1982, statements of defense "on the issues of jurisdiction." Similar orders were issued in cases by Chambers 2 and 3.

On April 30, 1982, Iran and NIOC filed their Statement of Defense concerning jurisdiction in this case. Iran and NIOC filed virtually identical Statements of Defense in 19 other cases. In these Statements of Defense, Iran and NIOC denied liability on any ground for debts and obligations incurred by OSCO and sought "a declaration by the Tribunal that to the extent that the Claims seek to make NIOC and/or Iran liable for the obligations of OSCO, the Claims are outside the jurisdiction of the Tribunal."

On May 6, 1982, Chamber 1 issued an order in this case "relinquish[ing] jurisdiction to the Full Tribunal . . . for the limited purpose of hearing and deciding the jurisdictional issues raised in the Preliminary Statement of Defense...." By its order dated May 7, 1982, the Tribunal directed Oil Field "to file a brief with the Tribunal by June 8, 1982, addressing itself to the jurisdictional issue."

In its memorial, Claimant asserted that the question presented was, "[d]oes the Tribunal have jurisdiction over those claims of Oil Field related to the Lease Agreement?"

Respondent in its memorial asserted that "[t]he OSCO issue is therefore the jurisdictional question: does the Tribunal have jurisdiction over claims filed with it which are either against OSCO as Respondents or are against Iran and/or NIOC as Respondents on the basis that they are/were jointly or individually liable for the obligations of OSCO?"

http://www.iusct.com/Documents/En/1269.aspx

During the hearing, which was held on July 26-28, 1982, Counsel for Oil Field asserted that it was not then pursuing a claim against whatever presently remained of the entity OSCO, but rather was proceeding on claims against NIOC and Iran arising out of an agreement executed by Oil Field and OSCO.

Unfortunately the Tribunal and the parties intertwined issues of jurisdiction and of liability. There never was a serious question of jurisdiction. The Tribunal and the parties all share responsibility for the confusion caused by initially framing the issues as jurisdictional and then expanding into issues of liability.

The majority has discussed what it perceives to be three issues (none of which relates to jurisdiction): (1) whether OSCO executed the lease agreement with Oil Field as an agent of NIOC so as to impose liability thereunder upon NIOC; (2) whether NIOC is liable for OSCO's contractual obligations by virtue of NIOC's control over OSCO; and (3) whether NIOC is liable for OSCO's contractual obligations as a successor to the debts of OSCO.

Claimant has based its claim on a number of theories, some of which are not grounded on agency, control or succession. In this respect, Claimant has alleged that Iran and NIOC expropriated its property and its contract rights and tortiously interfered with its contract rights and that Iran breached the 1955 Treaty of Amity, Economic Relations, and Consular Rights between The United States of America and Iran, 8 U.S.T. 899, 284 U.N.T.S. 93, by, inter alia, not providing effective means of enforcement of contractual rights. Claimant has also asserted that to the extent it could not recover under its contract, it had an alternative claim for unjust enrichment.

The majority, however, only deals with whether NIOC and Iran are liable to Claimant under the OSCO-Oil Field lease agreement by virtue of the alternative theories -- agency, control and succession. The majority's opinion, by not dealing with Claimant's other theories, presumably leaves Claimant and other claimants free to pursue claims under such other theories.

## FACTS

Prior to 1951, the Anglo-Iranian Oil Company, an English company, was the sole concessionaire of Iran's oil properties and was generally responsible for the exploration, production, refining, and transportation of Iranian oil. In 1951 Iran nationalized its oil industry, and the Government of Iran founded the National Iranian Oil Company to operate the nationalized oil industry. All of the shares of stock of NIOC have been owned by Iran.

In 1954, Iran and NIOC entered into an agreement with eight major oil companies -- a "consortium" of American and European oil companies ("Consortium"). Under the agreement Iran granted the Consortium exploration, drilling, refining, and transportation rights with respect to oil in a specified sector of Iran. Furthermore, the agreement called for the establishment by the Consortium of two operating companies. The first, Iranian Oil Exploration and Producing Company ("OEPC"), was to explore for and produce oil; the second, Iranian Oil Refining Company

Case 3:08-mc-80124-JSW    Document 3-6    Filed 03/13/2008    Page 18 of 33

("IORC"), was to operate a refinery.

In 1973, the parties replaced the 1954 agreement with a new agreement ("1973 Main Agreement") whereby NIOC took over control of all exploration, extraction and refining activities in Iran. Since NIOC desired the type of technical assistance previously provided by IOEPC and IORC, the 1973 Main Agreement required the Consortium members to form a "Service Company." That "Service Company" was to be formed as a non-profit Iranian joint stock company to "carry out operations as assigned to it by NIOC in accordance with a Service Contract to be entered into with NIOC." Under the 1973 Main Agreement, NIOC was to fund [2] and control [3] the "Service Company's" operations.

Pursuant to the 1973 Main Agreement, the Consortium formed the "Service Company", OSCO, as an Iranian nonprofit corporation, [4] which then entered into the service contract with NIOC ("1973 Service Contract"). All of the issued shares of OSCO, except nominal qualifying shares required by Iranian law to be held by the directors of OSCO, were owned by Iranian Oil Participants Limited ("IOPL"), a company incorporated in England. The Consortium members owned all of the issued shares of IOPL.

Also in 1973 NIOC entered into an agreement with Iranian Oil Services Limited, ("IROS"), the shares of which were owned by the Consortium but which was to act "outside Iran for NIOC's operations at Abadan Refinery." Under the 1973 Services Contract, OSCO was to contract with IROS to obtain materials and services outside Iran.

The preamble to the 1973 Service Contract referred to NIOC as the "owner and operator" of, in essence, the Iranian oil industry. Provisions of the 1973 Service Contract indicated NIOC's control over OSCO's activities and funding. In this connection it is important to set forth the following specific provisions of the 1973 Service Contract:

## Article 2: Operations

The Service Company, as a contractor, shall carry out the Operations in accordance with good oil industry practice and sound engineering principles on behalf of and under the overall direction and control of NIOC.

## Article 3: Planning and Budgeting

The Service Company shall, upon the receipt and within the limits of NIOC's directives given in accordance with Article 16 of the Main Agreement, work out for NIOC's approval, detailed programmes and budgets for the Operations as well as expansions and development thereof.

Programme and budget proposals developed by the Service Company in accordance with NIOC's directives with any alternative solutions shall

be submitted to NIOC for selection and approval. Budget proposals and any revisions thereof shall be implemented by the Service Company when approved by NIOC.

NIOC may in preparing for programmes, plans and budgets require the Service Company to carry out through consultants or sub-contractors such studies or investigations as may be required by NIOC to assist in developing forward planning.

Article 4: Engagement of Contractors and Consultants, Materials Agency

Within the budgets approved by NIOC, the Service Company may award contracts to sub-contractors and consultants and purchase and administer materials in accordance with the procedures in use in respect of operations within the Area at the effective date of this Contract, or with any amendments thereto, or any alternative procedures that may be agreed from time to time between the parties hereto.

Article 10: Costs; Funding; Accounts; Auditors

The Service Company shall carry out its duties under this Contract without profit, and all costs and expenses incurred by the Service Company shall be on behalf and for the account of NIOC. The Service Company shall deliver to NIOC in respect of each year (and monthly on a provisional basis) accounts of such costs, in a form to be agreed with NIOC.

NIOC shall provide all capital and other funds required by the Service Company in performing this Contract and the parties will agree on a cash call procedure for the implementation of this funding.

Thus, as set forth in the 1973 Main Agreement, the 1973 agreements fulfilled Iran's determination "that the full and complete ownership, operation and control in respect of all hydrocarbon reserves, assets and administration of the petroleum industry shall be exercised by NIOC..." [5] The Consortium still had rights to purchase and sell Iranian Oil.

The former Chairman of the Board and Managing Director of OSCO, George H. Link, submitted an affidavit in which he stated that NIOC's approval was required or obtained for all of OSCO's major projects and plans, OSCO's budgets, various "commitments for expenditures" by OSCO, OSCO's list of approved bidders on contracts over $1 million and the awarding of contracts to such bidders, recommendations concerning bid lists and the awarding of contracts to bidders, the awarding of contracts of over 1 million rials (approximately $15,000) and the hiring of expatriates. [6] According to Mr. Link, OSCO owned no realty or equipment; NIOC held title to all such property; and all disbursements of funds by OSCO were made through "cash calls" from OSCO to NIOC since OSCO had no money of its own other than what it received from NIOC under these procedures.

Mr. Link also declared that of the 10,000 persons working for OSCO in 1978, about 600 were expatriates. Of these 600 expatriates, 200 were

provided by the Consortium members. He asserted that Iranian nationals held positions at all levels of OSCO, including on its Board of Directors, and that no director or senior manager of OSCO was replaced without consultation with NIOC.

In 1974, Claimant was contacted about the possibility of leasing four blowout preventers and related equipment for use in Iran. Mr. Alan Ruch, the Chairman of the Board of Directors of Claimant, stated in an affidavit, that at that time, he made inquiries as to the relationship between OSCO and NIOC and obtained information about the main features of the 1973 Service Contract. He further stated that Oil Field made an offer to lease equipment to OSCO "only because NIOC appeared to be responsible for OSCO's debts and obligations."

Oil Field and OSCO executed a lease agreement dated February 26, 1975 whereby Oil Field provided equipment for use in Iran ("Lease Agreement"). [7] IROS acted as agent of OSCO in connection with this Lease Agreement. The Lease Agreement did say that it is between Oil Field and OSCO, but the preamble to that Lease Agreement provided that NIOC "has under an international agreement appointed [OSCO] to undertake certain operations in the production and export of crude oil from South Iran." Under the Lease Agreement, OSCO was required to maintain an insurance policy on the leased property, which insurance policy "shall name the Company [OSCO], NIOC and the Contractor [Oil Field] as named insureds thereunder." The Lease Agreement also provided that it "and any legal relationship arising therefrom shall be subject to English law."

In December of 1975, Claimant received a letter from OSCO's London representative referring to the Lease Agreement and stating as follows:

We have to advise you that it is now an Iranian Government requirement that all foreign firms engaged in business activity with the Government of Iran or its related organisations [sic], companies and contractors, should complete a duly certified affidavit in accordance with the print enclosed; such affidavit to form part of the contract documents.

The form affidavit provided to Claimant stated that the contractor (i.e. Claimant) "proposes to engage in certain business activities ... with, for, or involving" the Government of Iran. The affidavit (called a "Fidelity Affidavit") dealt with a representation of no improper payments. Oil Field complied with the request by supplying a signed copy of the required affidavit to a consular officer of Iran and to OSCO.

According to Claimant, the obligations of the Lease Agreement were fulfilled until the latter part of 1978. Since that time lease payments were delayed and then ceased, amounts for goods remained unpaid, Claimant received no payment for a leased blowout preventer destroyed by fire and leased equipment was not returned.

In late 1978 and early 1979, during the civil unrest which occurred prior to and during the revolution, OSCO's expatriate personnel left Iran.

On March 10, 1979 NIOC wrote to the Consortium that in "our future operations, there will be no place for OSCO...." The letter further provided that all "Iranian personnel employed in the operations by OSCO shall be transferred to NIOC under the terms and conditions of the contracts with OSCO" and that "NIOC is willing to take over all contracts with contractors and consultants entered into by OSCO for its operations under the present arrangements."

REPRINTED IN: 1-1

Indeed, in its memorials NIOC asserted that in order to keep the oil industry functioning, it had "to carry out the operations which had previously been contracted to OSCO by virtue of the Service Contract." Also, a March, 1979 NIOC circular referred to a merger of certain units with "the present organizations and operations at Abadan and the fields" and that certain activities would be under the supervision of a manager of "National Iranian Oil Company (Oil Services Company of Iran (Private Company))."

Thereafter it was announced in a Government circular that "NIOC-Fields (the former Iran Oil Services Company) shall be closed down and its subject units merged with the relevant units of the National Iranian Oil Company ...." [8]

During the Spring of 1979, NIOC began to communicate directly with companies that had contracts executed by OSCO. OSCO had previously carried out such contract-related communications. Initially, correspondence was sent over the signature of NIOC representatives on OSCO stationery. For a brief time thereafter, NIOC officials corresponded on paper without a letterhead. Ultimately, correspondence was either on NIOC stationery or on stationery containing the letterhead, "NIOC-Oil Fields" in Farsi.

NIOC explicitly represented itself to many companies as the party to their contracts executed by OSCO. NIOC caused the following telex to be sent to a number of companies in late March, 1979:

We are requested to inform you that Mr. Esmail Fakhraie has been appointed as Manager Drilling [sic] and that he will be the Company representative in all OSCO contracts related to Drilling effective immediately.

We request you to advise your interested associated companies, subsidiaries and subcontractors of this appointment.

NIOC paid to Oil Field and other companies certain monies due under various contracts executed by OSCO. The payments were made directly to the contracting companies and not through OSCO. NIOC directed various companies to perform activities under contracts executed by OSCO. For example, in a letter dated March 28, 1979, Mr. Fakhraie, signing on behalf of NIOC (but on OSCO stationery), requested Sediran Drilling Co. to mobilize its drilling rigs. NIOC sent an identical request dated March 28, 1979 to Sedco International S.A. Similarly, Compag Francaise de Prospection Sismique received a letter dated May 22, 1979, written under a NIOC-Oil Field letterhead, requesting a resumption of seismic operations. Halliburton Ltd. and Dowell Schlumberger received a memorandum from Mr. Fakhraie, dated June 3, 1979, requesting commencement of cementing activities on specified wells.

NIOC asserted purchase option rights under various contracts executed by OSCO. For example, in a letter to Santa Fe International Services, Inc dated May 14, 1979, Mr. Fakhraie stated:

On the basis of clause 15 of the contract No. 3-75-046-339 dated 15/1/1973 signed between Santa Fe and the Company NIOC would like to exersize [sic] its option to purchase the drilling units currently stacked in Ahwaz.... (Emphasis added).

Similarly, Irano-Reading & Bates reported it received a July 31, 1979 telex providing that:

Case 3:08-mc-80124-JSW   Document 3-6   Filed 03/13/2008   Page 5 of 16

NIOC is considering to exercise its option to purchase drilling plant under the subject contract. In order to work out accrued depreciations, you are requested to provide NIOC with documentary evidence of the date of purchase of individual units. (Emphasis added).

An Irano-Reading & Bates telex dated August 14, 1979, quoted a letter written by Mr. Fakhraie in which NIOC informed that company that NIOC had "decided to take advantage of its legitimate rights mentioned in Article 14 of the Contract to purchase the drilling rigs." (Emphasis added).

NIOC asserted certain rights of termination under various contracts executed by OSCO. For example, Mr. Fakhraie, in a letter dated March 28, 1979, stated that Irano-Reading & Bates had,

failed to comply with the terms of the abovementioned contract in mobilizing the rest of the rigs. Therefore, in compliance with Article 40 in general and Clause 6-1-40 and 5-140 in particular of the contract, we would like to bring to your attention that effective 6/1/1358 [March 26, 1979] we declare the contract nil [sic] and void.

In a letter dated April 13, 1979, NIOC purported to cancel Sedco International's contract but reserved the "other rights of this company contemplated in the contract mutually agreed upon, in accordance with Article 41 of the contract." (Emphasis added). NIOC sent a similar letter of termination to Sediran dated April 13, 1979. On December 9, 1979, Halliburton received a telex stating that NIOC was terminating "the subject contract and ammendments [sic] with cause without prejudice to our other right contemplated under subject contract." (Emphasis added).

In number of other contexts, NIOC acknowledged its obligations under contracts executed by OSCO. For example, in a letter to Iranian authorities dated July 22, 1979, a NIOC official stated that Santa Fe's contracts which had been executed by OSCO, were with NIOC:

According to the agreement between Santa Fe and NIOC regarding the equipment which has been imported without payment of customs t... to drill oil wells for NIOC and as per the agreement and future operations of this company, permission to export all rigs stated above has been given under the auspices of NIOC material department. (Emphasis added).

NIOC entered into a settlement agreement with Santa Fe, dated August 30, 1979, in which agreement NIOC expressly admitted having taken over OSCO's activities under Santa Fe's drilling contracts:

WHEREAS, the National Iranian Oil Company has subsequently taken over all activities previously done by The Oil Service Company of Iran (Private Company) as the "Company" under said drilling contracts....

Further, NIOC entered into a settlement agreement with Williams Brothers International Corp., dated October 15, 1979, on NIOC-Oil Fields stationery, covering payments due under a contract executed by OSCO for construction of high pressure gas transmission lines.

ttp://www.iusct.com/Documents/En/1269.aspx

3/5/2008

Case 1:08-cv-06024-RJW Document 3-6 Filed 03/13/2008 Page 66 of 116

All of these activities by NIOC suggest that it, rather than OSCO, had at all times been, or at least became, the real party to the contracts.

Such a suggestion also follows from NIOC's conduct towards Claimant. In June of 1979, NIOC had paid Oil Field for rents due on certain equipment through December 1978. But in July, 1979, Oil Field received a telex from IROS (which had been acting for OSCO and was NIOC's representative in London), stating that "the Islamic Court of Ahwaz has instructed NIOC to stop any payment to Oil Field rentals until further instructions...." A representative of IROS in London told Claimant to discuss the matter with "Mr. Fakhraie of NIOC."

In 1980, NIOC asked Oil Field to provide details to present a claim for the insurance on the destroyed blowout preventer and even requested that Oil Field waive its rights under the insurance policy in favor of NIOC.

In 1979, NIOC was placed under the authority of, and became affiliated with, the Iranian Oil Ministry. In 1980, Iran purported to "nullify" tł 1979 Main Agreement.

In 1982, Iranian entities submitted claims to the Tribunal asserting that NIOC was OSCO's successor.

There is no indication that the entity OSCO has ceased to exist. It appears, however, that since NIOC took over its assets, OSCO has remained as a shell. It could not and did not even pay its former employees. In 1980 IOPL entered into an agreement with IROS to loan monies to IROS "for the purpose of making payments on behalf of Oil Service Company of Iran . . . to certain former OSCO expatriate staff in respect of losses incurred by them and credit balances on their personal accounts." This agreement, which was not executed by OSCO, was to take effect, inter alia, when "the delivery [was made] to IOP[L] by OSCO of an assignment. . . by OSCO to IOP[L] of its right to be reimbursed by NIOC or any other source for the sums expended by IROS out of the loans made hereunder...."

## JURISDICTION

Article II, paragraph 1, of the Declaration Of The Government Of The Democratic And Popular Republic Of Algeria Concerning The Settlement Of Claims By The Government Of The United States Of America And The Government Of The Islamic Republic Of Iran ("Claims Settlement Declaration") provides that this Tribunal shall decide claims of nationals of the United States against "Iran" if the claims "are outstanding on the date of this agreement, whether or not filed with any court, and arise out of debts, contracts (including transactions which are the subject of letters of credit or bank guarantees), expropriations or other measures affecting property rights...." Article VII, paragraph 3, of the Claims Settlement Declaration provides that "'Iran' means the Government of Iran, any political subdivision of Iran, and any agency, instrumentality, or entity controlled by the Government of Iran or any political subdivision thereof."

In the instant case, Claimant, which purports to be a United States national, has brought a claim against the Government of Iran and NIOC, which is an agency, instrumentality or entity controlled by the Government of Iran, based on debts, contracts, expropriations or other measures

affecting property rights.

There can be no serious question that this Tribunal has jurisdiction over Oil Field's claim as against Iran and NIOC. Since the Claimant is not now proceeding against the entity OSCO, there is no pending issue of jurisdiction over a claim against OSCO.

SUCCESSION

The majority has gone beyond any issue of jurisdiction to consider NIOC's liability based on evidence of the NIOC-OSCO relationship. As I discuss infra, I conclude that NIOC is liable for OSCO's debts as OSCO's principal. I agree, however, with the majority that if NIOC is not liable as OSCO's principal, NIOC is liable as OSCO's successor. In my view, as such a successor, NIOC is fully liable for OSCO's obligations under traditional legal principles, for that is the consequence and meaning of succession. [9]

If OSCO was not acting as agent of NIOC, the evidence supports the alternative theory adopted by the majority that NIOC is OSCO's successor. Prior to late 1978, OSCO had 10,000 employees and was administering numerous contracts and annually disbursing substantial monies provided by NIOC. By March of 1979, OSCO's 600 expatriates had departed, and all of the other OSCO operations had been taken over by NIOC. [10]

While the corporate shell of OSCO may still exist, its principal assets have been taken over by NIOC. Indeed, since OSCO's Statutes (articles of incorporation) limited its purpose to providing services to NIOC in connection with oil development and production in Iran -- work now done directly by NIOC -- there is no longer any reason for OSCO's continued existence.

NIOC began communicating with companies as if NIOC had supplanted OSCO as a contracting party. NIOC sent some of such communications on OSCO stationery. Moreover, NIOC represented itself to companies as the party to their contracts executed by OSCO. NIOC made payments, requested performance and claimed rights under such contracts, including exercising purchase options and termination clauses. On one occasion NIOC even referred to its "legitimate rights" under a contract executed by OSCO and another company.

In two claims filed with the Tribunal, Iranian Governmental entities alleged and relied on the fact that NIOC was OSCO's successor. [11]

In circulars, Iran and NIOC described the assumption of OSCO's assets and activities by NIOC as a merger.

In short, NIOC simply took over a going concern from OSCO, without any payment to OSCO, and then continued OSCO's business. OSCO apparently remains a shell, unable to pay even its former employees. Yet NIOC has not made provision to compensate OSCO's creditors, such as Oil Field. NIOC has asserted rights under contracts while at the same time refusing to comply with its obligations thereunder. NIOC, although taking over all of the assets and business of OSCO, seeks to avoid liability for the obligations of that business. Moreover, NIOC and Iran have in other matters, in effect, represented and admitted that NIOC is OSCO's successor.

Case 3:08-mc-80024-JSW Document 8-6 Page 8 of 16 03/13/2008

As a result of the facts and the law, NIOC must be treated as the successor to OSCO's liabilities and must be obligated to the same extent as OSCO.

The majority holds NIOC liable with respect to OSCO's obligations to OSCO's creditors by applying international law derived from analogy to municipal law governing mergers and succession. Although Respondents suggest that Iranian law should apply, there is no clear showing that Iranian law specifically deals with the situation in issue or is inconsistent with the principles of commercial and international law found applicable by the majority. Cf. Norwegian Shipowners Claims (U.S.A. v. Norway) 1 R.Int'l. Arb. Awards 305,330-331 (1922). Without going into a discussion of how one formulates or determines international law, a subject of a great deal of scholarship, it appears that the majority's conclusion is supported by recognized principles of law and analogies thereto.

Indeed, when, as here, a Tribunal is faced with "a new situation," Reparation for Injuries Suffered in the Service of the United Nations, [1949] I.C.J. Rpts. 174, 182, that Tribunal is justified in grounding its decision on principles of international law. See Simpson and Fox, International Tribunals 136 (1952); see also Article V of the Claims Settlement Declaration. In the instant case the Tribunal has adopted as international law, a doctrine which can be derived from municipal law, legal authorities and principles of justice. Thus, holding that NIOC's liability can be based on a "de facto" succession is justified under Article V of the Claims Settlement Declaration, which requires that all cases be decided "on the basis of respect for law," and which directs the Tribunal to utilize applicable "principles of commercial and international law." [12]

There is legal authority for the proposition that even in the absence of a formal merger or consolidation, which normally protects creditors, when one company takes over and continues the business of another, especially without consideration or provision for creditors, the former company is liable to creditors of the latter on the theory that there has been a de facto merger or consolidation. Such liability is based on the theory that under such circumstances it would be unjust for the company obtaining the assets of a business to avoid any liabilities connected therewith. See Annot, 49 ALR 3d 881 (1973); accord, Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182 n.5 (1973).

As one authority on comparative law has written:

One point are courts more united than that the successor to the assets of a going concern must accept the debts with it. This point is expressed in most of the laws which contain any significant detail of the means and consequences of fusion... Where statutes are silent, courts may be expected to apply the rules developed for 'transfer of assets,' which impose liabilities on the successor to assets even without legislative guidance.

Conrad, Fundamental Changes in Marketable Share Companies, XIII Int'l Ency. of Comp. Law, Ch. 6 at 88 (undated) (footnote omitted). [13] To

http://www.iusct.com/Documents/En/1269.aspx

3/5/2008

allow an entity to take over the assets of another without any consideration, thereby leaving the creditors of the latter without any remedy, would result in a gross injustice. [14] See id. at 60-61.

Moreover, NIOC has, in order to derive certain benefits, represented itself as the party to contracts executed by OSCO. Iranian Government entities have even represented to this Tribunal that NIOC is OSCO's successor. Such representations may amount to an implied assumption of liability for OSCO's debts. See Eadjevardian v. Laidlaw-Coggeshall Inc., 431 F. Supp. 834, 839-840 (S.D.N.Y. 1977). At the very least, such representations should be viewed as admissions, which would constitute powerful evidence of succession. See D.W. Bowett, Estoppel Before International Tribunals and Its Relation to Acquiescence, [1957] Brit. Y.B. Int'l L. 176,195. In addition, there is authority for the proposition that Iran and NIOC should not now be able to disavow these representations.

A one writer, quoting in part from a leading English case, has stated:

It is a principle of good faith that "a man shall not be allowed to blow hot and cold -- to affirm at one time and deny at another ... Such a principle has its basis in common sense and common justice, and whether it is called 'estoppel', or by any other name, it is one which courts of law have in modern times most usefully adopted."

3. Cheng, General Principles of Law As Applied by International Courts and Tribunals 141-42 (1953); see also Argentine-Chile Frontier Case, XVI R. Int'l. Arb. Awards 115, 164 (1966).

The principle has long been accepted as a rule of international law. Another writer has noted:

The doctrine has been invoked [by international tribunals] in varying forms over a period of a century and a half, and although there have been occasions on which it has been held to be inapplicable to the particular facts, its jurisprudential basis has been unchallenged.

I. MacGibbon, Estoppel in International Law 7 Int'l & Comp. L.Q. 468, 479 (1958). There are suggestions that in international law, "estoppel", or its equivalent, may be utilized, even in the absence of technical municipal law requirements, such as reliance. Id. at 478. Underlying the principle of estoppel or analogous doctrines in international law "is the requirement that a State ought to be consistent in its attitude to a given factual or legal situation." Id. at 468. Such a principle should apply in the instant case.

Thus, for all of the foregoing reasons, if, as the majority concludes, NIOC was not OSCO's principal, NIOC is the successor to the liability of OSCO to Oil Field and should be liable to Oil Field to the same extent as would be NIOC's predecessor, OSCO.

AGENCY

The majority has held that OSCO did not enter into the Lease Agreement with Oil Field as an agent of NIOC. Whether such an arrangement can be viewed as creating an agency relationship is not free from doubt. The arrangement between NIOC and OSCO was unusual. Nevertheless, I would hold that the relationship is such that agency principles are applicable, thus rendering NIOC fully liable under contracts executed by

Case 3:08-md-80004-JSW Document 3-6 Filed 03/23/2008 Page 30 of 33

OSCO in the course and scope of such relationship.

The Lease Agreement between OSCO and Oil Field provided that the "contract and any legal relationship arising therefrom shall be subject to English law." This choice of law provision makes English law "the proper law of the contract." 2 Dicey and Morris, The Conflict of Laws 753 (10th ed. 1980). Moreover, since OSCO's representative in London (IROS) dealt with foreign contractors, such as Claimant, in connection with contracts executed by OSCO, the transaction in issue has sufficient contacts with England for choice of law purposes, quite apart from the choice of law clause.

Authorities suggest that there is uncertainty as to the source of choice of law doctrines and the proper law to apply. See 1 Schwarzenberger, International Law 74-78 (3d ed. 1957); see also Steiner and Vagts, Transnational Legal Problems 774-776 (1977); Riphagen, The Relationship Between Public and Private Law and the Rules of Conflict of Laws, Academie de Droit International, I [1961] Recueil des Cours 215. Although the law of the contract, English law, might seem an appropriate selection to supply the choice of law principles, 1 Dicey and Morris, The Conflict of Laws 64 (10th ed. 1980), the fact that the issue involves NIOC's relationship to OSCO and whether NIOC is a party to the contract adds some doubt to this conclusion. Because of this uncertainty in the applicable choice of law rules, the Tribunal should apply its own rules of conflict of laws. Restatement (Second) of Foreign Relations Laws of the United States, Sec. 194 Comment a. at pp. 584-85 (1965); see Sapphire International Petroleum Ltd. v. National Iranian Oil Company 35 I.L.R. 136, 170-176 (1963). In the instant case, however, the applicable choice of law rule does not affect the result. [15]

Generally questions as to the existence of an agency relationship, as well as the scope thereof, are decided by resort to the law of the country where the relationship is to have been created. 2 Dicey and Morris, The Conflict of Laws 909 (10th ed. 1980); Fridman, The Law of Agency 289 (3d ed. 1971). Also important is the fact that the 1973 Service Agreement between OSCO and NIOC incorporates the choice of law provisions of the 1973 Main Agreement providing that the latter agreement is to be interpreted in accordance with the laws of Iran. Thus, in view of the circumstances of this case, Iranian law is applicable to the question of whether the agreement between OSCO and NIOC resulted in an agency relationship.

If there was an agency relationship between NIOC and OSCO, issues of the liability of NIOC as OSCO's principal to a third party, such as Oil Field, should be determined by the law of the contract, which, in the instant case, is English law. 2 Dicey and Morris, The Conflict of Laws 911-917 (10th ed. 1980); Cheshire and North's Private International Law 238 (10th ed. 1979); see generally Rigaux, Agency, III Int'l Ency. of Comp. Law, Ch. 29 (undated). As one authority has stated in pointing out that "the law of external relationship" often determines the rights of a third party against a principal in an international commercial transaction, the "protection of third parties who act in good faith must be the overriding consideration." Schmitthoff, Agency in International Trade, Academie de Droit International, [1970] I Recueil des Cours 107, 180. [16]

NIOC refers to Article 968 of the Iranian Civil Code which provides: "Liabilities arising out of transactions are subject to the laws of the place of the performance of the transaction except in cases where the parties to the transaction are both foreign nationals and have explicitly or impliedly declared the transaction to be subject to the laws of another country." To the extent such a law is applicable or binding, the place of

Case 3:08-mo-80024-JSW   Document 3-6   Filed 03/13/2008   Page 11 of 16

performance -- payment and delivery -- was the State of Texas in the United States. Agency principles in the United States are generally similar to the agency laws of England, since both countries utilize the common law.

Respondents correctly state in their memorial that "[w]hether or not an agency exists in a given case . . depends upon the particular circumstances of that case. It is question [sic] of fact." Iranian law provides that "[a]n attorneyship comes into being, whether by way of proposal or acceptance, by any word or act which indicates an agency." The Civil Code of Iran, Article 658 (Sabi trans. 1973) (also translated as, "[a]n agency is effected by offer and acceptance by any word or act which is indicative thereof." Vafai, Commercial Laws of the Middle East - Iran, Bk.8,p. 91 (1982)). The agency relationship may therefore arise either expressly or by implication. See also Schmitthoff, Agency in International Trade, Academie de Droit International, [1970] I Recueil des Cours 107, 135-138 (civil law generally); see also Restatement (Second) of Agency | 32, Comment a; id. at | 33, Comments a,b and c; id. at | 34. Thus, there is no prerequisite for the parties to identify themselves expressly as "principal" and "agent." See Fridman, The Law of Agency 10-11 (3d ed. 1971).

The 1973 Main Agreement provided that NIOC was to exercise "full and complete ownership, operation and control" over its oil industry, and that the Service Company [OSCO] was to "carry out operations as assigned to it by NIOC...." The 1973 Service Contract provided that OSCO "shall carry out the Operations . . . on behalf of and under the overall direction and control of NIOC," and that "all costs and expenses incurred by [OSCO] shall be on behalf and for the account of NIOC." NIOC controlled the budget, finances and programs of OSCO and provided to OSCO all capital and other funds required by OSCO to carry out its activities. Indeed OSCO had no function other than to render services to and on behalf of NIOC.

NOC's extensive control over the activities of OSCO suggests an agency relationship, especially since that control was to further NIOC's own, rather than OSCO's business. [17] OSCO's connection with the Consortium has no bearing on OSCO's agency relationship with NIOC, especially vis-a-vis contractors such as Oil Field.

Since OSCO was put in a position where it was dependent upon NIOC's resources and control and was given authority to act solely for NIOC, and not for itself, it would be reasonable to conclude that OSCO was in a position to affect NIOC's relations with third persons, a position which is the essence of agency. Fridman, The Law of Agency 8 (3d. ed. 1971). Thus, based on the express terms of the 1973 Service Contract and the above-mentioned facts, OSCO was acting in a representative capacity for NIOC.

Since OSCO was NIOC's agent, it remains to determine whether under English law, NIOC is liable as a principal to Oil Field. [18] An agent may contract with third parties on matters within the scope of the agency relationship, and thereby create a "direct contractual relationship ... between [the] principal and third part[ies]." Fridman, The Law of Agency 160 (3d ed. 1971). The Lease Agreement itself includes the following clause in the preamble:

The National Iranian Oil Company . . . has under an international agreement appointed the [Oil Service] Company [of Iran] to undertake certain operations in the production and export of crude oil from South Iran. (Emphasis added.)

Interestingly, the word "appointed" is used in Iranian agency law. That law provides, "[a]n attorneyship is a contract whereby one of the parties appoints the other as his representative for the accomplishment of some matter." The Civil Code of Iran, Article 656 (Sabi trans. 1973) (amphasis added). The preamble clause, pursuant to which the Lease Agreement was then entered into, functioned as a disclosure by OSCO that it acted as NIOC's agent in dealing with Oil Field. Thus, even if the Lease Agreement did not specifically refer to NIOC as OSCO's principal, such a reference was unnecessary, since the circumstances indicated such agency relationship to Claimant. Schmitthoff, Agency in International Trade, Academie de Droit International [1970] I Recueil des Cours 135,138-143. In addition to the preamble language, the Lease Agreement required NIOC to be one of the beneficiaries of the insurance on the leased equipment. If NIOC was not a party to the agreement; it would have no insurable interest. Also, Claimant asserts it was generally aware of the 1973 Service Agreement at the time the Lease Agreement was executed ai _ pelieved that NIOC was responsible for agreements executed by OSCO. Moreover, the later-required Fidelity Affidavit confirmed that Oil Field's contract with OSCO constituted business "with, for, or involving" NIOC and Iran.

Certainly the Lease Agreeemt was within the scope and purpose of OSCO's agency relationship with NIOC. All of OSCO's activities were "on behalf of and under the overall direction and control of NIOC." All of OSCO's costs and expenses were incurred "on behalf of and for the account of NIOC." 1973 Service Agreement.

That NIOC undertook obligations entered into by OSCO is also consistent with such an agency relationship. In this connection NIOC made payments and exercised options under contracts executed by OSCO, thus suggesting that NIOC considered itself to be in effect the contracting party. NIOC expressly referred to rights under contracts executed by OSCO as NIOC's rights.

That the 1973 Service Contract refers to OSCO as a "contractor" does not, as the majority suggests, negate an agency relationship. A contractor, and even an independent contractor, may also be an agent. See Restatement (Second) of Agency | 2(3) (1958); Rigaux, Agency, Ch. 29, III Int'l E· ·. of Comp. Law 7 (undated). Indeed, in Iranian law an "agent may be an employee of the principal or an independent contractor." Sabi, The Commercial Laws of Iran 20 (1973), reprinted in IV Nelson, Digest of Commercial Laws of the World (1982). Thus, the majority's conclusion is premised in large part on the erroneous assumption that a "contractor" and an "agent" are mutually exclusive. [19]

Moreover, Article 19(E) of the 1973 Main Agreement stated: "[OSCO], functioning solely as contractor for NIOC on a non-profit making basis, shall not be liable to any contractor's or income tax." This exemption reflects a status inconsistent with OSCO's alleged role as an independent third party acting for its own account. Article 2 of the 1973 Service Contract by providing that OSCO as "a contractor, shall carry out the Operations... on behalf of and under the overall direction and control of NIOC," indicated that OSCO would be acting for the account of NIOC -- not its own. Article 4 of OSCO's Statutes restricts OSCO's actions as "contractor to the NIOC," to those "in accordance with the terms and provisions of the service contract," which, I submit, established OSCO as NIOC's agent.

For the above reasons, on the basis of agency principles, I would hold NIOC liable to Oil Field as a party to the Lease Agreement.

CONTROL

Before discussing the issue of "control," one should ask, control for what purpose? Cf. Vagts, The Corporate Alien: Definitional Questions in Federal Restraints On Foreign Enterprise, 74 Harv . L.Rev. 1489, 1547 (1961).

First, control may be relevant to jurisdiction in connection with the definition of Iran or the United States under Article VII, paragraphs 3 and 4, of the Claims Settlement Declaration. This issue is not now before the Tribunal since Claimant is presently not pursuing a claim against OSCO as an entity controlled by Iran or otherwise. [20]

Second, the issue of control might concern whether NIOC exercised such control over OSCO that NIOC would be liable for OSCO's debts under theories of corporate identity or alter ego or of piercing the corporate veil. [21] Such theories normally would not apply in a case such as the instant one where the Claimant is not attempting to impose liability on the shareholders. [22]

This is not to say that alter ego or identity theories are never applicable when the question involves the liability of those who are not the record owners of the stock of a corporation. For example, such principles might, in some circumstances, apply to persons or entities, who, by their control of the corporation or its stock, may be treated as actual, assumed, beneficial or constructive owners of the controlled entity or as the real parties in interest. In the instant case, however, neither the parties nor the Tribunal focused on the legal or factual issues involved in such a determination. This may be due to the manner in which the issues were framed by the parties and the Tribunal. See supra. The Tribunal's cursory discussion of the "alter ego" or "identity" issue reflects the inadequacy of the Tribunal's record on the issue. In light of that record, the Tribunal should not have reached the question.

Third, the degree of control might be relevant to other theories of liability, such as tortious interference with contractual or advantageous relations and liability to creditors by virtue of an expropriation of a company or of its assets. Although these theories have been raised by Claimant, they were not the subject of the preliminary proceeding heard by the Tribunal.

The level, degree and purpose of control is relevant in the present proceeding only on the question of the application of agency principles. If NIOC exercised such control over OSCO that OSCO was in reality acting on behalf of NIOC, then OSCO would, in effect, be NIOChs agent, and NIOC would be liable under agency principles. "Control" in this sense is simply one factor to be considered in connection with agency issues.

Thus, the control exercised by NIOC over OSCO supports the Claimant's position that NIOC was liable under the Lease Agreement as a principal by virtue of principles of agency.

CONCLUSION

I concur in the "Interlocutory Award" of the Tribunal holding that NIOC is the de facto successor to OSCO's rights and obligations and that the Tribunal has jurisdiction over Oil Field's claims.

The Hague December 10, 1982
Richard M. Mosk

END

[1] Since the majority opinion does not deal with the liability of the Government of the Islamic Republic of Iran ("Iran"), I do not discuss that issue.

[2] "NIOC shall provide as necessary to the Service Company [OSCO] in accordance with the provisions of the Service Contract all capital and other funds to enable the Service Company to carry out the operations assigned to it." Art 17 (B).

[3] During the term of the Service Contract referred to in Article 17 NIOC shall entrust to the Service Company the duty of working out the detailed programmes and budgets provided for in this Article as directed and controlled by NIOC. Such programmes and budgets shall be submitted for final approval to NIOC and shall become operative after such approval." Article 16 (D).

[4] "The paid in capital was 1,000,000 rials or about $15,000.

[5] In Iran, the new agreement was seen as the zenith of Iranian triumph in the nationalisation [sic] of Iranian oil industry." 1976 Iran Almanac 223 (Echo of Iran).

[6] Respondent submitted a telex from an unidentified person, apparently connected with NIOC, to NIOC's counsel in this case, denying that some of these approvals were required or solicited. Respondents also submitted what purported to be a memorandum concerning OSCO's contracting policy in which there is no reference to NIOC, but rather to various contracts committees.

[7] The Lease Agreement was amended from time to time (as late as June, 1977) to add additional equipment and to extend the term. Oil Field also, pursuant to the Lease Agreement sold some materials for use in Iran.

[8] Many written communications were submitted to the Tribunal by the parties which were not authenticated formally. Generally there were no evidentiary objections to such communications being considered by the Tribunal. As I noted in my dissenting and concurring opinion, "On The Issues of Jurisdiction" in Case Nos. 6, 51, 68, 121, 140, 159, 254, 293 and 466 (Forum-Selection Clauses), "International tribunals apply liberal standards in accepting and considering evidence. Indeed, one authority has written: 'In international procedure ... evidence is always admitted upon being duly presented in accordance with the time limits fixed by the tribunal; it will only be excluded upon a showing by the party challenging it of a specific ground requiring such action.' Sandifer, Evidence Before International Tribunals 179 (rev.ed. 1975)."

[9] See Black's Law Dictionary 1283 (5th ed. 1979) ("Successor" - "Term with reference to corporations, generally means another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes burdens of first corporation.")

[18] NIOC's justification for such a takeover is irrelevant. Whether or not OSCO or the Consortium were at fault, as suggested by Respondents, has no bearing on NIOC's legal responsibility to Claimant Oil Field.

[11] Claimant requested the production of other claims filed or lodged by Iran with the Tribunal involving Oscorelated transactions. Iran delivered to the Tribunal several hundred claims, of doubtful jurisdiction, by its oil agencies against United States nationals, which claims would seemingly be OSCO-related, since it was OSCO that had most of the direct dealings with contractors. Iran not only opposed the production of such claims but withdrew and removed most of them at the time of the proceedings in the instant case. Quite apart from the propriety of such actions (see Sandifer, Evidence Before International Tribunals 115, 163 (rev.ed. 1975)), they should result in the drawing of inferences against Iran and NIOC. Id. at 147-154.

[13] The Tribunal shall decide all cases on the basis of respect for law, applying such choice of law rules and principles of commercial and international law as the Tribunal determines to be applicable, taking into account relevant usages of the trade, contract provisions and changed circumstances." Art. V, Claims Settlement Declaration.

[13] See Art. 231 of The Civil Code of Iran (Sabi trans. 1973) ("Undertakings or contracts are only binding on the two parties concerned or their legal substitutes..." (Emphasis added)).

[14] Even in those situations where it has been held that a government expropriation of a company does not constitute a taking of rights of creditors against such a company, the possibility of Government liability for that debt has been recognized. See In the Matter of the Claim of Universal Oil Products (1959) (U.S. Foreign Claims Settlement Commission) quoted in 8 Whiteman, Digest of International Law 995-96 (1967). Holdings by the United States Foreign Claims Settlement Commission that expropriations of companies did not constitute takings of creditors' rights were based on statutory requirements that compensation could only be for expropriations, not for other theories of liability, such as succession. Moreover, there is other authority holding that the failure to compensate a creditor of an expropriated company does constitute a taking. See generally 8 Whiteman, Digest of International Law, supra at 997-98. Dickson Car Wheel Company (1931) United States-Mexico Claims Commission, 4 R. Int'l Arb. Awards 669 is distinguishable in that the Commission denied a claim by a creditor of a railway company against the Government which took over the assets of the railway company because the Commission found the railway company still had assets and income and would have assets returned to it so that it could respond to claims. There is no such evidence in the instant case. Moreover, the dissenting opinion by Commissioner Nielsen in that case appears persuasive. Id. at 682.

[1] Claimant asserts that by virtue of Article V of the Claims Settlement Declaration, the "applicable legal rules and principles should be those derived from general commercial law and international law, rather than from the municipal law of any single nation." I believe that my conclusion is consistent with general principles of commercial and international law.

[16] But see Fridman, The Law of Agency 291 (3d ed. 1971) ("Indeed, it can be said that the agency relationship in the conflict of laws is still the subject of considerable doubt.") In view of the principle expressed by Prof. Schmitthoff, the law of the contract with the third person should govern on questions of apparent authority and undisclosed principal. See Rigaux, Agency, III Int'l Ency. of Comp. Law. Ch. 29 p. 16 (undated); 2 Dicey and Morris, The Conflict of Laws 912 (10th ed. 1980). Although the doctrines of or related to apparent authority and undisclosed principal might be invoked to impose liability on NIOC, I need not reach such issues because of my conclusion that there was an agency relationship, the essence of which was disclosed to Claimant.

[17] "Whenever one uses control of a corporation to further his own, rather than the corporation's business, he will be liable for the corporation's acts under the doctrine of agency..." House of Koscot Dev. Corp. v. American Line Cosmetics, Inc. 468 F.2d. 64, 67 (5th Cir. 1972). Interestingly, counsel for NIOC analogized OSCO's relationship with NIOC to IROS relationship with NIOC. IROS acted not only as agent for OSCO, but also for NIOC. Indeed IROS contracted with NIOC to act outside Iran for NIOC. In

1979 NIOC insisted that IROS could only continue its activities if its stock were transferred to NIOC.

[18] Claimant and Respondents submitted conflicting evidence on Iranian law.

[19] The majority states that Claimant had "not submitted sufficient evidence to prove OSCO acted as an agent of NIOC." That the Oil Field Lease Agreement includes indications that OSCO was a party thereto is, I believe, outweighed by the other factors I discuss.

[20] Control as a jurisdictional factor under Article VII, paragraph 2, of the Claims Settlement Declaration, is not in issue in this case.

[21] There has been some confusion between agency and identity for purposes of imposing liability -- at least in the context of parent and subsidiary companies. See Weisser and Mursam Shoe Corporation, 127 F. 2d 344, 348 n. 11 (2d Cir. 1942); House of Koscot Dev. Corp. v. American Line Cosmetics, Inc., 468 F. 2d 64, 67 n.2, n.3 (5th Cir. 1972).

[22] See Banco Nacional de Cuba v. Sabbatino, 27 F.R.D. 255, 258 (S.D.N.Y. 1961); Banco Nacional de Cuba v. First National City Bank, 478 F.2d 191, 193 (2d Cir. 1973); Banco p    el Commercio Exterior de Cuba v. First National City Bank, 658 F.2d 913 (2d Cir. 1981), cert. granted ___ U.S. ___ (1982), 51 U.S.L.W. 3303 (Oct. 18, 1982).

# EXHIBIT "F"

REPRINTED IN:12 IRAN-U.S.C.T.R. 160

ONESCO, INC., Claimant,

v.

NATIONAL IRANIAN GAS COMPANY and THE ISLAMIC REPUBLIC OF
IRAN, Respondents.

CASE NO. 263
CHAMBER TWO
AWARD NO. 254-263-2
Iran - United States Claims Tribunal
Si~ ~d September 18, 1986
Fil~u September 18, 1986


AWARD

Appearances:

For the Claimant: Mr. E.A. Eisenberg, Attorney
For the Respondents: Mr. Mohammed K. Eshragh, Agent of the Government of the Islamic Republic of Iran Mr. Akbar Shirazi, Legal Adviser to the Agent
Mr. Hossein Piran, Assistant to the Agent Mr. Mansour Daftarian Mr. Ghassem Nikou Nazar Mr. Abbas Hashemi, Representatives of the National Iranian Gas
Company
Also Present: Mr. Daniel M. Price, Deputy Agent of the Government of the United States of America

I. THE CLAIM

1. . .ie Claimant, ONESCO, INC., seeks a total of $710,934.63, plus interest and costs of arbitration, in connection with a contract for the sale of gas and
steam turbine generator sets and related equipment. The Claimant named as Respondents the NATIONAL IRANIAN GAS COMPANY ("NIGC") and THE
ISLAMIC REPUBLIC OF IRAN ("the Government of Iran"). All Parties filed written pleadings and a Hearing was held on 24 June 1986.

2. The Claim is composed of three separate items. The first is for damages measured by the cost of providing bank guarantees required under the terms of a
letter of credit when the underlying contract did not require such bank guarantees. The second item is also for damages for failure to abide by the payment
schedule provided in the contract, measured by the interest the monies could have earned had payments been made according to the schedule. The third item
of the Claim is for reimbursement of the time and expenses of service engineers incurred during several visits to Iran.

3. The Claim stems from the purchase by NIGC of several turbine generator sets and related equipment, all covered by an extended warranty. Davy Powergas,
Inc. ("Davy Powergas"), acting on behalf of NIGC, issued an Inquiry to which the Claimant responded with a Bid Proposal based on terms negotiated with the
turbine manufacturer, Westinghouse Canada Limited ("Westinghouse"). On 12 November 1975, NIGC awarded the contract to the Claimant by sending a
Telex of Intent accepting the Bid Proposal. The formal Purchase Order was executed in May 1976 and delivery of all of the turbines and equipment was
completed by early 1978.

## II. JURISDICTION

4. The Claimant submitted as evidence of its nationality a state certificate, an affidavit of the corporate secretary, and copies from the U.S. passport of the individual majority shareholder of Onesco, Inc. indicating that Onesco is a privately-held corporation formed on 25 June 1968 in the State of New York and that more than 50 percent of the capital stock is owned by a natural person who is a U.S. citizen. On the basis of the evidence, the Tribunal is satisfied that the Claimant is a United States national as defined in Article VII, paragraph 1, of the Claims Settlement Declaration.

5. The Respondents clearly fall within the definition of "Iran" contained in Article VII, paragraph 3, of the Claims Settlement Declaration.

6. The Claimant alleged that the claims were owned continuously during the relevant period as required by Article VII, paragraph 2, of the Claims Settlement D  aration. The Claim, as described above, clearly arises out of "debts, contracts . . ., expropriations or other measures affecting property rights" as required by Article II, paragraph 1, of the Claims Settlement Declaration.

7. The Respondents, however, argued that the Claim was not outstanding on the date of the Claims Settlement Declaration. The Respondents based this argument on the fact that the Claimant had not filed suit on its claim with any court. The Tribunal observes that the requirement in the Claims Settlement Declaration that claims and counterclaims be "outstanding on the date of this Agreement" is directly followed by the words "whether or not filed with any court." The plain meaning of this phrase contradicts the argument advanced by the Respondents and it is dismissed accordingly. Accord Phillips Petroleum Company Iran and The Islamic Republic of Iran et al., Award No. ITL 11-39-2 (30 Dec. 1982) at pp. 9-10; Amoco Iran Oil Co. and The Islamic Republic of Iran et al., Award No. ITL 12-55-2 (30 Dec. 1982) at pp. 8-9.

8. Based on the foregoing evaluation of the evidence and the contentions of the Parties, the Tribunal concludes that it has jurisdiction over this Claim.

## III. THE MERITS

### A. The Damages Claims

1. The Bank Guarantee Expenses

9. The Claimant alleged that it incurred expenses of $105,707.59 in fees for bank guarantees demanded by NIGC to secure the amounts to be advanced under a letter of credit prior to delivery of the turbine generator sets. The Claimant argued that the requirement of bank guarantees under the Letter of Credit was in breach of the payment terms of the underlying contract and that, in any event, NIGC later promised to reimburse the Claimant for these extra expenses. The evidence consists of copies of the Claimant's invoices for these expenses with the debit notices of the issuing bank, the Purchase Order, the Letter of Credit, and correspondence among the Parties and Davy Powergas regarding the issue of reimbursement.

10. NIGC argued that since the Claimant accepted the terms of the Letter of Credit, a separate contract which contained the provision for the bank guarantees, it has no grounds for claiming the associated costs before the Tribunal. NIGC also argued that pursuant to normal trade practices, it is customary to provide bank guarantees for advance payments received under a letter of credit and that therefore the requirement of bank guarantees was an implied term of the contract of sale between the Parties. Finally, NIGC denied liability for the alleged promises of one of its employees and of Davy Powergas to reimburse the Claimant for the bank guarantee expenses, promises which NIGC asserts were made without authority.

11. The Tribunal notes from the evidence submitted that the Inquiry issued by Davy Powergas provided that payment be made "by an irrevocable and confirmed letter of credit." No further payment terms were specified. The Bid Proposal of the Claimant issued in response to this Inquiry was not submitted in evidence by either of the Parties. The Telex of Intent sent by NIGC on 12 November 1975 accepting the Claimant's bid only stated in this regard that a "confirmatory purchase order . . . will be mailed soonest and letter of credit opened." The Purchase Order was not received by the Claimant until 3 May 1976. The payment terms in the Purchase Order provided that payment would be made by an irrevocable letter of credit with funds disbursed according to the following schedule:

(i) 20% of total value with contract;
(ii) 75% divided in monthly payments beginning 1 month after contract date, providing progress is monitored by Davy Powergas and Invoices approved by Davy Powergas; and
(i··· the balance of 5% 30 days after final delivery to port of shipment.
The contract date was defined by the Purchase Order as 12 November 1975, the same date as the Telex of Intent accepting the Claimant's bid.
12. The Claimant was advised on 7 May 1976 that the Letter of Credit had been opened. The terms of the Letter of Credit were not communicated until 27 May 1976. One of the conditions to drawing the downpayment was presentation of an unconditional bank guarantee conforming to one of two standard forms provided by Bank Markazi. One of the other terms of the Letter of Credit was also unacceptable to the Claimant since it conditioned payment on delivery of the goods, rather than in advance of delivery, as specified in the payment terms of the Purchase Order. The bank guarantee condition also did not provide for a reduction in the amount of the guarantee as deliveries of turbines were accomplished. Consequently, the Parties negotiated two amendments to the Letter of Credit in July and August 1976. However, the condition of the bank guarantee remained in the amended Letter of Credit.

13. On 12 October 1977, the Claimant invoiced NIGC for the bank guarantee expenses incurred up to that date for payments it had made to Chase Manhattan Bank, requesting payment because during "the period of the negotiation and inquiry stage of the [Purchase Order] it was never brought to [Onesco's] attention by Davy Powergas or National Iranian Gas Co. that the forthcoming letter of credit would require bank guarantees as a prerequisite to drawing advance and progress payments from the credit." In May and June 1978, the Claimant invoiced NIGC for the additional expenses incurred up to the expiration of the bank guarantees following the completion of the deliveries and the final draw on the Letter of Credit in May 1978.

1··. On 1 June 1978, Davy Powergas informed both NIGC and the Claimant of the results of its investigation into the issue of responsibility for the cost of the bank guarantees. Davy Powergas concluded that "N.I.G.C. is obligated to pay" because "the cost of this unconditional bank guarantee . . . was not included in Onesco's quotation nor was the cost part of the purchase order issued by N.I.G.C." and because such costs were paid by NIGC to other vendors "under the same circumstances."

15. The Claimant provided evidence that, following this report, the Parties held a number of discussions on the question of the bank guarantee costs, including discussion of an amendment to the Purchase Order which would have provided for reimbursement of the bank guarantee costs by NIGC. The amendment was never executed and Onesco's invoices were never paid.

16. The Tribunal decides that while the Claimant consented to the condition of bank guarantees in connection with the Letter of Credit, such a requirement by NIGC was inconsistent with the payment terms of the Purchase Order. The Purchase Order provided that the Claimant was to provide certain goods according to a certain schedule and NIGC was to pay a certain amount by letter of credit according to a certain schedule. There was no obligation on the Claimant corresponding to the Letter of Credit to provide bank guarantees securing those amounts paid prior to delivery of the goods. While the Tribunal shares NIGC's

opinion that advance payments made pursuant to an irrevocable letter of credit are typically secured by a bank guarantee, it notes that such guarantees are expressly required by the underlying contract. In this regard, the Tribunal notes that in NIGC's own contract with Davy Powergas, it specified that Davy Powergas would provide a bank guarantee to secure the advance payment, but that NIGC would bear the cost of the bank guarantee. The Claimant disputed the obligation to provide bank guarantees from the time the issue first arose and maintained its position throughout the course of relations between the Parties, both before and after the establishment of the Letter of Credit. In these circumstances, the Tribunal declines to imply in the Purchase Order any obligation on Onesco to provide the bank guarantees. Accordingly, the Tribunal awards the Claimant the amount of $105,707.59 for the fees charged to Onesco for the bank guarantees, as represented in the amount of its invoices to NIGC in this regard.

2. Damages for Late Payments

17. The Claimant alleged that it is entitled to $560,553.70 as damages for the failure of NIGC to make timely payments as required under the terms of the Purchase Order. The Claimant calculated the losses represented by these late payments in terms of an annual rate of 9 percent simple interest for the number o^ ys each payment was received late with respect to the payment schedule contained in the Purchase Order. The payment schedule contained in the Purchase Order, quoted above in paragraph 11, provided for NIGC to make two types of payments prior to delivery of the final piece of equipment -- a 20 percent downpayment with the contract and 75 percent payable in sixteen equal monthly installments starting one month after the date of the contract. The final 5 percent was only payable following completion of all deliveries. The 20 percent downpayment was received by the Claimant on 30 July 1976, over 8 months after the date of the contract. The Claimant did not receive the progress payments according to the monthly schedule contained in the Purchase Order. The Claimant based its argument on liability for damages on the failure of NIGC to open the Letter of Credit within a reasonable time and the conditions in the Letter of Credit which prevented the Claimant from receiving progress payments according to the monthly schedule.

18. NIGC argued that the Purchase Order did not specify a date by which it was required to open the Letter of Credit and that under Clause 10 of the General Conditions attached to the Purchase Order the Claimant had 10 days in which to lodge any complaint about delay in establishing the Letter of Credit.

19. The Tribunal notes that Clause 10 of the General Conditions reserves to NIGC the right to change specifications, method of shipment or packing, and place or time of delivery, with possible consequent effect on the purchase price. The Tribunal deems this provision irrelevant to the question of failure to abide by the payment schedule of the contract. While no date was specified in the contract for the establishment of the Letter of Credit, the Tribunal decides that it s^ ld have been established within a reasonable time. Accord Economy Forms Corporation and The Government of the Islamic Republic of Iran, Award No. 55-165-1 (14 June 1983) at p. 19. In the circumstances of this Case, given that the first monthly progress payment was due within one month of the contract date, a reasonable time could not have been any longer than one month. Indeed, the evidence indicates that one month after the contract date, the Claimant requested that the downpayment be paid. The Claimant also informed NIGC on 2 January 1976 that the first progress payment was overdue and reiterated that the downpayment had not been received. In these circumstances, the Tribunal finds that NIGC breached its obligation to open the Letter of Credit or to make the required payments within one month of the contract date. The questions remain, however, as to whether the Claimant has proven any damages arising from the breach and whether it has waived its claim to any such damages.

20. According to the evidence submitted to the Tribunal, the Claimant wrote to NIGC on 12 October 1977 explaining that it had been charged interest by Westinghouse for late payment of the 20 percent downpayment and the monthly progress payments established pursuant to the parallel payment schedule in its Purchase Order with Westinghouse and requesting a settlement of the amounts owed Westinghouse. Westinghouse calculated its interest charges at 1 percent over the prime rate available from Canadian banks during the relevant periods. The interest rate applied by Westinghouse therefore fluctuated between 10.25 percent and 8.25 percent. However, the amount claimed by Westinghouse in respect of the monthly progress payments was reduced to correspond to the amount of progress on manufacture actually achieved in comparison to that assumed by the payment schedule. The discount applied by Westinghouse in early

1977, after the first set of deliveries, was 40 to 50 percent. Later, on 16 August 1979, Westinghouse presented the Claimant with its total claim, based this time strictly on the payment schedule, in the amount of Canadian $356,988.49. In the meantime, on 30 June 1978, after all payments finally had been drawn under the Letter of Credit, the Claimant invoiced NIGC for interest at the constant annual rate of 9 percent for the number of days payment was received after becoming due according to the payment schedule, which invoice totalled $560,553.70.

21. The record fails to demonstrate to the Tribunal's satisfaction that the Claimant ever paid Westinghouse for its interest claim or that the Claimant remains liable for that amount on its separate contract with Westinghouse, which is not at issue in this proceeding. To the extent that this part of the Claim is based on monies alleged to be owing to Westinghouse, it is dismissed for lack of proof. Moreover, the earliest date reflected in the record that the Claimant asserted its own claim for interest on late payments was in its letter of 12 October 1977, over a year after it started drawing payments and only after it was faced with a claim from Westinghouse. In these circumstances and to the extent that this part of the Claim is based on loss of use of monies, the Tribunal decides that the Claimant waived any claim for damages from NIGC in connection with the late establishment of the Letter of Credit by drawing the 20 percent downpayment without making any contemporaneous claim within a reasonable amount of time for interest on that late payment.

22. With respect to the monthly progress payments, the Tribunal notes that under the Letter of Credit, once established, the Claimant could have caught up with the payment schedule by drawing at once all of the monthly progress payments to which it was entitled up to that time. One of the Purchase Order conditions on drawing progress payments under the amended Letter of Credit was that each invoice be approved by Davy Powergas. There is no evidence in the record that Davy Powergas was ever requested to approve monthly invoices, or that it ever refused. Rather, the record indicates that the Claimant drew payments on roughly a quarterly basis. No explanation was given for the variance with the payment schedule set forth in the Purchase Order. The Tribunal also notes that this category of advance payments was only payable "providing progress is monitored by Davy Powergas." Therefore, this category of advance payments was also subject to a condition which could have affected the payment schedule. In the absence of further evidence, the Tribunal decides that the Claimant has not shown that any progress payments were in fact late. Therefore, the Tribunal finds that the Claimant is not entitled to any damages in connection with these progress payments.

B. The Engineers' Services Claim

23. The Claimant stated that it arranged, at NIGC's request, for several visits to Iran by Westinghouse service engineers for inspection of equipment following delivery and for supervision of installation of the gas turbine generator sets. According to the Claimant, these expenses represent additional services available under the Purchase Order but not included in the contract price, for which it submitted invoices totalling $44,673.34. The Claimant submitted in evidence its invoices, backup expense documentation, and correspondence between the Parties.

24. NIGC stated that it never received the invoices prior to these proceedings, although at the Hearing it acknowledged that upon inspection of the invoices submitted in evidence it did not dispute this element of the Claim. NIGC argued, however, that it should not be assessed interest on this amount because it never received original invoices, signed and sealed by the Claimant, with which it could have processed payment at the time.

25. The Tribunal notes that all of these invoices were submitted to NIGC c/o Davy Powergas in the United States. In the absence of information concerning Davy Powergas, the Tribunal is satisfied that NIGC had notice of the amounts due, if not directly, then at least indirectly through Davy Powergas. The Claimant is therefore entitled to interest on the amounts found owing.

26. In view of the agreement of the Parties on the invoices, the Tribunal awards the full amount of the invoices for the engineers' expenses.

C. Interest

27. In order to fully compensate the Claimant for the elements of the Claim to which it is entitled, the Tribunal considers it reasonable to award simple interest at the annual rate of 11 percent.

28. Because the invoice amounts were due as of a number of different dates, the Tribunal has calculated interest from 30 days after the date of each invoice up to and including 4 October 1979, the date payment was due on the last invoice, in order to provide the Depositary Bank with a common date from which it may calculate the interest up to the date payment is effected from the Security Account.

D. Costs

E    Party shall bear its own costs of arbitration.

E. Summary

29. The Tribunal finds that the Claimant is entitled to payment of $105,707.59 for the bank guarantee expenses and $44,673.34 for the service engineers' expenses, making a base amount of $150,380.93. Interest at 11 percent from the date payment was due on each invoice awarded up to and including 4 October 1979 amounts to $21,385.87. The Tribunal therefore awards the amount of $171,766.80, plus additional interest on the base amount from 5 October 1979.

IV. AWARD

For the foregoing reasons.

THE TRIBUNAL AWARDS AS FOLLOWS:

(a) The Respondent NATIONAL IRANIAN GAS COMPANY is obligated to pay the Claimant ONESCO INCORPORATED the sum of One Hundred S    nty-One Thousand Seven Hundred Sixty-Six United States Dollars and Eighty Cents (U.S.$171,766.80), representing U.S.$150,380.93 in principal awarded plus U.S.$21,385.87 in simple interest up to and including 4 October 1979, plus additional simple interest on the base amount of U.S.$150,380.93 at the annual rate of 11 percent (365-day basis) from 5 October 1979 up to and including the date the Escrow Agent instructs the Depositary Bank to make payment out of the Security Account.

(b) This obligation shall be satisfied by payment out of the Security Account established pursuant to Paragraph 7 of the Declaration of the Democratic and Popular Government of Algeria of 19 January 1981.

(c) Each of the Parties shall bear its own costs of arbitration.

(d) This Award is hereby submitted to the President of the Tribunal for the purpose of notification to the Escrow Agent.

Dated, The Hague 18 September 1986

Robert Briner
Chairman
Hamid Bahrami-Ahmadi
Dissenting in part, Concurring in part

George H. Aldrich

END

# EXHIBIT "G"

4 IRAN

REPRINTED IN: 4- I.US.CT.R. 212


DAMES & MOORE, Claimant,

v.

THE ISLAMIC REPUBLIC OF IRAN, THE ATOMIC ENERGY ORGANIZATION
OF IRAN, THE NATIONAL IRANIAN STEEL COMPANY, THE
IRANIAN MEDICAL CENTER and THE NATIONAL
IRANIAN GAS COMPANY, Respondents.

CASE NO. 54
CHAMBER THREE
ARD NO. 97-54-3
Iran - United States Claims Tribunal
Filed December 20, 1983

AWARD

<u>DISSENTING OPINION OF RICHARD M. MOSK TO DISMISSAL OF CLAIMS</u>
ON JURISDICTIONAL GROUNDS


## **AWARD**

APPEARANCES:

For Claimant: Mr. Stephen Howard, Mr. Jeffrey Hamerling, Attorneys

For Respondents: Mr. Mohammad K. Eshragh, Deputy Agent of the Islamic Republic of Iran Mr. Khosrow Tabasi, Legal Adviser to the Agent Mr. Mohammad Adib Nazari, Attorney of the Atomic Energy Organization of Iran Ms. Farzin Faridani, Attorney of the National Iranian Steel Company Mr. Reza Ashraf, National Iranian Steel Company Mr. Allahyar Mouri, Attorney for National Iranian Gas Company Mr. Moinee, Attorney of Ministry of Health of the Islamic Republic of Iran

Also Present: Mr. Arthur W. Rovine, Agent of the United States of America Ms. Elisabeth Keefer, Assistant to the Agent

I. THE PROCEEDINGS

On 17 November 1981, Claimant, DAMES & MOORE, filed its claims before the Tribunal against the Respondents, the ISLAMIC REPUBLIC OF IRAN ("Iran"), the ATOMIC ENERGY ORGANIZATION OF IRAN ("AEOI"), the NATIONAL IRANIAN STEEL COMPANY ("NISCO"), the NATIONAL IRANIAN GAS COMPANY ("NIGC") and the IRANIAN MEDICAL CENTER ("IMC").

AEOI filed a Statement of Defence, including a counterclaim, on 13 April 1982, in response to which Claimant filed a Reply on 27 May 1982.

Statements of Defence were filed on 2 July 1982 by Iran, NIGC and the Iranian Ministry of Health. On the same date, NISCO and IMC filed Statements of Defence, including counterclaims.

On 23 August 1982, Claimant filed a general denial to the NISCO and IMC counterclaims. The Ministry of Health submitted a Supplemental Statement of Defence on 24 August 1982. Claimant filed certain affidavits and a Pre-Hearing Conference Statement on 3 November and 8 November, respectively.

A Pre-Hearing Conference was held on 17 November 1982. On the same day, AEOI filed a Memorial and NISCO filed a Supplemental Statement of Defence, both of which included additional counterclaims.

On 13 January and 27 January 1983, respectively, AEOI and Claimant submitted Memorials on the issue of subject matter jurisdiction. Supplemental Statements of Defence were filed by NISCO on 3 February 1983 and by IMC and AEOI on 18 March 1983. On the latter date, NISCO submitted certain d·  ·uments. AEOI filed an additional statement on 4 April 1983. On 16 March 1983, the Tribunal ordered that the issue of jurisdiction, originally to be decided as a preliminary matter, should be joined with the merits.

On 14 April 1983, Claimant filed affidavits, exhibits and its Hearing Memorial, in which it offered to withdraw its claims against IMC and NISCO. NISCO filed exhibits on 25 April 1983, a further supplement to its Statement of Defence and Counterclaim on 5 May 1983 and a Hearing Memorial on 9 May 1983. AEOI filed its Hearing Memorial on 10 May 1983.

The Iranian Ministry of Economic Affairs filed a Statement of Counterclaim on 11 May 1983 relating to taxes allegedly due in connection with services performed for AEOI.

On 12 and 13 May 1983, a Hearing was held at which all parties were present except IMC. On the first day of the Hearing, IMC filed its consent to the withdrawal of the claims against it and its own counterclaims and NISCO filed a further supplemental statement. On the second day of the Hearing, AEOI and NISCO filed supplemental exhibits.

F··owing the Hearing, the member of the Tribunal appointed by the Islamic Republic of Iran resigned. A new member was appointed. The Tribunal has hereby determined not to repeat the prior Hearing (see Article 14 of the Tribunal Rules.)

On 10 June 1983, Claimant filed an additional affidavit, additional documents and written objections to certain of NISCO's counterclaims.

On 27 July 1983, NISCO filed additional materials. AEOI filed a Post-Hearing Memorial on 8 August 1983 and NIGC made an additional filing on 31 August 1983, presenting new evidence and introducing a counterclaim for taxes and social security premiums.

On 16 September 1983, NIGC filed a further written submission and an additional exhibit. Claimant filed on 3 October 1983 its objections to the 31 August and 16 September filings of NIGC. On 14 December 1983, NIGC filed a submission containing further evidence and arguments.

Fairness, orderliness and possible prejudice to the other party in the case require that the Tribunal disregard the unauthorized filings made by the parties after the Hearing. Consequently, the counterclaim asserted by NIGC for taxes and social security premiums cannot be admitted.

In light of Claimant's withdrawal of its claim against IMC, and with IMC's consent, the Tribunal dismisses this claim and the counterclaim of IMC. The remainder of this Award relates only to the remaining claims and counterclaims.

## II. AN OUTLINE OF THE CONTENTIONS OF THE PARTIES

Claimant contends that the Tribunal has jurisdiction over all of the claims, asserting that they are all claims of a national of the United States against Iran arising out of contracts, debts, expropriations or other measures affecting property rights. Iran and AEOI dispute that the claims against them are the claims of a national of the United States.

Claimant claims against AEOI for breach of a contract between AEOI and Dames & Moore International S.R.L. ("D & M International"), a Venezuelan limited liability company, or, in the alternative, for quantum meruit for services rendered, or for amounts allegedly due under an account stated. AEOI contends that the Tribunal is divested of jurisdiction over the claim under the final exclusion clause of Article II, paragraph 1, of the Claims Settlement Declaration. (FN [1]) AEOI also contends that the Tribunal lacks jurisdiction to hear claims for quantum meruit or for amounts due under an account stated. On the merits, AEOI denies liability on grounds of defective performance, other contract breaches and invoicing discrepancies.

AEOI asserts counterclaims against Claimant for damages allegedly incurred as a result of the claimed defective performance, for taxes and social insurance premiums allegedly due and for the release of a United States court attachment. Claimant denies the allegation of defective performance and objects to the Tribunal's jurisdiction over the counterclaims for taxes and social insurance premiums. Claimant also contends that the attachment has been released thereby rendering this counterclaim moot.

The claim against The Government of the Islamic Republic of Iran is based upon Claimant's contention that certain of its equipment has been expropriated. This Respondent defends by contending that the Claimant was not the owner of the equipment in issue, having conveyed it to various Iranian nationals.

With regard to the claim against NISCO, Claimant seeks, alternatively, payments due, but not paid, in breach of a contract with D & M International, quantum meruit for services performed and amounts due under an account stated. NISCO pleads that it has made all the payments in dispute.

NISCO counterclaims for damages for breach of contract, unpaid social insurance premiums, defective performance and injury to reputation. Claimant denies that D & M International breached the contract or that NISCO suffered damage as the result of any such breach and objects to jurisdiction over the counterclaim for social insurance premiums. Claimant also denies the allegation of defective performance and maintains that the counterclaim was improperly filed.

Claimant claims against NIGC, in the alternative, for failure to pay invoices in breach of a contract with D & M International, for quantum meruit for services rendered and for amounts due under an account stated. NIGC denies the existence of a contract and maintains that the Tribunal lacks jurisdiction over claims for quantum meruit or for amounts due under an account stated.

All parties seek their costs of arbitration.

## III. JURISDICTION: OWNERSHIP OF THE CLAIMS AND JURISDICTION OVER RESPONDENTS

Article II, paragraph 1, of the Claims Settlement Declaration established the Tribunal for, inter alia, "the purpose of deciding claims of nationals of the United States against Iran...". Article VII, paragraphs 1, 2 and 3, of the Declaration define the relevant terms as follows:

1. A "national" of Iran or of the United States, as the case may be, means (a) a natural person who is a citizen of Iran or the United States; and (b) a corporation or other legal entity which is organized under the laws of Iran or the United States or any of its states or territories, the District of Columbia or the Commonwealth of Puerto Rico, if, collectively, natural persons who are citizens of such country hold, directly or indirectly, an interest in such corporation or entity equivalent to fifty per cent or more of its capital stock.

2. "Claims of nationals" of Iran or the United States, as the case may be, means claims owned continuously, from the date on which the claim arose to the date on which this Agreement enters into force, by nationals of that state, including claims that are owned indirectly by such nationals through ownership of capital stock or other proprietary interests in juridical persons, provided that the ownership interests of such nationals, collectively, were sufficient at the time the c'... n arose to control the corporation or other entity, and provided, further, that the corporation or other entity is not itself entitled to bring a claims under the terms of this Agreement. Claims referred to the Arbitral Tribunal shall, as of the date of filing of such claims with the Tribunal, be considered excluded from the jurisdiction of the courts of Iran, or of the United States, or of any other court.

3. "Iran" means the Government of Iran, any political subdivision of Iran, and any agency, instrumentality, or entity controlled by the Government of Iran or any political subdivision thereof.

Claimant alleges that, from the time each of the claims arose to the present, it has been a partnership organized under the laws of the United States, that more than 50 per cent of the partnership has been owned by natural persons who are United States citizens and that it has been a United States national within the meaning of Article VII, paragraph 1. In support of these allegations, the Claimant submitted an affidavit of its chief financial officer stating such and enumerating the ownership interests in Dames & Moore to demonstrate that approximately 90 per cent of its partners have been United States citizens during the relevant period. Also submitted were documents which Claimant was required by law to file with the United States Department of Defense on 26 June 1979 and 16 December 1981 listing the name and citizenship of each of its partners in confirmation of the facts attested to. Finally, Claimant has submitted a report by an independent accountant indicating that the ownership interests of persons who are not United States citizens did not exceed . per cent of Claimant's equity on 30 March 1979, 29 March 1980 and 27 March 1981.

While Respondents have contested the adequacy of the above evidence on nationality, they have introduced no evidence to the contrary. The Tribunal finds, therefore, that Claimant is a United States national.

Claimant further alleges that it held an ownership interest in D & M International which was, during the relevant period, sufficient to control that company, that D & M International is itself ineligible to bring claims before the Tribunal and that D & M International assigned its full title to the claim against AEOI to Claimant. Claimant's evidence in relation to these allegations consists of the affidavit referred to above, an affidavit of a Dames & Moore partner who serves as Chief Administrator of D & M International, excerpts from the latter company's articles of association and an undated document executed by officials of D & M International confirming the assignment of its claim against AEOI to Claimant.

This evidence shows that 5 per cent of the equity in D & M International was held in the name of its Chief Administrator, who is a partner in Dames & Moore and a United States citizen, 5 per cent in the name of a Venezuelan national and 90 per cent in the name of Claimant. Further evidence has been submitted consisting of two trust instruments by which the two 5 per cent owners indicated that their interests were purchased with funds provided by Claimant.

Respondents have neither contested nor offered evidence to contradict these allegations. The Tribunal finds, therefore, that Claimant has been the owner of at least 90 per cent of all outstanding interests in D & M International since the claim arose. In light of this finding, it is unnecessary to determine the effect, if any, of the purported assignment of the claim against AEOI to Claimant.

Respondents have argued that Claimant does not meet the provision of Article VII, paragraph 1, requiring that its ownership interest be "sufficient at the time the claim arose to control" D & M International. Respondents cite Article 10 of the latter's articles of association, which Article provides that decisions may be taken at meetings of the company only when at least two owners holding at least 60 per cent of the company's equity are present. On the basis of this provision, the Respondents maintain that, even though the Claimant has been the legal owner of 90 per cent of D & M International company, it could not itself cause decisions to be taken and thus cannot be said to have controlled the company.

The Tribunal is unable to accept this contention. The two nominal 5 per cent owners, by their own agreement, serve as trustees for the Claimant and as such they could not prevent the convening of a company meeting. Moreover, even if the nominal minority shareholders could prevent a quorum from being a ``eved at a company meeting, this would have little bearing on the issue of whether the majority shareholder in fact controlled the company. It has not been suggested that quorum requirements were not in fact met. In addition, all actions taken by the company could still be dictated by majority holders who could, in any event, cause the quorum requirement to be amended. In view of the above, the Tribunal is satisfied that Claimant had a sufficient interest to control D & M International during the relevant period.

In light of the above, the Tribunal concludes that all of the claims are claims of a national of the United States within the meaning of Article VII, paragraph 2, of the Claims Settlement Declaration.

It is not contested that AEOI, NISCO and NIGC are entities controlled by the Government of Iran and, therefore, all of the claims are against "Iran" as that term is defined in Article VII, paragraph 3, of the Claims Settlement Declaration.

IV. THE CLAIM AGAINST AEOI

a. Factual Background

On 8 December 1977 D & M International and AEOI entered into a contract ("AEOI Contract") retroactive in application to 16 July 1977. Under the contract, D & M International agreed to perform site validation and environmental studies in connection with a proposed nuclear power plant project in the province of Isfahan, Iran. AEOI agreed to pay invoices for these services, including costs incurred, at rates which were spelled out in the contract. The AEOI Contract provided that such invoices were to be payable subject to review and approval by AEOI within 60 days after receipt by AEOI and that invoices not objected to within that period of time were to be deemed approved by AEOI.

AEOI terminated the AEOI Contract on 30 June 1979 prior to its completion, in accordance with the terms of the contract.

D & M International submitted 21 invoices for services which it performed under the three phases of the contract for a total amount of US $7,090,971. AEOI made payments on the first 14 invoices in excess of US $3.6 million but objected to other amounts sought thereunder. D & M International issued credits in response to AEOI's objections.

With regard to Invoice Nos. 1, 2, 4, 5, 6, 8, 10, 12, and 14 Claimant contends that the amount of US $595,259 still remains owing after deducting all amounts

to which AEOI objected when the invoices were rendered and deducting all other payments by AEOI and credits to which AEOI is entitled.

Invoices Nos. 15, 16, 17, 18 and 19 were submitted to AEOI between August 1978 and March 1979. On 23 July 1979, after the AEOI Contract had been terminated, D & M International submitted a final statement to AEOI. As of that date, AEOI had not paid, nor objected to, any of these five invoices. The final statement included a relisting and resubmission of the invoiced amounts. In addition, the final statement included certain charges that had not been previously billed and certain costs of termination. On 27 August 1979, Dr. Nowroozi, then the Nuclear Regulatory Director of AEOI, wrote to D & M International and acknowledged receipt of the final statement; he did not object to any of the amounts listed and promised final settlement of "all claims due and total amounts due". AEOI made no payments on any of the amounts listed. In a letter dated June 1980, after Claimant had commenced litigation for breach of contract in a United States court, AEOI stated objections to all outstanding invoices.

Claimant seeks (a) the amount of US $3,437,553.02 representing the sum of the unpaid invoices allegedly remaining due under the Contract and (b) the a   unt of US $40,000 "for defending against a warranty claim asserted by AEOI", together with interest on these amounts.

With regard to the claim for the amount under (a) above Claimant seeks, in the alternative, recovery of the same amount, US $3,437,553.02, under the theory of quantum meruit, arguing that this amount represent the reasonable value of services rendered and costs incurred.

As a further alternative basis for its claim, Claimant argues that the sum of US $2,069,268 is owing under the theory of account stated. This claim consists of US $1,474,006, representing the aggregate amounts of Invoice Nos. 15-19 and 21, and US $595,262, representing amounts unpaid on Invoice Nos. 1, 2, 4, 5, 6, 8, 10, 12 and 14 (see above). Claimant argues that AEOI by its conduct assented to pay these amounts and that a new agreement was thereby made, which is separate and distinct from the AEOI Contract.

b. Jurisdiction over the Claim

(i) The Claim for Breach of the AEOI Contract

Under Article II, paragraph 1, of the Claims Settlement declaration, the Tribunal's subject matter jurisdiction extends to claims which "arise of debts, contracts (   'uding transactions which are the subject of letters of credit or bank guarantees), expropriations or other measures affecting property rights, excluding ... claims arising under a binding contract between the parties specifically providing that any disputes thereunder shall be within the sole jurisdiction of the competent Iranian courts..."

AEOI has objected to the Tribunal's jurisdiction over the claim on the ground that the AEOI Contract included, in Article 10.16, a clause which falls within the provisions of the final exclusion clause of Article II, paragraph 1. This contract clause reads as follows:

Any dispute or disagreement arising under this Contract shall first be discussed amicably by both parties. Failing agreement, such dispute or disagreement shall be submitted to conciliation. Each party shall have the right to appoint one conciliator and a third conciliator shall be appointed by the Plan and Budget Organization of the Government of Iran. In the event that either party is unwilling to accept the decision of the conciliation board, the matter shall be decided finally by resort to the courts of Iran.

In another case before it, the Tribunal has held that it lacks jurisdiction by virtue of a similar contract clause. See T.C.S.B., Inc. v. Iran, Interlocutory Award No. ITL 5-140-FT. While stating its disagreement with the decision in that case, Claimant has conceded that the forum selection clause at issue therein cannot

4 IRAN

be distinguished from Article 10.16. The Tribunal concludes that, by virtue of the article, it lacks jurisdiction over the claim for breach of the Contract. That conclusion applies to the claim for US $40,000 "for defending against a warranty claim asserted by AEOI", since it must also be deemed to arise under the Contract.

(ii) The Alternative Claims for Quantum Meruit and Account
Stated

Claimant argues that, even if the Tribunal has no jurisdiction over the breach of contract claim, Claimant may nonetheless maintain its claim on the alternative bases of quantum meruit and account stated. AEOI denies that the claim may be so maintained on three grounds: first, that the Tribunal's affirmative jurisdiction does not extend to claims based upon quantum meruit or accounts stated; second, that, under whatever theory it is advanced, the claim arises "under" the Contract and is therefore barred by the final exclusion clause of Article II, paragraph 1; and, third, that remedies for quantum meruit and an a ·unt stated are available only when an enforceable contract remedy does not exist.

The Tribunal has found earlier that it does not have jurisdiction over the claim insofar as it is based on the alleged breach by AEOI of the AEOI Contract. The crucial question with regard to the two alternative claims is whether they arise "under" the Contract in accordance with the terms of Article II, paragraph 1, of the Claims Settlement Declaration; if they are deemed to do so, the Tribunal will not have jurisdiction over the alternative claims either.

The claim against AEOI is based primarily on the Contract, without the existence of which no services would presumably have been performed. The validity and enforceability of the Contract has not been contested.

The quantum meruit claim is for the value of services rendered under the Contract. That claim clearly arises under the Contract. Therefore the Tribunal finds that it has no jurisdiction over that claim. To assume jurisdiction over the quantum meruit claim in this case would, in effect, mean circumventing the exclusion provision in Article II, paragraph 1, thereby rendering it ineffective.

With regard to the second alternative claim, for account stated, Claimant's basic argument is that AEOI in fact, by implication, acknowledge its indebtedness to Claimant by not objecting within a reasonable period of time to a number of invoices transmitted to it; with regard to the claim related to invoice Nos. 1, 2, 4 · 6, 8, 10, 12 and 14 the argument appears to be that the amount sought has been assented to through AEOI not disputing that portion of the invoices. According to Claimant such acknowledgement by AEOI of its indebtedness constituted a new separate agreement, distinct from and independent of the underlying AEOI contract. By basing its claim on such new agreement, Claimant argues, it avoids the forum selection clause in the AEOI contract being applicable.

It is a well-established general principle in various legal systems that in commercial relationships one party may be obligated to pay another party, with which it has been doing business, a sum specified in an invoice if it receives the invoice but does not object to it within a certain period of time. The question here is, however, whether AEOI's mere passivity in the present case caused an entirely new agreement to come into existence, independent of and replacing the underlying AEOI Contract. The Tribunal finds that the alleged lack of objections from AEOI to the invoices cannot be implied so as to constitute such a new agreement. Accordingly, the Tribunal holds that also the alternative claim for account stated must be deemed to arise under the AEOI Contract and that it thus has no jurisdiction over this claim.

The Tribunal's conclusion is therefore that it is not vested with jurisdiction over the claim against AEOI on any of the theories presented by the Claimant.

Likewise, AEOI's counterclaim must be deemed to fall outside the Tribunal's jurisdiction.

## V. THE CLAIM AGAINST THE ISLAMIC REPUBLIC OF IRAN

Claimant alleges that in the course of its work in Iran, it accumulated substantial movable property which it claims has been expropriated by the Islamic Republic of Iran. The subject matter of this claim falls clearly within the terms of Article II, paragraph 1, of the Claims Settlement Declaration and, thus, the Tribunal has jurisdiction over the claim.

According to Claimant, the property, which included vehicles, office equipment, instruments and other equipment, was kept at a rented privately-owned warehouse near Tehran and at three field laboratories in various other locations.

Claimant submitted sworn statements of one Mr. Yaghoubian and one Mr. Askari, described, respectively, as the Managing Director and General Manager of C ˙ 'mant's activities in Iran during the relevant period. They both state that, in the autumn of 1980, representatives of the Government of Iran had occupied the warehouse and informed representatives of Claimant that the warehouse was to be used to house refugees of the war and that any useful equipment stored therein would be turned over to the Iranian army. The affidavits further state that representative of Claimant were thereafter denied access to the equipment. Claimant also submitted a list of equipment it alleges to have stored in the warehouse, as derived from its inventory records, along with the original purchase date and price of each item. The Claimant seeks to recover the total original cost of the equipment of US $354,924.

With regard to the three field laboratories, the Claimant alleges that it has been unable to recover any of the equipment left at the field locations, a fact which it contends demonstrates that the equipment has been confiscated. In the two above mentioned affidavits it is stated that company records indicate that the equipment had an original purchase price of US $80,000, which amount the Claimant seeks as relief in connection with its claim.

The Government of the Islamic Republic of Iran originally asserted a general denial of liability. Subsequently, AEOI submitted on 4 April and 10 May 1983 two statements in defence to the claim. AEOI's statements are deemed to have been presented on behalf of the Government of Iran. Essentially, AEOI alleges that authorized representatives of Claimant had conveyed all of the equipment concerned to various Iranian Individuals and companies before the time of the alleged taking.

I˙ ˙ ˙ ˙pport of this allegation. AEOI presented an affidavit of Mr. Felix Sahkian with whom Claimant had previously contracted to serve as a custodian of the warehoused equipment. Mr. Sahakian states that he was given a power of attorney by Mr. Askari, Claimant's General Manager in Iran, authorizing him to assign ownership of the equipment to anyone, including himself. He further states that, in order to reimburse himself for certain unpaid expenses he incurred on behalf of Claimant, he subsequently conveyed all of the equipment to himself. With regard to the three field laboratories, Mr. Sahakian states that one was sold by Claimant to a firm doing business as Zamiran Company and one has previously been placed in the warehouse and conveyed along with the other equipeent. to himself. He also states that the Claimant's records in Iran reveal that the third field laboratory was not at a separate site and suggests that the equipment must have been included with the equipment of the other two sites.

Attached to Mr. Sahakian's affidavit are a power of attorney dated 3 April 1979 purportedly signed by Mr. Askari; two documents indicating debts allegedly owed by the Claimant to Mr. Sahakian arising out of his termination from prior employment and expenses incurred by him on behalf of the Claimant; a statement of ownership interest dated 22 March 1979, again purportedly signed by Mr. Askair, indicating that all of the warehoused equipment belongs to Mr. Sahakian and that the Claimant has no further claim on the equipment; and an undated letter to D & M International from Zamiran Consulting Engineers indicating that the Claimant had sold one of the field laboratories to Zamiran on 18 August 1979, requesting the payment of rent for D & M International's continued use of the equipment through 21 November 1979, and, in a handwritten notation, indicating that the requested pa ment has been made in full.

Neither the Government of Iran nor AEOI contest Claimant's evidence that the warehouse and its contents have been sequestered by government representatives. The unilateral taking of possession of property and the denial of its use to the rightful owners may amount to an expropriation even without a formal decree regarding title to the property. The interference with the use of the stored equipment in the present case is so complete that it must be deemed unreasonable. The Tribunal concludes that a taking of the property occurred no later than 1 January 1981.

Having reviewed the evidence before it, the Tribunal finds that the allegation that Claimant conveyed its ownership interest in the warehoused equipment is not sufficiently substantiated. Having found that the property has been taken by the Government of Iran, the Tribunal holds that Claimant is entitled to compensation for the value of the equipment as of 1 January 1981.

The evidence of a taking with regard to the field laboratories is less convincing. Claimant has submitted no evidence which would demonstrate that its equipment has been taken and has not rebutted Respondent's evidence that ownership of one of the field laboratories has been conveyed. Respondent's evidence indicates, however, that another of the field laboratories had previously been stored in the warehouse prior to the government's sequestration. It must be concluded that this equipment was among the property taken and is therefore included in the above award. Claimant's claim with regard to the other two field laboratories must be dismissed for lack of proof.

As evidence of the value of the expropriated equipment, Claimant has submitted materials indicating that the original purchase price of all items stored in the warehouse, including the one field laboratory, was US $354,924. However, there is no evidence regarding the relationship between the price of each item on the date of purchase and the value in the fall of 1980. Because of this gap in the evidence and the difficulties in quantifying the actual amount of damages in this respect with any precision, the Tribunal is justified in estimating such amount. Considering all the circumstances, including the age of the equipment, the Tribunal decides that the approximate value of Claimant's expropriated property is US $100,000, to which amount Claimant is now entitled.

Claimant has also sought interest on this claim at various rates. The Tribunal finds that Claimant is entitled to interest on the principal amount awarded on this claim at 10 per cent per annum from 1 January 1981 to the date on which the Escrow Agent instructs the Depositary Bank to pay the Award.

## VI. THE CLAIM AGAINST NISCO

Claimant claims against NISCO for amounts allegedly due for services rendered under a Contract between D & M International and NISCO dated 1 August 1975. Claimant alleges that, pursuant to the Contract, D & M International performed quality control work during the construction of a steel mill at Ahwaz, Iran, from early 1979 until the spring of 1980. The Claimant seeks US $123,523 as the dollar equivalent of the amount due under six invoices issued from 2 June 1979 to 31 December 1979 and totalling 8,689,874 rials.

NISCO contends that the Tribunal lacks jurisdiction over the claim because it arises under a contract which includes a forum selection clause which falls within the terms of the final exclusion clause of Article II, paragraph 1, of the Claims Settlement Declaration. On the merits, NISCO defends by alleging that it has satisfied its obligation with regard to these six invoices and to a seventh invoice issued during this period. NISCO alleges that these seven invoices totalled 11,020,031 rials, and that, after making certain deductions required by law and after crediting itself 3,000,000 rials for "payments on account", it paid the net amount due of 7,391,889 rials into D & M International's bank account on 3 February 1980. Moreover, NISCO alleges that, on the same day, this amount was paid over to Mr. Felix Sahakian as a representative of D & M International.

Article 20 of the Contract sets forth the procedures agreed upon by the parties for the settlement of disputes. That article reads, in pertinent part, as follow:

All disputes arising out of this contract or of interpretation thereof between the parties thereto which are not settled shall be referred to an ad hoc committee consisting of the highest authority in the execution unit (or his assistant) and the Consulting Engineer party to the contract, and in case the committee fails to settle the disputes on the basis of the contract and related regulations, the dispute shall be settled under the laws of Iran by recourse to a competent court of law.

The Tribunal has previously ruled in other cases that claims arising under contracts containing similar provisions did not come within the terms of the final exclusion clause of Article II, paragraph 1, of the Claims Settlement Declaration. See for instance Gibbs & Hill, Inc. v. Iran Power Generation and Transmission Company, et. al., Interlocutory Award No. ITL 1-6-FT. For the reasons stated in that award, the Tribunal holds that the claim is not excluded by virtue of Article 20 of the Contract.

In  port of its defence on the merits, NISCO submitted bank statements and other financial records which demonstrate that it made a payment of 7,391,889 rials to the bank account of D & M International and that this sum was thereupon paid to Mr. Sahakian. In the face of this evidence, Claimant has conceded the allegation regarding the payment.

Claimant maintains its claim in respect of the 3,000,000 rials deducted by NISCO from its invoice payments. NISCO contends that this amount reflects a "payment made in advance on account". Claimant denies that D & M International ever received this amount as an advance payment and contends that it represents amounts paid to former employees of that company who were re-hired directly by NISCO. In support of its position, Claimant cites NISCO's own assertions concerning such payments and the fact that the Contract makes no provision for advance payments.

However. NISCO has submitted financial records which support its contention and demonstrate that the 3,000,000 rials were paid during 1979, the period for which D & M International submitted invoices. There are no circumstances which would cast doubt upon the authenticity of these records and in view of the fact that there is no indication that D & M International objected at the time to the amount paid on the invoices, as reduced to reflect the 3,000,000 rials deduction, the Tribunal finds that the claim must be dismissed for lack of proof.

## VII. THE COUNTERCLAIMS OF NISCO

NISCO presents four separate counterclaims against Claimant relating to alleged liabilities of D & M International. First, NISCO alleges that the expatriate managers of D & M International left Iran in 1978 in breach of the Contract thus requiring NISCO to employ new professional staff to perform the tasks covered by the Contract. NISCO claims US $42,077.20 paid to these employees.

Second, NISCO alleges that D & M International failed to pay social insurance premiums due for work performed by its employees, an unspecified portion of which NISCO alleges it has paid as required by Article 38 of the Social Security Act of Iran. NISCO now seeks to recover the US dollar equivalent of the 17,464,892 rials it alleges to be due.

Third, NISCO alleges that soil tests performed for the construction of the Ahwaz mill led to major defects in the foundation that was subsequently constructed. NISCO seeks to recover US $1,474,000 in expenses that it allegedly incurred to investigate and repair the foundation defects.

Fourth. NISCO seeks unspecified damages for "false accusation and injury to reputation" allegedly caused by the prosecution of Claimant's case.

Case 3:08-mc-80024-JSW    Document 3-8    Filed 03/13/2008    Page 12 of 24

a. The Counterclaim for Reimbursement of Employee Payments

NISCO has submitted no evidence to support the allegation that it hired and paid new employees to perform the obligations of D & M International under the Contract. Certain bank records and internal company documents which NISCO submitted indicate only that it paid 856,000 rials to five employees of D & M International for services performed from 20 March to 20 April 1980. However, these same documents reveal that the D & M invoice for this period had not yet been prepared and would be "turned down" in any event. This payment was for services performed by D & M International personnel for which services NISCO would have been obligated to pay D & M International under the Contract in any case. Thus it does not give rise to liability. In the absence of further evidence the Tribunal must dismiss this counterclaim for lack of proof.

b. The Counterclaim for Social Insurance Premiums

T̤   ̣vidence that D & M International remains liable for unpaid social insurance premiums consists of a letter dated 7 April 1982 from the Social Insurance Organization of Iran to NISCO stating that, on the basis of 77,043,860 rials paid under the Contract, D & M International owes a total of 17,464,892 rials in principal and delayed payment damages. The method used for calculating the amount due is not indicated, nor does the letter suggest that the records of the Social Insurance Organization have been reviewed to determine what, if any, payments have already been made. Finally, the legal basis for the calculation is not set forth.

With regard to the 7 April 1982 letter the Tribunal further notes that NISCO has claimed that it has made some of the payments on behalf of D & M International under Article 38 of the Social Insurance Act. These payments would have been credited against the total liability and should have affected the calculation of outstanding amounts due. However, no such credit appears in the letter, indicating either that the payments were not made or that the calculation is inaccurate. Moreover, Claimant contends that the social insurance premiums are payable only on employee renumeration, which constitutes only about 20 per cent of the total payments made under the Contract. NISCO has not countered this argument.

The Tribunal must conclude that the evidence in support of the counterclaim is insufficient to prove liability. While Claimant has challenged the Tribunal's jurisdiction over the counterclaim on a number of grounds, the Tribunal need not determine this objection in light of this conclusion.

c. The Counterclaim for Defective Performance

On 17 November 1982, the day of the Pre-Hearing Conference, NISCO submitted its third counterclaim seeking compensation for damages allegedly resulting from purportedly defective soil tests performed by D & M International.

The evidence offered consists of an undated internal NISCO memorandum stating simply that a number of foundations had collapsed due to incorrect soil mechanics calculations and a number of photographs purportedly demonstrating defects in the building. NISCO presented no expert opinion on either the validity of the soil tests or on the relation of any testing defects to the foundation problems that later developed. Claimant presented the testimony of one of its officers indicating that the building defects could be attributed to a number of causes unrelated to the tests performed by D & M International. On the basis of the submitted evidence the Tribunal is unable to find that D & M International's performance was in any way defective. The counterclaim is therefore dismissed for lack of sufficient proof. In light of this holding, the Tribunal need not decide on the objections to the Tribunal's jurisdiction over and timeliness of this counterclaim.

d. The Counterclaim for Injury to Reputation

NISCO first presented its counterclaim for alleged injury to its reputation in its Hearing Memorial filed on 9 May 1983, three days before the Hearing. No circumstances have been suggested which would justify this delay in filing the counterclaim. The Tribunal determines that the counterclaim must be dismissed for non-compliance with Article 19, paragraph 3, of the Tribunal Rules.

## VIII. THE CLAIM AGAINST NIGC

The claim against NIGC arises out of services performed under an alleged Contract executed by D & M International and NIGC in 1973. The Claimant seeks US $108,435 due under two invoices issued under that contract or, in the alternative, this same amount either in quantum meruit for the services performed or under the invoices as an account stated.

NIGC does not contest that the services were performed or that the invoices are accurate. Instead, NIGC contends that the Claimant has not proven that the parties had entered into a contract and that the Tribunal has no jurisdiction over claims based upon quantum meruit or account stated.

In support of the claim, Claimant has submitted the two invoices referred to and the affidavit of Mr. Yaghoubian, the Managing Director of Claimant's Tehran offic during the relevant period.

While Claimant has not presented a copy of the alleged contract, explaining that it has been unable to recover its records from Iran, the two invoices submitted both refer to "contract agreement No. 302/2093". These references, together with the statement of Mr. Yaghoubian and the fact that NIGC does not dispute that the services were performed, are sufficient to indicate that the parties entered into a contract.

There being no dispute regarding the services or that payment has not been made, the Tribunal holds that the Claimant is entitled to the US $108,435 due 30 days after the date of the last invoice, that is 24 November 1978. The Tribunal also finds that the Claimant is entitled to interest at a rate of 10 percent per annum on the principal amount as from that date to the date on which the Escrow Agent instructs the Depositary Bank to pay the Award.

## IX. COSTS OF ARBITRATION

The Tribunal determines that each of the parties shall bear its costs of arbitration.

## X. AWARD

THE TRIBUNAL HEREBY AWARDS AS FOLLOWS:

The Claim against, and the Counterclaims of, Respondent IRANIAN MEDICAL CENTER are dismissed.

The Claim against, and the Counterclaims of, Respondent THE ATOMIC ENERGY ORGANIZATION are dismissed.

The Claim against, and the the Counterclaims of, Respondent NATIONAL IRANIAN STEEL COMPANY are dismissed.

Respondent THE ISLAMIC REPUBLIC OF IRAN is obligated to pay and shall pay to Claimant DAMES & MOORE the sum of One Jundred Thousand United States Dollars (US $100,000) plus simple interest at the annual rate of ten (10) per cent calculated as from 1 January 1981 up to and including the date on which the Escrow Agent instructs the Depositary Bank to pay the Award.

Respondent NATIONAL IRANIAN GAS COMPANY is obligated to pay and shall pay to Claimant DAMES & MOORE the sum of One Hundred and Eight Thousand Four Hundred and Thirty Five United States Dollars (US $108,435) plus simple interest at the annual rate of ten (10) per cent calculated as from 24 November 1978 up to and including the date on which the Escrow Agent instructs the Depositary Bank to pay the Award.

Such payments shall be made out of the Security Account established pursuant to paragraph 7 of the Declaration of the Government of the Democratic and Popular Republic of Algiers dated 19 January 1981.

Eč.  of the parties shall bear its costs of arbitration in this case.

This Award is hereby submitted to the President of the Tribunal for notification to the Escrow Agent.

Dated. The Hague 20 December 1983

Nils Mangard
Chairman Chamber Three
Richard M. Mosk
Dissenting Opinion as to Part IV
Parviz Ansari Moin
Dissenting Opinion as to Part III, V, VII and VIII

## DISSENTING OPINION OF RICHARD M. MOSK TO DISMISSAL OF CLAIMS ON JURISDICTIONAL GROUNDS

I dissent to that portion of the Tribunal Award dismissing the claims against the Respondent Atomic Energy Organization of Iran ("AEOI") on jurisdictional grounds. I concur in the remainder of the Award.

[2]
Under Article II, paragraph 1, of the Claims Settlement Declaration, (FN   ) the Tribunal's subject matter jurisdiction extends to claims which "arise out of debts, contracts (including transactions which are the subject of letters of credit or bank guarantees), expropriations or other measures affecting property rights, excluding . . . claims arising under a binding contract between the parties specifically providing that any disputes thereunder shall be within the sole jurisdiction of the competent Iranian courts...."

Respondent AEOI has objected to the Tribunal's jurisdiction over the claims against it on the ground that the contract between AEOI and Claimant's foreign-owned entity, Dames & Moore International, S.R.L., included a provision which falls within the above-quoted (or final) exclusion clause of Article II, paragraph 1. That contract provision reads as follows:

10.16 Settlement of Disputes

Any dispute or disagreement arising under this Contract shall first be discussed amicably by both parties. Failing agreement, such dispute or disagreement shall be submitted to conciliation. Each party shall have the right to appoint one conciliator and a third conciliator shall be appointed by the Plan and Budget Organization of the Government of Iran. In the event that either party is unwilling to accept the decision of the conciliation board, the matter shall be decided finally by resort to the courts of Iran.

The yfull Tribunal held that it lacks jurisdiction in another case by virtue of a similar contract clause. (FN [3]) T.C.S.B., Inc., v. Iran, Interlocutory Award No. ITL.5-140-FT (5 November 1982), 1 Iran-U.S. C.T.R. 261, 264-67. While stating its disagreement with the decision in that case, Claimant has conceded that th' an forum selection clause at issue in T.C.S.B. cannot be distinguished from Article 10.16 of the contract involved in the instant case. Although I adhere to my view that such contract clauses should not divest the Tribunal of jurisdiction over claims (see Dissenting and Concurring Opinion of Richard M. Mosk on the Issues of Jurisdiction, Case Nos. 6, 51, 68, 121, 140, 159, 254, 293 and 466 (5 November 1982), 1 Iran-U.S. C.T.R. 305), I recognize the binding authority of the Full Tribunal's decision.

Claimant argues, however, that despite the unavailability of jurisdiction over its breach of contract claim in this Tribunal, it may nevertheless maintain in the Tribunal its claims against AEOI on the theories of quantum meruit and account stated -- theories which it pleaded in the alternative to the breach of contract claim in its Statement of Claim filed with the Tribunal.

The Tribunal has, without any significant legal analysis or discussion, rejected Claimant's contention, holding, in effect, that as the Iran forum selection clause in the contract between the parties precludes Tribunal jurisdiction over the contract claim, the Tribunal does not have jurisdiction over the alternative quantum meruit or account stated claims based on performance of that contract. (FN [4])

The Claims Settlement Declaration only purports to exclude from Tribunal jurisdiction "claims arising under a binding contract between the parties s₁ ifically providing that any disputes thereunder shall be within the sole jurisdiction of the competent Iranian courts...." Article II, paragraph 1. (Emphasis added). As one court has noted, "[t]he term 'arising under' is relatively narrow as arbitration clauses go." Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, 253 F.Supp. 359, 364 (S.D.N.Y. 1966). For example, the term "arising under" is a much narrower expression than the term "arising out of or relating to," which is a frequently used arbitration clause. See Model Arbitration Clause provided for in the UNCITRAL Arbitration Rules. Thus, a claim may relate to a contract but may not arise under it. A claim arising under a contract is one to enforce contractual obligations or to recover damages for the breach of such obligations. See Management Investors v. United Mine Workers of America, 610 F. 2d 384, 390 (6th Cir. 979).

One having a claim arising under a contract and a related (and even inconsistent) noncontractual claim may assert both of those claims in the alternative, as Claimant has done in the instant case. There is nothing in the Tribunal rules which precludes the pleading of claims in the alternative. Indeed, alternative pleading is widely recognized. See, e.g., 36 Halsbury's Laws of England | 44 at 35 (4th ed. 1981); Lena Goldfields Arbitration | 23 (1930) reprinted in 36 Cornell L.Q. 42, 50-51 (1950); A. von Mehren and J. Gordley The Civil Law System 165 (2d ed. 1977).

The jurisdictional issue in the instant case is whether or not the quantum meruit claim or the account stated claim arises under the contract containing the Iran

forum selection clause. If those claims do not, then the Tribunal has jurisdiction over them.

Claims based upon quasi-contract theories, such as quantum meruit, restitution and unjust enrichment, have long been recognized under international law as well as under the laws of the United States and Iran. See 3 Whiteman, Damages in International Law 1732-61 (1943); 12 Williston on Contracts || 1459-1459A at 68-108 (3rd ed. 1970); Restatement of the Law, Restitution || 1, 108 (1936); Civil Code of Iran, Arts. 301-306, 336; Haidariyan, Fundamentals of Law: A Comparative Study 240 (1971) (in Farsi)

The principle of quantum meruit is based upon a recognition that there is a legal duty to pay for services which one has received. An entitlement based upon quantum meruit arises out of a debt created by the application of principles of unjust enrichment. The Tribunal has jurisdiction over claims arising out of "debts". Claims Settlement Declaration, Article II, paragraph 1. An obligation imposed by the principle of quantum meruit, and thus by law, is a "debt" within the meaning of Article II, paragraph 1, of the Claims Settlement Declaration. Moreover, the Tribunal has previously held that it has jurisdiction over claims based upon unjust enrichment. See Benjamin R. Isaiah v. Bank Mellat, Award No. 35-219-2, (30 March 1983); ____ Iran-U.S. C.T.____. Therefore, the Tr    nal has jurisdiction over claims for quantum meruit.

Although a claim for quantum meruit may relate to a contract claim, it is, as stated by AEOI itself, "based on a completely different and separate bases [sic] and, in principle, definitions of claims arising out of the doctrine of unjust enrichment appearing in the laws of various countries give rise to the clear inference that such claims have a basis other than a contract." Rejoinder of AEOI at 7 (filed 13 January 1983). A quantum meruit claim is separate and independent from a breach of contract claim. As one authority has written, unjust enrichment claims "constitute an independent category of actions based on obligations which must be distinguished from claims arising in contract or in tort." Zweigert and Muller-Gindullis, "Quasi-Contract", Ch. 30 in III International Encyclopedia of Comparative Law 4 (undated).

A quantum meruit remedy is limited to the reasonable value of the claimant's services; a breach of contract remedy, on the other hand, entitles one to damages that would put him in the same position he would have been in had the contract been fulfilled. See Treitel, "Remedies for Breach of Contract", Ch. 16 in VII International Encyclopedia of Comparative Law 27 (1976). To establish a breach of contract, a party must prove the existence of a valid contract, its own performance and the breach itself. The party normally need not show the value of the services performed. Unlike a breach of contract claims, a claim based on quantum meruit places on the claimant the burden of establishing the actual value of the services rendered. Thus, a quantum meruit claim deals with facts and legal issues different from those presented in a contract claim.

A quantum meruit claim, therefore, is independent of any contract claim which may exist and gives rise to a remedy different from that arising under a contract claim. Such a quantum meruit claim cannot be said to arise under a contract and, therefore, is not excluded from the Tribunal's jurisdiction by the exclusion clause at the end of Article II, paragraph 1, of the Claims Settlement Declaration.

A similar analysis applies to the account stated claim. An account stated is an agreement between a creditor and a debtor as to an amount due. Such an agreement may be implied from the conduct of the parties, as when a creditor renders a statement of account to a debtor and the debtor retains such a statement without objection for an unreasonably long period, thereby resulting in an inference that the debtor has assented to the statement. See Restatement
[5]
(Second) of The Law of Contracts | 282(1) (1981); (FN    ) 15 Williston, supra || 1862-64 at 564-581; cf. Civil Code of Iran, Art. 292(1).

An account stated claim is based upon a new, separate and independent agreement, thus precluding certain defenses, such as a statute of limitation or improper venue, which would have been applicable to a claim based upon the original contract. See 6 Corbin on Contracts | 1309 at 247-49 (1962); 15 Williston, supra | 1862, note 11 at 566-67; see generally I. Jacob, Bullin and Leake and Jacob's Precedents of Pleadings 187-190 (12th ed. 1975).

Case 3:08-cv-80024-JSW    Document 3-8    Filed 03/13/2008

http://www.iiqct.com/Document/En/l580.cpxx

The final exclusion clause of Article II, paragraph 1, of the Claims Settlement Declaration would be applicable to an account stated only if, as an independent contract, it included an applicable Iran forum selection clause, a circumstance which does not exist in the instant case.

It would not be incongruous to preclude Claimant from presenting its contract claim to this Tribunal and yet permit Claimant to invoke the jurisdiction of this Tribunal with respect to alternative and related claims. As noted above, the alternative claims involve different remedies -- remedies that generally provide less compensation than those available under the excluded claim. Moreover, it is not unusual for claimants to plead in such a way as to come within the jurisdiction of a particular forum. For example, in the United States, a claimant may forego a claim lying exclusively in a federal court in order to maintain a state court action. Similarly, a claimant may give up a portion of a claim in order to bring an action in a court in which jurisdiction is limited to an amount less than that to which the claimant believes it is entitled. A claimant may, in some instances, frame a claim in such a way so as to avoid the jurisdiction of an administrative tribunal and thereby maintain the claim in a court. It is also quite common for a claimant to plead alternative claims in order to ensure that it can continue to pursue one remedy if another one appears unobtainable.

Claimant is presently seeking to proceed before the Tribunal on its quantum meruit and account stated claims in lieu of litigating its breach of contract claim in another forum. (FN    ) Claimant has therefore elected to seek certain remedies and assume additional evidentiary burdens in order to maintain a claim before this Tribunal. Accordingly, by retaining jurisdiction over the alternative claims, the Tribunal would not, as the Award states, render "ineffective" or circumvent the exclusion language of the Claims Settlement Declaration or the decisions of the Full Tribunal.

[6]

It is been helf that the resolution of a breach of contract claim is not necessarily res judicata as to a subsequently asserted quantum meruit claim and vice versa. See Annot, 35 ALR 3d 874 (1971 and Supp. 1978). This indicates the essential differences between those claims.

Thus, I believe that the Tribunal should have ruled that it has jurisdiction over the claims for quantum meruit and account stated. Such a ruling would not have been a determination of whether the claims are legally cognizable in this circumstance. In order to make such a determination, the Tribunal would have to decide whether the Claimant has stated facts sufficient to constitute a legal claim for quantum meruit or for an account stated in light of the fact that there exists a valid contract covering the services which are the subject of these alternative claims. Such a question would seem to be one of substantive law,

a. though it has procedural aspects; it is not a question of jurisdiction.

There are a number of different choice of law doctrines that could be utilized in determining which law to apply to this legal question. See Zweigert and Miller-Gindullis, "Quasi-Contract," supra. The Tribunal has no evidence of how Iranian law would bear on the substantive issue; also, the Tribunal has little evidence or indication of how other municipal systems would deal with the subject.

I recognize that, even within the United States, there is a division of authority as to whether a party may assert a quantum meruit claim arising out of services performed under a valid contract. Compare Falls Sand and Gravel Co. v. Western Concrete, Inc., 270 F. Supp. 495, 505 (D. Mont. 1967) with Cole v. Benavides, 481 F. 2d 559, 561 (5th Cir. 1973).

Under these circumstances, I believe that the Tribunal can and should determine this legal question on the basis of what it believes to be the most appropriate and sensible rule. See Claims Settlement Declaration, Article V.

One well known treatise on contract remedies has thoroughly discussed the subject, and it is worthwhile to quote that discussion at length:

If ... the plaintiff has only partly performed and has been excused from further performance by prevention or by the repudiation or abandonment of the contract by the defendant, he may recover the value of the services rendered:

"Where one party to an express contract is wrongfully prevented by the other party from completing, he may sue upon the contract for a breach thereof, in which case the measure of his damages will be the value of the part performed as measured by the contract price plus the profits which would have accrued to him had he completed the contract according to its terms; or he may ignore the contract, and declare on a quantum meruit or quantum valebat, in which case his measure of damages will be the fair and reasonable value of what he has done."

Actually, however, such a remedy is no more necessary than where he has fully performed, since in both cases alike the plaintiff has an effectual remedy in an action on the contract for damages. As the court pointed out:

"A plaintiff situated as this one is may declare for a quantum meruit or he may declare specially on the contract, or he may join such counts in his complaint. The choice of one of these remedies does not in law amount to the rejection of the other." And, as signalized by a federal court in a case of novel impression:

"The doctrine of election of remedies thus invoked seeks to prevent a party from shifting his position inconsistently. Since it is rooted in estoppel, the doctrine is not available as a defense unless the defendant has materially changed his position as a consequence of plaintiff's previous conduct.... The applicability of the doctrine to the situation here presented appears not to have been decided previously in this jurisdiction; but we think the better rule is that no election is required between contract and quasi-contract. The two remedies may be joined and pursued in the same action."

In some jurisdictions, if a price or rate of compensation is fixed by the contract, that is made the conclusive test of the value of the services rendered. More frequently, however, the plaintiff is allowed to recover the real value of the services even though this may be substantially in excess of the contract price. The reason for this is found in the following judicial utterance wherein the pertinent rule is stated:

"It being settled as the general rule that upon prevention of performance the injured plaintiff may treat the contract as rescinded and recover upon a quantum meruit without regard to the contract price, why should he be limited to the contract price in case payments for portions of the entire contract have been made o.. .quidated? Those payments were received in full only on condition that the entire contract be performed. But, if the contract is rescinded, the prices fixed by the contract are also rescinded. As aptly said ... 'Where the defendant undertakes to limit the plaintiff's recovery by treating the contract price as a limitation upon such recovery, he is asserting a right under the very contract which he himself has discharged.'"

The latter rule seems more in accordance with the theory on which the right of action must be based - that the contract is treated as rescinded, and the plaintiff restored to his original position as nearly as possible.

12 Williston, supra, ¶ 1459 at 77-91 (citations omitted).

In the instant case, AEOI's termination of the contract, although not a breach of contract, prevented Dames & Moore International S.R.L. from completing its remaining obligations under the contract. It is clear that AEOI had breached the contract by not making required payments. As the contract in the instant case and performance there-under were not completed, Claimant should have the choice of a breach of contract remedy and a quantum meruit remedy. Moreover, in ascertaining Claimant's remedy for past services rendered, there is no compelling reason to distinguish a contract terminated according to its terms from one

terminated by a breach, or to distinguish a contract fully performed from one partially performed. In any of these situations. when the respondent has breached its obligations. the claimant is entitled to compensation, and the damages to the claimant, either as measured by the contract or by the value of the services rendered. are entirely foreseeable. There does not seem to be any reason why the injured party should not be able to choose its remedy - at least when none of the remedies would result in the recovery of more than the party would have received if the contract had been fully performed. (FN[7])

It should be noted that in a leading international case, in which a claim was pleaded alternatively for damages for breach of contract and for quantum meruit, the arbitral tribunal held that the claim should be allowed for quantum meruit despite the existence of the pleaded, fully enforceable contract claim. Lena Goldfields Arbitration ‖ 23, 25 (1930) reprinted in 36 Cornell L. Q. 42, 50-51 (1950).

Accordingly, I believe that Claimant has stated a cognizable claim in quantum meruit for services rendered, notwithstanding the fact that those services were performed under a valid contract.

Claimant has also stated a legally sufficient claim for an account stated. As discussed above, because an account stated claim is based on an agreement separate and independent from any contract giving rise to the services covered by the account stated, such a claim may be maintained regardless of the existence of a valid contract.

In view of the decision of the Tribunal, I need not discuss in any detail whether Claimant has submitted sufficient evidence to sustain its claims based on quantum meruit or on an account stated. The evidence before the Tribunal demonstrates that Dames & Moore International, S.R.L. performed valuable services for AEOI and that Claimant is entitled to compensation therefor. In view of this conclusion, it is not necessary to determine whether the invoices to which AEOI failed to respond constitute an account stated. (FN[8])

For the foregoing reasons, I dissent to the dismissal of the claims against AEOI on jurisdictional grounds. I concur on the remainder of the Award in which Claimant is awarded $ 208,435 plus interest at the rate of 10%.

Dated, The Hague 20 December 1983
Richard M. Mosk

END

[1]
    Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims By the Government of the United States of America and the Government of the Islamic Republic of Iran dated 19 January 1981.

[2]
    Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the

4 IRAN

Government of the Islamic Republic of Iran, dated 19 January 1981.

[3]
    Such a clause shall hereinafter be referred to as an "Iran forum selection clause."

[4]
    The Tribunal's decision with regard to the account stated claim is confusing. It appears that the Tribunal accepts that there can be an alternative claim for an account stated, which is a separate contract. The Tribunal seems to discuss the merits of the claim, but concludes that there is no jurisdiction over it.

[5]
    "An account stated is a manifestation of an assent by debtor and creditor to a stated sum as an accurate computation of an amount due the creditor. A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent."

[6]
    In view of the Tribunal's decision in this case, the Claimant may, of course, seek to litigate the breach of contract claim in another forum.

[7]

[8]

# EXHIBIT "H"

321REPRINTED IN: 17- I.US.CT.R.-183

IRAN NATIONAL GAS COMPANY, Claimant,

v.

UNITED STATES OF AMERICA, Respondent.

Iran - United States Claims Tribunal

CASE NO B40

CHAMBER 2

Signed November 20, 1987

AWARD

I. FACTUAL AND PROCEDURAL BACKGROUND

1. On 15 January 1982, the IRAN NATIONAL GAS COMPANY ("the Claimant") filed a Statement of Claim seeking 25,252 million Rials in damages from the UNITED STATES OF AMERICA ("the Respondent"). The claim arises from the economic sanctions imposed on Iran by the Respondent on 14 November 1979. These sanctions allegedly prevented the shipment of machinery and equipment procured by the Claimant, which in turn resulted in delays in the completion and productive operation of the Khangiran Gas Refinery, the Khangiran Gas Collection [1] system, and related projects.

[2]
2. On 19 April 1982, the Respondent filed a "Petition of the United States for an Order Dismissing Claims for Lack of Jurisdiction."    In its Petition, the United States argues that the claim is excluded from the Tribunal's jurisdiction as it does not conform with the requirements of Article II of the Claims Settlement Declaration. In any event, the Respondent asserts that, as the claim arises from the imposition of economic sanctions, it is excluded from the Tribunal's jurisdiction by Article II, paragraph 1, of the Claims Settlement Declaration. In conclusion, the United States requests the Tribunal, in accordance with Article 21 of the Tribunal Rules of Procedure, to rule on its Petition as a preliminary question before proceeding further with the Case.

3. By Order filed on 20 November 1986, the Tribunal instructed the Claimant to file its comments on the Respondent's Petition, which it subsequently did on 26 August 1987. In its Reply, the Claimant denies that Iran has waived claims arising out of the imposition of economic

sanctions and, more specifically, denies that such claims are covered by the exclusion contained in Article II, paragraph 1, of the Claims Settlement Declaration. In addition, in response to the Respondent's arguments that this claim does not fall within the specific grants of

[3]

jurisdiction contained in Article II, the Claimant relies on a broader argument based on General Principle B of the General Declaration namely, the Parties' stated intention to settle disputes through arbitration.

4. On 29 September 1987, the Respondent sought the Tribunal's permission to file a "short Rejoinder" to the Claimant's Reply. Since both Parties have had the opportunity to present their views on the jurisdictional issue raised in this Case and in view of the Tribunal's decision infra, the Respondent's request is denied.

5.   either Party has requested a Hearing. The Tribunal decides to determine the question of jurisdiction raised in this Case on the basis of the documents submitted.

## II. REASONS FOR THE AWARD

6. The Tribunal notes that the claim was filed by the Iran National Gas Company under the signature of the Deputy Minister of Oil of the Islamic Republic of Iran. The Tribunal has previously determined that this Claimant is an entity controlled by the Government of Iran and that it clearly falls within the definition of "Iran" contained in Article VII, paragraph 3, of the Claims Settlement Declaration. See Dames and Moore and The Islamic Republic of Iran et al., Award No. 97-54-3 (20 December 1983) at p. 11; and Onesco, Inc. and National Iranian Gas Company, Award No. 254-263-2 (18 September 1986) at p. 3. Therefore, the claim is one between the two Governments and is an "official claim[]" the Tribunal's jurisdiction over which is defined in Article II, paragraph 2, of the Claims Settlement Declaration.

7. The Tribunal's jurisdiction over "official claims" is limited to those which arise out of contractual arrangements entered into between the two Governments for the purchase and sale of goods and services. In this Case, the Claimant has not alleged the existence of such a contract or cntracts between itself and the Respondent. Indeed, it states categorically that the claim "resulted from the economic sanctions of the United States of America." Therefore, as the claim is an official claim but does not arise out of contractual arrangements of the type specified in Article II, paragraph 2, the Tribunal is satisfied that the claim is outside its jurisdiction. In view of this finding, the Tribunal finds it unnecessary to rule on the Parties' arguments as to the relevance of the exclusion set forth in Article II, paragraph 1, of the Claims Settlement Declaration.

8. The Claimant, however, also relies on General Principle B of the General Declaration as an alternative basis for jurisdiction in this Case. It argues that, notwithstanding the express reference to contractual arrangements for the purchase and sale of goods and services contained in Article II, paragraph 2, of the Claims Settlement Declaration, the stated intention of the two Governments was to settle all disputes through arbitration and, therefore, that the Claims Settlement Declaration must encompass this Claim. The Full Tribunal has previously ruled that this expressed intention of the two Governments is qualified by the phrase which immediately precedes it, namely, "within the framework of and pursuant to the provisions of the two Declarations". See Decision No. DEC 1-A2-FT (26 January 1982). The Tribunal is of the view that if this claim as presented, is to be within the Tribunal's jurisdiction, it must be considered under the rubric of Article II, paragraph 2, of the Claims

[4]

Settlement Declaration.     For the reasons stated above (see paragraph 7 supra) the Tribunal finds that the claim fails to satisfy the requirements

of Article II, paragraph 2, of the Claims Settlement Declaration and must therefore be dismissed.


III. AWARD

9. For the foregoing reasons,
THE TRIBUNAL AWARDS AS FOLLOWS:
(a) The claim of the Iran National Gas Company is dismissed for lack of jurisdiction.
(b) Each Party shall bear its own costs of arbitration.
Dated, The Hague, 20 November 1987

R.  ert Briner
Chairman


George H. Aldrich


Hamid Bahrami-Ahmadi
Dissenting

END


[1]
    The Statement of Claim does not purport to raise a dispute or question of interpretation or performance of the Algiers Declarations or, indeed, to relate to actions by the Respondent subsequent to the date those Declarations entered into force, that is, 19 January 1981.
[2]
    The Petition also sought similar relief in Case No. B46, Case No. A10, and Case No. B54. The first two Cases were subsequently terminated following requests for withdrawal by the Claimants. Case No. B54 is currently pending before Chamber One.
[3]
    Declaration of the Government of the Democratic and Popular Republic of Algeria of 19 January 1981.
[4]
    See footnote 1 supra.

# EXHIBIT "I"

REPRINTED IN: 15-Iran. United States Claims tribunal Reports p189


AMOCO INTERNATIONAL FINANCE CORPORATION, Claimant,

v.

THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, NATIONAL
IRANIAN OIL COMPANY, NATIONAL PETROCHEMICAL
COMPANY and KHARG CHEMICAL COMPANY
LIMITED, Respondents.

CASE NO. 56
CHAMBER THREE
A˜ ˙ARD NO. 310-56-3
I˙  - United States Claims Tribunal
Fi˜˜˙ July 14. 1987
Signed July 14. 1987

PARTIAL AWARD

CONCURRING OPINION OF JUDGE BROWER ( See Part II)



PARTIAL AWARD

Appearances:

F˙   the Claimant: Mr. Brice M. Clagett, Mr. O. Thomas Johnson, Jr., Ms. Corinne A. Goldstein, Mr. Christopher T. Curtis, Attorneys for Amoco International
˙F˙  ˙˙ce Corporation; Mr. Thomas S. James. Mr. Robert D. Agdern, Mr. L. Bates Lea, Mr. Mark Noetzel, Representatives of Amoco International Finance
Co˙poration: Mr. Donald W. Smith. Vice President, Morgan Stanley & Co., Inc.; Professor Bruno Solnik; Professor Ezra Solomon; Mr. L. Dean Jones, Senior
Vice President. Professor Ezra Solomon; Mr. L. Dean Jones, Senior Vice President, DeGolyer and MacNaughton; Mr. Troy Green, Amoco-Egypt Oil
Company.
For the Respondents: Mr. Mohammad K. Eshragh, Agent of the Government of the Islamic Republic of Iran; Mr. Nozar Dabiran, Legal Advisor to the Agent
of the Government of the Islamic Republic of Iran; Mr. Abbas Hashemi, Mr. Hossein Pyran, Assistants to the Agent of the Government of the Islamic
Republic of Iran; Professor Derek Bowett, Q.C. Mr. Timm T. Riedinger, Mr. Rodman R. Bundy, Mr. Walter D. Sohier, Mr. George Joffe, Attorneys for the
Respondents; Mr. Mohammad A. Movahed Mr. Houshang Omid, Mr. Abolghasem Shirazi, Mr. Mostafa Zaynoldin, Attorneys for National Iranian Oil
Company; Mr. Mohammed E.Y. Bakhtiar, Director of Khemco; Mr. Yeprem Nabizadeh, Mr. Ali Vahidnia, Representatives of National Petrochemical
Company; Professor Edith T. Penrose; Dr. Paul Stevens; Dr. Thomas R. Stauffer.
Also Present: Mr. John R. Crook, Agent of the United States of America; Mr. Daniel M. Price, Deputy Agent of the United States of America; Mr. David
Balton. Assistant to the Agent of the United States of America.

ABBREVIATIONS

Amoco: Amoco International S.A., a company established under the laws of the Canton of Geneva, Switzerland, presently named Amoco Chemicals (Europe).

AIFC: Amoco International Finance Corporation, the Claimant, a corporation established under the laws of the State of Delaware, United States of America.

Casinghead Gas: Defined in relevant agreements to mean "Natural Gas which is produced from petroleum reservoirs with the related production of crude oil."

CSD: The Declaration of the Government of the Democratic and Popular Republic of Algeria concerning the Settlement of Claims by the Government of the United States of America and the Islamic Republic of Iran of 19 January 1981.

Dome Gas: Defined in all relevant agreements to mean "Natural Gas which is produced from petroleum reservoirs without the related production of crude oil."

Gas Purchase Agreement: Agreement executed effective 1 April 1967 between Khemco, on the one hand, and NIOC and PANINTOIL, on the other hand, for the purpose of sale and purchase of Natural Gas from the "NIOC/PANINTOIL Joint Structure Agreement Area."

JS    Agreement entered into between Pan American Petroleum Company (whose rights on 19 May 1958 were assigned to PANINTOIL) and NIOC, dated 24 A   1958, generally referred to as the "Joint Structure Agreement." The alleged expropriation of PANINTOIL rights under the JSA is the subject matter of Ca.. 55 presently pending before this Tribunal.

Khemco: Kharg Chemical Company Limited, a company established under the laws of Iran.

Khemco Agreement: Agreement executed as of 12 July 1966 between Amoco and NPC for the formation of Khemco as a joint venture.

LPG: Defined in relevant agreements to mean "liquified petroleum gas consisting primarily of butane and/or propane."

Natural Gas: Defined in relevant agreements to mean "Casinghead Gas, Dome Gas, and all other gaseous hydrocarbons produced through oil or gas wells, which Natural Gas may also contain other gaseous components such as hydrogen sulfide and carbon dioxide.

NGL: C sub5 plus Natural Gas Liquids, defined in all relevant agreements to mean "natural gasoline consisting of pentane and heavier hydrocarbons."

NIOC: National Iranian Oil Company, one of the Respondents, a company established under the laws of Iran.

NPC: National Petrochemical Company, one of the Respondents, a company established under the laws of Iran.

OSCO: Oil Service Company of Iran, a company established under the laws of Iran.

PANINTOIL: The Pan American International Oil Company, a company registered under the laws of Iran, presently named Amoco-Iran.

Treaty: The Treaty of Amity, Economic Relations, and Consular Rights between the United States and Iran signed 15 August 1955, entered into force 16 June 1957 (284 U.N.T.S., 93 T.I.A.S. No. 3853, 8 U.S.T. 900).

I. ... TRODUCTION

1. The present claim arises out of the Khemco Agreement, entered into on 12 July 1966 between Amoco and NPC, pursuant to which the parties thereto agreed to form a joint venture company, Khemco, for the purpose of building and operating a plant for the production and marketing of sulfur, natural gas liquids and liquified petroleum gas derived from natural gas.

2. The Claimant, AIFC, contends that the Government of the Islamic Republic of Iran ("Iran"), independently and through its agencies and instrumentalities, deprived AIFC of its 50% property interest in Khemco. AIFC now seeks recovery of the value of its property interest in Khemco. The factula circumstances relevant to the present Case are generally not in dispute, but the Parties disagree as to the legal characterization and effects of these factual circumstances. The Parties also disagree as to the applicable standards of valuation of AIFC's property interest and the appropriate method of quantifying any damages or compensation to which AIFC may be entitled.

II. PROCEEDINGS

3. On 17 November 1981 AIFC filed its Statement of Claim naming as Respondents Iran, NIOC, NPC and Khemco. All Parties have submitted extensive pleadings and documentary evidence.

4. A Pre-Hearing conference was held on 8 May 1985. By Order of 8 July 1985 a Hearing was scheduled to take place on 10 and 11 December 1985. On 7 November 1985 the Respondents submitted a "Request to Postpone Hearing" (supplemented by a submission dated 21 November 1985). By Order of 22 November 1985 the Tribunal decided not to grant this request. On 5 December 1985 the Respondents submitted an "Objection to the Order of 22 November 1985" to which the Claimant responded by a submission received by the Tribunal on 9 December 1985. In view of these submissions, the Chairman met with the Agent of the United States of America, the Agent of the Government of the Islamic Republic of Iran, Counsel for the Claimant and Counsel for the Respondents at the Tribunal, on 9 December 1985. With the agreement of the Parties, the Tribunal then decided to make certain modifications in respect of the pr　eedings in this Case. These modifications were reflected in the Tribunal's Order of 11 December 1985 which stated as follows:

1.　ιe Hearing in this Case on 10 and 11 December 1985 will be held as scheduled.
2.　. this Hearing the Parties shall fully and finally argue all the issues in this Case with the exception of the issue of quantification of damages and the Counterclaims raised in this Case. In addition thereto, the Claimant may however present the oral testimony to be given by the three expert witnesses on the issue of quantification of damages.
3. The following written submissions shall be made by the Parties respectively:
a. The Respondents shall file by 10 February 1986 their final submission, solely as to the issue of quantification of damages.
b. The Claimant shall file by 10 February its final submission regarding the Counterclaims.
4. No extensions of the time limits set for the final written submissions will be granted.
5. A complementary Hearing in this Case is hereby scheduled on 10 March 1986, at 9.30 a.m, at which the Parties shall present full and final arguments solely regarding the issues of quantification of damages and of counterclaims.

5. The Hearing was held as scheduled on 10 and 11 December 1985 at which the Parties appeared and presented oral argument.

6　ʹhe Parties' final submissions subsequently were filed in compliance with the above cited Tribunal Order. The Respondents' final submission included a document entitled "Affidavit of Dr. Mohammad Ali Movahed" and a notice to the Tribunal of the witnesses the Respondents intended to present at the _complementary Hearing on 10 March 1986. In this list of witnesses the Respondents named, inter alia, Mr. M.E. Youssefi Bakhtiar. On 19 February the Cl. .nant submitted a "Motion to Strike" the Affidavit of Dr. Movahed and to "exclude" the oral testimony of Mr. Bakhtiar. By Order filed 5 March 1986 the Tribunal decided that it did "not find ground to reject" Dr. Movahed's affidavit and that "[t]he same applied to Mr. Youssefi Bakhtiar's proposed testimony" which was accepted "insofar as it deal[t] with the Respondent's theory of quantification of damages."

7. The complementary Hearing was held, as scheduled, on 10 March 1986 at which the Parties appeared and presented oral argument .

8. On 27 August 1986 the Claimant submitted a document entitled "Supplemental Affidavits Relating to Costs." The Respondents objected to the filing on the ground of untimeliness. By Order filed 8 October 1986, the Tribunal decided not to reject these documents as untimely filed.

III. JURISDICTION

9. The Claimant contends that the present claim is properly within the Tribunal's jurisdiction. The Respondents have raised several jurisdictional objections,

all of which, the Claimant contends, are without merit.

A. The Claimant's U.S. Nationality

10. The Respondents generally dispute the sufficiency and relevance of the evidence submitted by the Claimant as proof of its United States nationality.

11. The Claimant has provided evidence, including good standing certificates, copies of proxy statements issued during the relevant period and affidavits of corporate executives and accountants of the affiliated corporations involved, which, according to the Claimant, show that Amoco is a company duly incorporated under the laws of the Canton of Geneva, Switzerland, and that Amoco has, at all relevant times, been owned -- through a chain of corporations including the United States corporations AIFC, Amoco International Oil Company and Amoco Chemicals Corporation -- by a United States Corporation, Standard Oil Company. The evidence submitted also shows that at least 50% of the voting shares of Standard Oil Company were owned by United States nationals during the relevant period.

12. The Tribunal holds that this evidence satisfactorily proves the United States nationality of the Claimant within the terms of the CSD.

B. The Claimant's Right to Raise an Indirect Claim

13. The Respondents contend that AIFC does not have locus standi before this Tribunal as the Tribunal does not have jurisdiction over indirect claims owned directly by Amoco, a Swiss company.

14. The Tribunal finds that the terms of the CSD and the consistent jurisprudence of the Tribunal clearly recognize that the Tribunal is authorized to exercise jurisdiction over indirect claims asserted by corporations that are nationals of the United States on behalf of their wholly-owned foreign subsidiaries. Accordingly, AIFC may properly assert claims on behalf of Amoco.

C. Continuous Ownership of Claim

15. Based on the evidence submitted, and in the absence of any specific objection by the Respondents, the Tribunal is satisfied that AIFC's claim in this Case, at all relevant times, has been owned by a national of the United States as defined in Article VII, paragraph 2 of the CSD.

D. Possible Prejudice Caused by Multiple Proceedings

16. The Respondents assert possible prejudice if the present Case is adjudicated by this Tribunal. They argue that the provisions of Article 26 of the Khemco Agreement obligate the parties thereto to settle any disputes by arbitration and that those provisions remain binding. They argue further that Amoco neither did nor was contractually able to assign its rights arising from the Agreement to AIFC. The Respondents contend that the contracting party, Amoco, in fact, has instituted separate arbitral proceedings and that these proceedings are still pending. The Respondents conclude that a decision to entertain AIFC's indirect claim before this Tribunal could prejudice the Respondents by subjecting them to multiple liability in the event Amoco subsequently decided to pursue its claim directly in a separate forum.

17. The Claimant disputes that the Tribunal's jurisdiction depends on any assignment of rights from Amoco to it, as argued by the Respondents. Although the Claimant does not dispute that Amoco instituted arbitral proceedings prior to the date of the CSD it contends that the Respondents' assertion of possible

prejudice is without merit as Amoco is not pursuing those arbitral proceedings.

18. The Tribunal holds that its jurisdiction is determined exclusively by the CSD and does not depend on or arise out of any contractual assignments. As to the alleged risk that the Respondents could be subject to multiple liabilities, the Tribunal notes that, in any event, the principles of res judicata or estoppel would bar Amoco in most. if not all, legal systems, from successfully prosecuting a claim, the merits of which have been finally determined by this Tribunal.

E. Exhaustion of Local Remedies

19. The Respondents further contend that the Single Article Act passed by the Revolutionary Council in Iran on 8 January 1980 precludes the Tribunal from adjudicating AIFC's claim. The Respondents' argument is twofold: first, that the Special Commission established pursuant to the Single Article Act has exclusive competence over Amoco's -- and thus over the Claimant's -- claim to compensation, and second, that, by not seeking compensation through the Sp ial Commission. Amoco has failed to exhaust its local remedies.

20. . he Claimant contends that the Tribunal's jurisdiction is established by the CSD and that the Single Article Act does not oust the Tribunal of jurisdiction conferred by the CSD.

21. The Tribunal notes that the objections raised by the Respondents pertain to issues both of jurisdiction and of the merits of the present Claim. To the extent that these objections pertain to issues of jurisdiction, the Tribunal holds, as it has held earlier, that its jurisdiction over claims raised is determined exclusively by the provisions in the CSD, and that the CSD does not condition the Tribunal's jurisdiction on the exhaustion of local remedies as the Respondents contend. See Amoco Iran Oil Company and Islamic Republic of Iran, Award No. ITL 12-55-2 (30 December 1982), reprinted in 1 Iran-U.S. C.T.R. 493.

F. Outstanding Claim

22. The Respondents dispute that any claim was outstanding on 19 January 1981, as required by the CSD, since no claim had been formulated or communicated to the Respondents or filed with any court or other judicial institution prior to 19 January 1981.

23 Vith reference to the terms of the CSD, the Tribunal also rejects this argument.

G. . oper Parties to the Case

24. The Respondents argue that the Claimant has not sufficiently identified the Respondents against which the claim is directed. They contend that to the extent the claim is based on the theory of breach of contract the claim is inattributable to the named Respondents, Iran and NIOC, and that, to the extent the claim is based on an alleged expropriation, the claim cannot be brought against either NPC, Khemco or NIOC since they are separate corporate entities, distinct from Iran.

25. Although the Tribunal finds no reason to dispute the separate corporate status of NIOC, NPC or Khemco, such status is irrelevant in determining whether these companies are proper Respondents. It is undisputed that these three companies are entities controlled by Iran within the terms of the CSD and are thus potentially proper Respondents to this claim. The claim in this Case is based on two distinct legal theories: first, expropriation and, second, breach of contract. It is clear that each of the named Respondents is prima facie a proper party to at least one of the alternative theories. Under the expropriation theory Iran is indisputably a proper Respondent. Each of the other Respondents was directly or indirectly involved in the contractual relationship here at issue, thus raising

the possibility of liability under the breach of contract theory. Whether any of the Respondents is ultimately found liable on these theories is an issue which pertains to the merits of this Case. The Tribunal thus cannot determine the attributability of the claim to the respective Respondents named as a preliminary issue.

## H. Subject Matter Jurisdiction

26. Finally, and in the absence of any objections raised, the Tribunal holds that the subject matter of this claim is within its jurisdiction pursuant to the terms of Article II. paragraph 1 of the CSD.

## I. Jurisdiction over Counterclaims

27. Issues of jurisdiction related to the counterclaims are examined in the section of this Award dealing with the counterclaims .

## IV. THE CLAIMS

## A. Facts and Contentions

## 1. The Contractual Background

28. The Khemco Agreement at issue in this Case, executed by Amoco and NPC on 12 July 1966, was part of the overall business relationship between the Claimant's corporate affiliates and the Respondents, arising out of their joint development of Iran's petroleum resources. Close to ten years prior to the signing of the Khemco Agreement, NIOC (the corporate parent of NPC) and an affiliate of the Claimant, then known as PANINTIOL, entered into the JSA providing for the exploration by PANINTOIL, and the joint development of production by NIOC and PANINTOIL, of four offshore oil fields in the Persian Gulf named Ardeshir, Cyrus, Darius and Fereidoon ("JSA Area"). These oil fields are situated within a radius of approximately 100 km. to the south and southwest of Kharg Island. The geological structure of the JSA Area oil fields is such that in association with the crude oil extraction substantial amounts of natural gas become available as a by-product. This gas is referred to as Casinghead Gas and sometimes also as "associated gas." The Khemco Agreement established a mechanism for processing this gas and selling various associated chemicals, especially sulphur extracted therefrom.

29. In the Khemco Agreement, Amoco and NPC agreed to and defined a structure of interrelated agreements. At the core was the establishment of an Iranian joint stock company, Khemco, which was to be jointly owned and managed by Amoco and NPC. Khemco was to receive technical assistance and services from NPC and Amoco in order to design, construct, install and initially operate the envisioned plant under a separate agreement. It was anticipated that the natural gas necessary for the operation of the Khemco plant would come primarily from the facilities on Kharg Island jointly operated by NIOC and PANINTOIL. and the Khemco Agreement was conditioned on the execution by Khemco of a gas purchase agreement with NIOC and PANINTOIL on terms and conditions set forth in the Khemco Agreement.

30. It is not disputed that Khemco in fact was formed as planned and executed all the relevant agreements. The envisioned gas processing plant was designed and constructed on Kharg Island and the Khemco plant commenced commercial operations as of 1 January 1970.

31. To the extent here relevant, the contractual history and the essential contents of the above-mentioned agreements will be described in more detail in the following.

a) The Khemco Agreement

32. The signatories to the Khemco Agreement were, as noted earlier, Amoco and NPC. NPC was legislatively authorized by Iran to enter into the Khemco Agreement by the Act Concerning the Development of Petrochemical Industries, effective 15 July 1965, which vested authority in NPC to "enter into partnership with Iranian or foreign institutions or companies possessing technical and financial qualifications." This Act also provided that "[a]ll arrangements and agreements concluded in the implementation of this object shall be enforced after approval by the High Council of Petroleum Industries, the general meeting of the N.I.O.C. and the Council of Ministers and upon ratification by the Finance and Economic Joint-Committees of the Two Houses of Majlis."

33. These conditions were reflected in the Khemco Agreement itself and the evidence submitted shows that the contractually required governmental ratification was obtained in due course. ya transmittal letter dated 19 March 1967, co-signed by the President of the Senate and the Speaker of the Majlis, officially notes that the Khemco Agreement had been ratified by the Joint Economic and Financial Committees of the Majlis. Also in evidence are a letter dated 28 March 1967 in which the Prime Minister notified the Minister of Finance of this ratification and a letter of 29 March 1967 in which the Managing Director of NPC formally notified Amoco that the relevant conditions of the Khemco Agreement had been satisfied by the ratification of these committees, and by the prior approval of the High Council of Petrochemical Industries, the General Meeting of NIOC, and the Council of Ministers.

34. Pursuant to Article 2, paragraph 2 of the Khemco Agreement the ratification by the Joint Economic and Financial Committees of the Majlis was

considered acceptance by the Government of all obligations of the Government and the grant by the Government of all facilities and privileges conferred by the Government under this Agreement, including privileges accorded to foreign companies under the "Law Concerning the Attraction and Protection of Foreign Investment in Iran" dated 7 Azar, 1334 (November 28, 1955), the "Act of 24 Teer 1344 (July 15, 1965) Concerning the Development of Petrochemical Industries", and any future amendments to such acts.

35. The effective date of the Khemco Agreement was 2 March 1967, i.e., the date of ratification by the Joint Economic and Financial Committees of the Majlis. The Khemco Agreement was to continue thereafter for a period of 35 years or until the termination of the JSA, whichever period was longer. Upon the request of either party, the Khemco Agreement could be extended by additional intervals of fifteen years on the basis of terms to be negotiated and concluded by both parties.

36. The Khemco Agreement incorporated, in essence, the terms and conditions governing all aspects of Khemco's establishment, management and operations. The terms and conditions of the related separate agreements for the provision of technical assistance to Khemco and purchase of gas by Khemco (described in more detail below) were thus set forth in the Khemco Agreement. The Khemco Agreement also governed the sale of Khemco products, providing that Khemco's entire production of NGL was to be resold to NPC and Amoco in equal shares at a specified price.

37. The Khemco Agreement set forth also the financial policies to be followed by Khemco, specifying that after deduction for taxes and required reserves all remaining profits were to be distributed as dividends. Pending the distribution of dividends, and subject to provisions for debt retirement and maintenance of working capital in accordance with good business practices, all cash flow was to be loaned equally to shareholders on an interest-free, due-on-demand basis, unless such loans would create a critical financial condition or the parties otherwise agreed to retain the funds in Khemco for expansion programs or other purposes.

38. The Khemco Agreement also contained detailed provisions as to the economic and regulatory aspects thereof, including terms governing applicability of

foreign exchange restrictions and defining the application of import and customs regulations. Article 15 of the Khemco Agreement also provided for a five year exemption from Iranian income tax liability on net profits of Khemco from the date of commencement of commercial production, while specifying that otherwise NPC, PANINTOIL, and Khemco were subject to Iranian income tax laws.

b) Establishment of Khemco

39. Pursuant to the Khemco Agreement, Khemco was organized on 14 March 1967 as a joint stock company under the laws of Iran "for the purpose of extraction and sale of sulfur, LPG and C sub5 plus Natural Gas Liquids and the production of such other products as [NPC and Amoco] may agree upon." Khemco was to "install, own and operate" a plant "with a capacity to extract about five hundred (500) tons per day of elemental sulfur and about six thousand (6,000) barrels per day of LPG and C sub5 plus Natural Gas Liquids, with additional capacities to be provided as the parties hereto may hereafter agree."

40. Khemco's initial share capital was Rls. 524,000,000 equivalent, at that time, to approximately U.S. $7,000,000. As required, Amoco and NPC subscribed to the same number of shares, each of which entitled the shareholder to one vote. Detailed provisions in the Khemco Agreement ensured the right of both parties to participate equally in the management and affairs of Khemco.

c) The Technical Services and Assistance Agreement

41. The Technical Services and Assistance Agreement was executed as of 12 July 1966 by NPC, Amoco and Khemco. Pursuant to this agreement, Amoco agreed to provide technical assistance in connection with the design, engineering, construction, installation and initial operation of the Khemco plant. This agreement was to remain effective until twelve months after the date of completion and acceptance of the plant. In accordance with the Technical Services and Assistance Agreement the plant was completed and was accepted by 1 January 1970.

d) The Gas Purchase Agreement

42. As noted earlier, performance under the Khemco Agreement was conditioned upon Khemco's concluding with NIOC and PANINTOIL a "mutually satisfactory" gas sale and purchase agreement within 30 days of the effective date of the Khemco Agreement. The Khemco Agreement defined the essential conditions regarding quantity, source and price of the feed stock natural gas. The Khemco Agreement provided that the natural gas could be purchased from other sources, but specified that JSA Gas, i.e., gas which was a by-product of NIOC's and PANINTOIL's oil extraction operations pursuant to the JSA, was to have priority "unless otherwise agreed between the parties."

43. These terms and conditions were incorporated in the Gas Purchase Agreement which was executed on 1 April 1967. Pursuant to Article 2, paragraph 1 of the Gas Purchase Agreement NIOC and PANINTOIL agreed to sell, in equal quantities, and Khemco agreed to buy Casinghead Gas produced from the JSA Area, "to the extent available and which may be required for the operation" of the Khemco plant as initially constructed or subsequently expanded. Pursuant to Article 2, paragraph 2, NIOC further agreed "to secure from sources on Kharg Island other than the [JSA] Area, to the extent available, and sell to KHEMCO . . . such amount of Natural Gas as may be required for the operation of the aforesaid Plant in addition to the Casinghead Gas purchased by Khemco pursuant to Paragraph 1 (i.e., the JSA gas)."

44. The Claimant contends that NIOC's and PANINTOIL's obligation to supply Khemco with natural gas was subject to certain contractual limitations. Article 2, paragraph 5, of the Gas Purchase Agreement provides that "the petroleum reservoirs from which the Natural Gas is to be supplied are being operated primarily for the production and sale of crude oil and . . . the availability of natural gas contemplated by this Agreement is subservient to such operation."

Although the JSA is not otherwise in evidence in this Case, the Claimant refers to a provision of the JSA whereby the parties thereto agreed to "exert their utmost efforts to develop any discovered fields to the maximum extent consistent with good petroleum industry practice" and "to extract such petroleum as shall be discovered at a rate insuring that such part of the discovered reserves as may be economically extracted by the utilization of the most up-to-date methods and practices of the petroleum industry shall be fully extracted during the term of the [JSA]."

45. The price of the natural gas to be supplied to Khemco was essentially fixed over the life of the Khemco Agreement, and was the same regardless of whether the natural gas was provided by PANINTOIL and NIOC from the JSA Area, or whether it was provided by NIOC from other sources. For the first fifteen years the price was set at U.S . $0.02 per thousand standard cubic feet ("TSCF"). Subsequent to that period the price was to be agreed upon by the parties for each subsequent five-year interval. No adjustment was permitted, however, that would reduce the price to less than the initial U.S. $0.02 per TSCF or that would raise the price so as to reduce the ratio of Khemco's average F.O.B. product unit sales price to its average product unit cost. Moreover, the price charged to Khemco was not to exceed the price charged to other specified petroleum and petrochemical users in Iran.

2. Operation of Khemco's Facilities

46. As mentioned above, the natural gas processing plant provided for in the Khemco Agreement and the related separate agreements commenced commercial operations as of 1 January 1970. The plant facilities consisted of gas compressors, a hydrogen-sulfide extraction unit, sulfur recovery plant, gas dehydration units, refrigerated absorption equipment, product-fractionation towers, propane and butane treating units, and power generation facilities. In addition, there were storage facilities for large quantities of propane, butane, and sulfur as well as vessel loading facilities. It appears from evidence submitted by the Claimant that, with these facilities, Khemco had a maximum daily average product yield of about 800 metric tons of sulfur, 5,300 barrels of propane, 6,200 barrels of NGL and 3,000 barrels of butane.

47. During the initial years of operation Khemco used exclusively natural gas supplied from the JSA fields. It appears, however, that other gas richer in the products extracted by Khemco was available from the Kharg Island oil fields operated by OSCO. By letters dated 15 August 1972 (not in evidence in this Case) and 7 November 1972 Khemco proposed to the two other signatories of the Gas Purchase Agreement, PANINTOIL and NIOC, that it use this richer OSCO gas for a period of two years, suspending the preferential purchases of JSA gas under the Gas Purchase Agreement. This proposal contained an offer to extend the two year period if appropriate.

48. By letter of 9 December 1972 from Mr. Parviz Mina, Alternate Director and Deputy Director, Technical and International Affairs, NIOC, to Mr. Shapur Sharifi, Director of Technical and Marketing Affairs, NPC, NIOC agreed to the proposal "for the exclusive period of two years." As required by the Gas Purchase Agreement and the Khemco Agreement, the price for this gas was set at U.S. $0.02 per TSCF, the same price charged for the JSA Gas.

49. The Parties disagree as to the continued validity of the agreement to use OSCO gas. The record before the Tribunal indicates, however, that neither Amoco nor NPC objected at the time to the continued purchase of OSCO gas by Khemco and that Khemco continued to purchase OSCO gas supplied by NIOC even after the two year period had expired.

50. The Khemco plant continued operations using OSCO gas without any significant interruptions through 1977, which was the last full year of production prior to the disruptions caused by the Iranian Revolution. According to evidence submitted by the Claimant, the plant produced during 1977 an average of 559 tons of sulfur, 3,647 barrels of NGL, and 6,319 barrels of LPG per day. Due to increasing deliveries of particularly rich gas during 1977 and early 1978 production of NGL and LPG was increasing rapidly. It is not disputed that the management of Khemco by the respective parties proceeded smoothly through

this period and all funds earned by Khemco were disbursed as agreed pursuant to the Khemco Agreement.

51. According to evidence submitted by the Claimant, the Khemco plant was profitable and various expansion plans were considered. It appears that increasing amounts of low pressure gas became available to Khemco for processing. These low pressure gas streams apparently contained higher concentrations of extractable products and the processing of this gas was potentially more profitable. At the time, however, the processing of these gas streams exceeded the plant's capacity. In 1979 Khemco therefore considered and budgeted for an expansion plan estimated to cost U.S. $9 million over a two-year period. Of this amount, U.S. $4 million was designated for the purpose of installing an additional low-pressure compressor in 1979. It is undisputed, however, that the expansion plan was not effectuated by the time the claim arose.

3. Events Affecting the Operation and Management of Khemco

52. The Parties agree that after 1977 civil unrest occurring in Iran increasingly affected plant production. During 1978, as the events of the Islamic Revolution gained momentum, strikes by workers in the oil industry disrupted production and hampered operation of oil processing facilities, including those of Khemco. These strikes began in mid-October and continued, off and on, through the end of the year. By 1 November 1978 there were total stoppages of oil exports.

53. The Claimant contends that by the end of December 1978 the increasing levels of anti-American sentiment caused Amoco to propose to Khemco that the Amoco personnel working for Khemco should be temporarily permitted to evacuate Iran. By telex dated 27 December 1978 Mr. M. Tayeban, the managing director of Khemco, informed Amoco that "we concur with Amoco's suggestion that until further notice no Amoco personnel working for Khemco should remain in Iran."

54. According to the Respondents, however, the withdrawal of Amoco's personnel was made without NPC's approval or consent and this withdrawal, as well as the general withdrawal of expatriate personnel from Iran, reduced production at the Khemco plant to negligible levels during the first quarter of 1979. As outlined in further detail below, the Respondents invoke these conditions in Iran as proof that the Khemco Agreement as well as the related agreements thereby became frustrated and non-operational. In addition, they argue that, as the JSA also had become frustrated and non-operational, the Khemco Agreement automatically was rendered non-operational.

55. Amoco's evacuated personnel were transferred to an office in Dubai, where, according to the Claimant, during the first quarter of 1979 Amoco held its personnel in readiness for return to normal operations, pending an announcement of the new government's intentions regarding Khemco. The Claimant has also submitted evidence that the Khemco plant resumed commercial operations in April 1979 without the return of Amoco personnel.

56. The Claimant contends that on 30 April 1979 it received newspaper reports containing the first significant indications that the resumption of normal activities under the Khemco Agreement probably would not be possible. According to these reports NIOC had announced that "Iran's oil industry will operate without foreign technicians."

57. It was further reported that NPC intended to terminate all foreign interests in petrochemical plants. The Claimant refers to a statement by Mr. R. Abedi, managing director of NPC, according to which NPC intended to commence negotiations to buy out all shares of petrochemical plants held by foreign interests, with the goal of bringing such plants under a single management. Khemco's plant was specifically mentioned as targeted for such a transfer and NPC displayed an interest in a possible purchase of Amoco's share in Khemco. NPC also announced that the transfer price would be the book value of shares prior to the Revolution.

58. On 13 May 1979 Mr. Abedi met in Tehran with Amoco representatives to discuss the situation. According to testimony of the Amoco's officials present at the meeting, Mr. Abedi stated that it had been and would continue to be impossible for Khemco's expatriate personnel to work in Iran because they would be in personal danger. Mr. Abedi further stated that salaries and expenses of Khemco expatriates would be suspended as of December 1978.

59. The Respondents have submitted an extract from a telex originating from the United States Department of State which reports a meeting with Mr. Abedi held in May 1979

Abedi confirmed that NPC had notified foreign partners in all four firms [i.e., Khemco and three other joint petrochemical ventures] of NPC's . . . desire/intention to acquire their equity interests and had invited these firms to send delegations to Tehran to negotiate the sale. According to Abedi, discussions will take place within the next 3-4 weeks.

Th telex further stated that "NPC does not expect much if any opposition by its foreign partners to the proposed take-over."

60. Whether negotiations concerning the proposed purchase of Amoco's shares were undertaken at this point is unclear from the record.

61. The next significant event occurred by the end of June 1979 . In evidence is a letter dated 27 June 1979 by which Mr. Abedi advised Mr. Tayeban, managing director of Khemco, that "in accordance with company resolutions, sales of Khemco products would thereafter be managed by NPC." This letter also announced that regular reports as to the current inventory of sulfur would be required. Prior to this time, Khemco had not approved such policies .

62. On 7 July 1979 Khemco held a meeting of its board of directors in Tehran. According to the minutes of this meeting, two out of three of Khemco's U.S. expatriate directors were physically present and the third was represented by proxy. All Iranian directors were present. At this meeting the Khemco board considered and approved for presentation to the shareholders Khemco's 1978 Annual Report, which included the balance sheet and profit and loss statement for that year. Khemco's managing director proposed that Khemco transfer its marketing activities to NPC, but this proposal was not accepted. The board adopted, however, amendments to ease operations of Khemco in the event Amoco's designated representatives were physically absent from Iran; it approved telex authorizations for checks, drafts and payment orders under certain conditions.

63. A general shareholders' meeting was also held on 7 July 1979. According to the minutes of this meeting the shareholders approved the annual report and financial statements. Out of total 1978 profits of Rls. 1,107,000,000 Khemco declared approximately 10%, Rls. 111,000,000, as dividends payable in 1979. Payment of Amoco's share of this dividend was never received by Amoco.

64. On 11 July 1979 a meeting was held for the express purpose of "determining Company's policy for the sale of Khemco's products." Present at this meeting were a representative of NIOC (Mr. Reva Azima, Supervisor of International Affairs), and officials of NPC (Mr. H.A. Hajarizadeh, Supervisor of Management of Operations; M. Mofez, Supervisor of Management of Finance, Legal and Administrative Affairs; and Mr. A.H. Khakzad, Supervisor of Management of Training), as well as Khemco's managing director, Mr. Tayeban. According to the minutes of this meeting, the following was decided:

1. In consideration of Government's policy that all sales of hydrocarbons produced in the country must be made by NIOC, and also, in consideration of Iran and NPC's interests, and discussions made with Amoco for the purchase of their shares in Khemco, sale of liquid gas and naptha produced in Khemco's complex, will be handled totally by NIOC International Management.

2. On the basis of a policy which will be agreed upon later, in gaining the aim mentioned in Para. 1, Khemco will advise NIOC International Affairs [of] its

stock and production of liquid gas and naptha. In addition, Khemco's personnel specialized in the sale of liquid gas will be transferred to NIOC International Management.

3. . . . NIOC will deposit to the account of NPC the funds derived from the sale of liquid gas and naptha produced by Kharg's complex.

5. On the basis of previous instructions, sale of sulfur produced by Khemco will be made totally by NPC Trading Management. The funds derived from the sale will be deposited in a special account in NPC. Of course, all Khemco's current expenses will be borne by NPC, effective the date this policy is executed.

7. Mr. Tayeban, Khemco's Managing Director, will advise Amoco of the NIOC and NPC's policy.

65. The Claimant contends that this meeting was held under the supervision of NIOC, since NIOC's representative at the meeting signed the minutes "c...firmed by me pending approval by Mr. Nazih," which the Claimant presumes to be a superior at NIOC.

66. Khemco was formally notified of these actions by letter of 17 July 1979 from Mr. Hosseinali Hajarizadeh, Acting Supervisor of Management of Operations and NPC's Shareholders Representative to Khemco. The letter requested "that action be taken in accordance with the attached minutes of the meeting," and stated that "a decision for how to sell Khemco's products, as reflected in the attached minutes of meeting, has been taken considering [both the] purchase of Amoco's shares in Khemco by NPC" and the subsequent merging of Khemco's operations in the management of NPC.

67. The events were formally announced to Amoco and its affiliates by a letter of 18 July 1979 from Khemco's managing director, Mr. Tayeban. The letter announced that "as of this date we are putting NPC's directives in this connection into effect," and "are transferring all rights and obligations under all existing contracts to NPC . . . and NIOC." The letter concluded that "any new sales will of course be made directly by NPC or NIOC."

68. According to the Claimant, this decision also was contemporaneously announced at a meeting held on 18 July 1979 in Tehran between representatives of Amoco and NPC. Amoco was informed at this meeting that its participation in the income and expenses of Khemco was terminated effective as of 31 December 1978.

69. The Claimant contends that the implementation of these policies clearly and effectively excluded Amoco from all of Khemco's operations. Amoco's formal protest to the decisions announced 18 July 1979 was communicated in two telexes of 6 August 1979, one to Khemco and one to NPC. These telexes stated that the alleged takeover was beyond the authority of Khemco's managing director, inconsistent with the Khemco Agreement and Khemco's corporate articles, and had previously been rejected by Khemco's board of directors. The telex to NPC concluded that "[s]uch unilateral takeover of Khemco's marketing activities amounts to nationalization while the discussion of the purchase of Amoco's share in Khemco is still pending."

70. The Respondents do not dispute that the announced policies were, in fact, carried out despite Amoco's protest. They argue, however, that these decisions were taken with the interest of Khemco in mind and that, furthermore, NPC was obligated to implement these policies by virtue of decisions taken by NIOC. The Respondents rely, inter alia, on a telex from NPC to Amoco of 14 August 1979, in response to Amoco's 6 August 1979 telex, in which NPC stated that the

arrangement for sales of Khemco's products was made to protect NPC's interest. Higher prices could be obtained by combining sales of sulphur from Kharg and Shampur plants. Similarly [LPG] can be sold through NIOC in conjunction with IMS product at higher prices.

This telex went on to state that:

With regard to transfer of your [Amoco's] Khemco's share to NPC we [NPC] are ready to resume negotiation immediately.

71. Neither Party has submitted any evidence as to the substance of the proposed negotiations for the sale of Amoco's shares to NPC, and nothing in the record indicates that negotiations resumed at any time after 14 August 1979. It is in any case undisputed that the Parties never reached an agreement on the terms of NPC's purchase of Amoco's shares.

72. Subsequently, on 8 January 1980, the Revolutionary Council of the Islamic Republic of Iran promulgated the Single Article Act Concerning the Nationalization of the Oil Industry of Iran ("Single Article Act"). This Single Article Act stated that "[a]ll oil agreements considered by a special commission appointed by the Minister of Oil to be contrary to the Nationalization of the Iranian Oil Industry Act shall be annulled and claims arising from conclusion and execution of such agreements shall be settled by the decision of said commission."[1] It appears that the "Iranian Oil Industry Act" referred to was the Act concerning the Nationalization of the Petroleum Industry Throughout the Country, dated 5 May 1951, by which the Iranian oil industry previously had been na   nalized.

73. On 11 August 1980 Amoco served on NPC a Notice of Arbitration pursuant to the Khemco Agreement. NPC did not respond to this notice, nor did it appoint an arbitrator as required by the Khemco Agreement. As a consequence, reference was made to a third party, who appointed a sole arbitrator. The record does not disclose whether subsequent arbitral proceedings were held. The Claimant, however, has stated that Amoco is not pursuing these arbitral proceedings.

74. On 24 December 1980 Iran's Minister of Petroleum served notice on Amoco by telex that the Khemco Agreement was declared null and void by the Special Commission established in accordance with the provisions of the Single Article Act ("Special Commission"). The notifying telex stated in relevant parts:

This notification is served to inform you that the special committee convened by this ministry in accordance with the provisions of the Single Article Act approved by the Revolutionary Council of the Islamic Republic of Iran has, after due consideration of all relevant facts, declared the [Khemco Agreement] null and void.

T. . Single Article Act, inter alia, provides that any would be claim arising from the conclusion and execution of the said null and void agreement should be referred to and settled by the special committee.

75. The Claimant contends that, prior to receipt of this telex, Amoco had not received any notification that the Special Commission was reviewing the validity of the Khemco Agreement, or that it had reached a decision. There is no evidence in the record describing the process by which the Special Commission reached the conclusion under the terms of the Single Article Act that the Khemco Agreement was "null and void."

76. The Tribunal is further uninformed whether any settlement discussions took place between the Parties subsequent to Amoco's receipt of this notice of nullification. In any event, by telex of 19 September 1981 NPC notified Amoco that it was not authorized to provide any redress for Amoco since "the claims of Amoco in respect [of] nationalization of its shares/assets in Kharg is subject to negotiation with a special commission created for dealing with all such claims . . . ." It is undisputed that Amoco has not pursued any remedy with this Special Commission.

B. The Legal Characterization of the Facts

1. The Issue

77. In the present Case, the Parties do not disagree on the occurrence of the factual events discussed above. They differ, however, as to the legal characterization and consequences of these events, these being the issues on which the Tribunal has to decide.

78. According to the Claimant these facts establish the Respondents' liability on one of two theories. First, the Claimant argues that NPC and Khemco have materially breached or repudiated the Khemco Agreement and that NIOC and Iran are liable as well because of their control over NPC and Khemco. The Claimant also argues that the record demonstrates that Iran has expropriated Amoco's rights under the Khemco Agreement or its shares and shareholders' rights in Khemco and that such expropriation was wrongful. In response, the Respondents argue that the revolutionary events which took place in Iran "totally fr̵̶̵̵̵̵ated and [thereby] discharged by conditions of force majeure" the Khemco Agreement as of late 1978. They contend further that if the Khemco Agreement is not considered frustrated and terminated, the Single Article Act of 8 January 1980 "could also be characterized as a legitimate nationalization by Iran of the Claimant's interest in the Khemco plant."

79. The Respondents' assertion that the Khemco Agreement was frustrated by force majeure in late 1978 is preemptive in nature, and would preclude, if accepted, the claims for expropriation or breach of contract alleged to have taken place thereafter. Therefore, this contention will be discussed first. After considering force majeure the Tribunal will examine the issues of expropriation and breach or repudiation of the Khemco Agreement.


2. Frustration by Force Majeure

80. According to the Respondents, the dramatic events which took place in Iran in 1978 and 1979 had a direct bearing on the life of the Khemco Agreement. As a consequence of strikes and civil disturbances production at the Khemco plant completely stopped and remained negligible for the first quarter of 1979. Production started again in the spring of 1979, but remained "continually hampered by sporadic strikes and difficulties in obtaining required materials and technical assistance from abroad." In addition, the revolutionary events provoked the withdrawal by Amoco of all its United States personnel in the first days of ̵̶̵cember 1978. The Respondents assert that Amoco made no serious efforts to return its personnel to Iran and it is a fact that the United States personnel did not return to Iran. The Respondents insist that Amoco's experts and technical skills were needed for the project and that "[w]ithout the Claimant's participation NPC and Khemco ceased being able to fulfil their specific obligations in conjunction with the Claimant." They conclude that because of these difficulties, and the fact that the JSA was also allegedly rendered inoperable, the Khemco Agreement was "totally frustrated."

81. It cannot seriously be questioned that the conditions in Iran in late 1978 and early 1979 amounted to a state of force majeure. Both Parties admit that the departure of Khemco's expatriate personnel in December 1978 was justified by force majeure. The consequences on the Khemco Agreement of such a situation depends on the terms of the Khemco Agreement. Article 19 of the Khemco Agreement deals with the question of force majeure. The two relevant paragraphs of this Article read as follows:

1. Where any force majeure occurrence, beyond the reasonable control of either of the parties hereto or the Company [Khemco], renders impossible or hinders or delays the performance of any obligation or the exercise of any right under this Agreement, then this failure or omission of either Party of the Company shall not be treated as a failure or omission to comply with this Agreement

3. If the performance of any obligation or the exercise of any right is rendered impossible, hindered or delayed by a force majeure cause for a period exceeding

twelve (12) consecutive months, the parties shall, if practicable, consult together as to the best means of overcoming the applicable event of force majeure, but if they shall fail to achieve a solution or if consultation shall be impracticable then either Party may refer the situation to arbitration under Article 26 for solution.


82. It is clear from this Article that force majeure, per se, does not terminate the Khemco Agreement. Its effect is solely to suspend the performance of obligations and exercise of rights under the Khemco Agreement. Even if the situation of force majeure extends over a period exceeding twelve consecutive months, there is no automatic termination of the Khemco Agreement. Rather the parties have in such a case the obligation to consult; if they fail to find a solution, they have the right to resort to arbitration.

83. It is undisputed that, long before the expiry of the initial period of twelve months, contacts were made between the parties, meetings of Khemco's board of directors and of its shareholders were held, and decisions relating to the production and marketing of Khemco's products were taken. The record shows, the fore, that, according to its own terms, the Khemco Agreement could not be considered as terminated at the time of the events invoked by the Claimant as constituting a breach of contract or expropriation. It is true that in the event the parties did not find "the best means of overcoming" the situation, and that the Khemco Agreement did not subsequently revive. The parties' negotiations concerning the possible sale of Amoco's shares in Khemco do not suggest that at the relevant time the Khemco Agreement was terminated by force majeure, but rather demonstrate that the parties recognized that Amoco retained an interest in the enterprise which could be sold. The Tribunal therefore concludes that the Khemco Agreement survived the force majeure conditions. Consequently, the Tribunal now proceeds to examine the Claimant's allegations of expropriation and breach of contract.

3. Expropriation

84. According to the Claimant, by the end of July 1979 the Respondents "had totally and unequivocally breached and repudiated the Khemco Agreement and had expropriated Amoco International's rights thereunder, including its ownership interest in Khemco, for their own benefit, use and ownership." The Claimant alleges, therefore, that 1 August 1979 should be considered the date of expropriation. In such circumstances the Claimant contends the expropriation must be unlawful.

85. The Respondents do not deny that, given the Tribunal's findings on force majeure, an expropriation took place. They emphasize that the Claimant does not co  st that "the enactment of the Single Article Act of 8 January, 1980 by the Revolutionary Council of Iran was a valid legislative act under Iranian Law." Therefore they argue that "the Agreement was nullified pursuant to the Single Article Act as a valid exercise of Iran's sovereign legislative power." Noting that the Single Article Act "is expressly designed to implement the original [Nationalization] Act of 1951," the Respondents imply that the nullification of the Khemco Agreement by decision of the Special Commission in December 1980 is to be construed as a legitimate nationalization within Iran's sovereign powers. They also set its occurrence as no earlier than 24 December 1980, when the decision of the Special Commission was communicated to Amoco.

86. The Parties thus agree that Amoco's interest in Khemco was expropriated, but they disagree as to the circumstances and consequences of the expropriation, and in particular as to its lawfulness. As the Tribunal holds that the question of the lawfulness or unlawfulness of the expropriation has a direct bearing on the issue of compensation, this issue will be discussed in the following section.

4. Lawfulness or Unlawfulness of the Expropriation

a) The Applicable Law

87. Both Parties contend, and the Tribunal agrees, that the lawfulness of the expropriation must be decided by reference to international law. The Claimant maintains that the expropriation was unlawful because it was contrary to the Treaty, which in any case incorporates the rules of customary international law as a minimum standard. For their part, the Respondents contend that any expropriation was made in conformity with international law, since it was the legitimate exercise of Iran's right to nationalize, such right being recognized by customary international law. On the other hand, the Respondents submit that the Treaty is neither operative nor applicable to this Case. Given the Parties' contentions, the main issue to be discussed in this context relates to the nature of the rules of international law to be applied in the instant Case.

(i) The Treaty

88. According to the Respondents, the Treaty is applicable in the instant Case only if it was operative at the time of the expropriation, at the time of the submission of the claim to the Tribunal and, possibly, at the time of the award. The Respondents contend, however, that the Treaty was not operative at any of th⁀ times for several reasons. First, the Respondents argue that the Treaty was never binding on Iran, since it was executed by a Government installed as a result of a foreign intervention. If the Treaty was validly concluded, the Respondents continue, it ceased to be operative in November 1979 at the latest, by reason of the United States' violations of it by taking measures against Iranian assets, as well as by the general change of circumstances. At that time, the relations between the two countries could no longer be considered amicable, which fact is assertedly decisive, since the Tribunal is specifically authorized by Article V of the CSD to take into account changed circumstances. The Respondents deny that official notification of termination was necessary, since termination by conduct of the parties is largely admitted in international law. Furthermore, the Respondents argue that the decision to the contrary of the International Court of Justice in the Case Concerning United States Diplomatic and Consular Staff in Tehran (United States of America v. Iran), 1980 I.C.J. 3 (Judgment of 24 May 1980), reprinted in 19 Int'l Legal Mat'ls 653 (1980) is irrelevant, since this decision only concerned jurisdiction and the case was not argued by Iran. The Respondents similarly distinguish the Tribunal's similar holding in INA Corporation and Islamic Republic of Iran, Award No. 184-161-1, p. 9 (13 August 1985). Finally, the Respondents contend that even if the Treaty were operative, it would not be applicable to the circumstances of this Case.

89. In support of its contentions that the Treaty is applicable, the Claimant submits that the termination of a treaty can be inferred from the conduct of the parties only if this conduct demonstrates a tacit agreement to consider such treaty as lacking any authority. It asserts that no such inference is appropriate here, since the United States repeatedly has invoked the Treaty and has continued routinely to confer on Iranian nationals benefits arising from its provisions. S⁀ 'arly, Iran itself has invoked the Treaty before United States courts, as recently as the summer of 1985.

90. The Tribunal finds that the time period for which the issue of the applicability of the Treaty is relevant is the time when the events which gave rise to the claim occurred, which, in all instances, was prior to signing of the Algiers Accords. The Tribunal's jurisdiction does not rest on the Treaty, but is derived from the Algiers Accords. The pertinent facts have to be assessed in the light of the law governing them at the time they occurred, not the law applicable some time after their occurrence, be it at the time of the submission of the claim to the Tribunal or at the time of the rendering of the award. The Tribunal therefore need not consider whether the Treaty was still in force when the claim was submitted to the Tribunal or whether it is in force at the present time.

91. The Tribunal further notes that at the time the Treaty was signed and ratified the two Governments were recognized by the whole international community. There is no evidence, and it has not been contended, that the Treaty was executed under duress, or by fraud, within the meaning of Articles 49, 51 and 52 of the Vienna Convention on the Law of Treaties, U.N. Doc. A/CONF. 39/27 (23 May 1969), entered into force 27 January 1980, reprinted in 8 Int'l Legal Mat'ls 679 (1969) ("Vienna Convention"). None of the provisions of the Treaty can be considered as contrary to an imperative norm of international law (jus cogens), in the meaning of Article 53 of the Vienna Convention. Nothing, therefore, suggests that the Treaty was null and void ab initio.

92. In its judgment of 24 May 1980 in Case Concerning United States Diplomatic and Consular Staff in Tehran, supra, the International Court of Justice held that the Treaty was in effect at least as of 29 November 1979. It is true that because Iran declined to participate in the argument the case was not argued as a case normally would be presented under the Statute and the Rules of the Court, but the Iranian Government stated its position in two communications to the Court. In these communications it objected to the jurisdiction of the Court, but made no suggestion that the Treaty was not in force on 29 November 1979 when the United States submitted the dispute to the Court, as was noted by the Court itself. See 1980 I.C.J. at 28, 19 Int'l Legal Mat'ls at 566.

93. While the Court dealt with the question of the applicability of the Treaty mostly in relation to the problem of jurisdiction, it did not make its findings thereon in its jurisdiction only on a prima facie basis. Rather, the Court pronounced itself on the validity of the Treaty, after a careful scrutiny, in its judgment on the merits. Its holding is still more forceful because, as the Court explained, it might have grounded its decision on two other conventions which already furnished an indisputable basis of jurisdiction, without addressing the question of the validity of the Treaty. Id. at 26, 19 Int'l Legal Mat'ls at 565. Furthermore, th   ourt dismissed the suggestion that the Treaty was rendered inapplicable because of the counter measures the United States had taken against Iran. Id. at 27-28, 19 Int'l Legal Mat'ls at 565-66. Finally, the Court emphasized, in this context, that "mutual undertakings [of the Parties] to ensure the protection and security of their nationals in each other's territory" are specially related to the "very purpose of amity and, indeed, of a treaty of establishment" like the Treaty. Id. at 28, 19 Int'l Legal Mat'ls at 566.

94. In addition to the Judgment of the International Court of Justice, three previous Awards of this Tribunal have concluded that the Treaty is applicable to the relations between the two nations at the time the relevant claims arose. INA Corporation and Islamic Republic of Iran, Award No. 184-161-1 (13 August 1985); Phelps Dodge Corp. and Islamic Republic of Iran, Award No. 217-99-2 (19 March 1986); Sedco Inc. and National Iranian Oil Company, Award No. ITL 59-129-3 (27 March 1986), reprinted in 25 Int'l Legal Mat'ls 629. The Tribunal sees no reason to depart from these precedents.

95. To some extent, the judgment of the International Court of Justice gives an anticipatory answer to the Respondents' argument that changed circumstances and violations of the Treaty brought about its termination. The most dramatic events invoked in support of this argument -- the Islamic Revolution, the attack on the United States Embassy in Tehran and taking of embassy personnel as hostages, and the subsequent presidential freeze orders and rescue attempt -- took place before the Court's finding that the Treaty was still in force. In any event, the Tribunal need not determine whether these events constituted changes of such a nature and magnitude as to justify the termination of the Treaty in conformity with customary rules of international law as declared in Article 62 of the V    1a Convention. As Article 62 clarifies, change of circumstances never automatically terminates a treaty. It is always up to the parties to evaluate the consequences of the change and, if one or both of them arrive at the conclusion that these consequences legally justify termination of a treaty, to take the necessary steps to this effect. The same is true in case of violation of a treaty by a party.

96. On the other hand, the events which took place in 1978, 1979 and 1980 and caused the revolutionary change of government in Iran, the overrun of the United States Embassy in Tehran and the prolonged detention of its nationals as hostages, could not be without consequences upon the implementation of the Treaty. It is clear that the part of the Treaty which relates to consular relations was suspended with the closure of the consulates of both nations and the rupture of diplomatic relations. The implementation of the articles relating to the treatment of nationals of the other country was greatly disturbed by the civil unrest and disorders which preceded and accompanied the revolution in Iran and continued for some time after the establishment of a new government, as well as by the counter measures taken by the President of the United States in connection with the crisis. These events brought about a virtually complete interruption of communications between the two countries until after the execution of the Algiers Accords. Obviously, such a legal and factual context has to be kept in mind in considering the application of the Treaty to specific facts during this period, but it does not necessarily lead to the conclusion that the Treaty was no longer applicable, since, in the words of the International Court, "[i]t is precisely when difficulties arise that the [T]reaty assumes its greatest importance." See Case Concerning United States Diplomatic and Consular Staff in Tehran, supra, at 28, 19 Int'l Legal Mat'ls at 566. Thus there was no termination by changed

Case 3:08-cv-80024-JSW Document 19 Filed 03/13/2009

circumstances or alleged violations of the Treaty.

97. Formal notification of treaty termination is not necessary in every case. The intent of a party to terminate a treaty can be implied from its conduct. Yet such conduct may be construed as an implicit denunciation only if it clearly demonstrates the intent of the party concerned to terminate the treaty. In the present case, the Tribunal finds that, at all relevant times, the conduct of the parties was not such as to warrant such a conclusion.

98. Similarly the Tribunal does not agree that the negotiation of the Algiers Accords in January 1981 constitutes a termination of the Treaty. The severe crisis which plagued relations between the two parties in 1979-1980 found its epilogue in the Algiers Accords. In the words of the Declaration of the Government of the Democratic and Popular Republic of Algeria ("General Declaration"), the Accords were the result of negotiation on "the commitments which each [of the Parties] is willing to make in order to resolve the crisis within the framework of the four points stated in the Resolution of November 2, 1980, of the Islamic Consultative Assembly of Iran." The Accords, which provided for the release of the 52 United States nationals and the lifting of the freeze of the Iranian assets, do not mention the Treaty. The general reference to "changed circumstances" in Article V of the CSD, which deals with the law to be applied by the Tribunal, cannot be construed as a notice of intention to terminate the Treaty, or as constituting a finding that the Treaty was terminated on such a basis.

99. Before the Algiers Accords, Iran could easily have denounced the Treaty if it thought it proper to do so. Such a decision could be notified at any time, pursuant to the procedure described in Article XXIII, paragraph 3 of the Treaty, or made known by any other means of publicity. If Iran considered the judgement of the International Court of Justice to be in error in finding that the Treaty remained applicable, it could certainly have remedied the error by an express notice of termination to remove all doubt. Such a course of conduct was adopted by the French Government after the International Court of Justice held that France's status as a party to the General Act of Arbitration, which France had considered to have lost its effectiveness and fallen into desuetude, provided a basis for jurisdiction over it. See The Nuclear Tests Case (Australia v. France), 1973 I.C.J. 99 (interim protection order of 22 June 1973). While France reiterated its position, it formally denounced the Act. Following the judgement of the International Court of Justice concerning the Treaty, however, Iran took no such action.

100. For the foregoing reasons the Tribunal does not find evidence that the parties considered the provisions of the Treaty relating to the treatment of nationals to be terminated or suspended at the time of the occurrence of the facts to which the claim relates.

1. The Respondents submit a second line of arguments to the effect that even if the Treaty is deemed to be in force, it is not applicable to the expropriation of Amoco's interest in Khemco for four reasons: (1) Amoco's interest in Khemco is not "property" in the meaning of Article IV, paragraph 2 of the Treaty; (2) the Treaty clearly recognizes Iran's right to nationalize; (3) the Treaty creates rights and duties only between Iran and the United States, not for private entities; and (4) the United States and its nationals cannot take advantage of the Treaty's special standard of compensation, since the Treaty originated from the unlawful conduct of the United States. The Tribunal will discuss these arguments in reverse order.

102. The last objection is disposed of by the Tribunal's finding that the Treaty was valid and in force at the time of the expropriation. Since the Treaty was in force, the rights and obligations it established were valid and enforceable according to its terms.

103. The question raised by the third objection, whether the Treaty did or did not create rights or duties for private persons, cannot be answered in the abstract, but can be decided only by reference to the terms of the Treaty and the procedures available for its implementation. It is indisputable, however, that certain provisions of the Treaty, including Article IV, set standards of treatment that each party must accord to the nationals and companies of the other party. The nationals and companies concerned, therefore, are entitled to receive such treatment. In an adjudication before an international tribunal such as this, which is expressly authorized by Article V of the CSD to apply the rules and principles of international law, it is immaterial whether or not the enforcement of such

Case 3:08-mc-80024-JSW Document 10 Filed 03/13/2008 Page

treaty rights and law by domestic courts would be dependent on the enactment of legislation introducing the provisions of the treaty into the law of the State.

104. As discussed further below, the Treaty recognizes the right of each party to nationalize the assets of the nationals and companies of the other party, under stated conditions. This recognition does not mean that any nationalization automatically is lawful, since this will be the case only if the conditions listed in Article IV are actually met. The Tribunal will consider at a later stage in this Award whether or not the expropriation here at issue was made in conformity with the requisites of the Treaty.

105. The first of the Respondents' objections to the applicability of the Treaty to the expropriation here at issue is by far the most elaborated one. The Respondents contend that (1) the Claimant's ownership interest in Khemco cannot be regarded as "property" within the meaning of Article IV, paragraph 2 of the Treaty, and (2) that Amoco, the party to the Khemco Agreement and the owner of 50% of the capital stock of Khemco, is a Swiss company whose property rights are not protected by the Treaty.

106. The first portion of the Respondents' argument, i.e., that the Claimant's rights under the Khemco Agreement do not fall within the scope of the Treaty provisions relating to expropriation, is inconsistent with their concession that Iran's nullification of the Khemco Agreement pursuant to the Single Article Act can be construed as a nationalization. Furthermore, the Respondents expressly note that in matters of nationalization "[t]here is . . . no basis for any distinction between real property and contract rights; both are subject to the State's right of eminent domain."

107. While that concession alone would suffice to condemn the Respondents' argument, the Tribunal notes that nothing in Article IV, paragraph 2 suggests that the word "property," as used in that paragraph, should be construed as applying only to rights in tangible assets. No convincing explanation has been adduced to justify such a narrow interpretation, which is not in line with the common usage of the word, nor with the express terms of the Treaty protecting not only "property" but also "interests in property."

108. Clearly the purpose of the second sentence of Article IV, paragraph 2 is to protect the property of the nationals of one party against expropriation by the other party. Expropriation, which can be defined as a compulsory transfer of property rights, may extend to any right which can be the object of a commercial transaction, i.e., freely sold and bought, and thus has a monetary value. The rights created by the Khemco Agreement had such a monetary value as was expressly recognized in the Khemco Agreement itself. Article 20 provides that the shares of either party could be transferred under certain conditions to any or company or companies and Article 24 granted NPC the right to purchase the shares of Amoco upon the termination of the Khemco Agreement. It is because Amoco's interests under the Khemco Agreement have such an economic value that the nullification of those interests by the Single Article Act can be considered as a nationalization.

109. More generally, it would be incongruous if Article IV, paragraph 2 could be construed as granting protection only against certain acts of expropriation, and not against others, according to the nature of the rights expropriated. Any interpretation of the term "property" to this effect would lead to "a manifestly absurd or unreasonable" result within the meaning of Article 32, paragraph b of the Vienna Convention. It therefore cannot be admitted.

110. As to the Respondents' objection that Amoco, as a Swiss corporation, is outside the protection of the Treaty, the Tribunal agrees that the legal protection afforded by the Treaty applies only to nationals of the parties to it. As a Swiss corporation, Amoco could not invoke such protection, just as it is not allowed to bring a claim before this Tribunal, which under the CSD has jurisdiction only over claims submitted by nationals of Iran or of the United States. In the present Case, however, the Claimant is not Amoco, but AIFC, the United States corporation which wholly owns and controls Amoco. AIFC relies on the terms of Article VII, paragraph 2 of the CSD, which defines "claims of nationals" as including

http://www.iusct.com/Documents/En/1750.com

Case 3:09-cv-00024-JSW Document 3:08 Filed 03/13/20... Page 2 of 9

claims that are owned indirectly by such nationals through ownership of capital stock or other proprietary interests in judicial persons, provided that the ownership interests of such nationals, collectively, were sufficient at the time the claim arose to control the corporation or other entity, and provided, further, that the corporation or other entity is not itself entitled to bring a claim under the terms of this agreement.

17. This phraseology is more elaborate than the simple phrase "interests in property" used in Article IV, paragraph 2 of the Treaty, and it contains specifications which substantially narrow its ambit. But, apart from this, the meaning is not very dissimilar. The property interests assertedly protected by the Treaty are not those of Amoco, but of AIFC. The term "interests in property" in ordinary usage, refers to the interests that one entity can own in the property of another entity. If such interests are owned by a national of one party to the Treaty, they are protected by the Treaty. See Sedco, Inc. and National Iranian Oil Company, Award No. 309-129-3, pp. 22-23 n. 9 (7 July 1987). The Tribunal concludes, accordingly, that the rights invoked by the Claimant fall within the scope of Article IV, paragraph 2 of the Treaty, which therefore is applicable.

(ii) Customary International Law

18. As a lex specialis in the relations between the two countries, the Treaty supersedes the lex generalis, namely customary international law. This does not mean, however, that the latter is irrelevant in the instant Case. On the contrary, the rules of customary law may be useful in order to fill in possible lacunae of the Treaty, to ascertain the meaning of undefined terms in its text or, more generally, to aid interpretation and implementation of its provisions.

19. It is worthwhile, in this context, to compare the provisions of Article IV, paragraph 2 of the Treaty with the customary rules of international law in the field of expropriation. A leading expression of these rules is the judgment of the Permanent Court of International Justice in the Case Concerning Certain German Interests in Polish Upper Silesia (Germany v. Poland), 1926 P.C.I.J., Ser. A, No. 7, (Judgment of 25 May 1926). As reflected in this case, the principles of international law generally accepted some sixty years ago in regard to the treatment of foreigners recognized very few exceptions to the principle of respect for vested rights. The Court listed among such exceptions only "expropriation for reasons of public utility, judicial liquidation and similar measures." Id. at 22. A very important evolution in the law has taken place since then, with the progressive recognition of the right of States to nationalize foreign property for a public purpose. This right is today unanimously accepted, even by States which reject the principle of permanent sovereignty over natural resources, considered by a majority of States as the legal foundation of such a right.

20. The importance of this evolution derives from the fact that nationalization is generally defined as the transfer of an economic activity from private ownership to the public sector. It is realized through expropriation of the assets of an enterprise or of its capital stock, with a view to maintaining such enterprise as a going concern under State control. Modern nationalization often brings into State ownership a number of enterprises of the same kind and may even be applied to all enterprises in a particular industry. It may result, therefore, in a taking of private property of much greater magnitude than the traditional expropriation for reasons of public utility, and is also of a very different nature, since it is always linked to determined political choices. For these reasons, and because it applies to going concerns, taken as such, modern nationalization raises specific legal problems, notably in relation to the issue of compensation.

21. The provisions of Article IV, paragraph 2 of the Treaty must be read against this background, since the negotiation of the Treaty must be presumed to have taken place in this legal context. Although the provisions are phrased in a negative form and emphasize the principle of the respect due to foreign property, they nevertheless amount to a clear recognition of the right to nationalize. In stating that "[s]uch a property shall not be taken except for a public purpose," the Treaty implies that an expropriation which is justified by a public purpose may be lawful, which is precisely the rule of customary international law.

116. The other condition to a lawful expropriation provided for in the same paragraph is "the prompt payment of just compensation," an obligation which is also accepted as a general rule of customary international law as well. While a few recent resolutions of international bodies or conferences, including the General Assembly of the United Nations, have cast doubts on the existence of an international rule to this effect (see especially the Charter of the Economic Rights and Duties of States, G.A. Res. 3281 (XXIX) (12 December 1974)), other less controversial resolutions, such as G.A. Res. 1803 (XVII) (14 December 1962) on the Permanent Sovereignty over Natural Resources, confirm the existence of the rule. Furthermore, the rule is generally recognized and applied by international tribunals and reflected in the practice of States, notably in numerous conventions relating to the treatment of foreign property or to the settlement of disputes arising from nationalizations. A number of such awards and conventions were referred to by both Parties in their pleadings. The Treaty on this point is just another example of such a practice.

b) The Application of the Law to the Facts of the Instant Case

117. The rules of customary international law relating to the determination of the nature and amount of the compensation to be paid, as well as of the conditions of its payment, are less well settled. They were, and still are, the object of heated controversies, the outcome of which is rather confused. Terms such as "prompt, adequate and effective," "full," "just," "adequate," "adequate in taking account of all pertinent circumstances," "equitable," and so on, are currently used in order to qualify the compensation due, and are construed with broadly divergent meanings. The parties to the Treaty agreed on a common position on this problem by the choice of the term "just compensation" and by listing, in the last sentence of Article IV, paragraph 2, what should be included under this term. The wording of the sentence, however, does not solve the problem of the method to be used in order to determine the value of the property or interest in property which was expropriated.

(i)  e Alleged Violation of Iranian Law

118. According to the Claimant, the expropriation of its rights in the Khemco Agreement was a violation of the 1965 Act Concerning Development of Petrochemicals Industries, which was in force at this time and which provided for the enforcement of such an agreement, once entered into and approved by the government and the competent parliamentary committees. The Claimant alleges furthermore that no statute or decree authorized the expropriation, which is therefore devoid of any legal basis. The Claimant denies that the Single Article Act and the decision of the Special Commission furnish such basis for several reasons. First, the Single Article Act and decision came much too late, since, according to the Claimant, the expropriation was complete by 1 August 1999, more than five months before the adoption of the Single Article Act. Second, the Single Article Act did not authorize or ratify takings of property; its only purpose was to authorize the Special Commission to declare contracts "null and void." Third, the Special Commission's decision was itself unlawful because it lacked fair procedure and any legal basis for its declaration. Finally, this decision did not purport to effect a nationalization, but merely repudiated ("nullified") the Khemco Agreement.

119. The Claimant lists five arguments in support of its contention that the expropriation was unlawful: (1) the expropriation was "supported by no shadow of legal authority or regularity under Iranian law;" (2) no compensation was paid and no offer of compensation was made prior to the taking; (3) the expropriation was discriminatory; (4) the expropriation violated the Khemco Agreement, including its stabilization clauses; and (5) the decision to expropriate was not prompted by a public purpose but by the motive to avoid contractual obligations and to stop paying a share of profits. All these arguments are rejected by the Respondents. The Tribunal will consider them seriatim below.

120. Conformity with domestic law is not usually cited as a condition for an internationally lawful nationalization, and the Treaty specifies no such condition. It is therefore doubtful whether it is one of the requisites of international law. The case law on this point is not very helpful. Violation of domestic law, when

invoked, is most often analyzed as evidence of the lack of fulfillment of one of the conditions imposed by international law, such as the existence of a public purpose, as in the Amco Asia case referred to by the Claimant, Amco Asia Corporation and Republic of Indonesia, 24 Int'l Legal Mat'ls 1022, 1030-31, paragraph 190 (1985), or of the payment of compensation.

121. In any event, a judgment on the compatibility of the expropriation with Iranian law requires a determination of the divergent views of Parties of the facts constituting the nationalization. It is now necessary to scrutinize these facts more closely.

122. As noted above, the Claimant alleges that NPC and NIOC "moved to exclude [Amoco] from its rightful role in the management of Khemco, in violation of the Khemco Agreement" approximately in April 1979, when the chairman of the board of NPC "declared publicly that Iran sought to purchase all foreign interest in its petrochemical industry" and "specially identified Amoco International's interests in Khemco as one investment that Iran sought to purchase." The Claimant identifies the following events and decisions as having effectuated the taking by 1 August 1979:

In  ay 1979 the chairman of the board of NPC advised Amoco that the expatriate United States citizens employed by Khemco who had been forced to leave Iran for reasons of personal safety in December 1978 would not be permitted to return to Iran;

By letter dated 27 June 1979, the same chairman informed Khemco that from then on the sale of products of NPC "complexes," including Khemco, would be managed by NPC. This policy was explicitly rejected at Khemco's board of directors meeting on 7 July;

On 11 July 1979, NPC and NIOC decided nevertheless that all sales of liquids produced by Khemco would be handled by NIOC and all sales of sulfur produced by Khemco handled by NPC, the proceeds of all sales would be deposited in an account of NPC and all Khemco expenses borne by NPC;

By letter dated 17 July 1979 NPC directed Khemco's managing director to implement the decisions just described;

By letter dated 18 July 1979, Khemco's managing director agreed to put into effect those directives;

The dividend declared at a 7 July 1979 meeting of Khemco's shareholders was never paid to Amoco and Amoco has not, since 1978, received any of the loans and dividends to which it was entitled under the Khemco Agreement.

123. According to the Claimant, the "cumulative effect" of those actions "was totally to deprive Amoco International of its rights under the Khemco Agreement and interest in Khemco by August 1, 1979" so that Amoco's "rights thereunder, including its ownership interests in Khemco, had been expropriated." Subsequent events "confirmed" the repudiation of the Khemco Agreement and the expropriation, notably a declaration by the Acting Foreign Minister of Iran, on 15 November 1979, "that all American assets in Iran had been nationalized," and a telex dated 24 December 1980 from Iran's Minister of Petroleum, which advised Amoco that the Khemco Agreement had been declared "null and void" by the Special Commission established pursuant to the Single Article Act.

124. It appears from this recital that the Claimant does not rely on any single act of nationalization, but considers that the expropriation of Amoco's contractual rights and interests in property was the result of a series of decisions of NIOC and NPC from May to July 1979, none of which can be singled out as an act of expropriation. In other words, the expropriation was the result of a process, which extended over several months, rather than of a discrete legal decision. The date of 1 August 1979, identified by the Claimant as the date of expropriation, does not correspond to a specific action or event, but was chosen for reasons of convenience as the first day of the first month following the time at which the deprivation of its rights, according to the Claimant, was complete.

Case 1:08-mc-00124-JSW Document 3-10 Filed 03/13/2008 Page ... of ...

125. The Tribunal agrees that the expropriation which took place in this Case was the outcome of a lengthy process, but it finds that the precise character of this process was, at the beginning and for a rather long period of time, ambiguous. The starting point of this process, according to the Claimant, is a declaration by the managing director of NPC that Iran sought to purchase all foreign interests in its petrochemical industry. The documents produced by the Claimant evidence that this intention of purchasing Amoco's interests in Khemco was announced at an early stage to Amoco and that both parties agreed to start negotiations to this end. Express reference to these negotiations is made in the minutes of the meeting of 11 July 1979, at which it was decided that the sale of Khemco products would be handled by NIOC and NPC. In a telex dated 6 August 1979, that is, after the date on which the Claimant believes the expropriation to be complete, Amoco expressly mentions the discussions pending between the parties on the purchase of Amoco's interests in Khemco and invokes them in support of its protest against the measures taken for the marketing of Khemco products, which, Amoco said, "amounts to nationalization."

126. In view of these facts, the Tribunal finds it difficult to accept the theory that an expropriation had taken place on 1 August 1979. It is well established that at its time, and already from April 1979 onwards at least, Iran had decided to acquire Amoco's share in the capital stock of Khemco. It seems equally clear that Amoco arrived at the conclusion that, in the circumstances then prevailing in the country, it had no future in the petrochemical industry in Iran. Both parties were substantially in agreement in agreement to terminate the participation of Amoco in Khemco. The way contemplated by the parties at the time, in order to arrive at such a result, was a purchase of Amoco's rights by NIOC, but according to their declarations before the Tribunal, serious differences concerning the price to be paid necessitated negotiations in order to try to solve this problem.

127. It was apparent that the negotiations to be conducted would be difficult and lengthy, but the final transfer of Amoco's rights could not be doubted by either party. Pending their outcome, NIOC and NPC decided to take a certain number of decisions relating to the management of Khemco. These decisions were the result of the situation then existing in Iran in the first months following the revolutionary change of government. They were rejected by Amoco's board of directors, but implemented by Khemco's managing director, in spite of Amoco's protest. The evidence that the decision of Amoco's board of directors was ignored on this matter does not affect the fact that at this time the Respondents were contemplating a purchase of Amoco's rights at a price to be agreed upon, rather than an expropriation.

128. The Tribunal is not aware of the way in which the purported negotiations were pursued during the following months or even whether such negotiations actually took place. The Claimant contends that, after the measures taken in the matter of marketing, it could no longer pursue negotiations. The events of November 1979, in any case, dramatically changed the whole situation and made it impossible for both parties to conduct any discussions. Eventually a new step, decisive was taken by the Iranian authorities, which decided to include the Khemco Agreement on the list of contracts nullified pursuant to the Single Article Act. The decision by the Special Commission, notified on 24 December 1980, declaring the Khemco Agreement "null and void," was the final act of the process started in April 1979. It was also the first decision taken directly by a governmental authority.

129. The Claimant contends that "the Act did not nationalize Claimant's property or even purport to ratify the prior taking; it merely authorized the Special Commission to declare contracts 'null and void.'" It adds that the nullification was unlawful, since it "violated due process and because no adequate legal basis for declaration of nullity was offered or could be offered." This last objection cannot be sustained since the decision of the Special Commission was taken pursuant to the Single Article Act, which is of a legislative nature. This fact suffices to give it a legal basis.

130. Formally, it is true that the Khemco Agreement was declared "null and void" by the Special Commission, pursuant to the terms of the Single Article Act. The real issue, however, is to determine how such a decision must be characterized in international law, which is the applicable law. In view of the tremendous political importance of the Single Article Act in the attainment of the objectives of the Islamic Revolution in Iran, the international legal meaning

of this Single Article Act can certainly not be ascertained without placing it in the context of the events which took place at this time in Iran, and without taking into account the political and legal position of the Islamic Government towards the previous regime.

129. The Single Article Act relates to the oil industry, which is not only Iran's major industry and source of revenue, but which has played a major role in the politics of Iran since the time of Mossadegh's national government. It is generally recognized that the strikes in the oil industry were decisive in the upheaval which led to the overthrow of the Shah and the establishment of a revolutionary government and that the exclusion of all foreign interests in the oil industry was one of the main objectives of the revolutionary movements. Since such interests were based on contracts executed after the Shah's return in 1953, numerous declarations tended to affirm that all such contracts were in violation of the 1951 Nationalization of the Iranian Oil Industry Act, and, therefore, null and void. The Single Article Act was framed in order to comply with this political, rather than legal, aim. It does not carry all the consequences of the theory of the nullity of the contracts, however, since it provides that compensation might be paid in case of nullification. As a matter of fact, its effect was a certain re-nationalization of the oil industry and, for all practical purposes, it amounted to a nationalization of the rights of the foreign parties to the nullified contracts. Such a construction of the Single Article Act as a measure of expropriation is, furthermore, expressly conceded by the Respondents. The Tribunal finds that it correctly defines the real meaning in international law of the Single Article Act and of the decision of the Special Commission.

130. The analysis of all the relevant facts known to the Tribunal thus reveals that the process which led to the expropriation of Amoco's rights and interests in Khemco was complete only on 24 December 1980, with the notification of the decision of the Special Commission. This process, which started more than twenty months before, was exceptionally lengthy, due to the extraordinary events which took place during this period. It also changed orientation over time, since, even if its original purpose was the transfer of Amoco's rights and duties to NPC, such a transfer was initially not contemplated to be accomplished by way of expropriation. Such a purpose was eventually realized by a decision taken under a procedure decided by a legislative act, the legality of which, under Iranian law, cannot be doubted by this Tribunal. The Claimant's argument that the expropriation was made in violation of Iranian law, therefore, is rejected.

**(ii) Lack of Compensation**

131. According to the Claimant, the "expropriation of Amoco International's rights, interests and property under the Khemco Agreement was wrongful because no compensation has been paid for this taking."

132. The Respondents reject this argument. They emphasize that the Single Article Act provided that compensation would be paid and that the Special Commission was empowered to determine its amount. They insist that Amoco never availed itself of the opportunity provided by the Single Article Act and never applied for compensation, while a number of settlement agreements were arrived at with other expropriated companies of various nationalities, including American companies, and the compensation payments were actually made. According to the Respondents, the Claimant cannot complain that there was no due process, since the expropriated companies were free to produce all documents they wanted in support of their demands and could be heard by the Commission. Neither, they assert, is it reasonable for the Claimant to contend that the compensation was not adequate, since neither the Claimant nor Amoco sought compensation and other companies considered the compensation offered to be adequate, and accepted it.

133. Article IV, paragraph 2 of the Treaty provides that the property of nationals and companies of either Party "shall not be taken . . . without the prompt payment of just compensation." The following sentence adds more precisely that

[S]uch compensation shall be in an effectively realizable form and shall represent the full equivalent of the property taken; and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.

136. The question of the standard of compensation, i.e., what is "the full equivalent," will be discussed in a later section of this Partial Award (see Section IV.C infra). For the present purposes, it suffices to note that the Treaty does not require that the amount of the compensation should be determined at or prior to the time of the taking. It only provides that "adequate provision shall have been made" in due time. The implementation of such a provision raises some problems in the case of an expropriation realized through a process which extended for more than twenty months, as in the present Case. However, the transfer of property formally took place upon the decision of the Special Commission, notified on 24 December 1980, and the provisions relating to the payment of compensation were included in the Single Article Act and hence made "at or prior to the time of the taking."

137. Another issue is to determine whether the provisions of the Single Article Act relating to compensation were "adequate," in the meaning of the Treaty. In so far as it does not apply to the compensation itself, but to the procedure for determining such compensation, this term is not very often used in practice and does not have a specific legal connotation. Taking into account the ordinary meaning of the term, the Tribunal considers that, to be "adequate," the provisions for ... e determination and payment of compensation must provide the owner of the expropriated assets sufficient guarantee that the compensation will be actually determined and paid in conformity with the requisites of international law, that is, in the present Case, that "just compensation" will be promptly paid. This does not necessarily imply that a judicial procedure should be set up to this effect. As a matter of fact, such a procedure is seldom provided for in the practice of States. More usually, compensation is decided by administrative authorities, very often without formal negotiation with the interested parties, but, in many cases, in implementation of principles defined by statute, or by constitutional law, with a possible recourse to ordinary judicial remedies.

138. The Single Article Act does not fix any standard for the compensation to be paid, but only empowers the Special Commission to determine such compensation. In practice, the Special Commission instituted negotiations with the companies party to the nullified contracts, in order to arrive at settlement agreements. Furthermore, in case of failure of the negotiations, the interested companies were entitled to have recourse to the procedures of settlement provided for in the contracts, usually by international arbitration. A number of settlement agreements were in fact executed and, in a few cases, arbitration procedures took place. In view of these facts, the Tribunal deems that the provisions of the Single Article Act for compensation were neither in violation of the Treaty nor, indeed, in violation of rules of customary international law.

(iii) Discrimination

139. In support of its contention that the expropriation was discriminatory, the Claimant relies on the fact that, in another of NPC's joint ventures, the Japanese share of a consortium, the Iran-Japan Petrochemical Company ("IJPC"), was not expropriated. In contrast, all American interests in petrochemical joint ventures with NPC were expropriated. The Claimant thus argues that the expropriation of Amoco's interest in Khemco was based on discrimination against American interests and was unlawful for this reason.

140. Discrimination is widely held as prohibited by customary international law in the field of expropriation. Although Article IV, paragraph 2 does not expressly prohibit a discriminatory expropriation, paragraph 1 of the same article obliges each party to "refrain from applying unreasonable or discriminatory measures that would impair [the] legally acquired rights and interests" of the nationals and companies of the other party. This wording is so broad that it certainly applies to expropriations. In any event, the Respondents recognize that a discriminatory expropriation is wrongful, but deny that the expropriation was discriminatory in the instant Case.

141. The Respondents assert that the Single Article Act applied to the entire oil industry, irrespective of the nationality of the foreign companies involved in this industry. In the event, it was applied to non-United States corporations as well as United States corporations. Therefore, it can not be held to be

discriminatory. That the Special Commission did not include the contract with IJPC among those which were nullified, the Respondents submit, was an exception due to specific circumstances. They mention specifically the fact that the operation of the IJPC joint venture was not closely linked with other contracts relating to the exploitation of oil fields, whereas the operation of the Khemco plant was linked to the supply of gas from the oil fields operated jointly by Amoco and NIOC pursuant to the JSA. Furthermore, the Respondents emphasize that IJPC was not yet an operational concern at the relevant time, a point that was confirmed by the Claimant.

143. The Tribunal finds it difficult, in the absence of any other evidence, to draw the conclusion that the expropriation of a concern was discriminatory only from the fact that another concern in the same economic branch was not expropriated. Reasons specific to the non-expropriated enterprise, or to the expropriated one, or to both, may justify such a difference of treatment. Furthermore, as observed by the arbitral tribunal in Kuwait and American Independent Oil Company (AMINOIL). (Reuter, Sultan & Fitzmaurice arbs, Award of 24 March 1982), reprinted in 21 Int'l Legal Mat's 976, 1019, a coherent policy of nationalization can reasonably be operated gradually in successive stages. In the present Case, the peculiarities discussed by the Parties can explain why IJPC was not treated in the same manner as Khemco. The Tribunal declines to find that Khemco's expropriation was discriminatory.

(iii) Breach of Contract

144. The Claimant's contention that the expropriation was unlawful under international law because it violated the Khemco Agreement intermingles with its alternative theory that the Respondents are liable for breach of contract. In order to avoid repetition, the Tribunal will deal with this objection in the Section devoted to the discussion of this second theory.

(iv) Lack of Public Purpose

144. When referring to the reasons why the Japanese interests in IJPC were not expropriated, the Claimant's counsel suggested, during the Hearing, that "a principal motive and perhaps the principal motive" for the expropriation of Khemco was simply to free NPC from the obligations created by the Khemco Agreement and, particularly, from the obligation to share the profits of the venture. The Claimant asserted that such a motive certainly is not legitimate. Counsel added that "only the ventures where all the money had been put up were expropriated, not the others." This last remark, indeed, suggests a differentiation for financial reasons rather than a discrimination on the basis of nationality.

145. A precise definition of the "public purpose" for which an expropriation may be lawfully decided has neither been agreed upon in international law nor even suggested. It is clear that, as a result of the modern acceptance of the right to nationalize, this term is broadly interpreted, and that States, in practice, are granted extensive discretion. An expropriation, the only purpose of which would have been to avoid contractual obligations of the State or of an entity controlled by it, could not, nevertheless, be considered as lawful under international law. See AMINOIL, supra, para. 109, 21 Int'l Legal Mat's at 1025. Such an expropriation, indeed, would be contrary to the principle of good faith and to accept it as lawful would run counter to the well-settled rule that a State has no right to commit itself by contract to foreign corporations. Id, para. 90, 21 Int'l Legal Mat's at 1021-22. It is also generally accepted that a State has no right to appropriate a foreign concern only for financial purposes. It must, however, be observed that, in recent practice and mostly in the oil industry, States have adopted expressly, in a certain number of cases, that they were nationalizing foreign properties primarily in order to obtain a greater share, or even the totality, of the revenues drawn from the exploitation of a national natural resource, which, according to them, should accrue to the development of the country. Such a purpose has not generally been denounced as unlawful and illegitimate.

146. The Tribunal need not determine the delicate legal issues raised in the preceding paragraph. It cannot be doubted that the Single Article Act was adopted for a clear public purpose, namely to complete the nationalization of the oil industry in Iran initiated by the 1951 Nationalization of the Iranian Oil Industry

Case 3:88-cv-80024-SJW   Document 33   Filed 03/13/2008   Page 15 of 19

Act, with a view to implementing one of the main economic and political objectives of the new Islamic Government. The decision of the Special Commission relative to Khemco was taken in apparent conformity with the Single Article Act. Even if financial considerations were considered in the adoption of such a decision -- which would have been only natural, but which has not been evidenced -- this fact would not be sufficient, in the opinion of the Tribunal, to prove that this decision was not taken for a public purpose.

145. In conclusion the Tribunal finds that the Claimant's arguments so far considered do not sustain the contention that the expropriation of Khemco was unlawful. The Tribunal has yet to consider the allegation that the Respondents breached the Khemco Agreement. This question and its possible consequences on the lawfulness of the expropriation will be discussed in the following section.

5. Breach or Repudiation of Contract

a) the Issue

146. The Claimant's alternative theory that the Respondents are responsible for breach and repudiation of the Khemco Agreement is based on the same facts that were invoked as evidence of expropriation. According to the Claimant, Amoco was wrongfully deprived of its lawfully acquired rights under the Agreement by NPC, NIOC, Iran and Khemco. Amoco was excluded from the management of Khemco allegedly contrary to Articles 4 and 5 of the Khemco Agreement and excluded from its rights to use Khemco's net cash flow on an interest free loan basis and from its rights to dividends allegedly contrary to Article 22 of the Khemco Agreement. All that occurred before the end of July 1979. The deprivation of Amoco's management rights was confirmed on 13 December 1979 when the Amoco-nominated managing director was not permitted by NPC to assume his office. The Claimant also alleges a breach of what it calls the "stabilization clauses" of the Khemco Agreement.

147. The Claimant contends that this claim arises under international law. The Claimant maintains that the Khemco Agreement "belongs to a special category of international contracts referred to as development agreements." For the Claimant, such contracts "by their nature require that they be insulated from the disruptive effects of changing municipal law" and therefore "the law from which they derive their binding force (loi d'enracinement) is international law." In support of this assertion, the Claimant relies on Article 30, paragraph 1 of the Khemco Agreement, which, according to the Claimant, provides that the terms of the Khemco Agreement must first govern the interpretation and implementation of the Khemco Agreement and that the laws of Iran apply only "subject thereto." Furthermore, in case of inconsistency between the terms of the Khemco Agreement and the laws of Iran, the former must prevail. "Consequently this Tribunal should enforce the contract according to the plain meaning of its terms and should not apply Iranian Law except insofar as it is consistent with the terms of the contract and furthers the intentions of the parties as manifested in the contract."

148. The practical consequences of this analysis, according to the Claimant, are that the Khemco Agreement would not only be governed by the principle of good faith mentioned in Article 21 of the Khemco Agreement, but also by the rule pacta sunt servanda. Therefore any breach of the Khemco Agreement would also be a breach of international law, for which the State is internationally responsible.

150. The Respondents completely reject this analysis. According to them, "the power of the State in the exercise of eminent domain to annul contracts, is generally recognized in municipal legal systems and, a fortiori, cannot be questioned in international law." This right is not precluded by the terms of the Khemco Agreement. Furthermore, the fact that Iran was not a party to the Khemco Agreement and thus was not bound by its terms, excludes the possibility of a breach of contract by Iran.

152. As to the remaining Respondents, the Respondents consider, on the basis of Article 30 of the Khemco Agreement, that Iranian law governs the Khemco

Case 3:08-mc-80024-JSW   Document 3-3   Filed 03/13/2008   Page 10 of

Agreement and must be applied by the Tribunal. They assert that under Iranian law the Agreement was frustrated by force majeure. They contend further that the concept of "changed circumstances" incorporated in Article V of the CSD must also be applied to the interpretation and implementation of the Khemco Agreement and they assert their conclusion that the Khemco Agreement was terminated by frustration. Since the Khemco Agreement allegedly was terminated before any breach took place, the Respondents deny that there can be any breach of contract.

154. The Tribunal will address the Claimant's allegation of contract breach after a discussion of a preliminary question which has a direct bearing on the solution to this issue, namely the question of the law applicable to the contract.

b) The Law of the Contract

153. The choice of the parties relating to the law of the Khemco Agreement appears in Article 30, headed "Applicable Laws," which reads as follows:

1. This Agreement shall be construed and interpreted in accordance with the plain meaning of its terms, but subject thereto, shall be governed and construed in accordance with the laws of Iran.

2. The provisions of any current laws and regulations which may be wholly or partly inconsistent with the provisions of this Agreement shall, to the extent of such inconsistency, be of no effect in respect of the provisions of this Agreement.

156. Construed according to the ordinary meaning of the terms, Article 30, paragraph 1 provides that an interpretation of the Khemco Agreement must be based first on the terms thereof. This is, of course, the normal way of interpreting a contract. If problems arise which cannot be solved in this way, the interpreter will have to look at the laws of Iran, which is also the usual way of applying the law of the contract in practice. On the basis of this reading, the Tribunal cannot accept that Iranian law plays only a subordinate role, as contended by the Claimant. Nor is the Tribunal convinced that the Khemco Agreement should be characterized as an agreement governed, by nature, by international law. Such a construction is manifestly contrary to the plain meaning of the terms of Article 30, paragraph 1. It is clear that the parties chose Iranian law as the law of the contract and no reason appears for reading the provisions otherwise.

155. In the present context the issue of the applicable law is quite different from the question of the law applicable to expropriation. It relates to the problem known in conflicts of laws, or private international law, as "the law of the contract," namely the law governing the validity, interpretation and implementation of the Khemco Agreement. Although such a distinction is rather simple, the discussion of the two issues by the Parties was not always pursued without some confusion.

155. Paragraph 2 of Article 30 does not change this conclusion; it only qualifies it. The purpose of this paragraph was not to submit the Khemco Agreement to any other than Iranian law, but only to solve any question which may arise in case of inconsistency between the "current laws and regulations" of Iran and the terms of the Khemco Agreement itself. In such a case the terms of the Khemco Agreement would nevertheless be considered as valid and binding on the parties. Thus, the contractual regime established by the Khemco Agreement may constitute an exception to the legal regime otherwise existing in Iran.

158. The Khemco Agreement was thus of a specific nature, since its provisions could be contrary to Iranian law without losing their binding force on the parties. In fact, a series of clauses of the Khemco Agreement determine how a number of public laws of Iran would apply to the parties in the implementation of the Khemco Agreement (see, inter alia, Articles 9, 10, 14, 15, 16, 17 and 18). For this reason, the provisions of Article 2 required NPC to submit the Khemco Agreement for approval and ratification by the High Council for Petroleum Industries, NIOC, the Council of Ministers and the Joint Economic and

Financial Committees of the Majlis.

159. Nothing in Article 30, paragraph 2 or Article 2 militates against the choice of Iranian law as the law of the contract made in Article 30, paragraph 1. Article 2 only provides for the approval by the competent Iranian authorities necessary to authorize those articles of the Khemco Agreement which establish a special regime within the framework of Iranian law. Article 30, paragraph 2, clearly intended that articles which are not inconsistent with Iranian law, as it existed at the time of execution of the Khemco Agreement, are subject to it as provided in Article 30, paragraph 1.

160. The law of the contract applies only to the interpretation and implementation of the Khemco Agreement (and possibly to its validity) as between the parties. Therefore, while it certainly applies to NPC and Amoco, as well as to Khemco, it does not apply to NIOC, which was not a party to the Khemco Agreement. The issue then arises as to whether the law of the contract applies to the other Respondent, namely Iran.

161. It cannot easily be found that Iran became a party to the Khemco Agreement through approval and ratification thereof pursuant to Article 2. The Preamble clearly identifies the parties between which the Khemco Agreement is concluded as NPC and Amoco, and makes reference, several times, to them as "both parties." While NPC is controlled by Iran and was established pursuant to a State law, it has a legal personality distinct from that of the State and NPC contracted only for itself.

162. It can be admitted that, in certain circumstances, the separate personality of an entity fully controlled by a State can be discarded and the State considered as bound by the terms of a contract entered into by such an entity. See K.-H. Bockstiegel, Arbitration and State Enterprises 34-48 (1984); K.-H. Bockstiegel, "The Legal Rules Applicable in International Commercial Arbitration Involving States or State-Controlled Enterprises," in International Chamber of Commerce, 60 Years On -- A Look at the Future 117, 130-46 (1984). Such a conclusion, however, can legitimately be drawn only if this entity acted as an instrument of the State. The Tribunal is not satisfied that such was the case in the present instance. It is true that the development of petrochemical industries was considered by the Iranian Government as an important goal of the development policy of the country, and was promoted by the enactment in 1965 of an Act authorizing NPC to enter into joint ventures with foreign companies to this effect, and providing for tax exemptions and other privileges beneficial to such joint ventures. Such legislation, however, clearly shows that the State had no intention itself to engage in such industrial and commercial endeavors and left NPC to take the financial and commercial risks associated with them. In approving and ratifying the Khemco Agreement, the Iranian authorities only acted pursuant to Article 1 of the Act concerning Development of Petrochemical Industries of 15 July 1965 ("the Act of 15 July 1965"), in order to permit Khemco to enjoy the statutory exceptions and privileges defined by Article 3 thereof. This approval and ratification were the conditions of application of the Act of 15 July 1965 to the Khemco Agreement but, for the reasons just set forth, cannot be considered binding Iran as a party to the Khemco Agreement.

163. The obligations of the government described in Article 2, paragraph 2 of the Khemco Agreement are based on Iranian law (and not international law), irrespective of the law governing the Khemco Agreement as between the parties. This is made clear in Article 1 of the Act of 15 July 1965, which does not require that agreements establishing joint ventures in implementation of that act be governed by Iranian law. These obligations, under the Act of 15 July 1965, as well as under the Law Concerning the Attraction and Protection of Foreign Investment in Iran of 28 November 1955, are referred to in Article 2, paragraph 2 and may be amended in the future, as expressly provided in the same Article. Such an amendment would not be forbidden by Article 30, paragraph 2, which is fully consistent with Article 2.

164. The conclusion to be drawn from the preceding analysis is that the obligations embodied in the Khemco Agreement are obligations only as between the parties, namely NPC and Amoco, and as between the parties and Khemco, within the limits set forth in Article 28. Iran's obligations are only those embodied in the two Acts of 1955 and 1965 in so far as they are also defined in the Khemco Agreement. Since only the rights of the parties in their mutual relationship,

including matters of management and share of dividends and loans, are at stake in the present Case, such rights can in no way be construed as creating obligations on the State. Iran is thus not liable for breach of contract on this basis. Such a finding was probably envisaged by the Claimant and it could be the reason why it laid great emphasis on the applicability of what are called the stabilization clauses.

c) The "Stabilization" Clauses

165. The Claimant alleges that the conduct of Iran in terminating the Khemco Agreement violated two articles thereof which the Claimant characterizes as "stabilization" clauses, namely Article 21, paragraph 2 and Article 30, paragraph 2. These clauses are actually quite different in nature, as revealed by the heading of the respective articles. Article 21 is headed "Guarantee of Performance and Continuity" and Article 30 "Applicable Laws."

166. Article 30, paragraph 2, as discussed above, had the effect of affirming the validity of contractual clauses inconsistent with Iranian laws and regulations. This cannot be considered as a stabilization clause in the usual meaning of the term, however, since that term normally refers to contract language which fr̶  ̶s the provisions of a national system of law chosen as the law of the contract as of the date of the contract, in order to prevent the application to the contract of any future alterations of this system . Article 30, paragraph 2 applied only to the provisions of any current laws and regulations, clearly referring solely to the laws and regulations existing at the time of execution of the Khemco Agreement. Therefore it provided no guarantee for the future and is not a stabilization clause.

167. Article 30, paragraph 2, furthermore, must be read in conjunction with Article 2, which, as already noted, referred to the grant of facilities and privileges conferred by the Government under the two Acts, but with the proviso that "any future amendments to such Acts" would also apply. This is the contrary of a stabilization clause.

168. Article 21, paragraph 2 is of a quite different nature. It does not relate to applicable law but to performance of the Khemco Agreement. It reads as follows:

Measures of any nature to annul, amend or modify the provisions of this Agreement shall only be made possible by the mutual consent of NPC and AMOCO.

1̶6̶  ̶The Claimant contends that this paragraph must be read in conjunction with the first paragraph of the same Article by which the parties to the Khemco Agreement undertook to perform the Khemco Agreement "in accordance with the principles of mutual good will and good faith and to respect the spirit as well as the letter of the provisions of the Agreement." It maintains that the reference to the principle of good faith is a clear indication of the intention of the parties to submit the contract to international law, where this principle plays an important role. The Tribunal cannot accept such a construction in view of the clear wording of Article 30. The principles of good will and good faith apply in practically all systems of law to contracts as well as to treaties. Article 21, paragraph 1 simply sets forth a principle of interpretation and implementation of the Khemco Agreement, which, as a long-term contract, implies a continuous cooperation between the parties and therefore must not be performed in a strict and formalistic way.

170. Paragraph 2 of Article 21 has a more precise meaning in so far as it prohibited changes in the provisions of the Khemco Agreement by unilateral measures. According to the Claimant the term "measures" in this context refers to legislative or regulatory measures. Such an interpretation is not easily reconcilable with the terms of Article 21, however, which mentions "[m]easures of any nature" and distinctly states that such measures "shall only be made possible by the mutual consent of NPC and Amoco," neither of which has power to take legislative or regulatory measures.

171. Article 21, paragraph 2 led the Parties to a discussion about the nature of the Khemco Agreement. It was questioned whether the Khemco Agreement was

Case 1:08-mc-80024-JSW   Document 10   Filed 03/13/2008   Page 10...

an administrative agreement, an international agreement or an economic development agreement. The Tribunal does not see any reason to decide this issue. It observes, however, that in State practice relating to contracts in the oil industry, at the time of the drafting of the Khemco Agreement and before, numerous examples of unilateral changes imposed by States parties to agreements with foreign companies can be found. For this reason, contracts concluded at this time often include a clause of renegotiation, in order to avoid such unilateral changes. This applies to contracts between foreign companies and States as well as to contracts between such companies and national entities controlled by the States, such as NPC in the present Case. On its face, Article 21, paragraph 2 appears to be a guarantee against unilateral changes by one party.

177 This does not mean, however, that Article 21, paragraph 2 imposed an obligation on the government of Iran. It certainly creates obligations for NPC and Amoco, confirming the preceding conclusions that they are the only parties to the Khemco Agreement. It should be noted that Khemco is not mentioned in Article 21, although pursuant to Article 28 Khemco is to be treated "as if [it] were" a party to the Khemco Agreement, but it did not become a party to the Khemco Agreement in the fullest sense of the term. Similarly, the government did not become a party to the Khemco Agreement and had nothing to do with the process of amending it.

177 In conclusion, the Tribunal does not find that the Khemco Agreement contains any "stabilization" clauses binding on the government. The clauses referred to by the Claimant bind only the parties to the Khemco Agreement, namely NPC and Amoco. According to its own terms, Article 30, paragraph 2 cannot be construed as a stabilization clause and Article 21, paragraph 2 only prohibits unilateral measures by NPC or Amoco to "annul, amend or modify" the provisions of the Khemco Agreement.

d) Breach of Contract as a Separate Basis of Claim

177 From the previous finding of the Tribunal that Iran was not party to the Khemco Agreement it is apparent that only NPC or Khemco could be held responsible for breach of contract. The facts of this Case demonstrate, however, that although NPC acted only for itself when it concluded the Khemco Agreement, it acted as an instrument of the Iranian Government when it took, together with NIOC, the measures characterized by the Claimant as breach and repudiation of the Khemco Agreement. It has already been emphasized that the minutes of the meeting at which these measures were adopted expressly reflect that they were taken "[i]n consideration of Government's policy that all sales of hydrocarbons produced in the country must be made by NIOC." See paragraph 64 supra. This clearly evidences that NPC did not act in its own interest, but as a performer of the government's policy of completely reorganizing the pe..eum industry in Iran. In the framework of this reorganization, its own functions were to be reduced and its interest in Khemco sacrificed. NPC thus did not act independently, but with, and under the supervision of, NIOC which, although not a party to the Khemco Agreement, was to be the main actor and beneficiary of the reorganization.

17 For the reasons just set forth, NPC (or Khemco) cannot be held liable for breach of contract for taking measures attributable to NIOC and, through NIOC, in the final analysis, to the Iranian Government. Such a conclusion is fully consistent with the previous finding of the Tribunal that these measures constituted the first steps of a process which, after the failure of the attempt to purchase Amoco's shares in Khemco, became a process of nationalization. It is, therefore, in this context that they have to be considered.

e) Breach of Contract as a Cause of Unlawfulness of the Expropriation

176. Article V of the CSD obliges the Tribunal to "decide all cases on the basis of respect for law." According to Article II of the CSD, the Tribunal's jurisdiction extends to claims of nationals of the United States or Iran which arise, inter alia, out of contracts. To decide such cases "on the basis of respect for...

law" means to decide them on the basis of respect for the contracts validly entered into and binding the parties at the time the claims arose. Such has been the consistent approach of the Tribunal in all the cases decided up to now.

177. It is worthwhile to emphasize that the CSD, concluded in dramatic circumstances between two States with very different political and judicial beliefs and traditions, thus contributed, to a greater extent than any other international compact, to the consolidation of the rule of international law that a State has the duty to respect contracts freely entered into with a foreign party. As is well known, this rule was spelled out by the United Nations General Assembly in 1962 in G.A. Res. 1803 (XVII) on Permanent Sovereignty Over Natural Resources, reprinted in Basic Documents in International Law 141 (I. Brownlie 2d ed. 1972). While the rule has been questioned since then, the CSD constitutes an implied but unequivocal recognition of this rule, which has been constantly confirmed by the abundant case law of the Tribunal and is not disputed by the Parties in this Case.

178. The quoted rule, however, must not be equated with the principle pacta sunt servanda, often invoked by claimants in international arbitrations. To do so we. .d suggest that sovereign States are bound by contracts with private parties exactly as they are bound by treaties with other sovereign States. This would be completely devoid of any foundation in law or equity and would go much further than any State has ever permitted in its own domestic law. In no system of law are private interests permitted to prevail over duly established public interest, making impossible actions required for the public good. Rather private parties who contract with a government are only entitled to fair compensation when measures of public policy are implemented at the expense of their contract rights. No justification exists for a different treatment of foreign private interests. To insist on complete immunity from the requirements of economic policy of the government concerned would be the most certain way to cause the repudiation of the quoted rule.

179. In international practice, and notably in the cases submitted to international arbitration, the dispute has focused on the question of the so-called "stabilization clauses." For the reasons set forth in the preceding paragraph, it is not seriously questioned that, in the absence of such a stabilization clause, a contract does not constitute a bar to nationalization. That is one aspect of the evolution of international law in this area and of the general recognition of the right of States to nationalize. As a fundamental attribute of state sovereignty, this right, commonly used as an important tool of economic policy by many countries, both developed and developing, cannot easily be considered as surrendered. The award in the AMINOIL case, rightly in the view of the Tribunal, held that while contractual limitations on a State's right to nationalize are undoubtedly possible, "what that would involve would be a particularly serious undertaking which would have to be expressly stipulated for and be within the regulations governing the conclusion of State contracts; and it is to be expected that it should cover only a relatively limited period." AMINOIL, supra, para. 95, 21 Int'l Legal Mat'ls at 1023. In the present Case, the Khemco Agreement was concluded for a shorter period (35 years) than the concession in the AMINOIL case (60 years), but in economic and legal terms 35 years cannot be considered a "relatively limited period." Neither the Law concerning the Attraction and Protection of Foreign Investment in Iran of 28 November 1955 nor the Act concerning the Development of Petrochemical Industries of 15 July 1965, referred to in Article 2 of the Agreement, exclude nationalization. Furthermore, it would be particularly adventurous to construe any provision of a contract to which the State is not named as a party as forbidding nationalization.

180. To sum up, the Tribunal finds that the expropriation in this Case cannot be characterized as unlawful as a breach of a contract, since Iran, the expropriating State, was not a party to the Khemco Agreement and, therefore, not bound by any stabilization clause allegedly contained herein. Moreover, even if Article 21, paragraph 2 could be considered as binding upon the government, that clause does not expressly prohibit nationalization of the contract.

181. It therefore remains only to be seen whether the fact that Iran caused NPC, NIOC and the managing director of Khemco to act in July 1979 contrary to the position taken by the board of directors of Khemco, thus practically depriving Amoco of its rights in the management of Khemco, should be considered to have some bearing on the Claimant's right to compensation. The Tribunal decides that this fact will be duly taken into account by determining that the date to be considered for the valuation of such compensation will be the date at which measures definitively took effect, rather than the date of the final decision of

nationalization. Accordingly, the date of valuation of Amoco's expropriated interest in Khemco will be 31 July 1979.

6. Conclusion

182. For the reasons set forth above, the Tribunal finds that Amoco's rights and interests under the Khemco Agreement, including its shares in Khemco, were lawfully expropriated by Iran. through a process starting in April 1979 and completed by the decision of the Special Commission, notified by telex on 24 December 1980. The next issue, therefore, relates to the rules to be applied in determining the compensation to be paid in such a circumstance.

C. The Rules Applicable to Compensation

1. The Contentions of the Parties

18_. According to the Claimant "[w]henever foreign-owned property is expropriated, and specifically when an agreement between a State and a foreign investor. such as the Khemco Agreement, is repudiated by the state party and the foreign investor's rights under that agreement are expropriated, the foreign investor is entitled to receive just compensation that is the full equivalent of the property or rights expropriated or repudiated, that is, compensation that will place the foreign investor in as good an economic position as he was in before the expropriation or repudiation occurred." Furthermore, "[t]he foreign investor's rights must be valued without regard to any reduction in value that would have resulted from apprehension that the rights might be expropriated without full compensation or that the state party might otherwise breach the agreement."

184. Another aspect of the Claimant's contention is that both the Treaty and customary rules of international law not only require the payment of compensation but also establish the standard of the compensation to be paid, which is "just compensation." The Claimant insists that international law requires compensation for expropriation whether the expropriation is lawful or unlawful, but asserts that an illegal seizure of property requires a standard of compensation higher than the standard for a lawful expropriation.

185. In determining "the full equivalent of the property or rights expropriated" the Claimant contends that when the expropriated rights involve an ongoing bu~iness activity with demonstrable future earning power, the just compensation is the going concern value, which, according to the Claimant, is equivalent to the .air market value.

186. In spite of some reservations of the Respondents on the general principle in customary international law, the question whether compensation is due in case of expropriation is not in dispute in this Case. In any event the obligation of compensation is clearly stated in the Treaty as was already noted. On the other hand, considerable disagreement exists between the Parties about the standard of compensation to be applied.

187. The Respondents further consider that the most relevant issue to be considered for the valuation of the compensation to be paid is whether the nationalization was lawful or not, and put great emphasis on such a distinction. According to them, if the nationalization is lawful the measure of compensation must be substantially less than the measure of damages for breach and, in any event, no compensation should be paid for loss of future profits . In such a case. the duty to compensate would be limited to the unjustified enrichment of the nationalizing State. This means that the compensation should be the equivalent of the net book value of the residual nationalized assets of the foreign person or entity. The Respondents contend, furthermore, that the award of future profits in the present Case would fall "outside [the] legitimate expectation" of the parties to the Agreement.

188. The main dispute thus relates to the consequences of the lawfulness or unlawfulness of the expropriation. This issue is therefore to be discussed first.

After that, the Tribunal will consider the question of the standard of compensation in case of lawful nationalization as in the present case.

2. The Effects of Lawfulness or Unlawfulness of
Expropriation on the Standard of Compensation

188. Both Parties consider that this issue must be decided by reference to customary international law. The Tribunal agrees. Article IV, paragraph 2 of the Treaty determines the conditions that an expropriation should meet in order to be in conformity with its terms and therefore defines the standard of compensation only in case of a lawful expropriation. A nationalization in breach of the Treaty, on the other hand, would render applicable the rules relating to State responsibility, which are to be found not in the Treaty but in customary law.

189. The Claimant asserts that in case of unlawful expropriation compensation would be more than the "full equivalent" standard which applies to lawful expropriation. The Respondents argue that in case of lawful expropriation the measure of compensation must be substantially less than for a wrongful expropriation and assert that in such a case compensation is limited to the unjustified enrichment realized by the nationalizing State, with no compensation for lost profit.

191. By and large, both Parties refer to the same authorities in the discussion of their respective theses, but give them opposite interpretations. They agree that the leading case in this context is Case Concerning the Factory at Chorzow (Germany v. Poland), 1928 P.C.I.J., Ser. A. No. 17 (Judgment of 13 September 1928) ("Chorzow Factory"), decided by the Permanent Court of International Justice in 1928. The Tribunal shares this view. In spite of the fact that it is nearly sixty years old, this judgment is widely regarded as the most authoritative exposition of the principles applicable in this field, and is still valid today. It must be recognized, however, that its treatment of compensation is fairly complex and must be carefully analyzed.

192. Undoubtedly, the first principle established by the Court is that a clear distinction must be made between lawful and unlawful expropriations, since the rules applicable to the compensation to be paid by the expropriating State differ according to the legal characterization of the taking. Id. at 46-47. Such a principle has been recently and expressly confirmed by the celebrated AMINOIL case, also invoked by both Parties. AMINOIL, supra, para. 138, 21 Int'l Legal Mat's at 1031.

193. According to the Court in Chorzow Factory, an obligation of reparation of all the damages sustained by the owner of expropriated property arises from an unlawful expropriation. The rules of international law relating to international responsibility of States apply in such a case. They provide for restitutio in integrum: restitution in kind or, if impossible, its monetary equivalent. If need be, "damages for loss sustained which would not be covered by restitution" should also be awarded. See Chorzow Factory, supra, at 47. On the other hand, a lawful expropriation must give rise to "the payment of fair compensation," id. at 46, or of "the just price of what was expropriated." Id. at 47. Such an obligation is imposed by a specific rule of the international law of expropriation.

194. The difficulty, obviously, is in determining the practical consequences of the distinction between reparation of the damage caused by a wrongful expropriation and payment of compensation in case of lawful expropriation. The legal bases of the two concepts are totally different and, logically, the practical methods to be used in order to derive the amount due should also differ. On this question, the principles enunciated by the Chorzow Factory case are equally important and have not lost their validity.

195. In Chorzow Factory the Court dealt with the question of reparation of the damages resulting from an unlawful expropriation. The analysis of the Court was so thorough, however, and its comparisons with the reverse hypothesis so systematic, that the judgment is also illuminating in analyzing the lawful expropriation before us.

196. Restitutio is well defined by the Court. It means the restitution in kind or, if that is impossible, the payment of the monetary equivalent. In both cases the principle on which it lies is the same: "that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if this act had not been committed."[2] Id. at 47. One essential consequence of this principle is that the compensation "is not necessarily limited to the value of the undertaking at the moment of dispossession" (plus interest to the day of payment). According to the Court, "this limitation would be admissible only if the Polish Government [the expropriating State] has had the right to expropriate, and if its wrongful act consisted merely in not having paid . . . the just price of what was expropriated." Id. This last statement is of paramount importance: It means that the compensation to be paid in case of a lawful expropriation (or of a taking which lacks only the payment of a fair compensation to be lawful) is limited to the value of the undertaking at the moment of the dispossession, i.e., "the just price of what was expropriated."

197. Obviously the value of an expropriated enterprise does not vary according to the lawfulness or the unlawfulness of the taking. This value can not depend on the legal characterization of a fact totally foreign to the economic constituents of the undertaking, namely the conduct of the expropriating State. In the traditional language of international law it equates the damnum emergens, which must be compensated in any case. Such a conclusion was already accepted by this Tribunal in Sedco Inc. and National Iranian Oil Company, Award No. ITL 59-129-3, pp. 11-12 (27 March 1986), reprinted in 25 Int'l Mat'ls 629. The difference is that if the taking is lawful the value of the undertaking at the time of the dispossession is the measure and the limit of the compensation, while if it is unlawful, this value is, or may be, only a part of the reparation to be paid. In any event, even in case of unlawful expropriation the damage actually sustained is the measure of the reparation, and there is no indication that "punitive damages" could be considered.

198. The Court "considers it preferable to endeavor to ascertain the value to be estimated by several methods, in order to permit of a comparison and if necessary of completing the results of the one by those of the others." Id. at 53. Consequently, it contemplated essentially two methods, corresponding to two different questions. Both methods have the same purpose: to determine how "to wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if this act had not been committed." Id. at 47.

199. What can be added to the value of the enterprise in order to meet the requirements of restitutio? An answer to this question can be found in the formulation of the questions on which an expert inquiry was arranged by the Court. See Chorzow Factory, supra, at 51. These questions are an integral part of the judgment, with the same authority as all the other parts, and have the advantage, with the benefit of explanations which the Court added to their terms, of being much more precise and concrete than the general principles previously enunciated.

200. The first method corresponds to Question I. The experts were asked to, as far as possible, separately determine: (A) the value of the enterprise on 3 July 1932, i.e., the date of the expropriation, and (B) the financial results (profits or losses) "which would probably have been given by the undertaking" from this date to the date of the judgment "if it had been in the hands" of the expropriated owners. The clear implication is that, with this method, the compensation would include the two elements: the value of the undertaking at the date of the expropriation, plus the profits which would have been earned after this date, had the taking not occurred, until the date of the judgment. Equally clear is the consequence to be drawn from this finding: that this lost profit was not included in the valuation of the enterprise as of the date of the taking. Otherwise, there would be double recovery.

201. Of paramount interest is the list of the components enumerated by the Court as included in the value of the undertaking. They appertain to three categories: corporeal properties (lands, buildings, equipment, stocks), contractual rights (supply and delivery contracts) and other intangible valuables

(processes, goodwill and "future prospects"). Using today's vocabulary, this would mean "going concern value", which is not a new concept after all. Only one component relates to the future: "future prospects." Since, for the reasons set forth in the preceding paragraph, future prospects does not mean lost profits, we safely can say, using the traditional vocabulary of international arbitration, that all these components pertain to damnum emergens.

26. On the other hand, part (B) of Question I indisputably relates only to "lucrum cessans," according to the same vocabulary, systematically calculated for a fixed period of time. The financial results (profit or losses) to be assessed are hypothetical, but their valuation implies no projection into the future, since they would have been earned before the date of the expert enquiry.

203. The comparison of the two subquestions (A) and (B) permits of only one conclusion: The lucrum cessans to be determined under subquestion (B) is something different from the "future prospects" mentioned in subquestion (A). The reasoning of the Court on this point is perfectly clear and was expressed without any ambiguity:

The purpose of question 1 is to determine the monetary value, both of the object which should have been restored in kind and of the additional damage, on the basis of the estimated value of the undertaking, including stocks, at the moment of [the] taking . . . together with any probable profit that would have accrued to the undertaking between the date of taking possessions and that of the expert opinion.

Id. at 52 (emphasis added). This statement confirms the previous finding that, for the Court, lost profit (lucrum cessans) is not incorporated in the value of the undertaking, although this value includes "future prospects." In other words, according to the Court, "future prospects" does not equal lost profit (lucrum cessans). Those are two different concepts. The first one clearly refers to the fact that the undertaking was a "going concern" which had demonstrated a certain ability to earn revenues and was, therefore, to be considered as keeping such ability for the future: this is an element of its value at the time of the taking. The second relates to the amount of the earnings hypothetically accrued from the date of the taking to the date of the expert opinion, had the enterprise remained in the hands of its former owner.

204. The other method used by the Court in order "to wipe out" the consequences of a wrongful taking consists of an estimation of the value of the undertaking at the time of the judgment. It is the object of Question II. The valuation of the undertaking is exactly the same, with the same components. Only the date changes. Furthermore, the valuation is hypothetical, since it refers to the undertaking as it would have been if it had remained in the hands of the expropriated owners. The Court deems that, in this second hypothesis, the profits, real or supposed, accrued between the taking and the judgment would be for the most part incorporated in the supposed value of the undertaking at the time of the judgment, [3] since they would have been absorbed by the costs of upkeep of the corporeal properties and of improvement and normal development of the installation. Id. at 53. If, however, there remains "a margin of profit," it "should be added to the compensation to be awarded." On the contrary, if an investment of fresh capital would have been required for the normal development of the undertaking, the amount of such sums should be deducted. Accordingly, if the expert study was well performed, the results yielded by the two methods should have been identical and confirm each other. If, on the contrary, these results had been different, the Court would have had to combine them and to make the necessary adjustments. To this effect, it expressly and fully reserved its right to review the expert's valuations and to determine the sum to be awarded in conformity with the legal principles set out in the judgment. Id. at 53-54. Obviously, had the second method yielded a value of the undertaking at the time of the expert opinion which was lower than the value at the time of the taking, the higher value would have prevailed. [4]

205. It is relevant to note that, even for the purpose of restitution, the Court takes into consideration lucrum cessans (in the meaning previously defined) only for a limited and rather short period of time. Furthermore, the quantification of lucrum cessans implies no projection into the future, since it finds its dies ad quem at the date of the judgment.

Case 3:08-mc-80024-JSW   Document 3-10   Filed 03/13/2008   Page 143 of 164

206. The case law developed since the judgment of the Court has generally followed the principles set forth in this judgment, at least on the distinction between lawful and unlawful expropriation. It is particularly remarkable that all the awards which adopted the standard of restitutio relate to expropriation found unlawful. See Lighthouses Arbitration Between France and Greece, (Verzijl, Mestre and Charbouns arbs., Claim 27, 24 July 1956), reprinted in 23 I.L.R. 299 (1956); Sapphire International Petroleums Ltd. v. National Iranian Oil Company, (Cavin arb., Award of 15 March 1963), reprinted in 35 I.L.R. 136, 185 (1967); BP Exploration Co. (Libya) v. Libyan Arab Republic, (Lagergren arb., Award of 1 August 1974), reprinted in 53 I.L.R. 297 (1979); Texaco Overseas Petroleum Co. (TOPCO) v. Libyan Arab Republic, (Dupuy arb., Award of 19 January 1979), reprinted in 53 I.L.R. 389 (1979); Benvenuti et Bonfant Srl. v. People's Republic of the Congo, (Trolle, Bystricky and Razafindralambo arbs., Award of 8 August 1980), reprinted in 21 Int'l Legal Mat'ls 740 (1982); AGIP Co. v. People's Republic of the Congo, (Trolle, Dupuy and Rouhani arbs., Award of 30 November 1979), reprinted in 21 Int'l Legal Mat'ls 726 (1982). The LIAMCO award could at first glance be considered as an exception, since it awards the Claimant a certain amount of lost profit after having found that the the expropriation of LIAMCO by Libya was lawful. See Libyan American Oil Company (LIAMCO) v. Libyan Arab Republic, (Mahmassani arb., Award of 12 April 1977), reprinted in 62 I.L.R. 139 (1982). It is clear, however, that this part of the compensation, awarded on the basis of "equity," does not cc ..rm to the concept or the standard of restitutio in integrum. As already noted, the AMINOIL case clearly recognizes that it is only in cases relating to indemnifications due in consequence of illicit acts that the calculation is effected as the equivalent of a restitutio in integrum. In that case limited lost profit wa... awarded only on the basis of the concept, specifically agreed upon by the parties, of "legitimate expectations" and in implementation of such an agreement. AMINOIL, supra, para. 138. 21 Int'l Legal Mat'ls at 1031.

CONTINUE IN PART TWO

[1] According to the Respondents, the phrase "shall be annulled" in the Single Article Act must be read to mean "are null and void ab initio."

[2] ...paration, as the Court sees it, would cover restitutio, or its monetary equivalent, plus any potential consequential damages, in order to "wipe out all the consequences of the illegal act."

[3] ...does the use of the term of lucrum cessans by the Court in the part of the judgment, which confirms the interpretation of Question 1.

[4] This does not seem to have been questioned by any of the judges, although Judge Rabel, in "observations" appended to the judgment, expressed his regrets that this was not expressly said by the Court. The other judges dissenting on this point considered that the compensation should be limited to the value of the undertaking at the date of the taking without any right to an enhanced value.

EXHIBIT "J"

Not Reported in F.Supp.2d, 2005 WL 1155255 (N.D.Cal.)

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
**IO GROUP, INC.**, a California corporation, Plaintiff,
v.
**Michael PURSER**, an individual, Bareback.Com, Inc. a New York Corporation, Defendants.
No. C-04-2823(SBA).
May 16, 2005.

Gill Sperlein (172887), San Francisco, California, for Plaintiff Io Group, Inc.

### AFFIDAVIT OF IDENTITY AND ORDER

ARMSTRONG, J.

### Cal.Code Civ. Pro. 680.135

**\*1** I, GILL SPERLEIN, declare:

1. I am an attorney at law licensed to practice in the State of California and attorney of record for Plaintiff Io Group, Inc.

2. I submit this Affidavit of Identity in accordance with California Code of Civil Procedure which reads in its entirety:

" "Affidavit of Identity" means an affidavit or declaration executed by a judgment creditor, under penalty of perjury, that is filed with the clerk of the court in which the judgment is entered at the time the judgment creditor files for a writ of execution or an abstract of judgment. The affidavit of identity shall set forth the case name and number, the name of the judgment debtor stated in the judgment, the additional name or names by which the judgment debtor is known, and the facts upon which the judgment creditor has relied in obtaining the judgment debtor's additional name or names. The affidavit of identity shall not include the name or names of persons, including any corporations, partnerships, or any legal entities not separately named in the judgment in which the judgment debtor is a partner, shareholder, or member, other than the judgment debtor." Cal.Code Civ. Pro. § 680.135.

3. The Court entered judgment in favor of plaintiff Io Group, Inc. and against defendants on January 26, 2005.

4. The names of the judgment debtors as listed on the Order of Judgment are Michael Purser and Bareback.com, Inc.

5. Judgment debtor Bareback.com, Inc. is also known as, and does business as, "A Workshop".

6. I relied on the following facts in obtaining the judgment debtor's additional name.

7. Bareback.com, Inc. is a New York corporation that owns and operates the website, *www.bareback.com.*

8. All domain names must be registered with an Internet Corporation for Assigned Names and Numbers (ICANN) accredited registrar. This process allows domain names to be associated with

specific locations on the Internet identified by an Internet Protocol (ip) address which consists of a series of numbers. Therefore, when someone enters a domain name such as *www.cand.uscourts.gov* into a Internet browser, the browser goes to a specified location on the Internet and nowhere else.

9. Each domain name can only be registered to one person or entity at any given time.

10. Information about the individuals or businesses who registered a specific domain name is publicly available on the Internet through a simple process called a "whois search". I personally performed a whois search for *www.bareback.com* and a true and complete copy of the result is attached hereto as Exhibit A.

11. For over three years I have been involved in tracing and identifying the true owners of Internet websites engaged in copyright infringement. In my experience, I have found that many individuals and organizations register domain names using pseudonyms, assumed names or fictitious names in order that they might operate an Internet website while maintaining a certain level of anonymity.

**\*2** 12. The domain name *www.bareback.com,* owned and operated by Bareback.com, Inc., is registered under the pseudonym, assumed name, or fictitious name "A Workshop," 300 West 49th Street, Apt.310, New York, New York, 10019.

13. The registration information for *www.bareback.com* also contains the e-mail address *amvscom@aol.com.* This e-mail address belongs to and is used by Michael Purser and *www.bareback.com.* I received e-mails from the e-mail address *amvscom @aol.com* signed, Michael, Bareback.com. Moreover, *amvscom@aol.com* is listed on the *www.bareback.com* website as the e-mail address for contacting customer service and in a separate location is listed as the e-mail address for the custodian of records for the site. In other words, Bareback.com, Inc. shares an e-mail address with "A Workshop" thereby indicating they are the same entity.

14. Bareback.com, Inc. registered the trademark bareback.com with the United States Patent and Trademark Office. The registration lists Bareback.com, Inc. as the owner of the mark, with the address of 300 West 49th Street, Apt.310, New York, New York, 10019.

15. Bareback, Inc. is incorporated in the State of New York and has registered its agent for service of process as Michael Purser, 300 West 49th Street, Apt. 310, New York, New York, 10019, however, neither Michael Purser nor Bareback.com, Inc are located at that address.

16. After unsuccessful attempts to serve Michael Purser and Bareback.com, Inc. at 300 West 49th Street, I requested a forwarding address from the United States Post Office. The United States Post Office reported that mail formerly received at 300 West 49th Street, Apt. 310, New York, New York, 10019 is currently being received at 676A, 9th Avenue, # 302, New York, New York, 10036.

17. The address for "A Workshop" on the registration for *www.bareback.com* is 676A, 9th Avenue, # 302, New York, New York, 10036. Therefore, Michael Purser and Bareback.com, Inc. also share an address with "A Workshop".

18. Businesses entities operating in New York State are required to either register with the New York Department of State (corporations-NY CLS Bus Corp § 403 and 1301; and limited liability companies-NY CLS LLC § 209) or must register with the Clerk of the County (partnerships and sole proprietorships using assumed names-NY CLS Gen Bus § 130).

19. "A Workshop" is not registered with the New York Department of State, or the New York County Clerk, thereby indicating "A Workshop" is not a unique and separate business entity, but rather serves as a pseudonym or assumed name for the existing business entity, Bareback.com, Inc.

20. In summary, Bareback, Inc., which holds an ownership interest in the trademark bareback.com, registered the domain name bareback.com using the fictitious business name "A Workshop." "A

Workshop," which is not registered as a separate business entity in New York, shares the same e-mail address and street addresses as Bareback.com. These facts indicate that Bareback.com Inc. uses the pseudonym or fictitious business name "A Workshop" and "A Workshop" should be included as a judgment debtor.

**\*3** Pursuant to the laws of the United States, I declare under penalty of perjury the foregoing is true and correct.

·

### ORDER

The Court having considered the above Affidavit of Identity,

IT IS SO ORDERED, that the term judgment debtor include the name "A Workshop."

### EXHIBIT A

whois

Whois:    bareback.com
@ whois.    Magic    Whois

Server Used: [whois.domaindiscover.com]

bareback.com = [64.49.215.69]

Registrant:

A Workshop

676A 9th Ave 302

New York N.Y. 10036-3602

US

Domain Name: BAREBACK.COM

Administrative Contact Technical Contact Zone Contact:

A Workshop

Webmaster

676A 9th Ave 302

New York N.Y. 10036-3602

US

347-251-3249

212-898-1173 [fax]

amvscom@aol.com

Domain created on 20-Nov-2000

Domain expires on 20-Nov-2009

Last updated on 15-Jul-2003

Domain servers in listed order:

NS.RACKSPACE.COM

NS2.RACKSPACE.COM

Register or transfer domains at BuyDomains for as low as 9/yr. Every

domain comes with 100 FREE Value Added Services: traffic stats

custom 1-page website email URL frame forwarding whois spam

protection toll free 24x7 phone support & more ...

N.D.Cal.,2005.
Io Group, Inc. v. Purser
Not Reported in F.Supp.2d, 2005 WL 1155255 (N.D.Cal.)

END OF DOCUMENT

(C) 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT "K"

**CERTIFIED FOR PUBLICATION**

FEB 22

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FREDRIC GOLDMAN, | B200082 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC036340) |
| v. | **COURT OF APPEAL - SECOND DIST.** |
| ORENTHAL JAMES SIMPSON, | **F I L E D** |
| Defendant and Appellant. | FEB 2 0 2008 |
| | JOSEPH A. LANE _____ Clerk |
| | _____ **Deputy Clerk** |

APPEAL from an order of the Superior Court of Los Angeles County, Gerald Rosenberg, Judge. Affirmed.

Richard L. Enkelis and Ronald P. Slates for Defendant and Appellant.

Sommer Barnard, Jonathan G. Polak; Haven Law, Peter T. Haven; Cook Collection Attorneys and David J. Cook for Plaintiff and Respondent.



## INTRODUCTION

Defendant Orenthal James Simpson appeals from an order denying his motion to vacate the renewal of a money judgment in favor of plaintiff Frederic Goldman. Simpson contends that the renewal of the judgment was void because he had insufficient contacts with California to confer personal jurisdiction when the renewal was entered. We conclude that the trial court properly denied Simpson's motion to vacate because it was untimely, and because it was based on a ground – insufficient contacts with California to confer personal jurisdiction at the time of the renewal – unavailable under the statutory renewal of judgment procedure. Rather, the court had continuing jurisdiction, derived from its jurisdiction at the time of the original judgment, to enter the renewal. Accordingly, we affirm the order denying the motion to vacate renewal of the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Judgment was entered against Simpson on March 10, 1997, in Goldman's action for wrongful death and for damages based on survival rights filed by Goldman individually, and as personal representative of the estate of Ronald Lyle Goldman, deceased. On September 21, 2006, Goldman filed an application for renewal of the judgment pursuant to Code of Civil Procedure section 683.120, well before the original judgment was due to expire by operation of law on March 10, 2007.[1] The clerk of the court entered the renewal (§ 683.150), and Goldman served and filed notice of renewal of the judgment (§ 683.160) on or about October 20, 2006.

---

[1]     All undesignated section references are to the Code of Civil Procedure.

2

Nearly six months later, on April 10, 2007, Simpson filed a motion to vacate renewal of the judgment. He contended that all defenses that would have been available to him at the time of the original judgment were still available at the time of the application for renewal of judgment. He argued that because he had moved from California to Florida and had become a resident of Florida, the California court did not have jurisdiction over him to renew the judgment.

The matter was heard in May 2007, after which the trial court entered an order denying the motion to vacate the renewal of judgment. This timely appeal followed.

## DISCUSSION

Simpson contends that when the renewal of the judgment was entered, he had insufficient contacts with California to confer personal jurisdiction. Therefore, according to Simpson, the renewal of the judgment was void, and the trial court erred in denying his motion to vacate the renewal. We conclude, however, that Simpson's motion was untimely, and that the trial court had continuing jurisdiction to renew the judgment.

Before the 1982 enactment of the Enforcement of Judgments Law (§ 680.010 et seq.), the sole method by which a judgment creditor could extend the enforcement period of a money judgment was by obtaining a new judgment against the judgment debtor in an independent action based on the judgment. (See *Pratali v. Gates* (1992) 4 Cal.App.4th 632, 637-638.) In the Enforcement of Judgments Law, the Legislature adopted an alternative summary procedure for renewal. (*Ibid.*; § 683.050; see Recommendation Proposing the Enforcement of Judgments Law (Oct. 1980) 15 Cal. Law Revision Com. Rep. (1980) p. 2009.) Under this procedure, a money judgment is enforceable for 10 years from the date it is entered. (§ 683.020.) To obtain a renewal of the judgment, the judgment creditor

3

must file an application for renewal with the clerk of the court that entered the judgment before the expiration of the 10-year period of enforceability. (§ 683.130, subd. (a); see § 683.140 [setting forth information to be included in application].) "Upon the filing of the application, the court clerk shall enter the renewal of the judgment in the court records." (§ 683.150, subd. (a).) The creditor must serve notice of the renewal on the debtor, (§ 683.160, subd. (a)), and the debtor then has 30 days after service to make a motion to vacate or modify the renewal (*ibid.*; see § 683.170, subd. (b)).

Thus, a judgment creditor has two distinct methods by which to continue to pursue collection of a judgment as it nears expiration of the 10-year period of enforceability: the renewal of judgment provisions set forth in sections 683.110 et seq., or an independent action on the judgment. Although the two methods are distinct, the defenses available to the judgment debtor in the statutory procedure are the same as in an independent action on the judgment. As here relevant, section 683.170, subdivision (a), provides that "[t]he renewal of a judgment pursuant to this article may be vacated on any ground that would be a defense to an action on the judgment."

In the instant case, Simpson filed a motion to vacate Goldman's statutory renewal of the judgment, contending that lack of personal jurisdiction would be a defense in an independent action on the judgment, and therefore, under section 683.170, subdivision (a), he could assert that defense in support of his motion to vacate the renewal of judgment. Simpson's motion, however, was untimely. Section 683.170, subdivision (b), provides that a noticed motion to vacate renewal of judgment must be filed "[n]ot later than 30 days after service of the notice of renewal." Here, Goldman filed his application for renewal of the judgment on September 21, 2006, and the court clerk entered the renewal on that date. Goldman served and filed notice of renewal of the judgment, as required by section

4

683.160, on or about October 20, 2006. Yet Simpson did not file his motion to vacate renewal of the judgment until almost six months later, on April 10, 2007. Thus, Simpson filed his motion too late.[2]

Apparently recognizing that his motion was untimely, Simpson attempts to resurrect the motion on the following logic (as best we understand it). Under section 683.170, subdivision (a), Simpson could raise in his motion any defense that would have been available in an independent action on the judgment. Lack of personal jurisdiction, rendering the judgment void, is a defense in an independent action on the judgment. Therefore, lack of personal jurisdiction could be raised in Simpson's motion to vacate. Further, because lack of personal jurisdiction renders the judgment void, and a void judgment can be attacked at any time, his motion cannot be deemed untimely. And finally, because the court that renewed the judgment had no jurisdiction over him, his motion to vacate the renewal should have been granted.

Simpson's logic fails on a host of grounds. In an independent action on a judgment, the debtor may challenge the judgment "in accordance with the rules and principles governing collateral attack" (*Kirkpatrick v. Harvey* (1942) 51 Cal.App.2d 170, 172; see also *Cradduck v. Financial Indem. Co.* (1966) 242 Cal.App.2d 850, 855), including "lack of personal or subject matter jurisdiction. . . . Nonjurisdictional errors, however, are not appropriate procedural targets

---

[2]    We note, as well, that Simpson's delay was calculated. At the hearing on the motion to vacate, Simpson's counsel admitted that "[a]s soon as March 10, 2007 passed [the date Goldman's judgment would expire], we notified this court that we would be bringing the action." He continued: "So this is a challenge that we made as soon as we were in a legal position to make it." In other words, Simpson waited until the 10-year period to enforce the judgment had passed in an attempt to ensure, in the event that the trial court were to vacate the renewal of judgment, that Goldman could not again seek to renew the judgment before it had expired.

within this context." (*Armstrong v. Armstrong* (1976) 15 Cal.3d 942, 950.) Such a *collateral attack* challenges the jurisdiction of the court to enter the *original* judgment. Certainly, therefore, in making a statutory motion under section 683.170, subdivision (a), to vacate a renewal of judgment, the debtor may contend that the court lacked personal jurisdiction *at the time of the initial judgment*. (See *Fidelity Creditor Service, Inc. v. Browne* (2001) 89 Cal.App.4th 195, 201-202 [failure to have ever served process on a defendant is a defense to an action on the judgment and therefore can be raised on a § 683.170 motion].) But it is an entirely different matter to contend that the renewed judgment must be vacated because the debtor has insufficient personal contacts with the state to confer personal jurisdiction *at the time of the renewal*.

The statutory renewal of judgment is an automatic, ministerial act accomplished by the clerk of the court; entry of the renewal of judgment does not constitute a new or separate judgment.[3] "Filing the renewal application (and paying the appropriate filing fee, Gov.C. § 70626(b)) results in *automatic* renewal of the judgment. No court order or new judgment is required. The court clerk simply enters the renewal of judgment in the court records. [See CCP § 683.150; *Jonathan Neil & Assocs., Inc. v. Jones* (2006) [138 Cal.App.4th] 1481, 1487, 1489." (Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2007) ¶ 6:75, p. 6A-41.) Thus, "[t]he judgment renewal procedure is a different mechanism to extend the life of a judgment than that of bringing an independent action on a judgment. (*Fidelity Creditor Service v. Browne, supra,* 89

---

[3]     In contrast, "[a]n action based on a judgment is an action based on contract. The judgment becomes a debt which the judgment debtor is obligated to pay and the law implies a contract on his part to pay it. [Citation.]" (*United States Capital Corp. v. Nickelberry* (1981) 120 Cal.App.3d 864, 867.) Thus, when successful, an action on a judgment results in the entry of a new judgment.

6

Cal.App.4th at p. 200.) Entry by the trial court clerk of a renewal is a ministerial act." (*Jonathan Neil & Associates, Inc. v. Jones, supra,* 138 Cal.App.4th at p. 1489, fn. 1.) "[R]enewal does not create a new judgment or modify the present judgment. Renewal merely extends the enforceability of the judgment." (*Id.* at p. 1489.) The renewed judgment "has no independent existence" from the original judgment.[4] (*Id.* at p. 1490.)

We conclude that the court that entered the original judgment has continuing jurisdiction to enforce the judgment through the statutory renewal process. Section 410.50 provides: "(a) Except as otherwise provided by statute, the court in which an action is pending has jurisdiction over a party from the time summons is served on him as provided by Chapter 4 (commencing with Section 413.10). . . . [¶] (b)

---

[4]    That a renewed judgment does not constitute a new or separate judgment is further evidenced by the fact that the renewed judgment is not appealable. "The renewal of a judgment is *not* an appealable event . . . because 'there is no separate entity called a "renewed judgment."' Although the renewal extends the enforceability period, the judgment creditor's rights still arise only from the underlying judgment. (*Jonathan Neil & Assocs., Inc. v. Jones* [*supra,* 138 Cal.App.4th] 1481, 1487.)" (Ahart, Cal. Practice Guide: Enforcing Judgments and Debts, *supra,* ¶ 6:91, p. 6A-46.) Instead, it is the order denying a motion to vacate renewal of a judgment that is appealable, as an order after (the underlying) judgment. (*Jonathan Neil & Associates, Inc. v. Jones, supra,* 138 Cal.App.4th at p. 1487.)

We also note that there is no statutory requirement that the notice of renewal be served on the judgment debtor in order for the renewal to be effective. (See § 683.160.) "Service on the judgment debtor is not necessary to renew the judgment. However, *no writ of execution* can issue on the *renewed* judgment until proof of service of the Notice has been filed with the court clerk. Nor, pending filing of proof of service, may the judgment creditor commence any other enforcement proceeding (e.g., examination of judgment debtor), unless it would have been available under the *nonrenewed* original judgment. [CCP § 683.160(b)]." (Ahart, Cal. Practice Guide: Enforcing Judgments and Debts, *supra,* ¶ 6:78, pp. 6A-41 to 6A-42.) Thus, there is no specified time period within which the renewal of judgment must be served on the judgment debtor. The statute instead provides that the judgment creditor may not initiate any enforcement proceedings unless and until the judgment debtor has been served with the notice of renewal.

*Jurisdiction of the court over the parties and the subject matter of an action continues throughout subsequent proceedings in the action.*" (Italics added.) The Judicial Council Comment following section 410.50 states that the statute "continues the law governing the acquisition of judicial jurisdiction by a California court (subdivision (a)) and *the continuation of such jurisdiction throughout all subsequent proceedings which arise out of the original cause of action* (subdivision (b)).

"Jurisdiction over the parties is necessary for the validity of any judgment in personam. (Cal. Code Civ. Proc. § 1917; *Pennoyer v. Neff* (1877) 95 U.S. 714, 722 [24 L.Ed. 565]; *Allen v. Superior Court* (1953) 41 Cal.2d 306, 309; Restatement, Judgments §§ 6, 14, and Intro. Note, p. 79.) Such jurisdiction depends upon three factors: (1) Jurisdiction of the state, based upon there being sufficient minimum contacts existing between this state and the parties or their property or other interests (see Section 410.10). (2) Notice and opportunity for a hearing (see Sections 412.10-412.30, 473.5). (3) Compliance with statutory jurisdictional requirements for service of process (see Sections 413.10-417.30). In addition, the court in which the action is pending must be competent to hear and decide the type of action and the amount in controversy that are involved in the case. When these factors are present, the court has acquired 'fundamental' jurisdiction over the parties, and *this jurisdiction continues to final judgment and in subsequent proceedings incidental thereto.*" (Italics added.)

The parties have not cited, and our research has not disclosed, any case law addressing whether the renewal of a judgment pursuant to section 683.120 constitutes a "subsequent proceeding[] in the action" as contemplated by section 410.50, such that a court has continuing jurisdiction over the parties as a result of its having had fundamental jurisdiction when entering the original judgment. However, because entry of the renewal by the court clerk is a ministerial act that

8

merely extends the enforceability of the original judgment, and because the renewed judgment has no independent existence apart from the original judgment (*Jonathan Neil & Associates v. Jones, supra,* 138 Cal.App.4th at pp. 1489-1490), we conclude that the renewal procedure is properly treated as a "subsequent proceeding" under section 410.50. The superior court, therefore, has ongoing, continuing jurisdiction to effectuate the statutory renewal of the judgment, and the renewal is not subject to attack on the ground that the debtor has insufficient personal contacts with California to establish personal jurisdiction when the renewal is entered. "[W]here jurisdiction of the person . . . has once attached it is not defeated by the removal of the person . . . beyond the jurisdiction of the court. [15 Corpus Juris, p. 824; 21 C.J.S., Courts, § 93.] Jurisdiction once acquired is not defeated by subsequent events which might have prevented jurisdiction had they occurred before personal service of the action was made. [Citation.]" (*Maloney v. Maloney* (1944) 67 Cal.App.2d 278, 280 [child custody proceedings]; see also *In re Larry P.* (1988) 201 Cal.App.3d 888, 895; 2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 401, at p. 1010 [citing § 410.50, subd. (b)]; Moore & Thomas, Cal. Civ. Prac. Procedure (database updated Oct. 2007) Judgments, § 28:4.)

Thus, Goldman's renewed judgment was not void for lack of personal jurisdiction. The trial court properly denied Simpson's motion to vacate because it was untimely, and because it was based on a ground – insufficient contacts with California to confer personal jurisdiction at the time of the renewal – unavailable under section 683.170, subdivision (a). Rather, the court had continuing jurisdiction under section 410.50, derived from its jurisdiction at the time of the original judgment, to enter the renewal.

9

## DISPOSITION

The order denying Simpson's motion to vacate the renewal of judgment is affirmed. Respondent shall recover his costs on appeal.

## CERTIFIED FOR PUBLICATION

WILLHITE, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

10

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco. CA 94102
4  Mailing Address: P.O. Box 270
   San Francisco. CA 94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,752

7  Attorneys for Plaintiffs
   STEVEN M. GREENBAUM. ALAN HAYMAN,
8  and SHIRLEE HAYMAN

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11
      STEVEN M. GREENBAUM, ALAN    )    CASE NO. 3:08-mc-80024-JSW
12    HAYMAN, and SHIRLEE HAYMAN,  )
                                   )
13              Plaintiffs,        )    [PROPOSED] ORDER DIRECTING CLERK
                                   )    TO ISSUE SECOND AMENDED AND ALIAS
14    vs.                          )    WRIT OF EXECUTION
                                   )
15    ISLAMIC REPUBLIC OF IRAN. et al.. )
                                   )
16              Defendant.         )
                                   )
17    ───────────────────────────────

18         Based upon the Declaration of David J. Cook, Esq.. and finding that

19         1.    National Iranian Gas Company
                 Website: www.nigc.org
                 Email: webmaster@nigc.org
20
           2.    National Iranian Petrochemical Company
21               Website: www.nipc.net
                 Email: webmaster@nipc.net
22
           3.    National Iranian Oil Refining and Distribution Co.
23               Website: www.niordc.ir
                 Email: info@niordc.ir
24
      and all subsidiaries. subdivisions. affiliates, and related entities, are agencies and/or
25
      instrumentalities of The Islamic Republic of Iran ("Iran"), along with The Ministry of Petroleum
26
      and The Ministry of Oil. and furthermore finding that Iran has nationalized its oil industry. and
27
      that the entities as described herein and its subsidiaries are agencies and/or instrumentalities of
28

      [PROPOSED] ORDER DIRECTING CLERK TO ISSUE SECOND AMENDED AND ALIAS WRIT OF
      EXECUTION - CASE NO. 3:08-mc-80024-JSW                                              1

1  Iran, and in the interest of justice herein, and without prejudice to any later motion to quash or set

2  aside this order. and for good cause appearing, therefore,

3        IT IS HEREBY ORDERED that the Clerk of this Court shall issue, forthwith, a Second

4  Amended and Alias Writ of Execution which identifies the Judgment Debtor. from THE

5  ISLAMIC REPUBLIC OF IRAN to THE ISLAMIC REPUBLIC OF IRAN aka The Ministry of

6  Petroleum on Behalf of the Islamic Republic of Iran, Ministry of Oil on Behalf of the Islamic

7  Republic of Iran. on behalf of the following:

8        1.      National Iranian Gas Company
                 Website: www.nigc.org
9                Email: webmaster@nigc.org

10       2.      National Iranian Petrochemical Company
                 Website: www.nipc.net
11               Email: webmaster@nipc.net

12       3.      National Iranian Oil Refining and Distribution Co.
                 Website: www.niordc.ir
13               Email: info@niordc.ir

14  and all subsidiaries. subdivisions. affiliates. and related entities.

15        IT IS FURTHER ORDERED that the granting of this order, issuance of the Writ of

16  Execution herein. and any levy and execution thereunder, shall be without prejudice to any third

17  party contesting the validity of the claims and assertions therein, and filing any adverse claim.

18  including a Third Party Claim which may be permitted under C.C.P. § 699.510. or otherwise as

19  allowed by law herein.

20

21  DATED: _____          _____
                                        JEFFREY S. WHITE
22                                      JUDGE OF THE UNITED STATES
                                        DISTRICT COURT
23

24  F:\USERS\DJCNEW\iran.ex2sf

25

26

27

28

1   **DAVID J. COOK, ESQ. (State Bar # 060859)**
    **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2   **COOK COLLECTION ATTORNEYS**
    **A PROFESSIONAL LAW CORPORATION**
3   165 Fell Street
    San Francisco, CA  94102
4   Mailing Address: P.O. Box 270
    San Francisco, CA  94104-0270
5   Tel.: (415) 989-4730
    Fax: (415) 989-0491
6   File No. 52.752

7   Attorneys for Plaintiffs
    STEVEN M. GREENBAUM, ALAN HAYMAN,
8   and SHIRLEE HAYMAN

9                 UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11
     STEVEN M. GREENBAUM, ALAN      )   CASE NO. 3:08-mc-80024-JSW
12   HAYMAN, and SHIRLEE HAYMAN,    )
                                    )
13              Plaintiffs,         )   PROOF OF SERVICE
                                    )
14   vs.                           )
                                    )
15   ISLAMIC REPUBLIC OF IRAN, et al., )
                                    )
16              Defendant.          )
                                    )
17   ─────────────────────────────  )

18   *Via Email dr-ahmadinejad@president.ir*      ISLAMIC REPUBLIC OF IRAN
     PRESIDENT DR. AHMADINEJAD                    Khomeini Avenue
19                                                United Nations Street
     ISLAMIC REPUBLIC OF IRAN                     Teheran, Iran
20   acting through its                           ATTN: Responsible Officer
     MINISTRY OF DEFENSE AND
21   SUPPORT FOR ARMED FORCES                     1.  National Iranian Gas Export Company
     No. 1 Shahid Kaboli Street                   Website: www.nigec.ir
22   Beginning of Resalat Highway                 Email: info@nigec.ir
     Seyyed Khandan Bridge
23   P.O. Box 16765-1479                          2.  National Iranian South Oil Company
     Tehran, Iran                                 Website: www.nisoc.com
24   Attn: Responsible Officer                    Email: info@nisoc.com

25   ISLAMIC REPUBLIC OF IRAN                     3.  National Iranian Offshore Oil Company
     Pasadaran Avenue                             Website: www.iooc.co.ir
26   Golestan Yekom                               Email: webmaster@iooc.co.ir
     Teheran, Iran
27   ATTN: Responsible Officer                    4.  National Iranian Central Oil Fields Co.
                                                  Website: www.icofc.ir
28                                                Email: info@icofc.ir

5. Khazar Exploration & Production Co.
Tehran HQ.
No.19 – 11th Alley - Vozara Ave. - Arjantin sq.
Tehran, Iran
Tel: +98-21-88722430, 3
Fax: +98-21-88711386

6. Petroleum Engineering & Development Co.
Website: www.pedec.ir
Email: info@pedec.net

7. Pars Oil and Gas Company
Website: www.pogc.org
Email: info@pogc.ir

8. Pars Special Economic energy Zone Co.
Website: www.pseez.com
Email: info@pseez.com

9. National Iranian Oil Terminals Company
Website: www.nioc-otc.com
Email: info@nioc-otc.com

10. National Iranian Drilling Company
Website: www.nidc.ir
Email: webmaster@nidc.ir

11. North Drilling Company
Website: www.northdrilling.com
Email: info@northdrilling.com

12. PetroIran Development Company
Website: petroiran.com
Email: info@petroiran.com

13. Ahwaz Pipe Mills Company
Website: www.apm-ir.com
Email: tabibi@apm-ir.com

14. Petropars
Website: www.petropars.com
Email: webadmin@ppars.com

15. Fuel Consumption Optimization Co.
Website: www.ifco.ir
Email: info@ifco.ir

16. National Iranian Tanker Co.
Website: www.nitc.co.ir
Email: administrator@nitc.co.ir

17. Exploration Service Company (ESC)
Website: www.oeoc.ir

Email: info@oeoc.ir

18. Kala Naft London Ltd.
Website: www.kalaltd.com
Email: admin@kalaltd.com

19. Kala Naft Canada Ltd.
Website: www.kalanaftcanada.com
Email: info@kalanaftcanada.com

20. Arvandan Oil and Gas Company
Website: www.arvandan.org
Email: info@arvandan.org

21. National Iranian Gas Company
Website: www.nigc.org
Email: webmaster@nigc.org

22. National Iranian Petrochemical Company
Website: www.nipc.net
Email: webmaster@nipc.net

23. National Iranian Oil Refining and Distribution Co.
Website: www.niordc.ir
Email: info@niordc.ir

1    I declare:

2    I am employed in the County of San Francisco, California. I am over the age of eighteen
     (18) years and not a party to the within cause. My business address is 165 Fell Street, San
3    Francisco, CA 94102. On the date set forth below, I served the attached:

4        SECOND EX PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT
         ISSUANCE OF SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO
5        INCLUDE ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135

6        MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND EX
         PARTE APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF
7        SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE
         ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135
8
         DECLARATION OF DAVID J. COOK, ESQ. IN SUPPORT OF SECOND EX PARTE
9        APPLICATION FOR ORDER AMENDING AND TO DIRECT ISSUANCE OF
         SECOND AMENDED AND ALIAS WRIT OF EXECUTION TO INCLUDE
10       ADDITIONAL NAMES PURSUANT TO C.C.P. § 680.135

11       [PROPOSED] ORDER DIRECTING CLERK TO ISSUE SECOND AMENDED AND
         ALIAS WRIT OF EXECUTION
12
     on the above-named person(s) by:
13
         XXX    (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage
14   thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the
     person(s) served above.
15
         XXX    (BY EMAIL) Emailing addressed to the person's/company's email address listed
16   above.

17       I declare under penalty of perjury that the foregoing is true and correct.

18       Executed on March 13, 2008.

19
                                                ____/s/ Karene Jen_____
20                                                    Karene Jen

21

22

23

24

25

26

27

28