1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52,752

7  Attorneys for Plaintiffs
   STEVEN M. GREENBAUM, ALAN HAYMAN,
8  and SHIRLEE HAYMAN

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11
   STEVEN M. GREENBAUM, ALAN      )    CASE NO. 3:08-mc-80024-JSW
12 HAYMAN, and SHIRLEE HAYMAN,    )
                                  )    MEMORANDUM OF POINTS AND
13          Plaintiffs,           )    AUTHORITIES PURSUANT TO ORDER FOR
                                  )    FURTHER BRIEFING
14 vs.                            )
                                  )
15 ISLAMIC REPUBLIC OF IRAN, et al., )
                                  )
16          Defendant.            )
17 ——————————————————————————————)

18        COMES NOW Plaintiffs STEVEN M. GREENBAUM, ALAN HAYMAN, and SHIRLEE

   HAYMAN ("Plaintiffs"), who hereby comply and respond to the ORDER FOR FURTHER
19
   BRIEFING, as follows:
20
                         **I. INTRODUCTION.**
21
          Plaintiffs registered this judgment under 28 U.S.C. § 1963 in the United States District
22
   Court, Northern District of California, on 3/11/08, the basis of which is a good faith that assets are
23
   located in this judicial district. The basis of the registration is the good faith belief that assets may
24
   be available for levy and execution in the Northern District of California, which in fact may come
25
   to fruition, in that Plaintiffs have levied upon Boeing Company, who may have a license under the
26
   Office of Foreign Asset Control for the sale to Iran of spare parts for maintenance of the fleet of
27
   Boeing Aircraft flown by Iran Air, the civilian airline of Iran.  Plaintiffs have also levied upon a
28

series of Japanese and European banks who may hold deposits and the like, on behalf of various Iranian financial institutions. such as the Central Bank of Iran, which likewise may be subject to levy and execution therein.  These banks include, but are not limited to. the Bank of Tokyo, Mitsubishi UFJ. Mizuho Corporate Bank, Sumitomo Mitsui Banking Corporation, UBS AG Credit Suisse. among others.  Parenthetically, Iran is the second largest importer of gasoline supplies, and engages European and Asian banks to issue letters and credit and other trade facilities, to enable third party wholesales to ship on a "credit basis" gasoline stocks to Iran.  For the court's general edification. this is more particularly set forth in various reports. including but not limited to, various reports such as the Congressional Research Service Report. and the like.

## II.  INTERVENING LEGISLATION.

Up to 2008, collection against a foreign sovereign. even a terrorist nation, was extremely difficult.  The Foreign Sovereignty Immunities Act ("FSIA") essentially prohibited virtually all levy and execution against a foreign sovereign, save and except that the foreign sovereign was a terrorist state as designated by the Secretary of State, and those assets subject to levy and execution had to be classified as "blocked."  This led to a series of difficult actions, in which judgment creditors would attempt to reach these assets, claiming that they were blocked.

In the face of the Marines judgment, Congress authorized for the abolition of the FSIA as to certain countries, which after certain legislative jousting, was generally limited to Iran. Libya. Syria, Cuba, North Korea. Sudan. among others. (Iraq was originally subject to levy and execution. but after jockeying between the President and Congress. ultimately still remains subject to FSIA.)  The key legislation is 28 U.S.C. § 1605A.  The key parts of that new section permitting meaningful collection efforts are found in 28 U.S.C. § 1605A(a)(1) & (g)(1). which provides as follows:

> "(a) IN GENERAL. --
> "(1) NO IMMUNITY. – A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage. hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official. employee, or agent of such foreign state while acting

1   within the scope of his or her office. employment, or agency."

2   "(g) PROPERTY IN CERTAIN ACTIONS –
       "(1) IN GENERAL. – subject to paragraph (3). the property of a foreign
3   state against which a judgment is entered under section 1605A. and **the property
    of an agency or instrumentality** of such a state, including property that is a
4   separate juridical entity or is an interest held directly or indirectly in a separate
    juridical entity, is subject to attachment in aid of execution, and execution. upon
5   that judgment as provided in this section. regardless of –
       "(A) the level of economic control over the property by the
6       government of a foreign state:
       "(B) whether the profits of the property go to that government:
7       "( C) the degree to which officials of that government manage the
        property or otherwise control its daily affairs:
8       "(D) whether that government is the sole beneficiary in interest of
        the property: or
9       "(E) whether establishing the property as a separate entity would
        entitle the foreign state to benefits in United States courts while
10      avoiding its obligations.

11      "(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE.
    Any property of a foreign state, or agency or instrumentality of a foreign state. to
12  which paragraph (1) applies shall not be immune from attachment in aid of
    execution. or execution. upon a judgement entered under section 1605A because
13  the property is regulated by the United States Government by reason of action
    taken against that foreign state under the Trading With the Enemy Act or the
14  International Emergency Economic Powers Act." (Emphasis added)

15  Paramount is the fact that the "agencies and instrumentalities" and deemed to be part of the

16  "sovereign state" as set forth in subparagraph 1605A(g)(1).

17  With all of this background in mind, this creditor now seeks an order amending the Writ of

18  Execution, for the purpose of adding the "agencies and instrumentalities."

19  ### III. RIGHT TO AMEND.

20  This creditor proceeds under C.C.P. § 680.135, which provides in relevant portion, as

21  follows:

22  § 680.135.
    "Affidavit of Identity" means an affidavit or declaration executed by a judgment
23  creditor, under penalty of perjury. that is filed with the clerk of the court in which
    the judgment is entered at the time the judgment creditor files for a writ of
24  execution or an abstract of judgment. The affidavit of identity shall set forth the
    case name and number. the name of the judgment debtor stated in the judgment. the
25  additional name or names by which the judgment debtor is known, and the facts
    upon which the judgment creditor has relied in obtaining the judgment debtor's
26  additional name or names. The affidavit of identity shall not include the name or
    names of persons, including any corporations, partnerships, or any legal entities not
27  separately named in the judgment in which the judgment debtor is a partner,
    shareholder, or member. other than the judgment debtor.
28

1      The order from the court seeks to distinguish the difference between obtaining an order

2  amending the Writ to permit a judgment creditor to describe the judgment debtor by all names by

3  which the judgment debtor may use. C.C.P. § 680.135, however, does not permit a judgment

4  creditor to add a new person or party. California courts has already addressed these issues in

5  partially permitting a judgment creditor to amend a judgment in the case of ***Dow Jones vs. Avenel***

6  151 Cal.App.3d 144 at pages 148 to 149 (Cal.App.1 Dist. 1984), in which the court stated as

7  follows:

8      "Dow Jones maintains, nonetheless, that a trial court may add a post-judgment
9      debtor, pursuant to Code of Civil Procedure section 187,[11] subject only to due
       process considerations.

10      We agree. A trial court has the authority to amend a judgment in order to add
       additional judgment debtors. Code of Civil Procedure section 187 has often served
11      as the basis for such an amendment of a judgment, pursuant to the alter ego
       doctrine. (E.g., see Alexander v. Abbey of the Chimes (1980) 104 Cal.App.3d 39,
12      44, 163 Cal.Rptr. 377; Schoenberg v. Romike Properties (1967) 251 Cal.App.2d
       154, 168. 59 Cal.Rptr. 359. See also 1 Witkin, Procedure (2d ed. 1970) Courts. §§
13      123-124, pp. 392-394; 2 Witkin, Actions, § 3, pp. 881-882, § 6. pp. 884-885.) And,
       the general rule is that "a court may amend its judgment at any time so that the
14      judgment will properly designate the real defendants." (Alexander v. Abbey of the
       Chimes. supra. 104 Cal.App.3d 39, 45, 163 Cal.Rptr. 377.)"

15

16      Plaintiffs do not seek to amend the underlying judgment, but rather seek to "retitle" the

17  judgment debtor to show all of the names by which the judgment debtor is known. Plaintiffs do

18  not assert that the "agencies and instrumentalities" are separate parties, but assert that they are

19  names by which Iran conducts its business and therefore avoid the requirements implicit in ***Dow***

20  ***Jones vs. Avenel, supra***, and its predecessor. ***Alexander vs. Abbey of the Chimes***, 104 Cal.

21  App.3d 39 (1980).

### IV. FACTUAL BASIS.

22      Plaintiffs through reasonable diligence have determined that Iran goes by multiple names.

23  They are set forth by way of the proposed amendments. Plaintiffs have already laid out a factual

24  basis to show that the entities are "agencies and instrumentalities" being precisely entities of the

25  government. This is found not only in the Ministry of Petroleum of Iran and their website marked

26  ***Exhibit "A,"*** but moreover. the OFAC Statement of Iran entitled "What Do You Need To Know

27  About U.S. Economic Sanctions" marked ***Exhibit "B,"*** which lists all of the banks and financial

28

institutions, which are specifically described.  The Central Bank of Iran website also identified and tracks the same banks as listed on the OFAC list by way of the Central Bank download, marked *Exhibit "C."*

The names of the oil agencies and instrumentalities, principally consisting of the various named national oil companies and related entities, and their subsidiaries, (listed in great detail on the Ministry of Petroleum website marked *Exhibit "A"* ) is confirmed by the EIA Department of Energy Report marked *Exhibit "D"* and at pages 2-4.

Plaintiffs have therefore met their reasonable burden of proof to show that the oil entities are in fact part and parcel of the government of Iran, and accordingly, Plaintiffs are entitled to an order amending the Writ of Execution, to show that Iran does business under the name of "Iran," and does business, e.g., under the name of Ministry of Oil, National Iranian Oil Company, and the like.  Plaintiffs likewise have reasonably identified the banks as agencies and instrumentalities, again predicated upon the Central Bank of Iran website and the OFAC report.

Accordingly, Plaintiffs have shown a sufficient factual basis to demonstrate that Iran does business under its oil and financial agencies and instrumentalities.

## V.  WHY IS THIS IMPORTANT?

Iran imports gasoline and other refined petroleum products, demonstrated by the EIA Report on page 4 under the title of "Gasoline." As a general business proposition, the sellers of these products wish to insure payment upon delivery (or other terms) and the traditional means of assuring payment for any international transaction is a letter of creditor, or other trade facility, either in favor of seller, or the exporting country's Import Export Bank.  Typically, the risk of the seller to a foreign sovereign is nonpayment and marginal (or no) recourse to civil means for collection. To assure payment, the seller (a foreign sovereign oil company, entitled typically National Oil Company or NOC) or commercial International Oil Company ("IOC")) will demand and receive a letter of credit issued by the exporter's domiciled bank to avoid any risk of nonpayment from the importer's domiciled bank, which is frequently government- owned or controlled, which is the case in Iran.  In inducing the exporter's country bank to issue a letter of

credit (or the local Import Export Bank to guaranty payment). they would demand and receive a large deposit of money from the importer's national bank serving as collateral supporting the letter of credit. The deposit in the hands of the exporter's bank (issuing the letter of credit) emanates from the importer's bank (Iran's bank). The exporter draws down on the letter of credit for payment of the gasoline stock, and the issuing bank(obligor under the letter of credit) is paid from the deposit on hand, or alternatively, Iran (probably the National Iranian Oil Company) directly reimburses the issuing bank.

This fact pattern leads to the conclusion that the government-owned banks of Iran on their own may have account with many international banks. such as BNP-Paribas, Credit Suisse, UBS AG. if not others.

## VI.  CONCLUSION.

Plaintiffs do not seek to add additional parties, but better identify Iran through its agencies and instrumentalities which under 28 U.S.C. § 1605A constitute Iran itself, and are no longer separate entities. Enabling Plaintiffs to amend the Writ will permit Plaintiffs to reach assets titled in the name of Iran's "agencies and instrumentalities" and reduce the barrier potentially proffered by any garnishee that no funds are held in the name of "Iran," while billions of dollars might be held in the name of the banks and oil companies of Iran.

DATED: May 9, 2008                    COOK COLLECTION ATTORNEYS

By:  /s/ David J. Cook
DAVID J. COOK, ESQ. (SB# 060859)
Attorneys for Plaintiffs
STEVEN M. GREENBAUM, ALAN HAYMAN.
and SHIRLEE HAYMAN

F:\USERS\DJCNEW\iran.mpabriefing

1  **DAVID J. COOK, ESQ. (State Bar # 060859)**
   **ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2  **COOK COLLECTION ATTORNEYS**
   **A PROFESSIONAL LAW CORPORATION**
3  165 Fell Street
   San Francisco, CA  94102
4  Mailing Address: P.O. Box 270
   San Francisco, CA  94104-0270
5  Tel.: (415) 989-4730
   Fax: (415) 989-0491
6  File No. 52.752

7  Attorneys for Plaintiffs
   STEVEN M. GREENBAUM, ALAN HAYMAN,
8  and SHIRLEE HAYMAN

9                UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11
   STEVEN M. GREENBAUM, ALAN          )    CASE NO. 3:08-mc-80024-JSW
12 HAYMAN, and SHIRLEE HAYMAN,        )
                                      )    DECLARATION OF DAVID J. COOK, ESQ.
13           Plaintiffs,              )    PURSUANT TO ORDER FOR FURTHER
                                      )    BRIEFING
14 vs.                               )
                                      )
15 ISLAMIC REPUBLIC OF IRAN. et al., )
                                      )
16           Defendant.               )
                                      )
17 _____

18     I, DAVID J. COOK, hereby declare and state as follows:

19     1. I am one of the attorneys of record for Plaintiffs in the above-entitled action. am duly

20 authorized to practice before all courts in the State of California, and am familiar with the facts

21 and circumstances in this action.

22     2. Plaintiffs through reasonable diligence have determined that Iran goes by multiple

23 names. They are set forth by way of the proposed amendments. Plaintiffs have already laid out a

24 factual basis to show that the entities are "agencies and instrumentalities" being precisely entities

25 of the government. This is found not only in the Ministry of Petroleum of Iran and their website

26 attached hereto marked *Exhibit "A,"* but moreover, the OFAC Statement of Iran entitled "What

27 Do You Need To Know About U.S. Economic Sanctions" attached hereto marked *Exhibit "B,"*

28 which lists all of the banks and financial institutions, which are specifically described. The

1   Central Bank of Iran website also identified and tracks the same banks as listed on the OFAC list

2   by way of the Central Bank download, attached hereto marked *Exhibit "C."*

3       3. Plaintiffs seek to amend the judgment through two lines of attack. First. Plaintiffs seek

4   to add the names of the oil agencies and instrumentalities, principally consisting of the various

5   named national oil companies and related entities, and their subsidiaries. which are listed in great

6   detail on the Ministry of Petroleum website marked *Exhibit "A."* This is further confirmed by the

7   EIA Department of Energy Report attached hereto marked *Exhibit "D"* and at pages 2-4.

8       I declare under penalty of perjury that the foregoing is true and correct.

9       Executed on May 9, 2008.

10

                                          /s/ David J. Cook
11                                        DAVID J. COOK, ESQ. (SB# 060859)

12   F:\USERS\DJCNEW\iran.mpabriefing

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "A"**



**National Iranian Oil Company**
### NIOC

**Companies Affiliated To NIOC**

:: Home > Subsidiaries



┌ Companies Affiliated To ─────────────■
**The Ministry Of Petroleum**

**Ministry of Petroleum of IRAN Subsidiaries:**

- National Iranian Oil Company
- National Iranian Gas Company
- National Iranian Petrochemical Company
- National Iranian Oil Refining and Distribution Company

**Preface:**

The National Iranian Oil Company (NIOC) was established in February 1948 with the objective of exploration, development, production, marketing of crude oil and natural gas. Having in possession huge hydrocarbon reserves, NIOC is the fourth largest state oil firm in the world.

NIOC's oil and gas in place reserves are 137 bn barrels and 28.17 trillion cubic meters, respectively which gives it a unique status on the global energy supply map. In fact, in recent years, NIOC has been invariably ranked as the world's fourth largest oil company.

Current NIOC production capacities include over 4 million barrels of crude oil and in excess of 437 million cubic meters of natural gas per day. On the export side, the company benefits from its modern extensive facilities on the three islands of Kharg, Lavan and Siri consisting of 17 jetties capable of berthing tankers of all sizes to lift and export its crude oil.

 **National Iranian Gas Export Company**
•Website: www.nigec.ir
•email:info@nigec.ir

**National Iranian South Oil Company**
•Website: www.nisoc.com
•email:info@nisoc.com

**National Iranian Offshore Oil Company**
•Website: www.iooc.co.ir
•email:webmaster@iooc.co.ir

**National Iranian Central Oil Fields Co.**
•Website: www.icofc.ir
•email:info@icofc.ir

**Khazar Exploration & Production Co.**

**Petroleum Engineering & Development Co.**
•Website: www.pedec.ir
•email:info@pedec.net

**Pars Oil and Gas Company**
•Website: www.pogc.org
•email:info@pogc.ir

**Pars Special Economic Energy Zone Co.**
•Website: www.pseez.com
•email:Info@pseez.com

**National Iranian Oil Terminals Company**
•Website:www.nioc-otc.com
•email:Info@nioc-otc.com

**National Iranian Drilling Company**
•Website: www.nidc.ir
•email:webmaster@nidc.ir

**North Drilling Company**

## Organizational Structure:

**NI**OC's General Assembly (consisting of the President, Vice President, Director General of the Management and Planning Organization, Ministers of Oil, Energy, Industries and Mines, Labor and Social Affairs, Economy and Finance) is its highest decision marking body. It determines the company's general policy guidelines, and approves annual budgets, operations, financial statements and balance sheets. The company's Board of Directors has the authority and major responsibilities to approve operational schemes within the general framework ratified by the General Assembly. It approves transactions and contracts, and prepares budgets and Board reports and annual balance sheets for presentation to the General Assembly. The Board supervises the implementation of general policy guidelines defined by the General Assembly, and pursues executive operations via the company's Managing Director.

## Subsidiary Companies:

**W**ith appropriate division of tasks and delegation of responsibilities to subsidiaries-affiliates, NIOC has been able to establish acceptable degrees of coordination within its organizational set up. In fact, NIOC's "Directors" act primarily in policy making and supervision while subsidiaries act as their executive arm in coordinating an array of operations such as exploration, drilling, production and delivery of crude oil and natural gas, for export and domestic consumption.


- Website: www.northdrilling.com
- email: info@northdrilling.com

**PetroIran Development Company**

- Website: www.petroiran.com
- email: info@petroiran.com

**Ahwaz Pipe Mills Company**
- Website: www.apm-ir.com
- email: tabibi@apm-ir.com

**Petropars**
- Website: www.petropars.com
- email: webadmin@ppars.com

**Fuel Consumption Optimization**

- Website: www.ifco.ir
- email: info@ifco.ir

**National Iranian Tanker Co.**

- Website: www.nitc.co.ir
- email: administrator@nitc.co

**Exploration Service Company**
- Website: www.oeoc.ir
- email: info@oeoc.ir

**Kala Naft London Ltd.**

- Website: www.kalaltd.com
- email: admin@kalaltd.com

**MSP Kala Naft Co. Tehran**

- Website: www.kalanaft.com
- email: info@kalanaft.com

**Arvandan Oil and Gas Company**

- Website: www.arvandan.org
- email: info@arvandan.org

**NIOC Today**
National Iranian Oil Company Today.
.wmv Format
4.37 MB

|Home| Subsidiaries| Tenders| Auctions|
|Seminars| News| Organization Chart| Contact|

© 2003, NIOC
Oil Company. All
email: webma

# EXHIBIT "B"

# IRAN

## What You Need To Know About U.S. Economic Sanctions

## An overview of O.F.A.C. Regulations involving Sanctions against Iran

### Iranian Transactions Regulations - 31 C.F.R. Part 560

As a result of Iran's support for international terrorism and its aggressive actions against non-belligerent shipping in the Persian Gulf, President Reagan, on October 29, 1987, issued Executive Order 12613 imposing a new import embargo on Iranian-origin goods and services. Section 505 of the International Security and Development Cooperation Act of 1985 ("ISDCA") was utilized as the statutory authority for the embargo which gave rise to the Iranian Transactions Regulations, Title 31 Part 560 of the U.S. Code of Federal Regulations (the "ITR").

Effective March 16, 1995, as a result of Iranian sponsorship of international terrorism and Iran's active pursuit of weapons of mass destruction, President Clinton issued Executive Order 12957 prohibiting U.S. involvement with petroleum development in Iran. On May 6, 1995, he signed Executive Order 12959, pursuant to the International Emergency Economic Powers Act ("IEEPA") as well as the ISDCA, substantially tightening sanctions against Iran.

On August 19, 1997, the President signed Executive Order 13059 clarifying Executive Orders 12957 and 12959 and confirming that virtually all trade and investment activities with Iran by U.S. persons, wherever located, are prohibited.

On March 17, 2000, the Secretary of State announced that sanctions against Iran would be eased to allow U.S. persons to purchase and import carpets and food products such as dried fruits, nuts, and caviar from Iran. This change was implemented through amendments to the ITR at the end of April 2000.

Corporate criminal penalties for violations of the Iranian Transactions Regulations can range up to $500,000, with individual penalties of up to $250,000 and 20 years in jail. Civil penalties of up to $50,000 may also be imposed administratively.

This fact sheet provides general information about the Iranian sanctions program under the Iranian Transactions Regulations, and incorporates sanctions imposed by Executive Orders 12957, 12959, and 13059. The sanctions are administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

• IMPORTS FROM IRAN - Goods or services of Iranian origin may not be imported into the United States, either directly or through third countries, with the following exceptions:

(a) Gifts valued at $100 or less;

(b) Information or informational materials;

(c) Foodstuffs intended for human consumption that are classified under chapters 2-23 of the Harmonized Tariff Schedule of the United States; and

(d) Carpets and other textile floor coverings and carpets used as wall hangings that are classified under chapter 57 or heading 9706.00.0060 of the Harmonized Tariff Schedule of the United States.

U.S. persons are prohibited from providing financing for prohibited import transactions. There are restrictions on letter of credit transactions involving the Government of Iran (see FINANCIAL DEALINGS WITH IRAN, FINANCING PURCHASES FROM IRAN OR ITS GOVERNMENT, and FINANCING IRANIAN-ORIGIN FOODSTUFFS AND CARPETS OTHER THAN PURCHASES FROM IRAN OR ITS GOVERNMENT below).

• EXPORTS TO IRAN - In general, unless licensed by OFAC, goods, technology (including technical data or other information subject to Export Administration Regulations), or services may not be exported, reexported, sold or supplied, directly or indirectly, from the United States or by a U.S. person, wherever located, to Iran or the Government of Iran. The ban on providing services includes any brokering function from the United States or by U.S. persons, wherever located. For example, a U.S. person, wherever located, or any person acting within the United States, may not broker offshore transactions that benefit Iran or the Government of Iran, including sales of foreign goods or arranging for third-country financing or guarantees.

In general, a person may not export from the U.S. any goods, technology or services, if that person knows or has reason to know such items are intended specifically for supply, transshipment or reexportation to Iran. Further, such exportation is prohibited if the exporter knows or has reason to know the U.S. items are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology or services to be directly or indirectly supplied, transshipped or reexported exclusively or predominately to Iran or the Government of Iran. A narrow exception is created for the exportation from the United States or by U.S. persons wherever located of low-level goods or technology to third countries for incorporation or substantial transformation into foreign-made end products, provided the U.S. content is insubstantial, as defined in the regulations, and certain other conditions are met.

Donations of articles intended to relieve human suffering (such as food, clothing, and medicine), gifts valued at $100 or less, licensed exports of agricultural commodities, medicine, and medical devices, and trade in "informational materials" are permitted. "Informational materials" are defined to include publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds, although certain Commerce Department restrictions still apply to some of those materials. To be considered

B

informational material, artworks must be classified under chapter subheadings 9701, 9702, or 9703 of the Harmonized Tariff Schedule of the United States.

With certain exceptions, foreign persons who are not U.S. persons are prohibited from reexporting to Iran sensitive U.S.-origin goods, technology or services to Iran or the Government of Iran. Foreign persons involved in such reexports may be placed on the U.S. Commerce Department's "Export Denial Orders" list.

U.S. persons may not approve, finance, facilitate or guarantee any transaction by a foreign person where that transaction by a foreign person would be prohibited if performed by a U.S. person or from the United States.

• DEALING IN IRANIAN-ORIGIN GOODS OR SERVICES - Except as authorized by amendments to the ITR relating to foodstuffs and carpets, which were issued at the end of April 2000, U.S. persons, including foreign branches of U.S. depository institutions and trading companies, are prohibited from engaging in any transactions, including purchase, sale, transportation, swap, financing, or brokering transactions related to goods or services of Iranian origin or goods or services owned or controlled by the Government of Iran.

Services provided in the United States by an Iranian national already resident in the United States are not considered services of Iranian origin.

These prohibitions apply to transactions by United States persons in locations outside the United States with respect to goods or services which the United States person knows, or has reason to know, are of Iranian origin or are owned or controlled by the Government of Iran. U.S. persons may not import such goods or services into or export them from foreign locations. A U.S. person may, however, engage in transactions in third countries necessary to sell, dispose of, store, or maintain goods located in a third country which were legally acquired by that U.S. person prior to May 7, 1995 on the condition that the transactions do not result in an importation into the United States of goods of Iranian origin.

• FINANCIAL DEALINGS WITH IRAN - New investments by U.S. persons, including commitments of funds or other assets, loans or any other extensions of credit, in Iran or in property (including entities) owned or controlled by the Government of Iran are prohibited. For your information, Appendix A contains a list of banks owned or controlled by the Government of Iran. While U.S. persons may continue to charge fees and accrue interest on existing Iranian loans, a specific license must be obtained to reschedule or otherwise extend the maturities of existing loans.

Payments for licensed sales of agricultural commodities, medicine and medical devices must reference an appropriate OFAC license and may not involve a debit or credit to an account of a person in Iran or the Government of Iran maintained on the books of a U.S. depository institution. Payments for and financing of such licensed sales may be accomplished by cash in advance, sales on open account (provided the account receivable is not transferred by the person extending the credit), or by third country financial institutions that are neither U.S. persons nor government of Iran entities. Any other arrangements must be specifically authorized by OFAC. U.S. depository institutions may advise and confirm letters of credit issued by third country banks covering licensed sales of agricultural commodities, medicine and medical devices.

Bank Saderat, one of the largest Iranian-government owned banks, has been found to be a significant facilitator of financial transactions between the government of Iran and Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command and the Palestinian Islamic Jihad. For these reasons, the Department of the Treasury has taken steps to completely cut off Bank Saderat from the U.S. financial system.

U.S. financial institutions are prohibited from all financial transactions directly or indirectly involving Bank Saderat, including transactions that

might otherwise be permitted under the ITR. Prohibited transactions include: processing of U-turn transactions and transactions ordinarily incident to licensed or exempt transactions, including payments and financing for the exportation of licensed agricultural goods, medicine and medical devices and non-commercial payments to or from Iran. The amendments contain grace periods for the completion of certain transactions which were in effect at the time of the amendment.

• FINANCING PURCHASES FROM IRAN OR ITS GOVERNMENT - Payments for authorized imports of foodstuffs and carpets must reference the relevant section of the ITR. While U.S. depository institutions may deal with Iranian banks on a documentary collection basis [URC 522] for authorized purchases of foodstuffs or carpets, neither payments under collections, nor any other payments, may involve a debit or credit to the account of a person in Iran or the Government of Iran on the books of a U.S. depository institution. U.S. depository institutions may issue letters of credit for purchases provided that the letters of credit are not advised, negotiated, paid, or confirmed by a bank that is included within the definition of the term Government of Iran. A bank that is included in the definition of the term Government of Iran may forward letter of credit documents strictly on a documentary collection basis, either directly to a U.S. depository institution or to a third country bank that is not included within the definition of the term Government of Iran, but cannot send them on an "approval" basis since it cannot be party to a letter of credit.

• FINANCING IRANIAN-ORIGIN FOODSTUFFS AND CARPETS OTHER THAN PURCHASES FROM IRAN OR ITS GOVERNMENT - U.S. depository institutions are authorized to issue, advise, negotiate, pay, or confirm letters of credit to pay for transactions in or related to foodstuffs and carpets as referenced in amendments to the ITR issued at the end of April 2000, other than purchases from Iran or its Government, provided that such letters of credit are not issued, advised, negotiated, paid, or confirmed by a bank that is included within the definition of the term Government of Iran.

• "PRE-ZERO CONTRACTS" - Letters of credit and other financing arrangements with respect to trade contracts in force as of May 6, 1995, may be performed pursuant to their terms provided that the underlying trade transaction was completed prior to June 6, 1995 (February 2, 1996 for "agricultural commodities"), or as specifically licensed by OFAC. Standby letters of credit that serve as performance guarantees for services to be rendered after June 6, 1995, cannot be renewed and payment may not be made after that date without authorization by OFAC.

• OTHER BANKING SERVICES - U.S. depository institutions, including foreign branches, are prohibited from servicing accounts of the Government of Iran, including banks owned or controlled by the Government of Iran (as in Appendix A) or persons in Iran. However, they are authorized to pay interest, deduct reasonable and customary service charges, process transfers related to exempt transactions, such as the exportation of information or informational material, a travel-related remittance, or a payment for the shipment of a donation of articles to relieve human suffering or, at the request of an account holder, effect a lump sum closure of an account by payment to its owner. They may not otherwise directly credit or debit Iranian accounts.

U.S. depository institutions may handle "U-turn" transactions—cover payments involving Iran that are by order of a third country bank for payment to another third country bank--provided they do not directly credit or debit an Iranian account. They are also permitted to handle non-commercial family remittances involving Iran and non-commercial remittances involving humanitarian relief (such as for the victims of the earthquake in Khorasan), provided the transfers are routed to or from non-U.S., non-Iranian offshore banks.

U.S. depository institutions initiating or receiving payment orders involving Iran on behalf of customers must determine prior to processing such payments that they do not involve transactions prohibited by the Iranian Transactions Regulations.

• **TRAVEL -** All transactions ordinarily incident to travel to or from Iran, including the importation of accompanied baggage for strictly personal use, payment of maintenance and living expenses and acquisition of goods or services for personal use are permitted.

• **NON-GOVERNMENTAL ORGANIZATIONS** – Under a general license issued by OFAC, effective August 22, 2006, U.S. persons that are employees or contractors for the following international organizations - United Nations, the World Bank, the International Monetary Fund, the International Atomic Energy Agency, the International Labor Organization or the World Health Organization - are authorized to engage in transactions for the conduct of official business in or involving Iran. Authorized transactions may include leasing office space or purchasing Iranian-origin goods necessary to carry out official business, provided that the funds transfers to and from Iran do not involve a debit or credit on the books of a U.S. financial institution. The exportation or the re-exportation of US-origin or non-U.S.-origin goods or technology listed on the Commerce Control List in the Export Administration Regulations is not authorized.

• **OVERFLIGHTS PAYMENTS -** Payments to Iran for services rendered by the Government of Iran in connection with the overflight of Iran or emergency landing in Iran of aircraft owned by United States persons or registered in the U.S. are authorized.

• **PERSONAL COMMUNICATIONS, INFORMATION AND INFOR-MATIONAL MATERIALS -** The receipt or transmission of postal, telegraphic, telephonic or other personal communications, which does not involve the transfer of anything of value, between the United States and Iran is authorized. The exportation from the United States to Iran of information and informational materials, whether commercial or otherwise, regardless of format or medium of transmission, and any transaction incident to such exportation is authorized.

• **TRANSACTIONS INVOLVING U.S. AFFILIATES -** No U.S. person may approve or facilitate the entry into or performance of transactions or contracts with Iran by a foreign subsidiary of a U.S. firm that the U.S. person is precluded from performing directly. Similarly, no U.S. person may facilitate such transactions by unaffiliated foreign persons.

• **IRANIAN PETROLEUM INDUSTRY -** U.S. persons may not trade in Iranian oil or petroleum products refined in Iran, nor may they finance such trading. Similarly, U.S. persons may not perform services, including financing services, or supply goods or technology, that would benefit the Iranian oil industry.

## APPENDIX A - BANKS OWNED OR CONTROLLED BY THE GOVERNMENT OF IRAN

AGRICULTURAL COOPERATIVE BANK OF IRAN (a.k.a. BANK TAAVON KESHAVARZI IRAN), No. 129 Patrice Lumumba Street, Jalal-Al-Ahmad Expressway, P.O. Box 14155/6395, Tehran, Iran

AGRICULTURAL DEVELOPMENT BANK OF IRAN (a.k.a. BANK JOSIAYI KESHAHVARZI), Farahzad Expressway Tehran, Iran

BANK JOSIAYI KESHAHVARZI (a.k.a. AGRICULTURAL DEVELOPMENT BANK OF IRAN), Farahzad Expressway Tehran, Iran

BANK MARKAZI JOMHOURI ISLAMI IRAN (a.k.a. THE CENTRAL BANK OF IRAN), Ferdowsi Avenue, P.O. Box 11365-8551, Tehran, Iran

BANK MASKAN (a.k.a. HOUSING BANK (of Iran)), Ferdows St., Tehran, Iran

BANK MELLAT, Park Shahr, Varzesh Avenue, P.O. Box 11365/5964, Tehran, Iran, and all offices worldwide, including, but not limited to

    □ BANK MELLAT (Branch), Ziya Gokalp Bulvan No 12, Kizilay, Ankara, Turkey

    □ BANK MELLAT (Branch) Binbir Cicek Sokak, Buyukdere Caddesi, P.O. Box 67, Levant, Istanbul, Turkey

    □ BANK MELLAT (Branch), 48 Gresham Street, London EC2V 7AX, England

BANK MELLI, P.O. Box 11365-171, Ferdowsi Avenue, Tehran, Iran, and all offices worldwide, including, but not limited to

    □ BANK MELLI (Branch), 4 Moorgate, London EC2R 6AL, England

    □ BANK MELLI (Branch), Schadowplatz 12, 4000 Dusseldorf 1, Germany

    □ BANK MELLI (Branch), Friedenskrasse 4, P.O. Box 160 154, 6000 Frankfurt am Main, Germany

    □ BANK MELLI (Branch), P.O. Box 112129, Holzbruecke 2, 2000 Hamburg 11, Germany

    □ BANK MELLI (Branch), Odeonsplatz 18, 8000 Munich 22, Germany

    □ BANK MELLI (Branch), 43 Avenue Montaigne, 75008 Paris, France

    □ BANK MELLI (Branch), 601 Gloucester Tower, The Landmark, 11 Pedder Street, P.O. Box

720, Hong Kong

    □ BANK MELLI (Representative Office), 333 New Tokyo Building, 3-1 Marunouchi, 3-chome Chiyoda-ku, Tokyo, Japan

    □ BANK MELLI (Representative Office), 818 Wilshire Boulevard, Los Angeles, California 90017, U.S.A

    □ BANK MELLI (Representative Office), 767 Fifth Avenue, 44th Floor, New York, New York 10153, U.S.A

    □ BANK MELLI (Representative Office), Smolensky Boulevard 22/14, Kv. 5., Moscow, Russia

    □ BANK MELLI (Branch), Flat No. 1, First Floor, 8 Al Sad El-Aaly, Dokki, P.O. Box 2654, Cairo, Egypt

    □ BANK MELLI (Branch), Ben Yas Street, P.O. Box No. 1894, Riga Deira, Dubai, U.A.E

    □ BANK MELLI (Branch), P.O. Box 2656, Shaikha Maryam Building, Lulu Street, Abu Dhabi, U.A.E

    □ BANK MELLI (Branch), B.P.O. Box 1888, Clock Tower, Industrial Road, Al-Ain Club Building in from Emartel Al Ain, Al Ain, Abu Dhabi, U.A.E

    □ BANK MELLI (Branch), P.O. Box 1894, Riga, Ban Yas Street, Deira, Dubai, U.A.E

    □ BANK MELLI (Branch), Mohd-Habib Building, Al-Fahidi Street, P.O. Box 3093, Bur Dubai, Dubai, U.A.E.

    □ BANK MELLI (Branch), P.O. Box 248, Fujairah, U.A.E

    □ BANK MELLI (Branch), Sami Sagar Building Oman Street Al-Nakheel, P.O. Box 5270, Ras-Al Khaimah, U.A.E

    □ BANK MELLI (Branch), P.O. Box 459, Al Bory Street, Sharjah, U.A.E.

    □ BANK MELLI (Branch), P.O. Box 785, Government Road, Shaikh Mubarak Building, Manama, Bahrain

    □ BANK MELLI (Branch), P.O. Box 23309, Shaikh Salman Street, Road No. 1129, Muharraq 211, Bahrain

    □ BANK MELLI (Branch), P.O. Box 5643, Mossa Abdul Rehman Hassan Building, 238 Al Burj St., Ruwi, Muscat, Oman

BANK OF INDUSTRY AND MINE (of Iran) (a.k.a. BANK SANAT VA MADAN), Hafez Avenue, P.O. Box 11365/4978, Tehran, Iran

BANK REFAH KARGARAN (a.k.a. WORKERS WELFARE BANK (of Iran)), Molfettah No. 125, P.O. Box 15815-1866, Tehran, Iran

BANK SADERAT IRAN, Bank Saderat Tower, P.O. Box 15745-631, Somayeh Street, Tehran, Iran, and all offices worldwide, including, but not limited to

    □ BANK SADERAT IRAN (Branch), Hamdam Street, Airport Road Intersection, P.O. Box 700, Abu Dhabi, U.A.E

    □ BANK SADERAT IRAN (Branch), Al-Am Road, P.O. Box 1140, Al Am, Abu Dhabi, U.A.E

    □ BANK SADERAT IRAN (Branch), Liwara Street, P.O. Box 16, Ajman, U.A.E

    □ BANK SADERAT IRAN (Branch), 3rd Floor Dom Dasaf Building, Mojloka Street 7A, Ashkhabad, Turkmenistan

    □ BANK SADERAT IRAN (Branch), 25-29 Panepistimiou Street, P.O. Box 4308, GR-10210, Athens 10672, Greece

    □ BANK SADERAT IRAN (Branch), Imam Ali Street, Sahat Yaghi, Ras Elain-Alektsad Building 2nd Floor, Baalbeck, Lebanon

    □ BANK SADERAT IRAN (Branch and Offshore Banking Unit), 106 Government Road, P.O. Box 825 Manama Town 316, Bahrain

    □ BANK SADERAT IRAN (Branch), Hamra Pavillion Street, Savvagh and Daaboul Building 1st Floor, P.O. Box 113-6717, Beirut, Lebanon

    □ BANK SADERAT IRAN (Branch), Alghobairi Boulevard, Beirut, Lebanon

    □ BANK SADERAT IRAN (Branch), 28 Sherif Street, P.O. Box 462, Cairo, Egypt

    □ BANK SADERAT IRAN (Branch), Old Ben-Ghanem Street (next to Gold Market), P.O. Box 2256, Doha, Qatar

    □ BANK SADERAT IRAN (Branch), Almaktoum Road, P.O. Box 4182, Deira, Dubai, U.A.E

    □ BANK SADERAT IRAN (Branch), Bazar Murshid, P.O. Box 4182, Deira, Dubai U.A.E

    □ BANK SADERAT IRAN (Branch), Afahid Road, P.O. Box 4182, Bur Dubai, Dubai, U.A.E

    □ BANK SADERAT IRAN (Branch), Sheraa Sheikhh Zayad Street, P.O. Box 316, Fujairah, U.A.E

    □ BANK SADERAT IRAN (Branch), Wilhelm Leuschner Strasse 41, P.O. Box 160151, W-6000 Frankfurt am Main, Germany

    □ BANK SADERAT IRAN (Branch), P.O. Box 112227, Hoptenhof Passage, Kaiser Bustah 6-10, W-2000 Hamburg 11, Germany

    □ BANK SADERAT IRAN (Branch), Lothbury, London EC2R 7HD, England

    □ BANK SADERAT IRAN (Representative Office), 707 Wilshire Boulevard, ste 1880, Los Angeles, California 90017, U.S.A

    □ BANK SADERAT IRAN (Representative Office), 55 East 59th Street, 16th Floor, New York, New York 10022, U.S.A

    □ BANK SADERAT IRAN (Branch), P.O. Box 4269, Murrah, Muscat, Oman

    □ BANK SADERAT IRAN (Branch), 16 rue de la Paix, Paris 2eme, 75002, France

    □ BANK SADERAT IRAN (Branch), Alaroba Road, P.O. Box 316, Sharjah, U.A.E

BANK SANAT VA MADAN (a.k.a. BANK OF INDUSTRY AND MINE (of Iran)), Hafez Avenue, P.O. Box 11365/4978, Tehran, Iran

BANK SEPAH, Emam Khomeini Square, P.O. Box 11364, Tehran, Iran, and all offices worldwide, including, but not limited to

    □ BANK SEPAH (Branch), Muenchener Strasse 49, P.O. Box 10 03 47, W-6000 Frankfurt am Main 1, Germany

    □ BANK SEPAH (Branch), 5/7 Eastcheap, EC3M 1JT London, England

    □ BANK SEPAH (Representative Office), 650 Fifth Avenue, New York, New York 10019, U.S.A

    □ BANK SEPAH (Branch), 17 Place Vendome, 75001 Paris, France

    □ BANK SEPAH (Branch), Via Barberini 50, 00187 Rome, Italy

    □ BANK SEPAH (Representative Office), Ufficio di Rappresentan Za, Via Ugo Foscolo 1, 20121 Milan, Italy

BANK TAAVON KESHAVARZI IRAN (a.k.a. AGRICULTURAL COOPERATIVE BANK OF IRAN), No. 129 Patrice Lumumba Street, Jalal-Al-Ahmad Expressway, P.O. Box 14155/6395, Tehran, Iran

BANK TEJARAT, 130 Taleghani Avenue, Nejatollahie, P.O. Box 11365-5416, Tehran, Iran, and all offices worldwide, including, but not limited to

□ BANK TEJARAT (Branch), 6/8 Clements Lane, London EC4N 7AP, England

□ BANK TEJARAT (Branch), 44 Avenue des Champs Elysees, 75008 Paris, France

DEUTSCH-IRANISCHE HANDELSBANK AG (n.k.a. EUROPAEISCH-IRANISCHE HANDELSBANK AG) Depenau 2, W-2000 Hamburg 1, Germany, and all offices worldwide, including, but not limited to:

　□ DEUTSCH-IRANISCHE HANDELSBANK AG (n.k.a. EUROPAEISCH-IRANISCHE HANDELSBANK AG) (Representative Office), 23 Argentine Square, Beihaghi Bulvard, P.O. Box 158151787, Tehran 15148, Iran

EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) Depenau 2, W-2000 Hamburg 1, Germany, and all offices worldwide, including, but not limited to:

　□ EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) (Representative Office), 23 Argentine Square, Beihaghi Bulvard, P.O. Box 158151787, Tehran 15148, Iran

HOUSING BANK (of Iran) (a.k.a. BANK MASKAN), Ferdowsi St., Tehran, Iran

IRAN OVERSEAS INVESTMENT BANK LIMITED (f.k.a. IRAN OVERSEAS INVESTMENT CORPORATION LIMITED), 120 Moorgate London EC2M 6TS, England, and all offices worldwide, including, but not limited to

　□ IRAN OVERSEAS INVESTMENT BANK LIMITED (Representative Office), 1137 Avenue Vali Asr off Park-e-Saii P.O. Box 15115/531, Tehran, Iran

　□ IRAN OVERSEAS INVESTMENT BANK LIMITED (Agency), Suite 3c Olympia House, 61/63 Dame Street, Dublin 2, Ireland

　□ IRAN OVERSEAS INVESTMENT BANK LIMITED (Agency), Improgetti, Via Germanico 24, 00192 Rome, Italy

　□ IRAN OVERSEAS TRADING COMPANY LIMITED (Subsidiary), 120 Moorgate, London EC2M 6TS, England

　□ IRAN OVERSEAS INVESTMENT CORPORATION LIMITED (n.k.a. IRAN OVERSEAS INVESTMENT BANK LIMITED), 120 Moorgate, London EC2M 6TS, England

THE CENTRAL BANK OF IRAN (a.k.a. BANK MARKAZI JOMHOURI ISLAMI IRAN), Ferdowsi Avenue, P.O. Box 11365-8551, Tehran, Iran

WORKERS WELFARE BANK (of Iran) (a.k.a. BANK REFAH KARGARAN), Moffettah No. 125, P.O. Box 15815-1866, Tehran, Iran

## Iranian Assets Control Regulations - 31 C.F.R Part 535

Separate Iranian sanctions regulations appear at 31 C.F.R. Part 535. On November 14, 1979, the assets of the Government of Iran in the United States were blocked in accordance with IEEPA following the seizure of the American Embassy in Teheran and the taking of U.S. diplomats as hostages. Under the Iranian Assets Control Regulations (Title 31 Part 535 of the U.S. Code of Federal Regulations), some US$12 billion in Iranian Government bank deposits, gold, and other properties were frozen, including $5.6 billion in deposits and securities held by overseas branches of U.S. banks. The assets freeze was eventually expanded to a full trade embargo, which remained in effect until the Algiers Accords were signed with Iran on January 19, 1981. Pursuant to the Accords, most Iranian assets in the United States were unblocked and the trade embargo was lifted. The U.S. Government also canceled any attachments that U.S. parties had secured against Iranian assets in the United States, so that the assets could be returned to Iran or transferred to escrow accounts in third countries pursuant to the Accords. This action was upheld by the Supreme Court in 1981 in Dames & Moore v. Regan. Although greatly modified in scope, the old Iranian Assets Control Regulations remain in effect. Many U.S. nationals have claims against Iran or Iranian entities for products shipped or services rendered before the onset of the 1979 embargo or for losses sustained in Iran due to expropriation during that time. These claims are still being litigated in the Iran-United States Claims Tribunal at The Hague established under the Algiers Accords. Certain assets related to these claims remain blocked in the United States and consist mainly of military and dual-use property.

This document is explanatory only and does not have the force of law. The Executive Orders and implementing regulations dealing with Iran contain the legally binding provisions governing the sanctions. This document does not supplement or modify those Executive Orders or regulations.

The Treasury Department's Office of Foreign Assets Control also administers sanctions programs involving the Balkans, Burma (Myanmar), Cuba, Diamond Trading, Iran, Iraq, Liberia, North Korea, Sudan, Syria, Zimbabwe as well as highly enriched uranium, designated Terrorists and international Narcotics Traffickers, Foreign Terrorist Organizations and designated foreign persons who have engaged in activities relating to the proliferation of weapons of mass destruction. For additional information about these programs or about sanctions involving Iran, please contact the:

OFFICE OF FOREIGN ASSETS CONTROL
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W. - Annex
Washington, D.C. 20220
http://www.treas.gov/ofac
202/622-2490

09-08-06

# EXHIBIT "C"



**CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN**

Home | Site Map | Links | Contact | **فارسی**

Search  Advanced Search

bout the Bank    Press    Monetary Policy    Publications    Statistics    Laws & Regulations    Bank Supervision    Payment Systems    Banknotes & Coins

ome » About the Bank » General Information

About the Bank

General Information

Governors

## General Information

🖨 PRINT
📑 BOOKMARK
✉ SEND

"BANK MARKAZI JOMHOURI ISLAMI IRAN" is the central bank of the Islamic Republic of Iran. The Central Bank of Iran (CBI) was established in 1960 (1339 solar year). As stated in the Monetary and Banking Act of Iran (MBAI), CBI is responsible for the design and implementation of the monetary and credit policies with due regard to the general economic policy of the country. Four major objectives of CBI as stated in the MBAI are:

- Maintaining the value of national currency
- Maintaining the equilibrium in the balance of payments
- Facilitating trade-related transactions
- Improving the growth potential of the country

To achieve the objectives as stated in the MBAI, CBI is endowed with the responsibility of fulfilling the following functions:

- Issuance of notes and coins
- Supervision of banks and credit institutions
- Formulation and regulation of foreign exchange policies and transactions
- Regulation on gold transactions
- Formulation and regulation on transactions and inflow/outflow of Domestic currency

As banker to the government, the CBI is mandated to keep government accounts, grant loans and credits to state enterprises and agencies. The CBI also covers such functions as lending facilities to banks, purchase and sale of government participation papers as well as other legal banking operations.

After the Islamic Revolution of Iran laws and regulations pertaining to money and banking institutions and monetary policy design and implementation were amended to reflect the priorities and principles as set out in the Constitution of the Islamic Republic of Iran. At present, CBI is responsible for the design and conduct of monetary policy within the context of government's five year development plan and annual budget. In line with the articles of the constitution, the monetary and credit policies are formulated and implemented in consistent with the MBAI as amended, Usury-Free Banking Act of 1983, the Banks Nationalization Act of 1979, and the Law for the Administration of Banks, of 1979.

Legal | Webmaster
Copyright © 2008 Central Bank of the Islamic Republic of Iran



Search  Advanced Search

About the Bank    Press    Monetary Policy    Publications    Statistics    Laws & Regulations    Bank Supervision    Payment Systems    Banknotes & Coins

Home » Bank Supervision » Banks and Credit Institutions

Bank Supervision

Banks and Credit Institutions

# Banks and Credit Institutions

🖨 PRINT

📑 BOOKMARK

📧 SEND

Specialized Government Banks | Private Banks | Near-bank | Commercial Government - Owned Banks

Specialized Government Banks

» Export Development Bank of Iran

» Bank of Industry & Mine

» Bank Keshavarzi

» Bank Maskan

Legal | Webmaster

Copyright © 2008 Central Bank of the Islamic Republic of Iran



Home | Site Map | Links | Contact : فارسی

Search  Advanced Search

About the Bank    Press    Monetary Policy    Publications    Statistics    Laws & Regulations    Bank Supervision    Payment Systems    Banknotes & Coins

Home ·· Bank Supervision ·· Banks and Credit Institutions ·· Commercial Government – Owned Banks

Banks and Credit
Institutions

## Commercial Government – Owned Banks

🖶 PRINT
⊞ BOOKMARK
⊟ SEND

- ·· Bank Mellat
- ·· Bank Melli Iran
- ·· Post Bank of Iran
- ·· Bank Refah
- ·· Bank Saderat Iran
- ·· Sepah Bank
- ·· Tejarat Bank

Legal | Webmaster

Copyright © 2008 Central Bank of the Islamic Republic of Iran

# EXHIBIT "D"



# Energy Information Administration
### Official Energy Statistics from the U.S. Government

Glossary



## Iran

### Oil

*Iran is OPEC's second-largest oil producer and the fourth-largest crude oil exporter in the world.*

According to *Oil and Gas Journal*, Iran has 136 billion barrels of proven oil reserves, or roughly 10 percent of the world's total proven petroleum reserves as of January 1, 2007. Iran has 40 producing fields, 27 onshore and 13 offshore, with the majority of crude oil reserves located in the southwestern Khuzestan region near the Iraqi border. Iran's crude oil is generally medium in sulfur content and in the 28°-35° API range.



October 2007

Background
Oil
Natural Gas
Electricity
Quick Facts
Links
Sources
Full Report
HTML
PDF
Contact Info
cabs@eia.doe.gov
(202)586-8800
[more contacts]



**Top Proven World Oil Reserves, January 1, 2007**

Source: Oil & Gas Journal, Jan. 1, 2007    **Billion Barrels**

Iran is OPEC's second-largest producer after Saudi Arabia. In 2006, Iran produced an estimated 4.2 million barrels per day (bbl/d) of total liquids, of which 3.8 million bbl/d was crude oil, equal to 5 percent of global production.



**OPEC Total Crude Oil Production in 2006E**

Source: EIA Short-Term Energy Outlook (May 2007)    **Million Barrels Per Day**

Iran's oil consumption totaled 1.6 million bbl/d in 2006. The Iranian government heavily subsidizes the price of refined oil products which has contributed to increased domestic demand. Iran has limited refinery capacity to produce light fuels, and imports much of its gasoline supply. Iranian domestic oil demand is mainly for gasoline and automotive gasoils, but domestic demand for other oil products are declining due to the substitution of natural gas. However, it is an overall net petroleum products exporter due to large exports of residual fuel oil. Oil export revenues represent the majority of Iran's total exports earnings, but the country suffers from budget deficits due to a growing population and large government

subsidies on gasoline and food products. In 2005, the International Monetary Fund (IMF) estimated that energy subsidies accounted for 12 percent of Iran's GDP, the highest rate in the world according to an International Energy Agency (IEA) study.

| Major Iranian Oil Field Production and Reserves, 2006 | | |
|---|---|---|
| Field | Production Capacity Thousand (bbl/d) | Reserves Millions of Barrels |
| Ahwaz-Asmari | 700 | 10,100 |
| Marun | 520 | 9,500 |
| Gachsaran | 480 | 8,500 |
| Karanj-Parsi | 250 | 4,650 |
| Agha Jari | 200 | 8,700 |
| Nowrooz and Soroosh | 200 | 6,000 |
| Doroud 1 & 2 | 200 | 600 |
| Rag-e-Safid | 180 | 2,400 |
| Bangestan | 158 | 6,500 |
| Abu Zar | 140 | 50 |
| Sirri A & E/C & D | 130 | 1,200 |
| Salman | 100 | 800 |
| Major Field Total: | 3.258 | 59,000 |

Source: Global Insight

Iran produced 6 million bbl/d of crude oil in 1974, but has been unable to produce at that level since the 1979 revolution due to a combination of war, limited investment, sanctions, and a high rate of natural decline in Iran's mature oil fields. Iran's oil fields need structural upgrades including enhanced oil recovery (EOR) efforts such as natural gas injection. Iran's fields have a natural annual decline rate estimated at 8 percent onshore and 10 percent offshore, while current Iranian recovery rates are 24-27 percent, 10 percent less than the world average. It is estimated that 400,000-500,000 bbl/d of crude production is lost annually due to reservoir damage and decreases in existing oil deposits.

*Upstream Projects*
The Azadegan project phases I and II represent the greatest potential increase in Iranian crude oil production. Azadegan contains 26 billion barrels of proven crude oil reserves, but is geologically complex and difficult to extract. Iran and Venezuela have agreed on a $4 billion investment in the Ayacucho 7 block, where there are an estimated 31 billion barrels of oil. Iran's Northern Drilling Company (NDC) has also worked with Russia's Lukoil on oil field development in the Caspian Sea. (See Caspian Sea Analysis Brief)

| New Major Iranian Upstream Projects through 2012 | | | |
|---|---|---|---|
| Field | Company | Thousand bbl/d | Online |
| Salman, Foroozan, Daroud | Total, Petro Iran | 200 | 2007 |
| Darkhovin, Phase II & III | ENI | 100 | 2007 |
| South Pars (Ahwaz) | NOIC | 150 | 2008 |
| Azadegan Phase I (south) | NIOC | 100 | 2009 |
| Kushk-Hosseinieh | NOIC | 300 | 2010 |
| Yadavaran | NIOC & Chinese Partners | 300 | 2011 |
| Azadegan Phase II (north) | NOIC | 110 | 2012 |
| New Potential Total: | | 1,260 | |

Source: OPEC, Global Insight

Iran plans to increase oil production to over 5 million bbl/d by 2010, but it will need foreign help. According to *Global Insight*, an estimated $25-35 billion is required to meet the government's 5.8 million bbl/d target by 2012. Investment in Iran's energy sector has been tempered due to the election of the conservative government of President Mahmoud Ahmadinejad in 2005, the international controversy surrounding the Iranian uranium enrichment and nuclear program, and economic sanctions. According to the IEA 2007 Medium-Term Oil Market Report, Iran will not be able to increase its net expansion capacity through 2012.

## U.S. Sanctions
U.S. sanctions against Iran due to Iran's historic support for international terrorism and its actions against non-belligerent shipping in the Persian Gulf impact the development of its petroleum sector. According to the Iran Transactions Regulations, administered by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), U.S. persons may not directly or indirectly trade, finance, or facilitate any goods, services or technology going to or from Iran, including goods, services or technology that would benefit the Iranian oil industry. U.S. persons are also prohibited from entering into or approving any contract that includes the supervision, management or financing of the development of petroleum resources located in Iran.

## Sector Organization
The state-owned National Iranian Oil Company (NIOC) is responsible for oil and gas production and exploration. The National Iranian South Oil Company (NISOC), a subsidiary of NIOC, accounts for 80

percent of local oil production covering the provinces of Khuzestan, Bushehr, Fars, and Kohkiluyeh va Boyer Ahamd. Though private ownership of upstream functions is prohibited under the Iranian constitution, the government has allowed for buyback contracts which allow international oil companies (IOCs) to enter exploration and development through an Iranian affiliate. The contractor receives a remuneration fee, usually an entitlement to oil or gas from the developed operation. In August 2007, President Mahmoud Ahmadinejad appointed NIOC executive Gholamhossein Nozari to serve as Acting Oil Minister, replacing Vaziri Hamaneh and creating controversy over President Ahmadinejad's role in the energy sector.

### Exports

According to International Energy Agency's Monthly Oil Data Service and Global Trade Atlas, Iran's net crude and product exports in 2006 averaged 2.5 million bbl/d, primarily to Japan, China, India, South Korea, Italy, and other Organization for Economic Co-operation and Development (OECD) nations, making it the fourth-largest exporter of crude oil in the world. In 2006, Iran's oil export revenues amounted to $54 billion.

| Top Iranian Crude Oil Exports, 2006 | |
|---|---|
| Country | Thousand (bbl/d) |
| Japan | 448 |
| China | 335 |
| India* | 302 |
| South Korea | 204 |
| Italy | 191 |
| Turkey | 179 |
| France | 135 |
| South Africa | 127 |
| Taiwan | 117 |
| Greece | 117 |
| Other | 345 |
| **Total Exports:** | **2,500** |

*India's imports only reported for April-August 2006
Source: IEA Monthly Oil Data Service, March 2007;
Global Trade Atlas

Iran's Oil Production and Consumption, 1976-2006E



Source: EIA International Petroleum Monthly
Short-Term Energy Outlook (July 2007)

### Export Terminals

Iran has the largest oil tanker fleet in the Middle East, the National Iranian Tanker Company, which holds 29 ships including Very Large Crude Carriers. Kharg Island is the country's largest terminal with a holding capacity of 16 million barrels of oil and a loading capacity of 5 million bbl/d, followed by Lavan Island with capacity to store 5 million barrels and loading capacity of 200,000 bbl/d. Other important terminals include Kish Island, Abadan and Bandar Mahshar, and Neka, which helps facilitate imports from the Caspian region. The Strait of Hormuz, on the southeastern coast of Iran, is an important route for oil exports from Iran and other Persian Gulf countries. (See Persian Gulf Analysis Brief) At its narrowest point the Strait of Hormuz is 34 miles wide, yet an estimated 17 million barrels, or roughly two-fifths of all seaborne traded oil, flows through the Strait daily. Iranian Heavy Crude Oil is Iran's largest crude export at 1.6 million bbl/d followed by Iranian Light at 1 million bbl/d.

| National Iranian Oil Company (NIOC) Crude Exports by Blend | | | |
|---|---|---|---|
| Name | API Gravity | Sulfur content | Exports (bbl/d) |
| Iranian Heavy | 31° | 1.70% | 1.6 million |
| Iranian Light | 34.6° | 1.40% | 1 million |
| Foroozan Blend and Sirri | 29-31° | n/a | 165,000 |
| Lavan Blend | 34-35° | 1.8-2% | 75,000 |

### Refining

Iran's total refinery capacity is 1.5 million bbl/d from nine refineries operated by the National Iranian Oil Refining and Distribution Company (NIORDC), a NIOC subsidiary. Iranian refineries are unable to keep pace with domestic demand, and face major infrastructure problems. The country plans to add around 985,000 bbl/d of refining capacity by 2012, mostly through expansions and upgrades for gasoline yields at the Bandar Abbas, Bushehr, and the 90-year-old Abadan refineries. Large expansion projects at Bandar Abbas, including new catalytic reformers, distillation units, and condensate splitters will help supply the domestic demand, but it will probably not eliminate all gasoline imports. Iran has also discussed joint ventures in Asia, including China, Indonesia, Malaysia, and Singapore to expand refining activity.

| IRAN REFINERY PROJECTS (through 2012) | | | | |
|---|---|---|---|---|
| Refinery | Project Type | Online | Additional Production Capacity (thousand bbl/d) | Notes |
| Bandar Abbas | Upgrade & Expansion | 2012 | 300 | heavy crude processing |
| Bushehr | New Refinery | TBD | 170 | |
| Abadan | Upgrade | 2009 | 140 | |
| Abadan | New Refinery | 2012 | 80 | gasoline production |
| Arak | Expansion | 2009 | 80 | |
| Bandar Assaluyeh | New Refinery | TBD | 80 | |
| Bandar Abbas | Expansion | 2009 | 60 | |
| Tehran | Expansion | 2012 | 50 | gasoline production |
| Tabriz | Expansion | 2012 | 25 | gasoline production |
| Total New Refinery Capacity: | | | 985 | |

Source: PFC Energy, *Global Insight*

### Pipelines

Iran has an expansive domestic oil network including 5 pipelines, and multiple international pipeline projects under consideration. Recently, an expansion of the 150 mile pipeline from the port of Neka on the Caspian coast to Rey, Tabriz, and Tehran refineries has reached a capacity of 300,000 bbl/d according to *Global Insight*. Iran has invested in its import capacity at the Caspian port to handle increased product shipments from Russia and Azerbaijan, and enable crude swaps with Turkmenistan and Kazakhstan. In the case of crude swaps, the oil from the Caspian is consumed domestically in Iran, and an equivalent amount of oil is produced for export through the Persian Gulf with a Swiss-trading arm of NIOC for a swap fee.

### Gasoline

*In 2006, Iran imported over 192,000 bbl/d of gasoline and relied upon imports to meet almost half of its fuel needs costing $5 billion.*

Iran is the second biggest gasoline importer in the world after the United States, consuming over 400,000 bbl/d. According to FACTS Global Energy, Iran imported over 192,000 bbl/d of gasoline in 2006 costing $5 billion. The gasoline consumption growth rate has averaged ten percent annually over the past six years, and the cost of imports is expected to reach $6 billion in 2007, up from $2.8 billion in 2005. Gasoline prices are heavily subsidized, and sold below the market price at around 42 cents per gallon, which has encouraged increased consumption. An increase in vehicle sales in recent years has also contributed to the problem. According to PFC Energy, car ownership in Iran grew 250 percent between 1990 and 2006, and a majority of these vehicles are older models. Gasoline powered vehicles in Iran are expected to reach 14.9 million by the end of 2007. Iran does not have sufficient refining capacity to meets its domestic gasoline and other light fuel needs. Therefore Iran imports gasoline from India, Turkmenistan, Azerbaijan, the Netherlands, France, Singapore, and the United Arab Emirates. Iran also imports from large, multinational wholesalers such as BP, Shell, Total, Vitol, LUKoil, and several Chinese companies.

### New Gasoline Rationing System

In June 2007, the Iranian government instituted a gasoline rationing system. The decision followed a 25 percent price increase to 42 cents per gallon in May. NIORDC is responsible for the program which allows private cars to purchase 26 gallons per month and taxis to buy 211 gallons per month. The rations and increased costs are politically unpopular in Iran. Customers are allowed to purchase their ration six months in advance. Part-time taxis, commercial vehicles, and government vehicles also have special

allowances. Records are maintained on smart cards, and later this year the government is expected to announce the price for gasoline bought beyond quota levels.

Iran's gasoline consumption dropped 30 percent immediately after the rationing scheme was adopted. NIOC executive, Hojjatollah Ghanimifard, stated that Iranian gasoline imports for August 2007 dropped 14 percent, although an additional $1.5 billion was requested by the Iranian Oil Ministry to increase gasoline imports through March 2008. The International Energy Agency reported in its August 2007 Oil Market Update that gasoline consumption will likely increase again due to the fact that Iran allows advance purchase of gasoline at a subsidized rate. The combination of rationing, price hikes, increased refining capacity, as well as compressed natural gas (CNG) production, will reduce Iranian gasoline import demand by an estimated 30,000 bbl/d in the next three years according to FACTS Global Energy.

Contact Us □ Feedback □ Privacy/Security □ Jobs □ About Us

1 | **DAVID J. COOK, ESQ. (State Bar # 060859)**
**ROBERT J. PERKISS, ESQ (State Bar # 62386)**
2 | **COOK COLLECTION ATTORNEYS**
**A PROFESSIONAL LAW CORPORATION**
3 | 165 Fell Street
San Francisco, CA 94102
4 | Mailing Address: P.O. Box 270
San Francisco, CA 94104-0270
5 | Tel.: (415) 989-4730
Fax: (415) 989-0491
6 | File No. 52.752

7 | Attorneys for Plaintiffs
STEVEN M. GREENBAUM, ALAN HAYMAN,
8 | and SHIRLEE HAYMAN

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11 |

12 | STEVEN M. GREENBAUM, ALAN      )    CASE NO. 3:08-mc-80024-JSW
HAYMAN, and SHIRLEE HAYMAN,     )
13 |                              )    PROOF OF SERVICE
           Plaintiffs,          )
14 |                            )
vs.                            )
15 |                            )
ISLAMIC REPUBLIC OF IRAN, et al.,  )
16 |                            )
           Defendant.          )
17 |                          )

18 | *Via Email dr-ahmadinejad@president.ir*
PRESIDENT DR. AHMADINEJAD
19 |
ISLAMIC REPUBLIC OF IRAN
20 | acting through its
MINISTRY OF DEFENSE AND
21 | SUPPORT FOR ARMED FORCES
No. 1 Shahid Kaboli Street
22 | Beginning of Resalat Highway
Seyyed Khandan Bridge
23 | P.O. Box 16765-1479
Tehran, Iran
24 | ATTN: President or Agent for Service of
Process
25 |
ISLAMIC REPUBLIC OF IRAN
26 | Pasadaran Avenue
Golestan Yekom
27 | Teheran, Iran
ATTN: President or Agent for Service of
28 | Process

ISLAMIC REPUBLIC OF IRAN
Khomeini Avenue
United Nations Street
Teheran, Iran
ATTN: President or Agent for Service of
Process

PROOF OF SERVICE - CASE NO. 3:08-mc-80024-JSW                                    1

1  I declare:

2  I am employed in the County of San Francisco, California. I am over the age of eighteen
(18) years and not a party to the within cause. My business address is 165 Fell Street, San
3  Francisco, CA 94102. On the date set forth below, I served the attached:

4  MEMORANDUM OF POINTS AND AUTHORITIES PURSUANT TO ORDER FOR
FURTHER BRIEFING
5
DECLARATION OF DAVID J. COOK, ESQ. PURSUANT TO ORDER FOR FURTHER
6  BRIEFING

7  on the above-named person(s) by:

8  __XXX__ (BY MAIL) Placing a true copy thereof, enclosed in a sealed envelope with postage
thereon fully prepaid, in the United States mail at San Francisco, California, addressed to the
9  person(s) served above.

10  __XXX__ (BY EMAIL) Emailing addressed to the person's/company's email address listed
above.
11
I declare under penalty of perjury that the foregoing is true and correct.
12
Executed on May 9, 2008.
13

14                                      /s/ Karene Jen
                                        Karene Jen
15

16

17

18

19

20

21

22

23

24

25

26

27

28